EXHIBIT "B"

**Cash Flow**



# AMERICAN ARBITRATION ASSOCIATION

-----------------------------------------------------------------X

**In re: Dissolution of** **AAA Case # ____________**

**ALTERNATIVE GLOBAL MANAGEMENT, LLC,**
**a limited liability company.**

-----------------------------------------------------------------X

## VERIFIED PETITION FOR DISSOLUTION OF ALTERNATIVE GLOBAL MANAGEMENT, LLC, A LIMITED LIABILITY COMPANY

Petitioners David Feingold ("Feingold") and Michael Dazzo ("Dazzo") (collectively, "Petitioners"), hereby respectfully petition this Arbitration Panel to dissolve Alternative Global Management, LLC, a Delaware liability company ("AGM" or "LLC"), and for a declaration that, based on good cause shown, Petitioners may wind up the affairs of the LLC. Further, Petitioners request an **emergency interim award**, preliminary injunction and permanent injunction against Respondent Richard Cardinale ("Cardinale") restraining him from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies (defined below) without the prior written approval and authorization from Petitioners. The grounds for this Verified Petition are as follows:

## SUMMARY OF ACTION

1. AGM was formed in September 2019 as a Delaware limited liability company. Feingold, Dazzo and Cardinale are the individual managers and control members of AGM.

2. AGM is the ultimate manager and 100% owner of six entities – Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC and Alternative Global Six, LLC (collectively, as the "Alternative Numbered Entities" and with AGM the "Alternative Global Companies"). Feingold,

Dazzo and Cardinale each are also the one-third beneficial owners of the Alternative Numbered Entities as the Alternative Numbered Entities are owned by AGM. As described below, RMD Holdings, LLC is listed as the manager of AGM and Dazzo as the Manager of RMD Holdings, LLC.

3. Due to Cardinale's fraud and other misconduct and involvement in illegal activity, Feingold and Dazzo resigned from the Alternative Numbered Entities on January 28, 2022, but they did not resign from AGM. Shortly thereafter, on February 5, 2022, Feingold and Dazzo sued Cardinale (and his co-conspirator spouse and alter-ego entities) in Florida federal court for fraud and other misconduct relating to the Alternative Global Companies.

4. In response to that initial lawsuit, Cardinale began filing lawsuits on behalf of the Alternative Numbered Entities in courts in New York, South Carolina and Florida without the consent or approval of the manager or control members of AGM - Feingold and Dazzo - as required by the Amended and Restated Operating Agreement for AGM (the "AROA") which requires unanimous consent of Feingold, Dazzo and Cardinale or the manager noted therein. A copy of the AROA is annexed as **Exhibit A**.

5. Those lawsuits were filed by Cardinale with full knowledge that he did not have corporate authorization and solely in retaliation for Feingold and Dazzo's lawsuit against Cardinale and Cardinale has made it clear that he would continue to file multiple lawsuits, without any authorization, against Feingold and Dazzo and others until they dropped their pursuit of him which involves millions of dollars of ill-gotten gains.

6. Not only do those actions on behalf of AGM have no authorization to be filed as Feingold and Dazzo have never consented, but if any suit were prevailed upon, it would lead to the illogical result of AGM (or one of its wholly owned subsidiaries, the Alternative Numbered

Entities) suing and making a recovery that would ultimately be paid to Feingold and Dazzo (as Delaware law requires that payment to Feingold and Dazzo as the ultimate beneficial owners of all of the entities). Hence, further proof that not only were the lawsuits filed without consent, but that they were filed consistent with Cardinale's threats of continuously filing lawsuits until Feingold and Dazzo would agree to ultimately drop their lawsuit in Florida federal court which will ultimately require Cardinale and his family to return millions of dollars that they have misappropriated.

7. In addition, Cardinale, without authorization from Feingold and Dazzo, has misappropriated funds from the AGM bank account and has also blocked Feingold and Dazzo from accessing these accounts to discover the amount taken. Further, Cardinale is believed to have siphoned off at least $300,000 which benefited him and without approval by Petitioners in particular in one asset of AGM known as Alternative Spin and, upon information and belief, he is taking assets from the Alternative Numbered Entities (and hence AGM) without proper authorization and approval. Cardinale, even though he has seized control of AGM, has also not filed tax returns for AGM. Also, since Feingold and Dazzo resigned, upon information and belief and under the stewardship of Cardinale, the value of assets has dropped in half with Cardinale refusing to provide any records allowing Feingold and Dazzo to see what he is doing, where he is spending monies owed to Feingold and Dazzo and it has already been established that Cardinale has taken millions in violation of federal securities laws.

8. It is no longer possible to carry on the business of the LLC because, among other things: (i) Feingold and Dazzo are locked in litigation with Cardinale over the Alternative Global Companies; (ii) Cardinale has improperly usurped control over AGM and has and is freezing out Feingold and Dazzo from AGM; (iii) Cardinale's improper usurpation of management and control

over AGM, and other misconduct, violates the AROA; (iv) Cardinale has engaged in multiple acts of fraud, breach of duty and conversion in connection with AGM; (v) Cardinale has improperly usurped control over AGM's sole asset, the Alternative Numbered Entities, and is destroying the sole asset; (vi) Cardinale has and continues to misuse the assets of AGM for his sole benefit; (vii) Cardinale has commenced and is prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo and with the ultimate result of those entities which are pursuing claims having to pay Feingold and Dazzo, the ultimate owners of the same.

9. Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage AGM, its business and its assets and has even told multiple people that he would rather destroy everything and continue to litigate. Thus, (i) Cardinale has failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems, (ii) Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin with millions in misappropriations and losses, (iii) Cardinale has and continues to decimate the value of Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing approximately half its value or about $25 million which losses he has also concealed from his investors, and (iv) Cardinale seemingly continues to support a lavish lifestyle while improperly charging AGM funds or assets for his own personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he unilaterally decides is L3 litigation.

10. Petitioners seek dissolution of the LLC and request permission due to good cause shown to wind-up the affairs of the LLC. Further, Petitioners seek a preliminary and permanent

injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners (which the AROA requires) and an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies.

## JURISDICTION

11. There is jurisdiction over this matter and AGM, Feingold, Dazzo and Cardinale pursuant to the broad arbitration provision in the AROA. Thus, Section 10.07 of the AROA provides:

> (a) Dispute Resolution Process. In the event of **any claim, dispute, or controversy arising under, out of or relating to this Agreement**, or any breach or purported breach thereof (the "Dispute") which the Parties hereto have been unable to settle or agree upon in the normal course of business, the Parties shall follow the dispute resolution process as set forth herein.
>
> (b) Negotiations. The Parties shall attempt in good faith to resolve the Dispute promptly by negotiation between representatives who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either Party (in this context, the "Disputing Party") may give the other Party written notice of the existence of any such Dispute ("Dispute Notice"). Within fifteen (15) days after delivery of the Dispute Notice, the Party receiving the notice shall submit to the Disputing Party a written response. The Dispute Notice and the response shall each include: (i) a statement of the relevant Party's position and a summary of arguments supporting that position; and (ii) the name and title of the representative who will represent the Party in the negotiations and of any other person who will accompany such representative. Within thirty (30) days after delivery of the Dispute Notice, the representatives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute ("Settlement Period"). However, this Settlement Period shall terminate no later than ninety (90) days after delivery of the Disputing Party's notice unless such period is extended by mutual written agreement of the Parties. All statements and/or negotiations pursuant to this Section are confidential and shall be treated as inadmissible compromise and settlement negotiations for purposes of all applicable state and/or federal rules of evidence.

(c) Arbitration. After, but only after, the Settlement Period set forth in Subsection (b) has terminated without a resolution, at the request of either Party to the Dispute, the Dispute shall be referred to and finally resolved by binding arbitration.

(i) **Any arbitration pursuant to this Section shall be administered by the American Arbitration Association (AAA)** using FINRA rules then in effect before a three member panel, with each Party selecting one arbitrator and the third arbitrator, who shall be the chairperson of the panel, being selected by the two Party-appointed arbitrators. The Party who initiates the arbitration process shall name its arbitrator in the demand for arbitration and the responding Party shall name its arbitrator within ten (10) days after receipt of the demand for arbitration. No arbitrator can be an employee, ex-employee, director, shareholder of record, Member, member, representative, or agent of such Party or its affiliates. The third arbitrator shall be named within ten (10) days after the appointment of the second arbitrator. If the two Party- appointed arbitrators are unable to agree upon the third arbitrator within that ten (10) day period, the third arbitrator shall be selected by the AAA. Each arbitrator shall be qualified by at least ten (10) years' experience in the corporate finance, private funds, and/or venture capital industry, and the chairperson of the arbitration panel shall be a licensed attorney whose primary area of practice for the preceding ten (10) years is in the corporate finance, private funds, and/or venture capital industry. If prior to the conclusion of the arbitration any arbitrator becomes incapacitated or otherwise unable to serve, then a replacement arbitrator shall be appointed in the applicable manner described above.

(ii) The arbitrators shall be bound by the terms and conditions of this Agreement, and any relevant evidence and testimony, and shall render their decision within thirty (30) calendar days following conclusion of the hearing. The award rendered by the arbitration panel shall be (i) in writing, signed by the arbitrators, stating the reasons upon which the award is based, (ii) rendered as soon as practicable after conclusion of the arbitration, and (iii) final and binding upon the Parties. Judgment on the award may be entered and enforced by any court of competent jurisdiction thereof. The Parties expressly invoke the provisions of the Federal Arbitration Act for purposes of confirmation, vacation or modification of the arbitration award (Title 9 U.S.C. §§ 9, 10 and 11). The preceding provisions of the Federal Arbitration Act are the sole and exclusive means by which an arbitration award can be reviewed, vacated or modified. The arbitrators shall, in any award, tax all of the arbitration fees (including arbitrators' fees) and costs of the arbitration (other than each Party's individual attorneys' fees and costs related to the Party's participation in the arbitration, which fees and costs shall be borne by such Party), against the losing Party. Until such award is made, however, the Parties shall share equally in paying the costs of the arbitration. Should

> it become necessary for the prevailing Party to seek judicial enforcement of the arbitration award, all attorneys' fees and costs associated with that effort shall be taxed against the losing Party.
>
> (iii) Only damages allowed pursuant to the terms of this Agreement may be awarded and, without limitation to the foregoing, the arbitrators shall have no jurisdiction to consider (i) any punitive, exemplary, special, indirect, incidental, consequential, or similar damages arising under, arising out of or related to this Agreement or damages beyond the limitations of liability contained in this Agreement, regardless of the legal theory under which such damages may be sought and even if the Parties have been advised of the possibility of such damages or loss, or (ii) any challenge to the validity of the limitation of liability provisions contained in this Agreement.
>
> (d) Exclusivity. **The procedures specified in this Section shall be the sole and exclusive procedures for the resolution of Disputes between the Parties arising out of or in connection with this Agreement**.
>
> (e) Tolling of Statute of Limitations. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the Settlement Period while the procedures specified in this Section are pending. The Parties will take such action, if any, required to effectuate such tolling.

Emphasis added.

12. Utilizing the pre-arbitration dispute resolution procedures would be futile since Feingold, Dazzo and Cardinale are currently locked and embroiled in multiple litigations and do not speak and have no interest in speaking, and they previously attempted to resolve disputes including by way of court ordered mediation without any success at all. Also, Cardinale has disavowed the AROA. Further, the pre-arbitration dispute resolution procedures are too vague and uncertain to be enforceable.

13. Petitioners select New York County as the place for the live evidentiary hearings as Respondent Cardinale resides in the State of New York at 178 Benedict Road, Staten Island, New York and Cardinale has testified that he runs the Alternative Global Companies out of his Staten Island residence and a local UPS store.

## FACTUAL BACKGROUND

14. We are dealing here with three individuals, Feingold, Dazzo and Cardinale. Beginning in 2019 and thereafter, they set up six entities, the Alternative Numbered Entities, through which they conducted various business, but the Alternative Numbered Entities took nothing, acted as a conduit and the monies flowed up to a seventh entity, AGM, which 100% owns and ultimately manages the Alternative Numbered Entities (as demonstrated in AGM's redated tax returns which show that AGM owns all of the Alternative Numbered Entities 100% with no other owners having any interest, **Exhibit B**).

**AGM, Alternative Numbered Entities and the AROA**

15. AGM is the initial entity formed by Feingold, Dazzo and Cardinale in connection with the Alternative's business, and the initial AGM Operating Agreement, signed by Feingold, Dazzo and Cardinale is annexed as **Exhibit C**.

16. AGM was formed in order to manage the Alternative Numbered Entities and collect from them the proceeds of their business endeavors and then those proceeds would be first used to pay back amounts owed to Cardinale's L3 Capital Income Fund, LLC ("L3 Capital") investors with amounts above and beyond to be split equally between Feingold, Dazzo and Cardinale. Thus, AGM is essential to the proper functioning of the entirety of the Alternatives' business. Further, the Alternative Numbered Entities take nothing as part of this process as those entities are merely a conduit for distribution to AGM, as they are simply entities that reflect the source of various monies, *i.e.*, specialty finance, real estate, debt settlement, homebuilding, and restaurants in order to keep track of sources of divisions but thereafter all monies and management flow up to AGM. Simply put, the Alternative Numbered Entities do not exist without AGM, Feingold, Dazzo and Cardinale.

17. In or about February 2021, Cardinale himself determined to engage in a restructuring of AGM to allow for certain of his investors to own Class B Units in AGM (non-voting), which resulted in the AROA. Cardinale sent dozens of emails to the Class B investors announcing the AROA and announcing the binding terms of the AROA to the entire AGM business.

18. The AROA, along with a confirming letter that Cardinale sent to each of his investors advising them of the operation of the business under said document, provides that the management and control of the business and affairs of AGM is vested in the Manager. *See* definition of "Manager" at p. 3, § 6.01. **Exhibit A**. This management and control of the business and affairs of AGM includes the business and affairs of AGM's only asset - - the Alternative Numbered Entities - - and the term "Affiliates" (which includes the Alternative Numbered Entities) is repeatedly used throughout the document (*See* definition of Permitted Transferee, 6.01(b), 6.01(c), 6.01(e), 6.10, 6.11(b), 6.12(a), 6.12(b), 6.12(c). 10.07(c)(i), 10.08, 10.16, 10.19, ).[1]

19. The initial manager of AGM is listed as RMD Holdings, LLC [standing for **R**ichard (Cardinale), **M**ichael (Dazzo) and **D**avid (Feingold)](at page 3) and Dazzo as the Manager of RMD, but Cardinale has secreted certain RMD related materials (and others). Originally, in Federal Court in Florida, Cardinale claimed that his computers were stolen and he had no documents and hence refused to make the AROA and RMD documents available, but now he is selectively making documents available and has miraculously changed his story that all of his computers were stolen,

[1] "Affiliate" is defined at page 1 and means: "with respect to any specified Person or entity, any Person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified Person or entity and, with respect to a specified Person that is an individual, such Person's Immediate Family Members. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."

yet he only makes that claim when it is beneficial to him. Nonetheless, it is irrefutable that the AROA requires the unanimous consent of the managers (if multiple managers are appointed) or the unanimous consent of Feingold, Dazzo and Cardinale to take any action. *See* Cardinale letter ("Class A Units will be the only class of interests in the Company that will have voting rights"), and §§ 6.02, 6.05, 9.01. Cardinale, Feingold and Dazzo agreed to be bound by this subsequent LLC agreement for AGM - the AROA - and each of Feingold, Dazzo and Cardinale individually signed member consents for this action pursuant to the initial AGM Operating Agreement between and among them.

20. It cannot be emphasized enough that Cardinale originally claimed in Federal Court in Florida that his computers were stolen and dubiously that the books and records involving AGM were missing. Cardinale now miraculously claims that he has certain documents, even though his alleged books and records were supposedly stolen, but miraculously, only the documents which in any way support Feingold and Dazzo have been claimed to be stolen and yet any document that might arguably help Cardinale, he is able to miraculously produce those documents even though all of his computers and records were miraculously stolen. This miraculous theft corresponds with a Federal District Judge taking the unusual step of having Cardinale and his wife appear for depositions before any other parties in the Initial Florida Federal Case (discussed below).

21. While Cardinale will likely object in this case and change his story once again about how he now continues to find documents, what is completely uncontradicted by all parties is that this AGM relationship is broken beyond repair and that the operation of AGM simply cannot continue as the owners of the same simply cannot continue working together in any manner, especially in light of the fact that one owner, Cardinale, continues to file lawsuits without the

express consent of the other two owners, Feingold and Dazzo, and Cardinale has multiple businesses already in severe trouble as discussed below.

22. Cardinale has unilaterally taken multiple improper actions, including freezing out Feingold and Dazzo, converting and destroying assets, and the filing of unauthorized lawsuits, without Feingold's and Dazzo's approval or consent. Significantly, in the multiplicity of litigations (described below), Cardinale has scrupulously avoided AGM because he is well aware that it is the 100% owner and ultimate manager of the Alternative Numbered Entities and that his improper unilateral acts and conduct, without Feingold's and Dazzo's approval, violate the AROA.

23. Cardinale's purported amnesia about AGM is startling. In fact, Cardinale's L3 entity *invoiced AGM* for over $1.3 million and was paid *by AGM* over $1.3 million for administrative services he claimed he had provided (but did not) for the Alternative Global Companies (*see* Exhibit D below, Second Amended Complaint, and Exhibit B thereto for those invoices) and Cardinale further received, among other things, a one-third profit split, amounting to approximately $3.3 million, *from AGM*.[2] This profit split occurred at the AGM level, the Alternative Numbered Entities *keep nothing*, and is for the amounts above and beyond those owing to the L3 Capital investors. Cardinale has already testified and admitted in a court ordered

---

[2] <u>Cardinale recently testified about this structure in the Initial Florida Federal Case that</u>:

Were there monthly invoices that were sent to Alternative Global Management, LLC? A. Yes.

Q. **So you've received nothing personally or to an entity that you own or controlled from Alternative Global Management, LLC** MR. BENAYOUN: Object to the form of the question. A. **I'm saying I have**. Several times. BY MR. WELTZ: Q. I thought you said you received those from L3. I'm going to ask this a different way. How about this, what is the total compensation that you received directly or indirectly as an advisory fee, a management fee, an acquisition fee, and a total compensation? MR. BENAYOUN: Object to the form of the question. A. Okay. So I received over time a $1.6 million acquisition fee, L3 Capital Management received roughly 1.5 million, give or take in fees, administrative fees of which 700,000 was Titan Communications invoicing L3 Capital Management and the balance went to administrative costs. Any other disbursements that were made to David Feingold, Michael Dazzo and Richard Cardinale totaling about 8 -- 6.8 million, 6.9 million. **And those were disbursements which were above the 12 and 15 percent returns that -- with the targeted returns to the investors in the fund.** (emphasis supplied).

deposition of him that he was paid $1.6 million (that is the number he admits to), yet he claims ignorance and stolen books and records even though there are no police reports, insurance claims, no written complaints or evidence of those alleged thefts. Only after Feingold and Dazzo sued Cardinale did Cardinale first claim his books and records were stolen (those same books and records that could be used against him to prove his multi-million dollar scam) and the same books and records which he accepted $1.6 million in fees as he always represented that he earned the fees by keeping all of the books and records.

24. Cardinale now conveniently forgets about AGM and the process that was followed, and that he was paid L3 acquisition fees of $1,598,601.81; L3 advisory fees of $620,000; Alternative Global Management, LLC payments to DZ Squared (between December 1, 2020 and January 1, 2021) of which Cardinale received $2,987,000; Alternative Global Management, LLC management fee payments to RVCSI, LLC (an entity controlled by Cardinale) (between July 24, 2020 and April 8, 2022) of $3,263,055.05; debt settlement payments to Cardinale (between October 19, 2020 and January 28, 2022) of $1,935,000; $410,000 on closing fees paid to L3 Capital Management, LLC; and the in excess of $1.3 million (that Cardinale testified is $1.6 million) paid to Cardinale for claiming to maintain the books and records of the Alternative Global Companies. All of these payments to Cardinale are set forth above to show that someone that received nearly $11 million in total compensation and $1.6 million in specific payments for keeping the same books and records that he claims are now missing which would prove his fraud, should at a minimum show this Arbitration Panel that the suspicious nature of his handling of critical documents in combination with the obvious acrimonious nature of relationship amongst the owners shows that AGM cannot proceed, is irrevocably broken and should be dissolved quickly.

**Feingold and Dazzo Resign From the Alternative Numbered Entities**

25. On January 28, 2022, Feingold and Dazzo resigned from the Alternative Numbered Entities, but not AGM, due to Cardinale's fraud and misconduct in connection with the Alternative Global Companies. Feingold and Dazzo stayed in AGM knowing it is the ultimate owner and control party because its value is enormous, millions of dollars were made from the business and by resigning Feingold and Dazzo were immediately entitled to the payment of the fair value of their interests in the business as codified under Delaware law. In short, Delaware law requires the payment of the fair value of the business to any LLC Members that resign and hence millions are owed to Feingold and Dazzo upon their resignation from the Alternative Numbered Entities. Thus, they removed themselves from involvement with Cardinale but did not remove themselves from the right to receive Delaware law mandated payments from him.

26. Feingold and Dazzo could simply no longer maintain a relationship with Cardinale due to dozens of complaints of fraud and dishonesty by investors against Cardinale and their desire to disassociate from him and they also learned of his organized crime ties, including conduct such as being involved in sending thugs to a competitor's home residence to threaten and beat that person. Feingold and Dazzo simply could not be involved with a person whose method of business involved such tactics.

**The Initial Florida Federal Case**

27. On February 5, 2022, Feingold and Dazzo sued Cardinale and others in the pending action styled *David Feingold and Michael Dazzo v. Richard Cardinale, Vania Cardinale, RVCNY, LLC and RVCSI, LLC*, U.S.D.C. Southern District of Florida, Case No. 1:22-cv-20375-RKS/LMR (referred to herein as the "Initial Florida Federal Case"), wherein the plaintiffs there (Feingold and Dazzo) assert claims against Cardinale (and others) for various misconduct including claims for

breach of fiduciary duty, conversion and fraudulent misrepresentation in connection with the Alternative Global Companies. A copy of the operative complaint, the Second Amended Complaint, is annexed hereto as **Exhibit D**.

28. The Second Amended Complaint in that Initial Florida Federal Case includes allegations and evidence that Cardinale, and his long-time business associate, Robert L. Giardina ("Giardina") (his partner of nearly 25 years as they conducted businesses together out of Staten Island), recently engaged in gangster-like tactics to try to force a competitor to give over his business to them.[3] (Exhibit D, at ¶¶ 55-62).

29. Feingold and Dazzo also allege that Cardinale was paid over $1.3 million to maintain books and records that he did not maintain (Cardinale verbally admits it to be $1.6 million), paid additional fees for non-existent advisory services, converted bank account funds and assets and failed to properly disclose the in excess of $10.8 million that Cardinale took from the investors in L3 Capital, an investment fund solely managed by Cardinale. It should be noted that those L3 Capital investors now have taken their own actions against Cardinale and demanded of him in his separate business that they too want to disassociate from him and have basically sought

[3] Cardinale, Giardina, and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement (see FTC press release annexed hereto as **Exhibit E)** and continuing action brought by the New York Attorney General (NYAG Complaint annexed hereto as **Exhibit F**). Giardina has also invoked the Fifth Amendment in response to questions concerning his own and Cardinale's involvement with that business. *See* portions of Giardina's deposition and court decision annexed hereto as **Exhibit G**. Giardina was also recently found liable under a civil RICO statute in connection with that business in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included "threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements." ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us."). *See Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 2022 US Dist. LEXIS 100837, at *16-18 (SDNY June 6, 2022). The similarity between these recent improper tactics and the ones used by Cardinale/Giardina's merchant cash advance company cannot be overstated. It has now further come to light that Giardina has been a secret owner of Cardinale's RIA, L3 Capital Advisors, LLC.

to redeem the overwhelming majority of their own fund money from Cardinale. Feingold and Dazzo also seek additional substantial damages against Cardinale and his alter-ego entities for the fair value of their membership interests in the Alternative Numbered Entities as mandated by Delaware law.

30. In the Initial Florida Federal Case, Feingold and Dazzo made a motion to require that Cardinale and the other defendants be deposed prior to their obtaining other discovery based upon concerns that Cardinale would fabricate testimony and the court granted that sequencing motion, finding (**Exhibit H** hereto, at 3-4):

> **Plaintiffs [Feingold and Dazzo] sufficiently allege the presence of unique circumstances that generate a concern that Defendants [including Cardinale] may tailor their testimony. *See Brown*, Case No. 15-21732-CV. These unique circumstances include the intricate structure of the investment funds and Cardinale's multiple roles in the companies.**

31. As the Initial Florida Federal Case shows, there are a litany of problems which Cardinale has created for himself including that Cardinale had a multitude of roles and conflicts and sources of income as, among other things, he acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Numbered Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise. Cardinale wore many hats in many businesses, much of which was not properly disclosed to his investors while he took millions for himself.

32. Not surprisingly, the court in the Initial Florida Federal Case has already quashed two and severely limited another of Cardinale's multiplicity of endless subpoenas seeking, among

other things, confidential and proprietary business information from non-parties. *See* **Exhibit I** the Order quashing subpoena to Davick Capital, LLC and **Exhibit J** the Orders quashing and then severely limiting subpoenas to Titan Communications. As set forth in the opposition declarations, those non-parties objected to handing over confidential and proprietary business records to Cardinale, an avowed competitor. In Titan Communication's opposition to the subpoena, its owner recounted yet additional wrongful conduct by Cardinale. *See* **Exhibit K** hereto (without exhibits) ( at ¶ 2) (Sanders terminated relationship with Cardinale "after discovery of what I believed to be unethical and illegal behavior by Cardinale including his attempts at overbilling his own hedge fund clients and improperly failing to pay me in a timely manner.").

33. Cardinale also issued bogus subpoenas to Blackstream, LLC, Durham Homes, LLC and Broadstreet, Inc, all South Carolina businesses, seeking confidential and proprietary business information. Those entities moved to quash those subpoenas and the subpoena actions are pending in Federal District Court in South Carolina in matters styled as *Ex. Parte: Blackstream, LLC*, 6:22-cv-03390-TMC; *Ex Parte: Broadstreet Inc.*, 6:22-cv-03365-TMC and *Ex Parte: Durham Homes LLC*, 6:22-cv-03366-TMC. As set forth in the opposition declarations there, these entities have grave concerns about giving over their business records to Cardinale, an avowed competitor, and properly objected to doing so. *See e.g.* **Exhibit L** hereto (at ¶ 2, and ¶¶ 8, 9, 16, 17, 30)("[N]one of the Alternative Global entities invested with Blackstream, LLC. In short, Blackstream, LLC has had absolutely nothing to do with them in any manner except for the fact that the firm is owned by myself, a duly licensed attorney in the State of south Carolina, and Mr. Ford Elliott, and we have a professional relationship with Mr. David Feingold.").

**<u>Cardinale Responds With Multiplicity of Unauthorized, Meritless Litigation</u>**

34. In response to Feingold and Dazzo's Initial Florida Federal Case, which has exposed to the world the extent of Cardinale's wrongful business practices and legal violations, Cardinale responded with a slew of phony cases for public relations purposes and to continue to defraud his L3 Capital investors, often using the Alternative Numbered Entities as the purported plaintiff without Feingold's or Dazzo's approval or consent as required. Notably, approximately 70% of Cardinale's investors in his L3 Capital business have sought redemptions from him, thus indicating the entire business community besides his family and associates like Giardina have learned of Cardinale's associations and multiple business failures which were fraudulently hidden from the business community and they too have determined to remove themselves from Cardinale.

35. **<u>Cardinale's Failed Delaware Action</u>**. *After* the filing of the Initial Florida Federal Case, Cardinale ran to Delaware Chancery Court to purportedly obtain the books and records that he was paid over $1.3 million to keep and maintain. Critically, Cardinale himself strenuously refused to produce any documents in that case. The Delaware Chancery Court in *Cardinale v. Feingold, et al.*, C.A. No. 2022-0133-LWW, recently dismissed Cardinale's efforts to obtain the books and records he was paid over $1.3 million to keep and maintain. *See* Vice Chancellor Lori W. Will's decision, dated January 10, 2023, annexed hereto as **<u>Exhibit M</u>**. As outrageous as it sounds, Cardinale sued claiming his books and records were stolen but refused to enumerate in that action (or ever) what books or records were stolen. Yet again, an example of Cardinale filing one of many illogical actions and all to distract from his horrific line of lies about his business successes and to try to hide his true business failures which he had defrauded his investors for so many years. In short, Cardinale relied upon fake business performance for years in order to solicit investors. In reality, no matter what Cardinale now says, it is uncontroverted that AGM simply

cannot operate with so much controversy and lack of corporate authorization and thereby it should be dissolved.

36. **Cardinale's New York State Case**: On or about October 17, 2022, Cardinale commenced a case in New York State Court styled *Alternative Global Six, LLC v. Durham Homes LLC,* Index No. 653837/2022 (Sup. Ct., NY Cty). This pending case involves Cardinale's breach of his agreement to fund Durham Homes LLC, among his other misconduct, and failure to abide by an arbitration agreement to arbitrate disputes. Cardinale had no authority to commence this case for Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

37. **Cardinale's Florida State Case I**: On or about November 17, 2022, Cardinale commenced a case in Florida State Court styled *Alternative* Global *Three, LLC v. DCG Staten Island, LLC, DCG Boca, LLC, DCG New Jersey, LLC, DCG New York, LLC, DCG Florida, LLC, DCG Texas, LLC,* Case No. 2022-022016-CA-01 (11th Judicial Circuit, Miami-Dade County Florida). This pending case is Cardinale essentially suing himself as he is one of the owners of the various "DCG" entities (standing for "Dazzo," "Cardinale," and "Giardina"). However, Cardinale in his investor "update" made it seem to his L3 Capital investors that suing himself actually accomplished something. Cardinale had no authority to commence this case for Alternative Global Three, LLC as it was done without the approval or consent of Feingold and Dazzo.

38. **Cardinale's South Carolina Federal Case**: On or about December 14, 2022, Cardinale commenced a case in South Carolina Federal Court styled *Alternative* Global *Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC v. Blackstream Development LLC*, Civil Action No. 6-22-cv-4501-TMC (D. South Carolina). This pending case involves Cardinale's claim that Blackstream Development, LLC, a large South Carolina real estate developer, somehow

owes the Alternative Number Entity plaintiffs there a fiduciary duty and an accounting even though Cardinale failed to present any written agreement and there is no basis for finding a fiduciary duty or for an accounting. Blackstream Development, LLC made a pre-answer motion to dismiss Cardinale's Complaint (which is pending). Cardinale had no authority to commence this case for Alternative Global Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC as it was done without the approval or consent of Feingold and Dazzo.

39. **Cardinale's Florida State Case II**: On or about January 17, 2023, Cardinale commenced a case in Florida State Court styled *Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, Alternative Global Six, LLC v. David Feingold and Michael Dazzo,* Case No. 2023-000688-CA-01, Section CA43 (11th Judicial Circuit, Miami-Dade County Florida). This pending case involves Cardinale's purported and false claims against Feingold and Dazzo in connection with the Alternative Global Companies. This case was filed not long after Cardinale was deposed in the Initial Florida Federal Case wherein he disputed his own allegations in this case. Cardinale had no authority to commence this case for Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, and Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

40. **Cardinale's Florida JAMS Arbitration**: On or about February 17, 2023, Cardinale commenced a JAMS Arbitration styled *L3 Capital Management, LLC v. RIG Select Ventures, LLC*, claiming, among other things, he needs books and records that he apparently already had, has or should have access to.

**Cardinale Opposes Efforts to Assist His L3 Capital Investors**

41. Not surprisingly, in January 2023, Cardinale reported he "**has received redemption requests for more than $58 million, which is more than 70% of the total capital contributed**" by his L3 Capital investors. *See* **Exhibit N** hereto (at 2), a recent letter, dated January 25, 2023, from Cardinale to his L3 Capital investors. Plainly, Cardinale's L3 Capital investors also want to get away from him as quickly as possible. In that same letter, Cardinale also told his L3 Capital investors that L3 Capital's attorneys' fees will "be paid out of Income Fund assets" (at 1).

42. On January 17, 2023, Broadstreet New York Inc. commenced an interpleader action in New York State Court styled *Broadstreet New York Inc. v. L3 Capital Income Fund, LLC and Alternative Global Management, LLC*, Index No. 650218/2023 (Sup. Ct NY Cty), primarily to insure that the investors in Cardinale's L3 Capital receive appropriate distributions *without* Cardinale's interference or attempt at taking monies or continuing to use these dissatisfied investors' monies to pay his own attorneys' fees. The Verified Interpleader Complaint is annexed hereto as **Exhibit O**.

43. Cardinale has engaged in extreme gamesmanship in this interpleader case (and the others), thwarting the interpleader, and using L3 Capital, whose investors are seeking to cut ties with him, and Alternative Global Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC as "proposed intervenors" there, to further his own selfish goals and motivations. In a Decision and Order, dated March 15, 2023, the court there rejected Cardinale's shenanigans. *See* Decision and Order attached as **Exhibit P**. Cardinale had no authority to seek to intervene in this case for Alternative Global Two, LLC, Alternative Global Four, LLC, and Alternative Global Five, LLC, as it was done without the approval or consent of Feingold and Dazzo.

44. In truth, Cardinale's unauthorized conduct and litigations is merely a continuation of Cardinale's specious efforts to try to destroy Feingold's business and relationships as he promised he would do when Feingold refused to accede to Cardinale's threats. *See* **Exhibit Q** hereto, declarations of Feingold (at ¶ 45) and Dazzo (at ¶¶ 4-6) submitted in the Initial Florida Federal Case. Those filings were accepted by the court in the Initial Florida Federal Case who then ordered Cardinale (and the other defendants) to sit for depositions before they obtained discovery due to concerns that Cardinale (and defendants) would tailor his testimony.

**There Exists Serious Concerns About Cardinale**

45. There are numerous issues of serious concern about Cardinale. Cardinale has lied about his background and past investment success (claiming an operational history of enormous investor returns yet unable to point to a single tax return or document to substantiate the fraudulent returns he claimed in order to induce his investors which are now redeeming), failed to detail his fees and earnings of in excess of $10.8 million made off his L3 Capital investors, has recently engaged in gangster-like activity against a potential witness and is an owner of another company that recently settled with the Federal Trade Commission for engaging in gangster-like conduct as well as a pending New York Attorney General action. Feingold has also recently uncovered additional evidence that Cardinale's claim that he never had any customer complaints against him is also untrue. There, in fact, are dozens of people with circumstances of negative issues with Cardinale.

46. Cardinale is also currently subject to pending litigation and substantial liability for his fraud and misappropriations.

47. Cardinale has also improperly seized control over AGM, wrongfully frozen out Feingold and Dazzo, and engaged and continues to engage in other improper and unapproved activity with AGM's assets and funds.

**Cardinale Lies to His Investors and Feingold and Dazzo**

48. Cardinale is clearly in trouble. In Cardinale's private placement memorandum for L3 Capital, it sets forth Cardinale's substantial investment experience and acumen, including:

> Richard Cardinale, having built and/or invested in companies that are non-bank providers of alternative financial services - from "concept" through exit - has a deep understanding of the challenges such businesses face, as well as what is needed from the management team to ensure a business can evolve and grow through its evolutionary challenges.
>
> Through his career, Mr. Cardinale has developed an extensive network of contacts in the start-up and growth-phase business communities across geographies and business segments, particularly with AFSPs.
>
> Mr. Cardinale has served as a managing member of the Manager since its inception. The Manager has served as the manager of other private funds which invest in late state pre-IPO companies. Mr. Cardinale has approximately 20 years' experience in the financial services industry with broad experience in stocks, bonds, options, fixed income investments and private placements. Mr. Cardinale was a registered representative at PHX Financial, Inc., a registered broker-dealer from February 2013 through September 2019. From 2007 until 2013, Mr. Cardinale was also a registered representative at Empire Asset Management Company, as well as National Securities Corporation from 2002 until 2007, and Joseph Stevenson & Company Inc from 1994 to 2002. In each of these positions, Mr. Cardinale acted in a sales capacity where he maintained his own retail business with a clientele consisting of both retail and high net worth individuals. **Mr. Cardinale is also a managing member of various real estate investment companies.** The Manager attended St. John's University from 1990 to 1993.

See L3 PPM, at 26, annexed hereto as **Exhibit R**.

49. The private placement memorandum for L3 Capital (at 5 and 21) also sets forth Cardinale's purported stellar track record of making outsized returns for his investors, as follows:

> The Manager is targeting for the Fund to make an annual return of between twelve (12%) to fifteen (15%) percent with payments made to Investors

> quarterly [footnote omitted]. The Manager believes that such return is achievable due to the structure of the Investments intended to be made and **the returns that the principal of the Manager has experienced previously in the non-traditional finance industry.**
>
> The principal of the Manager and his affiliates have invested their own capital in a number of different non-bank providers of alternative financial services for approximately the past ten years and have experienced returns on their investments that are consistent with the returns that the Fund is seeking to target for prospective investors in the Fund. The Fund seeks to achieve its investment objective by investing substantially all of its assets in Investments selected by the Manager based on the investment experience of the principal of the Manager in the alternative finance sector.

50. It turns out that Cardinale lied to investors in the private placement memorandum concerning his background and purported stellar track record of making outsized returns for his investors and in his recent deposition testimony in the Initial Florida Federal Case he could not substantiate those private placement memorandum representations and suddenly claimed that he, a purported fund manager, is unable to understand basic business terms. Thus, Cardinale, an investment fund manager with due diligence obligations, testified that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," as he stated in his deposition that he could not speculate on the meaning of such basic business terms.

## EMERGENCY RELIEF IS REQUIRED

51. In view of the irreconcilable differences between Petitioners Feingold and Dazzo on the one hand and Cardinale on the other hand, and the other continuing improper conduct and pending lawsuits by Cardinale in relation to AGM and its assets, AGM should be dissolved and its affairs wound up as quickly as possible. Emergency relief is required.

52. Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage

AGM and its assets. He has even told multiple people that he would rather destroy everything and continue to litigate.

53. Cardinale has even failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems. *See* **Exhibit S**.

54. Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin. Thus, it was conveyed to Feingold that Cardinale unilaterally removed Feingold and Dazzo from Alternative Spin and other portfolios, and locked them out. Upon information and belief, Alternative Spin is worth less than half of its value since the time of Feingold and Dazzo's resignation from the Alternative Numbered Entities in January 2022, meaning multiple millions of dollars have vanished - - Cardinale has misappropriated some these funds and lost or misappropriated others, but either way he is running this AGM asset into the ground.

55. In addition, upon information and belief, the value of Alternative Global One, LLC's structured finance portfolio has been cut in half since Feingold and Dazzo resigned meaning that about $25 million has disappeared. Cardinale has either lost or misappropriated these funds, but either way he is running this AGM asset into the ground. Ultimately, this structured finance portfolio is needed to first pay back loans from Cardinale's L3 investors, but Cardinale has insufficient funds to pay back his redeeming investors as the current redemption demands are believed to exceed $58 million. Thus, Cardinale's continuing fraud and misconduct here threatens any recovery for AGM as well. Not surprisingly, Cardinale has also hidden these massive losses from his L3 Capital investors.

56. Furthermore, as alleged in the Second Amended Complaint, Cardinale has improperly charged AGM funds for his own personal use and it is believed that he is continuing

to do so even while he has also stated that his L3 Capital investors are being required to finance what he considers L3 litigation. All the while, Cardinale seemingly continues to support a lavish lifestyle that includes a Staten Island mansion, a New Jersey farm and a pricey beach home next to Giardina's beach home along with expensive cars, jewelry, restaurants and home furnishings.

57. Moreover, as described, Cardinale has launched and continues to prosecute multiple litigations by the Alternative Numbered Entities without the consent or approval of Feingold and Dazzo while it also remains unclear who is paying for all these litigations. Regardless, as stated, these litigations are not authorized and left in Cardinale's stewardship are certain to cause further damage to AGM.

58. Feingold and Dazzo are also not on speaking terms with Cardinale, and Feingold and Dazzo detest Cardinale.

59. It is imperative that Cardinale be immediately restrained from taking any unilateral action by or on behalf of the Alternative Global Companies to avoid further and additional irreparable injury to the Alternative Global Companies by Cardinale.

## COUNT I
## DISSOLUTION OF THE LLC

60. The individual managers and control members of the LLC are unable to agree on carrying on the LLC's business pursuant to the terms of the AROA or otherwise and are not on speaking terms.

61. Cardinale has and continues to engage in acts and conduct designed to destroy the business of AGM and its sole asset, the Alternative Numbered Entities.

62. Cardinale's fraudulent and improper conduct in, among other things (i) improperly usurping control over AGM and freezing out Feingold and Dazzo from AGM; (ii) improperly usurping management and control over AGM, and other misconduct, violating the AROA and

applicable law; (iii) engaging in multiple acts of fraud and conversion in connection with AGM; (iv) improperly usurping control over AGM's sole asset, the Alternative Numbered Entities, and destroying the sole asset; and (v) commencing and currently prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo, establishes that it is impossible to carry on the business of the LLC.

63. Accordingly, the LLC should be dissolved.

## COUNT II
## PETITION TO WIND UP AFFAIRS

64. The foregoing facts satisfy any requirement to permit Petitioners to wind up the affairs of the LLC.

65. Accordingly, the LLC should be wound up by Petitioners or other suitable person that is not Cardinale.

## COUNT III
## EMERGENCY INTERIM RELIEF AND PRELIMINARY/PERMANENT INJUNCTION

66. Petitioners seek a preliminary and permanent injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners and an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners.

67. The foregoing facts demonstrate that Petitioners will likely succeed on the merits, there will be irreparable injury if the provisional relief is not granted, and the balance of the equities favor Petitioners.

* * *

## PRAYER FOR RELIEF

**WHEREFORE**, Petitioners respectfully request that this Arbitration Panel issue and Award:

**A.** dissolving the LLC;

**B.** declaring that Petitioners may wind up the LLC's affairs;

**C.** issuing a preliminary and permanent injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners;

**D.** issuing an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners;

**E.** requiring reimbursement of Petitioners' attorneys' fees and other expenses incurred by Petitioners regarding the dissolution, including this Arbitration; and,

**F.** awarding such other relief in Petitioners' favor as may be just and appropriate.

Dated: May 21, 2023
Mineola, New York

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

By: /s/ *Irwin Weltz*
Irwin Weltz
Thomas Scot Wolinetz
170 Old Country Road, Suite 310
Mineola, New York 11501
Telephone: (516) 506-0561
Irwin@weltz.law
twolinetz@weltz.law

*Attorneys for Petitioners*
David Feingold and Michael Dazzo

**VERIFICATION**

STATE OF FLORIDA )
) ss:
COUNTY OF MIAMI-DADE)

David Feingold, being duly sworn, deposes and says:

I am one of the Petitioners in this matter. I have read the foregoing Verified Petition and know its contents. The Verified Petition is true to my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

David Feingold

State of Florida County of Broward
The foregoing instrument was acknowledged before me via ☐ physical presence OR ☑ online notarizations this 22 day of May, 20 23.
By David Feingold
Personally known ✓ OR produced identification ______
Type of identification produced ______
Marisela Cusati
NOTARY NAME HERE, Notary Public
My Commission Expires 01/12/2024

MARISELA CUSATI
Notary Public-State of Florida
Commission # GG 925765
My Commission Expires
January 12, 2024

EXHIBIT "D"

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:22-cv-20375-ALTMAN/REID**

DAVID FEINGOLD and MICHAEL DAZZO,

Plaintiffs,

vs.

RICHARD CARDINALE, VANIA CARDINALE,
RVCNY, LLC and RVCSI, LLC,

Defendants.
_______________________________________/

**SECOND AMENDED COMPLAINT**

Plaintiffs David Feingold and Michael Dazzo file this Second Amended Complaint for damages against Defendants Richard Cardinale, Vania Cardinale, RVCNY, LLC, and RVCSI, LLC, and state and allege as follows:

**NATURE OF THE ACTION**

1. This is a civil action for failure to pay fair value for membership interests, breach of fiduciary duty, conversion, fraudulent misrepresentations, conspiracy to commit fraud, civil conspiracy, and aiding and abetting breach of fiduciary duty.

**PARTIES**

2. Plaintiff David Feingold ("Feingold") is a citizen of Florida who resides in the Southern District of Florida.

3. Plaintiff Michael Dazzo ("Dazzo") is a citizen of Florida who resides in the Southern District of Florida.

4. Defendant Richard Cardinale ("Cardinale") is a citizen of New York who resides at 178 Benedict Road, Staten Island, New York.

5. Defendant Vania Cardinale is a citizen of New York who resides at 178 Benedict Road, Staten Island, New York. Cardinale and Vania Cardinale are married and have been married during the relevant period herein.

6. Defendant RVCNY, LLC is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCNY" stands for "Richard Vania Cardinale New York." Cardinale and Vania Cardinale, both citizens of New York, are claimed by Cardinale to be the only members of RVCNY, LLC. As detailed below, RVCNY, LLC is an alter-ego entity of Cardinale.

7. Defendant RVCSI, LLC is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCSI" stands for "Richard Vania Cardinale Staten Island." Cardinale is a citizen of New York and Cardinale claims to be the only member of RVCSI, LLC. As detailed below, RVCSI, LLC is an alter-ego entity of Cardinale.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because this is a civil action between citizens of Florida and citizens of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Defendants through Defendants transacting, doing, and soliciting business in this District, and because a substantial part of the events occurred in this District. This controversy also involves multiple limited liability companies with their main corporate offices and registered agents in this District. Each action is alleged to have taken place in this District or via electronic communications that either originated in or were received in this District.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants transact business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## FACTS SUPPORTING CLAIMS

11. This Second Amended Complaint involves the actions of Cardinale hiding over ten million dollars of compensation from his investors in the L3 Capital Income Fund, in which he is the sole fund manager, as well as his fraudulent billings to Plaintiffs for services that Cardinale never performed and for which he has been claiming a lack of knowledge of substantially all businesses operations even though he was the highest compensated person with the responsibilities of manager, paid advisor, equity owner, fiduciary and paid consultant. Prior to providing testimony in this case, Cardinale has claimed, after many questions raised by his investors, that he has a complete lack of knowledge of not just the business operations but also no possession of critical business records for all businesses which he oversaw and was paid to oversee. Now Cardinale claims in testimony in this case that it was not his primary job or responsibility to oversee business operations, not his job to maintain the books and records and further admitted that he does not have the complete books and records that he was paid to keep and maintain. More than that, Cardinale has now further testified that he lacks an understanding of basic business and financial terms of common usage and that multiple representations that Cardinale made to his investors and to induce Plaintiffs are materially false and misleading.

12. The key facts begin on or about the first week of July 2019 when after numerous prior discussions, Cardinale asked Feingold and Dazzo to be co-managers of his investment fund he was forming, the L3 Capital Income Fund. Both Feingold and Dazzo rejected the proposal. Feingold and Dazzo told Cardinale they had no desire to be fund managers, that their offices were

Case 1:22-cv-20375-RKA Document 102 Filed 05/18/24 Page 33 of 364



not set up to service and administer a fund of retail investors, and that they had several outside businesses that would not allow them to devote the time necessary to be a fund manager and operate a fund.

13. Cardinale responded that he had operated nearly ten funds himself and already had a complete back office set up to operate a fund. Cardinale told Feingold and Dazzo he employed two administrative workers and one in-house attorney, and that he would provide all record keeping, reporting, due diligence, compliance and complete back-office services so both Feingold and Dazzo would not have to be responsible for any administrative services. Feingold and Dazzo still rejected the proposal.

14. In addition, Cardinale said that he had an advisory company, L3 Capital Advisors — a registered investment advisor ("RIA"). Cardinale also said that he was familiar with all legal requirements as his RIA held him to a higher standard and therefore, he was qualified to handle the services discussed. Feingold and Dazzo again advised Cardinale that they still were not interested in being managers of a fund.

15. Feingold and Dazzo conveyed that they were only looking for a source of non-recourse funding to pursue various businesses they were pursuing, including merchant cash advance and real estate. They advised Cardinale they could have their various businesses borrow money from Cardinale's fund, the L3 Capital Income Fund, and that they would pay above market interest rates if the money was loaned to them non-recourse and unsecured but they only wanted to find a lender, they were not interested in being fund managers and had never previously acted as fund managers and did not feel comfortable with such responsibilities or the back office and record keeping requirements and thereby Feingold and Dazzo rejected any proposal involving

responsibility for the L3 Capital Income Fund. Feingold and Dazzo were simply seeking a source of funding for the businesses that they wanted to pursue and were simply looking for a lender.

16. Cardinale said he would agree to having his fund, the L3 Capital Income Fund, be a lender to Feingold and Dazzo's intended business endeavors if he was made an equal equity owner in any borrowing business entity and could earn money from any monies generated from the borrowing business entities. These business entities eventually became Alternative Global One LLC (specializing in the merchant cash advance industry), Alternative Global Two LLC (seeking opportunities in infrastructure and real estate development), Alternative Global Three LLC (focusing on the debt-settlement industry), Alternative Global Four LLC (developing real estate), Alternative Global Five LLC (investing in the fast-food industry), and last, Alternative Global Six LLC (specializing in home building).

17. Cardinale, Feingold, and Dazzo agreed that another newly formed company, Alternative Global Management LLC, would receive all funds over any loan payments owed by Alternative Global One through Six (Alternative Global Management LLC and Alternative Global One through Six are hereinafter collectively referred to as the "Alternative Named Entities").

18. Eventually after further discussion, Feingold and Dazzo ultimately agreed that they would allow Cardinale as an equal member in the Alternative Named Entities if, and only if, (a) Cardinale disclosed all conflicts of interest and compensation to his clients and (b) if they could use L3 Capital Income Fund's back office administrative services, which included the entire staff of L3 Capital Income Fund to provide all record keeping, reporting, due diligence, compliance and complete back-office services and support for the Alternative Named Entities. This was all to be billed as administrative expenses.

19. Cardinale said that he would have himself and his entire back office provide such services for the Alternative Named Entities if the Alternative Named Entities paid all the administrative expenses of both the L3 Capital Income Fund and the Alternative Named Entities since it would all be the same staff for both the fund and Alternative Named Entities and Cardinale had already gone through the time and expense and had the experience of running complete back-office services. Hence, the Alternative Named Entities would pay all administrative expenses for themselves and the L3 Capital Income Fund in return for all of the back office, record keeping, due diligence, and compliance (which all were collectively referred to as the administrative expenses) which were to be provided in one spot, which was at the office location of Cardinale for not only the Alternative Named Entities but also the L3 Capital Income Fund.

20. This deal was beneficial for Feingold and Dazzo as they did not have to worry about any of the aforementioned administrative services for the Alternative Named Entities and this deal was also beneficial for Cardinale as all administrative services were paid for by the Alternative Named Entities with regards to Cardinale's operation of the L3 Capital Income Fund, the entity which he was the sole fund manager responsible to all of his retail investors. Therefore, Feingold and Dazzo would not have to worry about any administrative services and Cardinale would not have to worry about paying the administrative expenses for L3 Capital Income Fund.

21. Cardinale also represented to Feingold and Dazzo that he would solve all concerns about how he would make all conflict of interest and earnings disclosures as he was personally responsible for such disclosures anyway since he operated an RIA. See **Exhibit A**, p. 6. Thus, under law as an RIA, Cardinale was a fiduciary and would have to make all conflict-of-interest disclosures and complete and detailed compensation disclosures anyway and so the requirements of Feingold and Dazzo regarding disclosure would be met.

22. Cardinale also required that he be paid an advisory services fee through his RIA, L3 Capital Advisors, as he claimed to have the most real estate and financial experience, said he would oversee everything, and therefore he should earn even more fees for those additional services of overseeing all entities and providing what he described as his superior skills.

23. Cardinale boasted about his investment return history of 12-15% as well as his prior business endeavors throughout his business career. Cardinale repeated these lofty returns in the private placement memorandum he circulated for potential investors in the L3 Capital Income Fund and to Plaintiffs.

24. Cardinale made other representations in order to induce Plaintiffs to do business with him, including: (1) Cardinale represented he was a successful developer and largest developer in Leesburg, Florida and was making millions; (2) Cardinale represented he built 20 apartment buildings in New York; (3) Cardinale represented that he successfully developed a high-priced condo; (4) Cardinale represented that he had an unblemished record in finance and real estate; (5) Cardinale represented he had a gold fund where people made six times their money and it was going public; (6) Cardinale represented he raised over $30 million for a company called Graphoid where all investors made money and that company was going public; (7) Cardinale represented he produced a successful motion picture; (8) Cardinale represented that he successfully ran multiple debt settlement companies; (9) Cardinale represented he made significant returns in the payday lending business with Sky Capital; (10) Cardinale represented he had a successful sports bar operation in Leesburg, Florida; (11) Cardinale represented that he had a high-end, successful coffee shop in New York; (12) Cardinale represented he was opening tattoo parlors and acquired the equipment; (13) Cardinale represented he had a scrap metal operation in Brazil that was successful; (14) Cardinale represented he was a successful international developer including

successful development of townhomes in Brazil; and (15) Cardinale represented that in 2006 he made so much money as a real estate developer that he could retire and was only working because he enjoyed training young people.

25. As Plaintiffs would later learn, these representations to Plaintiffs were either false and/or could not be substantiated by Cardinale. These representations were made to induce the Plaintiffs to do business with Cardinale and continuously repeated to have the Plaintiffs continue to do business with Cardinale and consent to additional advisory fees and acquisition fees which only Cardinale received and for which Cardinale was paid millions and for which he conveniently and intentionally failed to in detail itemize to his investors that he made in excess of ten million dollars off of his investors.

26. Cardinale now had a multitude of roles and conflicts and sources of income as he now acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Named Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise. Thus, Cardinale had multiple sources of earnings, which had to be disclosed in detail to his investors with the complete detail enumerating the exact amounts he was being paid. In fact, Cardinale has never given such enumerated detail but rather now hides his enormous pay under the guise of following legal advice even though Cardinale operated nearly ten prior investment funds and is a fiduciary and certainly knows that he must give completely detailed disclosure to his investors. On the contrary, Dazzo and Feingold were simply part owners of the borrowers, the Alternative Named Entities.

27. Over the next two and a half years, Cardinale billed the Alternative Named Entities more than $1.3 million dollars. Feingold and Dazzo paid these amounts believing they were paying for all administrative expenses and Cardinale's continued promise he had maintained all the records, reporting, due diligence, and complete back-office services for the Alternative Named Entities.

28. Yet those promises were false. Still, Cardinale submitted monthly invoices and never once advised either Feingold or Dazzo that the services, which were being paid for every month, were not being done. See **Exhibit B** (voluminous bills submitted by Cardinale totaling over $1.3 million have been attached). Cardinale has now further confirmed that his promises were false, claiming that it was not his job to maintain all of the books and records for the Alternative Named Entities that he was paid to keep and maintain. Cardinale has testified that he received $1.6 million in administrative services payments but that his records are not complete and that even with the large sums of money that he received to keep all of the records, he claims to his investors that he cannot pay them because he does not have all records necessary yet he still issues them K-1s, he still issues them audited financials but when it comes to operating the businesses or paying his investors, Cardinale claims he is unable to make the payments because he does not have complete records. Cardinale and only Cardinale is mentioned as the sole Fund Manager of his investor's funds and his private placement memorandum lists the Fund Manager as the person with the sole and absolute discretion overseeing the investments, making the investments, operating the investments and performing all diligence on the investments. In fact, Cardinale's private placement memorandum makes reference to the Fund Manager (Cardinale) over 100 times with the risk factors specifying that Cardinale is the sole person responsible for all investment decisions and operation of the investments. Cardinale was absolutely required to have complete records not

only to comply with his paid obligations from Plaintiffs, but also his lawful obligations to his investors as per the private placement memorandum.

29. In some months, the bills Cardinale submitted to the Plaintiffs for administrative expenses exceeded one hundred thousand dollars and included charges from Cardinale's American Express "Black Card" where he was billing for travel and meals, all which he claimed were for the business and necessary as part of his due diligence and advisory and administrative services. Software related charges and office supply charges were also billed. Cardinale said these items were being billed because he was taking care of all the administrative services. Further, all Cardinale's employees' salaries and benefits were paid by the Alternative Named Entities, with the understanding and belief they were supplying the complete back-office services for those entities since neither Feingold nor Dazzo had any employees.

30. All told, Cardinale took more than $1.3 million from the Alternative Named Entities and an additional $620,000 in "advisory" fees under Feingold and Dazzo's reasonable belief that Cardinale was providing what he had promised.

31. For nearly two years, Feingold and Dazzo operated under the false assumption that the more than $1.3 million paid to Cardinale was for legitimate business expenses to support the back-office operations of the Alternative Named Entities. Now, upon information and belief, Cardinale fraudulently billed the Alternative Named Entities. For instance, travel and entertainment expenses were not for due diligence or advisory purposes and health insurance charges were not simply for the back-office staff, as it is believed that other persons besides Cardinale and his staff had their health insurance paid for and included in the administrative services bill. Further, the Alternative Named Entities paid for office space that had apparently

been closed at some point. Cardinale now operates the business out of a UPS storefront and there is no actual physical office in an office building.

32. In all, Cardinale billed more than $1.3 million for expenses and now it is learned that apparently Cardinale claims to only have some, incomplete back-office records and due diligence files (while previously claiming he had none), and that the substantial monies paid were not used as represented. Thus, Cardinale has now stated that he brought a lawsuit in Delaware Chancery Court for the books and records at issue "[b]ecause I don't have all of the books and records." Further, Cardinale's incredible view of due diligence files now seemingly includes texts, Skypes, certain PowerPoints and his own quarterly reports to investors, which can hardly be considered the proper due diligence files for the Alternative Named Entities.

33. At some points, Defendants even falsely represented to this Court that Plaintiffs stole Cardinale's computers from his offices in New York as well as Cardinale's QuickBooks, but have since avoided continuing to make such preposterous claims thus showing that depending on the audience, Cardinale changes his claims about his records from not having them when he wants to avoid paying his investors to claiming he has some records in order to avoid a situation where he is an investment manager breaching his ability to perform for his investors to claiming he had his computers stolen and making said statement in open court here in order to try to sway this Court.

34. In addition, Plaintiffs now believe that Cardinale did not disclose millions of dollars in earnings he made from the Alternative Named Entities to his fund clients although he claimed that he would make such disclosures. As a fiduciary, Cardinale had to specifically itemize and disclose to his investors the actual monies he made, but he never did so. There is no record of Cardinale giving his investors any itemized disclosures as he hid the amounts he made from his

investors. Cardinale intentionally omitted to disclose to his fund clients what he was making even though he had to do so, not only because he was a fiduciary but also for conflict-of-interest purposes and he also agreed to do so in the private placement memorandum for the L3 Capital Income Fund and represented to Plaintiffs that he would do so. In fact, Cardinale himself could not now even say that he itemized all earnings quarterly for the investors of the L3 Capital Income Fund rather in his deposition here Cardinale feigned an inability to understand and could not speculate as to what simple words such as definitions of types of "fees" meant even though his own private placement memorandum used those exact words.

35. Not only does Cardinale now cutely claim he is unable to describe the simple terms such as fees and costs, he also claims confusion and reliance upon others in determining what to disclose when the plain fact is that he is a fund manager spanning at least ten funds as well as owning an RIA and he knows that he must give complete detail to his investors of what he earned and not fake that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," as he stated in his deposition here that he could not speculate on the meaning of such terms.

36. Cardinale charged and earned what is estimated to be in excess of $10.8 million from his ownership in Alternative Global Management LLC, Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, Alternative Global Six LLC, L3 Capital Advisors for advisory services billed to the Alternative Named Entities, and additional compensation he took, such as in relation to debt settlement in Alternative Global Three LLC. That undisclosed compensation

related to debt settlement alone equated to approximately $2 million. In addition, further undisclosed monies were paid to L3 Capital Management.

37. There were over ten sources of earnings which would have required detailed disclosures to his investors, which Cardinale did not make. This was intentionally not disclosed by Cardinale who represented to Plaintiffs that as a fiduciary he knew what he was supposed to disclose. Yet he intentionally failed to do so. Now Cardinale claims it was not his job to keep records and he cannot speculate on what "compensation" means and he further claims reliance on others when he was supposedly the most skilled and experienced and highly compensated person due to his expertise, but now he is disclaiming all expertise and even disclaiming an understanding of simple finance terms that a seasoned fund manager making more than ten million dollars should know.

38. Upon further information and belief, for certain investments, Cardinale has had family members, such as his father, paid and returned capital ahead of other non-family member investors thereby showing improper preferences.

39. During the nearly two years of Feingold and Dazzo working with Cardinale, sometimes other persons in the financial community told stories of Cardinale's multiple misdeeds and acts of dishonesty including, but not limited to, falsification of investment success, falsification of deal performance, and arguing with colleagues.

40. Finally, by the end of 2021, Feingold and Dazzo realized that working with Cardinale was unwise. Even though Feingold and Dazzo were simply involved as borrowers from Cardinale's web of entities, it simply did not make sense to continue with a person who appeared to lie even while being caught in many contradictions. There was simply too much drama and too many people that had reasons to not like Cardinale and too many inconsistencies in his stories.

41. At first, Feingold approached Cardinale to discuss his concerns. Cardinale responded by referring to everyone else being a liar, being jealous of him because he was building a nearly $7 million home, had a multi-million-dollar beach house and a multi-million-dollar farm, and many luxury cars. In December of 2021, Cardinale travelled to Greenville, South Carolina for a group dinner and so many persons at the dinner simply ignored him due to their own issues with him that Cardinale claimed that he wanted to hold another meeting to cross examine nearly a dozen people who did not want to do business with him to prove their belief that he was dishonest and untrustworthy was really all about their jealousy of him and the enormous business success he claimed to have achieved and all of the assets he accumulated. Cardinale could not accept the fact that so many persons had tired of his lies and deceit and simply wanted nothing to do with him anymore.

42. Cardinale's explanations were not acceptable, and matters came to a head in January 2022, when Feingold sent a rather terse communication to Cardinale ceasing all relations. See **Exhibit C**.

43. Later in January 2022, both Feingold and Dazzo sent notice to Cardinale they were resigning from entities involving Cardinale. Feingold and Dazzo both had a lawful right to resign and disassociate themselves from Cardinale. The resignation was lawful and done in compliance with Delaware law.

44. Then Feingold and Dazzo sued Cardinale under Delaware law in this Court to receive their fair value of the assets they left behind upon their resignation and as permitted under Delaware law. See **Exhibit D**. ***After*** Feingold and Dazzo sued Cardinale in this Court, Cardinale sued Feingold and Dazzo in Delaware Court of Chancery seeking the same books and records he was paid to keep and maintain. In fact, Plaintiffs are aware that since that time Cardinale has

approached multiple persons for books and records that he promised he would keep and he was paid to keep in an effort to stuff his files to be able to say he complied with his representations to Plaintiffs.

45. For over two years, Feingold and Dazzo had Cardinale paid for all administrative expenses only to learn that Cardinale had claimed to have no records. That statement shows that Cardinale not only took monies for administrative services he did not perform, but also shows that Cardinale may have been claiming that he does not have records to avoid answering his investors' concerns.

46. Cardinale apparently represented to his investors as to their expected investment returns, telling some that they could expect to receive over 27% per year in returns (interest and profit distributions). When his income fund did not pay such returns, Cardinale, who is and has always been the sole manager, responded that he does not have the records so he cannot explain why the returns to some of his income investors have been lower than expected. As described, Cardinale has since testified in this case that it was not his job to keep those records, which is utterly false. Cardinale now claims he has *some* records, yet at times he has also claimed that his computers were stolen and that his QuickBooks was stolen and thereby he had no records. Amazingly, Cardinale keeps changing his story depending upon his audience.

47. When Cardinale could not meet the returns he told some of his investors, he, as sole manager, claimed ignorance and lack of possession or knowledge of records. However, by taking such a baseless stance, Cardinale has at a minimum admitted that he is not a fit fund manager. A person should not be permitted to manage a fund if they have no records and no proper due diligence files. Yet in an act of desperation, that is apparently the position Cardinale has been taking to avoid his investor's questions. Before his investors questioned him, Cardinale did not

make up excuses of not having records for over two years and before Feingold and Dazzo raised their concerns, Cardinale continued to take all his monies and represent to the world his key leadership role in all businesses and all decisions. Cardinale had consistent monthly payments to his L3 Capital Management entity for billed administrative expenses, and his billings to the entities for "advisory services" to oversee everything were always paid, and now miraculously he only complained about lack of knowledge and records ***after*** his being confronted about his multiple dishonest acts and inability to answer his investors about his promised returns to his investors in his fund which he is the sole fund manager. Cardinale was also paid acquisition fees in the businesses due to his professed incredible business skills. Yet now he claims difficulty in running the businesses and even claims difficulty in remembering if he got a business degree in college because it was so long ago that he cannot remember.

48. During the two years in which Cardinale received monies from the Alternative Named Entities, he never once claimed that he did not have records nor that he did not have due diligence. Rather, he not only kept receiving those monthly payments for expenses, but he also continued to bill an advisory fee claiming that he was providing advisory services overseeing the businesses under his many advisory contracts. See **Exhibit E** (advisory agreements that Cardinale had executed). In fact, Cardinale was also paid approximately $620,000 in advisory fees. He also billed acquisition fees to his fund again as a result of his professed business expertise and experience.

49. Once they became aware, Feingold and Dazzo complained and questioned Cardinale about these advisory services. Feingold and Dazzo have now learned that Cardinale, at other businesses and funds which he has operated, has employed a similar tactic of lack of knowledge, lack of records, and lack of understanding. For instance, Cardinale ran/runs a gold

fund where he advised certain investors they had made six times their money and that the fund was guaranteed to become publicly traded. But no such public offering happened, and no such returns have been experienced. Cardinale has now told investors that his long-time friend and business partner Robert L. Giardina ("Giardina") is running the gold fund for him and that they should address their gold fund questions to Giardina. Cardinale has taken the same tactic here that he has no knowledge and yet again at a fund where he is the manager.

50. Cardinale, when confronted at his deposition in this case about the advisory fees paid, and despite representing to Plaintiffs that he had been providing advisory services overseeing the businesses under his multiple advisory contracts, incredulously claimed that he was being paid under those agreements he signed not for advisory services (as the contracts state and he represented), but for purported "administrative expenses" and he refused to speculate on the meaning of "advisory." Yet again, Cardinale's promises and representations were false.

51. It was not until **after** Feingold and Dazzo put Cardinale on notice of the complaints against him and **after** Feingold and Dazzo resigned, that Cardinale, who is the sole Fund Manager of the L3 Capital Income Fund and the sole Manager of the Alternative Global numbered entities 1-6, miraculously claimed not only that he has no records but Cardinale also claimed he is unaware of business operations, and he cannot in detail explain the business to anyone even though he was the most highly compensated person with a full office and staff and multiple entities that he received earnings and compensation for his alleged expertise. Also, Cardinale participated in what is estimated to be more than one hundred conference calls on the businesses with Feingold and Dazzo and yet his claimed ignorance serves him well in avoiding questions by his investors and avoiding payment of large amounts of fair value admittedly owed to Plaintiffs.

52. Cardinale takes the position that the Plaintiffs know about all of his L3 business even though the Plaintiffs are not even mentioned once in the private placement memorandum and yet Cardinale as Fund Manager is mentioned more than 100 times. Feingold and Dazzo were nothing more than owners in the borrowing entities and had none of the legal obligations which Cardinale had and for which he had professed no knowledge or records to avoid the serious inquiries of his investors.

53. Cardinale's claims of prior outsized investment returns (12-15%) have now also been revealed false, as well. Cardinale now cannot substantiate these alleged prior investment returns. Cardinale made these false representations to induce potential investors to invest in the L3 Capital Income Fund. Cardinale also made these false representations to induce Plaintiffs to do business with him as he circulated the draft private placement memorandum of L3 Capital Income Fund to Plaintiffs, and Cardinale actively assisted in drafting the private placement memorandum but at no point did he remove his false investment history as he used that fake history of success as a way to keep the Plaintiffs doing business with him as well as inducing his investors. At the time, Plaintiffs were not aware that these material representations were, in fact, false. In fact, Cardinale now after this litigation has been filed describes himself as merely a passive investor in real estate.

54. Recently, Plaintiffs have also become aware that Cardinale has siphoned off nearly $300,000 if not more from "Alternative Spin," which is an account that holds separate funds of Alternative Global Management LLC.

55. Even more disturbing, in or about, May 2022, Cardinale learned that one of his business partners in the debt settlement business (which is also involved in Alternative Global Three), who had not signed a noncompete agreement, had left his business relationship with

Cardinale to pursue a competing enterprise. Cardinale apparently called this person impliedly threatening that something might happen to that person and which would be out of the control of Cardinale. Cardinale thus implied that something would be happening, an old-style gangster move of claiming that Cardinale would not be responsible for any unexplained events happening to the competitor. Shortly thereafter (within approximately one week), a group of people (including Giardina) showed up to the gated home of the competitor to harm and intimidate the competitor admitting that they intended to physically beat up the competitor. See **Exhibit F** (putting Cardinale on notice that the threat of physical violence has required the complete separation from Cardinale and that no further communications will be permitted).

56. This issue of violence is of such concern that a police report was made with the Boca Raton police department under case number 22-6838 by the victim who is not a party to this litigation (but a potential witness). There is also video and photos of the would-be attackers standing outside the competitor's home.

57. Cardinale was put on notice via email from the victim about the attempted attack. After receiving the email, Cardinale did not respond with shock or disgust as to what happened to the victim (a normal response by someone not involved) but simply ignored the email as if to send the message he knew what happened and was condoning such conduct by his silence to the events. See **Exhibit F** (email of the victim to Cardinale). The victim directly emailed Cardinale about the outrageousness of sending attackers to a home of a competitor to which Cardinale simply remained silent but later and likely after learning the police were involved, then claimed that he had no control over what his long-time business partner and close friend Giardina had done.

58. Because of the above, Feingold emailed to Cardinale advising him intimidation as a business tactic cannot be tolerated and used by Cardinale as a tool to achieve his desired goals and that no further contact would be continued with Cardinale. See **Exhibit G**.

59. Moreover, it has only now been revealed during Cardinale's testimony in this case that Giardina has been an owner of L3 Capital Advisors, but Cardinale did not disclose this to Plaintiffs at the time and there is no mention of Giardina being an owner in any of the RIA filings or the private placement memorandum for the L3 Capital Income Fund.

60. Giardina, Cardinale and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement and continuing action brought by the New York Attorney General. Giardina has repeatedly invoked the Fifth Amendment in response to questions concerning Cardinale's and others involvement with that business.

61. Giardina was also recently found liable under a civil RICO statute in connection with that same business owned with Cardinale in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included **"threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements"** ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us.").

**FACTS RELATED TO**
**ALTER EGO - REVERSE PIERCING DOCTRINE**

62. Upon information and belief, Cardinale has formed and/or used RVCSI, LLC and RVCNY, LLC for the purpose of defrauding creditors and secreting assets in order to evade liability for preexisting personal liability, including in connection with the claims and liabilities at issue here.

63. Cardinale thoroughly dominates and controls these entities, and always has, to such an extent that, in reality, there is no separate existence and the entities were and are, in fact, alter egos of Cardinale.

64. Cardinale testified in this case that RVCNY, LLC is merely a "flow-through" entity that made two investments in 2007 and 2015 (in Richmond Capital Group LLC n/k/a RCG Advances LLC and Red Zone) and engages in no other activity or business even though he later claimed the entity was actually formed in 2016. He further testified that he took the Red Zone entity on just for structure as a "set aside corporation." Cardinale further testified that Cardinale and Vania Cardinale are the only owners ever of RVCNY, LLC and that Cardinale has been the only manager ever of RVCNY, LLC. However, in the Form ADV, Part 2B (Cardinale's Brochure Supplement), dated March 29, 2019, for Cardinale's L3 Capital Advisors RIA it states that:

> Mr. Cardinale receives substantial compensation in connection with his ownership of 50% of the outstanding membership interests in each of L3 Capital Management LLC, RVCNJ LLC and RVCNY LLC. Each of these entities invest hold passive investments in various businesses on behalf of Mr. Cardinale. Mr. Cardinale is not involved in the management of each of these entities. L3 Capital believes that these ownership interests do not pose any conflicts of interest to clients.

65. Thus, if Cardinale, as he represented in the Form ADV, is not involved in the management of each of these entities, including RVCNY, LLC and L3 Capital Management, for which Cardinale receives "substantial compensation," then Vania Cardinale, as the only other

owner ever in both of those entities, would naturally have those management duties, but Vania Cardinale testified in this case that she has no knowledge about anything concerning the affairs of RVCNY, LLC or L3 Capital Management. Further, Cardinale testified here that he has been the only manager ever of RVCNY, LLC, but his Form ADV claims he is "not involved in the management of each of these entities." In addition, Cardinale testified that he owns various DCG ("Dazzo Cardinale Giardina") entities via L3 Capital Management as well.

66. Cardinale further testified that RVCNY, LLC never had: any officers or directors, physical office space, computers, employees, independent contractors, dedicated email address, business, business operations, phone number, reports, research, marketing, analysis, member meetings, committee meetings, resolutions, members consents, W-2s or 1099s.

67. Cardinale testified in this case that RVCSI, LLC is merely a "flow-through" entity that was formed in 2020 solely to receive funds and money from Alternative Global Management LLC. Cardinale further testified to being the only owner and manager ever of RVCSI, LLC and that it never had: any officers or directors, physical office space, computers, employees, independent contractors, dedicated email address, business, business operations, phone number, reports, research, marketing, analysis, member meetings, committee meetings, resolutions, members consents, W-2s or 1099s.

68. Cardinale could not articulate any legitimate purpose for the entities. Vania Cardinale's initials have been used in each of the Defendant entities and as Cardinale admitted to Feingold, he keeps all of the original books of said entities and he has a practice of switching original documents depending on the circumstance as an asset protection measure. In particular, with one company, the original books and records including the operating agreement signature page was often switched depending on the situation in order to shield Cardinale as this is his regular

practice of not holding corporate meetings or formalities or regular minutes or notes so that he can easily switch out and remove himself or his wife or add them or other entities. Likewise, Cardinale openly admitted to Feingold that one of his asset protection strategies was to selectively claim his wife was involved in his companies if it allowed him to make the company look like a multi-member LLC for multi-member protections, but in other instances he would change her involvement if her not being involved was to his benefit. In fact, Cardinale with the assistance of his wife intentionally kept no books and records nor resolutions nor corporate minutes of the two Defendant entities including as admitted in his wife's deposition, no formal meetings or records of the same and as she further showed in her deposition she was not even able to explain what the businesses did as they operated with no corporate formalities so that they could easily change records or claim to not have records in order to avoid liability and collectability depending on the circumstance.

69. Vania Cardinale could not articulate any legitimate purpose for the entities. Vania Cardinale repeatedly stated during her deposition in this case that she did not know anything about the entities, and that she would just sign any paperwork Cardinale would put in front of her even though Cardinale has also admitted it was possible that Vania Cardinale had signing authority over RVCNY, LLC bank accounts, had authority to sign agreements for RVCNY, LLC and it was possible that Vania Cardinale could log into bank accounts for RVCSI, LLC.

70. Vania Cardinale further testified at her deposition in this case to a complete lack of knowledge or understanding as to her involvement of her participation in these entities except for the obvious purpose of using her as a shield against creditors that she agreed to and that she is also the Trustee for the RVC L3 Family Trust but does not know what her duties are nor has she

participated in any meetings or any formalities thus showing the entities are frauds as real entities with real business purposes would follow the required business formalities.

71. Moreover, earlier, in 2019, Cardinale conveyed to Feingold that Cardinale used his entities and often included Vania Cardinale as a fake participant to protect himself as she had a past which would not provide any rationale to have her involved in businesses as she had no education or training in operating businesses and her work experience did not make her an appropriate candidate for anything other than using her name as a straw person. At one point, a clearing firm even raised an issue regarding Vania Cardinale being titled on an account as it appeared inappropriate, and which Cardinale reacted about the clearing firm comment and claimed that they should butt out of his personal affairs as the way he used his wife's name was for asset protection, that everyone knew she really had no business involvement other than Cardinale using her name as an asset protection ploy and that he felt it was a smart asset protection practice to use his wife's name in businesses. In fact, Vania Cardinale was getting paid compensation through an account normally only permitted to be paid to a licensed person being on such an account and Cardinale admitted to Feingold in multiple conversations regarding Vania Cardinale's usage in Cardinale's myriad of businesses including the example above. There were additional conversations between Feingold and Cardinale during which Cardinale stated that he used Vania Cardinale as a straw person to hide and protect assets and which others warned Cardinale that such conduct was troublesome. Further, Feingold is aware that RVCNY, LLC has changed its members/managers depending on the assets as Cardinale has admitted.

72. Cardinale has been aware of the Plaintiffs questioning his representations to them at least since 2021 and prior to the Plaintiffs questioning him, Cardinale also became concerned that other lawsuits and claims against him might be arising as stories in the press about one

business, Richmond Capital Group LLC (n/k/a RCG Advances LLC), began to arise indicating potential liabilities. Cardinale was and is an owner Richmond Capital Group LLC (n/k/a RCG Advances LLC) and has now taken to completely distance himself from that entity with the potential exposure arising from that entity from the FTC action, NY Attorney General action and other matters. Further, Cardinale also became aware of a number of his other investments not performing well, including his ventures in such businesses as real estate development, stocks such as Graphoid and individual businesses and he recognized that he might become the subject of lawsuits or government actions and hence he created transfers to fake entities that had no business purpose in order to avoid claims of creditors.

73. Cardinale has undergone a fraudulent practice of fraudulently conveying his assets as well as assets of Alternative Global Management LLC to RVCSI, LLC and RVCNY, LLC. Thus, for instance, Alternative Global Management LLC made management fee payments to RVCSI, LLC (between July 24, 2020 and April 8, 2022) of $3,263,055.05, and at his deposition Cardinale testified that RVCSI, LLC "received compensation" that was sent to it. Thus, Cardinale's dominated and controlled entities assisted Cardinale in diverting investor funds and/or payments which should have been paid to investors as part of their return on investment by accepting funds from L3 and/or Cardinale directly. As such, they are required to return the money received from the fraudulent activity.

74. In addition to the above-described acts, Cardinale paid unsubstantiated compensation to Vania Cardinale, and made unsubstantiated payments to other entities Cardinale created to assist in hiding the fraudulent activity described herein, including RVCNY, LLC and RVCSI, LLC.

75. Furthermore, Cardinale was aware of the fraudulent activity he engaged in herein, his breaches of fiduciary duty, his conversion and other improper conduct, and liability to the Plaintiffs, and has continued to use throughout RVCNY, LLC and RVCSI, LLC to defraud creditors and secret assets in order to evade liability to the Plaintiffs.

76. RVCNY, LLC and RVCSI, LLC are part and parcel to the activities of Cardinale, and his alter egos, and assisted Cardinale in committing the fraudulent and improper activities described herein and they are liable to the same extent as Cardinale for the damages of the Plaintiffs because they are merely alter egos of Cardinale.

77. **All conditions precedent to the filing of this action have been met, waived and/or excused.**

**COUNT I**
**PAYMENT OF FAIR VALUE**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC Under 6 Del. C. § 18-604)

78. Plaintiffs repeat and reallege the allegations in Paragraphs 1–77 as if fully stated herein.

79. On January 28, 2022, Feingold and Dazzo resigned as members and managers of Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, and Alternative Global Six LLC.

80. With that resignation, Plaintiffs demanded the fair value of their interest in these entities under Delaware law.

81. Cardinale received and acknowledged the resignations and the demands for the fair value of Plaintiffs' interests.

82. Cardinale has refused to comply with Delaware law and pay Plaintiffs fair value for their interests while admitting in open court here that Plaintiffs are owed their fair value.

Case 1:24-10601-EPK Doc 75-2 Filed 05/13/24 Page 56 of 364



83. Cardinale has taken complete control over the Alternative Named Entities, including all assets, records and bank accounts. Cardinale further refuses to pay fair value as required under Delaware law which said fair value would ultimately be paid directly to Plaintiffs if Cardinale had not completely seized control of all of the Alternative Named Entities and is thereby depriving Plaintiffs of their statutory mandated payment of fair value.

84. Upon information and belief, Cardinale is making payments out of the Alternative Named Entities without proper corporate approvals and treating all of said entities as his own when, in fact, any actions to be taken involving the Alternative Named Entities require corporate formalities and approvals which are being completely disregarded.

85. As a direct and proximate result of Cardinale's violation of his lawful obligations, Feingold and Dazzo have been damaged to the full extent of the fair value required to be paid under Delaware Code § 18-604 and additional damages incurred.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC)

86. Plaintiffs repeat and reallege the allegations in Paragraphs 1–85 as if fully stated herein.

87. As a manager of the Alternative Named Entities, Cardinale owes both members and fellow managers of these entities the basic fiduciary duties of care and loyalty, which includes good faith, oversight, and disclosure.

88. Cardinale breached his fiduciary duties by, among other things, failing to do the tasks which he represented that he was providing, failing to make material disclosures, concealment and by putting his personal interests above the interests of the entities or its members.

89. Cardinale further breached his fiduciary duty by, among other things, misappropriating funds from Alternative Global Management LLC.

90. Cardinale's breach of fiduciary duties proximately caused damages to Plaintiffs in an amount to be determined at trial.

**COUNT III**
**CONVERSION**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC)

91. Plaintiffs repeat and reallege the allegations in Paragraphs 1–90 as if fully stated herein.

92. Feingold and Dazzo remain as managers and members of Alternative Global Management LLC. As managers and members of that entity, Feingold and Dazzo have an equal ownership right and equal rights to access the bank accounts and all assets of that entity. Still, Cardinale, without authorization from Feingold and Dazzo, has taken funds from this account. Cardinale has also blocked Feingold and Dazzo from accessing these accounts to discover the amount taken.

93. Further, Cardinale is believed to have siphoned off at least $300,000 which benefited him and without approval by Plaintiffs in particular in one asset of Alternative Global Management LLC known as Alternative Spin and, upon information and belief, he is taking assets from the Alternative Numbered Entities without proper authorization and approval.

94. Cardinale has thus permanently deprived Feingold and Dazzo of these funds and any assets related thereto. This deprivation conflicts with Plaintiffs' ownership interests in the account and any assets related thereto.

95. Cardinale's conversion of these funds and any assets related thereto has proximately caused damages to Plaintiffs in an amount to be determined at trial.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
(Against Richard Cardinale, RVCSI, LLC and RVCNY LLC)

96. Plaintiffs repeat and reallege the allegations in Paragraphs 1–95 as if fully stated herein.

97. By stating to Feingold and Dazzo he had properly disclosed his conflicts of interest and his compensation and monetary benefits from the Alternative Named Entities with his investors in L3 Capital Income Fund, Cardinale made a false statement about a material fact.

98. When Cardinale made these false statements to Feingold and Dazzo, Cardinale intended that his false statement would induce Feingold and Dazzo to allow Cardinale to be a manager and member of the Alternative Named Entities.

99. In 2019, and right before incorporating Alternative Global Management LLC, a discussion was had between Plaintiffs and Cardinale about concerns that Cardinale would be a manager of Alternative Named Entities and a manager of L3 Capital Income Fund besides all of his various sources of compensation discussed and there were legal disclosures he needed to make. Cardinale stated that he knew his disclosure obligations, intended to make detailed disclosures, and that all of his roles and compensation would be disclosed to his investors in his income fund.

100. As described, Cardinale represented that he knew his disclosure obligations, and that he would make detailed disclosures, and that all his roles, compensation and monetary benefits would be properly disclosed to his L3 investors.

101. Now that litigation has begun, it has now been discovered that Cardinale never made such lawfully required disclosures and he misrepresented that he disclosed to keep Feingold and Dazzo as his co-managers in the Alternative Named Entities. Had Feingold and Dazzo known about Cardinale's material misrepresentations, as described herein, they would have never

commenced or continued to do any business with Cardinale as it is believed his failed disclosures are civil violations, if not worse.

102. In order to fraudulently induce Plaintiffs, Cardinale represented he was a successful real estate developer and largest developer in Leesburg, Florida and was making millions, when, in reality, Cardinale made no money in Leesburg, Florida.

103. In order to fraudulently induce Plaintiffs, Cardinale represented that he developed 20 apartment buildings in New York, when, in reality, he simply bought twenty low rent apartments and did not do any development.

104. In order to fraudulently induce Plaintiffs, Cardinale represented that he successfully developed a high-priced condo, when, in reality, Cardinale made no money, and was not successful.

105. In order to fraudulently induce Plaintiffs, Cardinale represented that he had an unblemished record in finance/real estate, when, in fact, Cardinale was sued about a failed real estate deal and has had constant issues with clients and parties in the brokerage community throughout his career.

106. In order to fraudulently induce Plaintiffs, Cardinale represented that he has a gold fund where people made six times their money and it was going public, when, in reality, no one has made money but Cardinale charging fees and the fund never went public. Nearly one year after this lawsuit has been filed, the gold fund still had not gone public (missing many promised dates of public filing) even though nearly two years before this lawsuit, Cardinale claimed that some investors had already six-timed their money.

107. In order to fraudulently induce Plaintiffs, Cardinale claimed he raised over $30 million for a company called Graphoid where all investors made money and that the company was

going public, when, in reality company never went public, he made money on the fees and his investors did not even make back their investment.

108. In order to fraudulently induce Plaintiffs, Cardinale claimed he produced a successful motion picture, when, in reality, no one made money but him for the fees he charged to raise the money.

109. In order to fraudulently induce Plaintiffs, Cardinale claimed he successfully ran multiple debt settlement companies, when, in reality, he made fees charging people to participate and raising money but the companies showed significant losses.

110. In order to fraudulently induce Plaintiffs, Cardinale claimed he made significant returns in the payday lending business with Sky Capital, when, in reality he lost millions, did not disclose the losses to his investors and paid money back to investors with returns from other deals in order to hide losses.

111. In order to fraudulently induce Plaintiffs, Cardinale claimed he had a successful sports bar operation in Leesburg, Florida, when, in reality, the business lost money and was shut down.

112. In order to fraudulently induce Plaintiffs, Cardinale claimed he had a high-end successful coffee shop in New York, when, in reality, the business never even opened and money was lost.

113. In order to fraudulently induce Plaintiffs, Cardinale claimed he was opening tattoo parlors and acquired the equipment, when, in reality, he was unable to open a single parlor.

114. In order to fraudulently induce Plaintiffs, Cardinale claimed he had a scrap metal operation in Brazil that was successful, when, in reality, it generated no profits.

115. In order to fraudulently induce Plaintiffs, Cardinale claimed he was a successful international developer including successful development of townhomes in Brazil, when, in reality, he did not make any money on the project.

116. In order to fraudulently induce Plaintiffs, Cardinale claimed that in 2006 he made so much money as a real estate developer that he could retire and was only working because he enjoyed training young people, when, in reality, he did not have enough success in real estate industry which would allow him to retire in 2006.

117. In order to fraudulently induce Plaintiffs, Cardinale also falsely represented his previous investment track record of investment returns as well as other investment returns, he was able to obtain. Cardinale also made this materially false representation with the intent of obtaining additional compensation for his purported investment expertise.

118. Cardinale made all these representations beginning in or about July 2019 and through November 2019, knowing they were false, with the intent of Plaintiffs relying on these representations with the objective to induce them into and continue the business relationship with Cardinale described herein.

119. Had Plaintiffs known about Cardinale's material misrepresentations they would have never commenced or continued to do any business with Cardinale as described herein and they would not have ceded a one-third interest in the Alternative Named Entities to him.

120. Feingold and Dazzo have been injured and damaged by justifiably relying on Cardinale's material misrepresentations and omissions in an amount to be determined at trial.

**COUNT V**
**FRAUDULENT MISREPRESENTATIONS**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC)

121. Plaintiffs repeat and reallege the allegations in Paragraphs 1–120 as if fully stated herein.

122. Feingold and Dazzo allowed Cardinale to be paid for administrative support for the Alternative Named Entities. Feingold and Dazzo allowed to be paid the monthly administrative expenses from L3 Capital Management with the understanding that all back-office services for the Alternative Named Entities were to be performed by Cardinale.

123. In addition, Cardinale received an advisory fee because of his representations of extensive business experience and success and oversight overall of all businesses through L3 Capital Advisors. Feingold and Dazzo allowed this "advisory fee" to cover Cardinale's claimed additional services. All the extra fees were a sham and Cardinale's representations of extensive business success were false.

124. Cardinale did not act as an advisor as he had agreed and he submitted false and inflated expenses to allow him to use an American Express Black Card and pay other personal expenses, none of which were for the Alternative Named Entities. Instead, the submitted expenses were for his personal expenses or expenses for his L3 Capital Income Fund which were not proper business expenses. In addition, Cardinale apparently did not use the billed administrative expenses to do all the books and records and services represented.

125. When Cardinale represented to Feingold and Dazzo these charges were for legitimate administration costs and legitimate advisory services, Cardinale knew these representations were false. Cardinale intended these false representations would induce Feingold and Dazzo to allow these illegitimate payments. Each month, Cardinale submitted a request for his fees and expense reimbursements and those reimbursements were materially false and used in part to defray his personal, non-business expenses.

126. In addition, Cardinale received an advisory fee through L3 Capital Advisors which was to compensate him for advising and operating the Alternative Named Entities operations and investments, among other fees, because of his false representations of extensive business experience and success and oversight over all the businesses, however, Cardinale now claims that he was not involved with the day-to-day operations, or "advising," and his role was to "raise capital."

127. Cardinale further omitted material facts related to his past experience with investors, business partners and in the financial industry. Indeed, Cardinale omitted the fact that he has received numerous complaints from customers, clients and business partners. Cardinale went even further to conceal these material omissions by stating that he had a "spotless record."

128. Feingold and Dazzo have suffered damages in justifiable reliance on Cardinale's material misrepresentations and omissions in an amount to be determined at trial.

**COUNT VI**
**CONSPIRACY TO COMMIT FRAUD**
(Against Richard Cardinale and Vania Cardinale)

129. Plaintiffs repeat and reallege the allegations in Paragraphs 1-128 as if fully stated herein.

130. Cardinale and Vania Cardinale agreed to perpetrate a fraud on Plaintiffs and agreed to a conspiracy to do an unlawful act or to do a lawful act by unlawful means.

131. Cardinale's participation in the conspiracy, overt acts in pursuit of the conspiracy and his various misrepresentations and omissions, are described herein.

132. Vania Cardinale was aware of some or all of Cardinale's false representations and omissions alleged herein in furtherance of the conspiracy.

133. Vania Cardinale participated in the conspiracy as well as personally benefiting thereby by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of over $1.3 million to L3 Capital Management and over $3 million to RVCSI, LLC ("Richard Vania Cardinale Staten Island") from Alternative Global Management LLC and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY, LLC and access to bank accounts for RVCSI, LLC.

134. Vania Cardinale engaged in overt acts in pursuit of the conspiracy as described herein, including, but not limited to, her actions and conduct in furtherance of Cardinale's sham entities described above, one of which received millions of dollars from Alternative Global Management LLC and another over $3 million, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the fraud and conspiracy, in which Cardinale directed funds from the Alternative Named Entities to be directed to, as well as receiving funds from various entities involved in this matter without providing services to, or on behalf of, such entities.

135. Feingold and Dazzo have suffered damages due to the acts performed by Cardinale and Vania Cardinale in an amount to be determined at trial.

## COUNT VII
## CIVIL CONSPIRACY

(Against Richard Cardinale and Vania Cardinale)

136. Plaintiffs repeat and reallege the allegations in Paragraphs 1-135 as if fully stated herein.

137. Cardinale and Vania Cardinale agreed to a conspiracy to do an unlawful act or to do a lawful act by unlawful means as described herein, including breaching the fiduciary duties alleged herein, conversion and other improper conduct alleged herein.

138. Cardinale's participation in the conspiracy, overt acts in pursuit of the conspiracy and his various breaches, conversion and other improper conduct, are described herein.

139. Vania Cardinale participated in the conspiracy as well as personally benefiting thereby by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of over $1.3 million to L3 Capital Management and over $3 million to RVCSI, LLC ("Richard Vania Cardinale Staten Island") from Alternative Global Management LLC and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY, LLC and access to bank accounts for RVCSI, LLC.

140. Vania Cardinale engaged in overt acts in pursuit of the conspiracy as described herein, including, but not limited to, her actions and conduct in furtherance of Cardinale's sham entities described above, one of which received millions of dollars from Alternative Global Management LLC and another over $3 million, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the breaches and conspiracy, in which Cardinale directed funds from the Alternative Named Entities to be directed to, as well as receiving funds from various entities involved in this matter without providing services to, or on behalf of, such entities.

141. Feingold and Dazzo have suffered damages due to the conspiracy and the acts performed in furtherance of it in an amount to be determined at trial.

**COUNT VIII**
**AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
(Against Vania Cardinale)

142. Plaintiffs repeat and reallege the allegations in Paragraphs 1-141 as if fully stated herein.

143. Cardinale owed a fiduciary duty to Plaintiffs by virtue of being a member and manager of the Alternative Names Entities.

144. Cardinale breached his fiduciary duties by, among other things, failing to do the tasks which he represented that he was providing, failing to make material disclosures, concealment and by putting his personal interests above the interests of the entities or its members.

145. Cardinale further breached his fiduciary duty by, among other things, misappropriating funds from Alternative Global Management LLC and the assets that Alternative Global Management LLC is entitled to.

146. Vania Cardinale had knowledge of these breaches as well as personally benefiting from them by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of over $1.3 million to L3 Capital Management and over $3 million to RVCSI, LLC ("Richard Vania Cardinale Staten Island") from Alternative Global Management LLC and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY, LLC and access to bank accounts for RVCSI, LLC.

147. Vania Cardinale substantially assisted the wrongdoing, by among other things, awareness of her role was part of an overall improper activity, assisting in concealment, executing

documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the breaches and scheme, in which Cardinale directed funds from the Alternative Named Entities to be directed to.

148. Feingold and Dazzo have suffered damages due to Vania Cardinale's aiding and abetting Cardinale's breach of fiduciary duty to Plaintiffs in an amount to be determined at trial.

## DEMAND FOR JURY TRIAL

149. Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Entering a judgment according to the relief sought;

B. Awarding Plaintiffs their monetary damages;

C. Awarding Plaintiffs their consequential damages;

D. Awarding Plaintiffs punitive damages;

E. Awarding Plaintiffs their costs and interest at the highest rate allowable under law; and

F. Entering such other further relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated: February 3, 2023

RESPECTFULLY SUBMITTED,

**DANIELS, RODRIGUEZ, BERKELEY, DANIELS & CRUZ P.A.**

By: */s/ Lorne E. Berkeley*
Lorne E. Berkeley, Esq.
Florida Bar No. 146099

4000 Ponce De Leon Blvd., #800
Coral Gables, Florida 33146
Telephone: (305) 448-7988
Facsimile: (305) 448-7978
LBerkeley@drbdc-law.com

**BROZYNSKI & DALTON, PC**
By:___*/s/ Bart Dalton*___________
Bart Dalton, Esq. (Pro Hac Vice)
Texas Bar No.: 24043418
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Telephone: (972)371-0679
Facsimile: (972) 637-9185
bart@bdlegalgroup.com

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**
By:___*/s/ Irwin Weltz*___________
Irwin Weltz, Esq. (Pro Hac Vice)
Thomas Scot Wolinetz, Esq.
Florida Bar No. 1001160
170 Old Country Road, Suite 310
Mineola, New York 11501
(516) 506-0561
Irwin@weltz.law
twolinetz@weltz.law

*Attorneys for Plaintiffs*
David Feingold and Michael Dazzo

# EXHIBIT A

**PART 2A OF FORM ADV: FIRM BROCHURE**

**L3 CAPITAL ADVISORS LLC**
**75 WALL STREET, SUITE 23R**
**NEW YORK, NEW YORK 10005**

**March 29,2019**

**This brochure provides information about the qualifications and business practices of L3 Capital Advisors LLC ("L3 Capital"). If you have any questions about the contents of this brochure, please contact us at (347) 223-7671. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.**

**Additional information about L3 Capital is also available on the SEC's website at www.adviserinfo.sec.gov.**

**L3 Capital is registered as an investment adviser with the SEC under the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act"). SEC registration does not imply a certain level of skill or training.**

## ITEM 2 – MATERIAL CHANGES

Except as described below, there have been no material changes made to the Brochure since L3 Capital's filing of its Brochure on March 30, 2018, however, L3 Capital has made some routine updates and clarifying changes to the Brochure, including those related to changes to the business of L3 Capital.

**Item 14 – Client Referrals and Compensation**

Item 14 was revised to add the following disclosure:

L3 Capital is a party to written solicitation agreements with third party solicitors whereby solicitors may introduce prospective clients to L3 Capital. Under these agreements, L3 Capital agrees to pay the solicitor a portion or percentage of the performance fee L3 Capital may be entitled to receive from certain clients who invest in one of the Private Investment Funds during the term of the agreement. A solicitor may be subject to conflicts of interest arising from these arrangements, because the payments might induce the solicitor to recommend an investment manager to a client which the solicitor might not otherwise recommend if there was no payment. L3 Capital enters into solicitation agreements, and pays fees under these agreements, in accordance with Rule 206(4)-3 under the Advisers Act. L3 Capital and the solicitors are not affiliated persons as defined in the Advisers Act.

**ITEM 3 - TABLE OF CONTENTS**


| | |
|---|---|
| ITEM 2: MATERIAL CHANGES | 1 |
| ITEM 3: TABLE OF CONTENTS | 2 |
| ITEM 4: ADVISORY BUSINESS | 3 |
| ITEM 5: FEES AND COMPENSATION | 5 |
| ITEM 6: PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT | 8 |
| ITEM 7: TYPES OF CLIENTS | 9 |
| ITEM 8: METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS | 10 |
| ITEM 9: DISCIPLINARY INFORMATION | 15 |
| ITEM 10: OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS | 16 |
| ITEM 11: CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING | 18 |
| ITEM 12: BROKERAGE PRACTICES | 19 |
| ITEM 13: REVIEW OF ACCOUNTS | 20 |
| ITEM 14: CLIENT REFERRALS AND OTHER COMPENSATION | 21 |
| ITEM 15: CUSTODY | 22 |
| ITEM 16: INVESTMENT DISCRETION | 23 |
| ITEM 17: VOTING CLIENT SECURITIES | 24 |
| ITEM 18: FINANCIAL INFORMATION | 25 |

# ITEM 4 – ADVISORY BUSINESS

L3 Capital Advisors LLC, a Delaware limited liability company ("L3 Capital") was founded in 2015 by Richard A. Cardinale to provide non-discretionary investment advisory services to the Private Investment Funds (as defined below).

Richard A. Cardinale is the sole owner and managing member of L3 Capital. As of December 31, 2018, L3 Capital manages regulatory assets under management of approximately $170,325,624, all on a non-discretionary basis.

L3 Capital is the managing member of and provides non-discretionary investment services to: L3 Cubed LLC, a Delaware limited liability company, launched in 2013 ("Private Investment Fund I"); Advanced Technology Select Fund LLC, a Delaware limited liability company, launched in 2015 ("Private Investment Fund II"); and Advanced Technology Select Fund II LLC, a Delaware limited liability company, launched in 2015 ("Private Investment Fund III"), Advanced Technology Select Fund III LLC, a Delaware limited liability company, launched in 2017 ("Private Investment Fund IV"), Advanced Technology Select Fund IV LLC, a Delaware limited liability company, launched in 2017 ("Private Investment Fund V"), Advanced Technology Select Fund V LLC, a Delaware limited liability company, launched in 2018 ("Private Investment Fund VI"), Advanced Technology Select Fund VI LLC, a Delaware limited liability company, launched in 2018 ("Private Investment Fund VII") and Advanced Technology Select Fund VII LLC, a Delaware limited liability company, launched in 2019 ("Private Investment Fund VIII"). L3 Capital is also the investment manager and provides non-discretionary investment advice to Mogo Industries LLC, a Delaware limited liability company, launched in 2013 ("Private Investment Fund IX") and Advanced Technology Fund LLC, a Delaware limited liability company, launched in 2014 ("Private Investment Fund X"; and together with Private Investment Fund I, Private Investment Fund II, Private Investment Fund III, Private Investment Fund IV, Private Investment Fund V, Private Investment Fund VI and Private Investment Fund VII, Private Investment Fund VIII and Private Investment Fund IX (the "Private Investment Funds"));

L3 Capital invests the net proceeds raised from the sale of membership interests (the "Interests") in the Private Investment Funds in equity securities of private companies located in the United States. L3 Capital concentrates largely on certain sectors, including the global technology, software and services sectors, but it has the option to invest in any company or companies that L3 Capital shall determine, in its sole discretion (all such securities are collectively referred to as "Issuer Securities" and the issuers thereof are collectively referred to as the "Issuers"). Such purchases may be accomplished through direct purchases from the holders thereof, through investments in various funds, limited liability companies, limited partnerships or other entities, or the Issuers, if possible (collectively, "Funds," and collectively with the Issuer Securities, the "Portfolio Securities"), and/or any other means that L3 Capital, in its sole discretion, so determines, including, but not limited to, through the entry of a forward contract or economic interest agreement with the holder(s) of any Portfolio Securities, without regard to excessive concentration or balance.

L3 Capital does not tailor its advisory services to the individual needs of investors in the Private Investment Funds ("Investors"). The terms and investment objectives and strategies applicable to the Private Investment Funds are set forth in a private placement memorandum provided to Investors or prospective Investors prior to the time of an investment.

L3 Capital has sole discretion over all decisions regarding each Private Investment Fund, such Private Investment Fund's Interests and the Portfolio Securities including, without limitation, when to buy, sell, and the price at which, Portfolio Securities will be purchased and/or sold, and whether to have membership interests redeemed by the Company and/or sold to third parties, and, in such case, at what redemption and/or sale prices. It currently does not have discretion to invest in any Portfolio Securities without the approval of Investors since L3 Capital currently conduct closings of the purchase and sale of Interests of a particular Private Investment Fund concurrently with the purchases of Portfolio Securities; though L3 Capital may, in its sole discretion, elect to conduct closings of a particular Private Investment Fund at any time in which cleared funds and accepted subscriptions have been received from prospective Investors. In addition, L3 Capital currently undertakes to invest all Portfolio Securities for a particular Issuer purchased on a particular date in a separate Series or sub-Series of Interests of a particular Private Investment Fund. See the discussion in Item 8, Methods of Analysis, Investment Strategies and Risk of Loss. The Private Investment Funds are open only to certain financially sophisticated and high net-worth individuals and entities, as more fully discussed in Item 7, Types of Clients.

# ITEM 5 – FEES AND COMPENSATION

The Private Investment Funds offer interests only to certain qualified investors and admission to these Private Investment Funds is not open to the general public. Investors in each Private Investment Fund generally must be "accredited investors" under Rule 501 of Regulation D of the Securities Act of 1933, as amended, and either "qualified clients" as such term is defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended (the "Advisers Act") or "qualified purchasers" as such term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). Investors and prospective Investors should refer to the confidential private offering memorandum for the appropriate Private Investment Funds for a detailed description of the applicable investor qualifications and fees.

L3 Capital receives a management fee for the Private Investment Funds it acts as a manager equal to two percent (2%) of the gross proceeds received from Investors, including additions to capital over the life of a Private Investment Fund (the "Management Fee"). The Management Fee is payable in advance upon closing of the sale of Interests in a Private Investment Fund to the Investors. L3 Capital does not receive any Management Fee for any services provided to Private Investment Fund IX and Private Investment Fund X, however, the Managing Member (as defined herein) receives such fees as part of his ownership interest in each of the respective managers of such entities.

L3 Capital is also eligible to receive a performance-based fee (the "Performance Fee") from the Investors in Private Investment Fund I, Private Investment Fund II and Private Investment Fund III, Private Investment Fund IV, Private Investment Fund V, Private Investment Fund VI, Private Investment Fund VII and Private Investment Fund VIII, equal to 10% of profits, subject to the general requirement that an amount in excess of 100% of the Investor's capital contributions be received prior to any Performance Fee being paid. The Performance Fee, if any, will be determined as of the time any distributions are made to the Investors. The calculation of the Performance Fee is complex, and Investors and prospective Investors should carefully review the more detailed terms of the Performance Fee set forth in the relevant Private Investment Fund's offering and governing documents. L3 Capital does not receive any Performance Fee for any services provided to Private Investment Fund VIX and Private Investment Fund VX, however, the Managing Member (as defined herein) receives such fees as part of his ownership interest in each of the respective managers of such entities.

The portions of the Management Fees and Performance Fees borne by Investors are deducted from Investor assets in the respective Private Investment Fund. Investors do not have the ability to choose to be billed directly for fees incurred.

Management Fees and Performance Fees are not negotiable but may be waived or modified in the sole discretion of L3 Capital, in the case of Private Investment Fund I, Private Investment Fund II Private Investment Fund III, Private Investment Fund IV, Private Investment Fund V, Private Investment Fund VI, Private Investment Fund VII and Private Investment Fund VIII and the applicable investment manager of Private Investment Fund VIX and Private Investment Fund VX.

L3 Capital is also entitled to the reimbursement of various expenses paid on behalf of each Private Investment Fund, which include, but are not limited to, investment expenses (e.g. brokerage commissions, clearing and settlement expenses, custodial fees), legal expenses, internal and external accounting, audit and tax preparation expenses, costs of printing and mailing reports and notices to Investors, costs of third party administrators, consultants, and extraordinary expenses, if any ("Administrative Fees"). Expenses of between $50,000-$75,000 per year are anticipated per Series (including all sub-Series) in each Private Investment Fund, and L3 Capital typically creates a reserve per Series (including any sub-Series) sufficient to cover expenses for a period of two (2) years to cover Administrative Fees. If there is more than one purchase of Portfolio Securities (as defined herein) per Issuer (as defined herein) in a particular Private Investment Fund which results in the creation of a sub-Series, all such sub-Series of such Private Investment Fund associated with a single Issuer will have a combined maximum expense of between $50,000 and $75,000 per year per Series. In the event a liquidity event does not occur within 24 months and a Private Investment Fund does not use all of the reserves set aside to cover the Administrative Fees during this two year period, L3 Capital intends to use any excess reserves to cover any additional Administrative Fees which a Private Investment Fund may occur until a liquidity event takes place. In the event a liquidity event occurs for a particular Series (or any sub-Series) of a Private Investment Fund and such Private Investment Fund has not used all of the reserves previously set aside to cover Administrative Fees, such reserves will be returned to the Investors of a Series in a Private Investment Fund on a pro rata basis upon such liquidity event. Amounts reserved for Administrative Fees will not be available for the purchase of Portfolio Securities. Each Private Investment Fund is obligated to pay out of the gross proceeds of any offering of Interests (each, an "Offering") the fees and expenses of the Offering, including initial legal expenses (excluding any fees payable for the registration or qualification of the Interests being sold thereunder). Such fees and expenses will be paid out of the gross proceeds of any amounts raised and accordingly, such funds will not be available to purchase Portfolio Securities. A Private Investment Fund may incur additional legal costs in the future, including any costs associated with the acquisition of Portfolio Securities by a Series (or Sub-Series) of a Private Investment Fund. There can be no assurance that a Private Investment Fund will be able to earn sufficient income to offset these charges.

The Managing Member is also a registered representative at a registered broker-dealer who has been engaged from time to time by each of the Private Investment Funds to provide various investment banking services in the ordinary course of business, for which such registered broker-dealer received and may continue to receive customary fees and commissions. In connection with any Offering undertaken by a Private Investment Fund, the Managing Member may receive a portion of any such fees received by such broker-dealer. Investors and prospective Investors should refer to the confidential private offering memorandum for the appropriate Private Investment Funds for a detailed description of the applicable fees payable to placement agent(s) for services rendered. Please refer to Item 10 of this Brochure for a description of L3 Capital's other financial industry activities and affiliations.

L3 Capital recognizes that it is a fiduciary and as such must act in the best interests of its clients. Further, L3 Capital recognizes that it must treat all clients fairly and must refrain from favoring one client's interests over another's. L3 Capital regularly assesses the allocation of its resources, including investment personnel, among its clients to ensure adherence to its fiduciary duties.

**IT IS CRITICAL THAT INVESTORS REFER TO THE RELEVANT OFFERING AND PRIVATE INVESTMENT FUND GOVERNING DOCUMENTS FOR A COMPLETE UNDERSTANDING OF APPLICABLE FEES AND EXPENSES. THE INFORMATION CONTAINED HEREIN IS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY SUCH DOCUMENTS.**

## ITEM 6 – PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT

As described in Item 5 above and in the relevant Private Investment Fund's offering and governing documents, L3 Capital is eligible to receive performance-based compensation from the Private Investment Funds. It should be noted that such a compensation arrangement may create an incentive for L3 Capital to make investments that are riskier or more speculative than would be the case if such arrangements were not in effect.

L3 Capital presently provides investment advisory services only to the Private Investment Funds and each is subject to a performance-based fee. As such, the conflict of interest related to managing accounts that charge performance-based fees alongside accounts that do not charge performance-based fees does not currently apply to L3 Capital.

## ITEM 7 – TYPES OF CLIENTS

L3 Capital manages and provides investment advisory services to the Private Investment Funds. Investors must meet the eligibility provisions outlined in Item 5, above. Any initial and additional subscription minimums in an Offering conducted by any particular Private Investment Fund are disclosed in the relevant offering documents.

## ITEM 8 – METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

The investment strategies, methods of analysis and material risks applicable to an investment in the Private Investment Funds are set forth in detail in a confidential private placement memorandum or similar document provided to prospective Investors. A brief summary is provided below.

**AN INVESTMENT IN A PRIVATE INVESTMENT FUND MAY BE DEEMED SPECULATIVE AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM. SUCH INVESTMENTS ARE APPROPRIATE FOR ONLY EXPERIENCED AND SOPHISTICATED PERSONS WHO MEET CERTAIN ELIGIBILITY CRITERIA, ARE ABLE TO BEAR THE RISK OF LOSS OF SOME OR ALL OF AN INVESTMENT, AND HAVE A LIMITED NEED FOR LIQUIDITY.**

Each Private Investment Fund is a special purpose investment vehicle organized to purchase restricted securities issued by Issuers. Such purchases may be accomplished through direct purchases from the holders thereof, through investments in the purchases of various funds, limited liability companies, limited partnerships or other entities, or the Issuers, if possible (collectively, "Funds," and collectively with the Issuer Securities, the "Portfolio Securities"), and/or any other means L3 Capital, in its sole discretion, so determines, including, but not limited to, through the entry of a forward contract or an economic interest agreement with the holder(s) of any Portfolio Securities, without regard to excessive concentration or balance, and may, in its sole discretion, pursue opportunities for liquidity in the Portfolio Securities by any method available, including but not limited to, redemption or sale of the Interests of a particular Private Investment Fund, individually or as a group, a sale of the entire Private Investment Fund or by any other methodology (the "Investment Objective"). Each Private Investment Fund may invest the net proceeds in any Offering of Interests in Portfolio Securities directly or through the use of financial intermediaries (including other broker dealers) and pay fees and commissions on a case-by-case basis, in L3 Capital's discretion. The fees payable to any financial intermediary may be built into the purchase price of any Portfolio Securities to be purchased by a Private Investment Fund.

The membership interests of a particular Private Investment Fund are issued in one or more series (each, a "Series") or sub-Series. Each Private Investment Fund is organized as a series limited liability company, such that a prospective Investor may purchase membership interests in separate Series or sub-Series created by L3 Capital from time-to-time that are established to hold separate and distinct investments. Each Series shall invest in Portfolio Securities of one Issuer and shall not hold any other securities of a different Issuer. In addition, L3 Capital may, from time-to-time, establish additional Series for the purpose of making separate and distinct investments in specific companies identified by L3 Capital or to purchase securities in such companies from secondary sources, or to invest in interests of investment funds whose portfolios are comprised of companies consistent with a Private Investment Fund's Investment Objective, each of which Series will each remain segregated from one another. The books and records of each Series (and the purchases and sales of Portfolio Securities and related gains and/or losses that are reflected therein) will be maintained separately for each Series of Interests. In the event that a Private Investment Fund purchases Portfolio Securities in same Issuer represented by a particular Series at different prices,

or in a manner inconsistent in any way whatsoever with a prior purchase, a Private Investment Fund may create additional "sub-Series" which will be treated as unique Series for the purposes of profits, losses, tax treatment, and all other legal benefits afforded to a Series under Delaware law.

L3 Capital has sole discretion over all decisions regarding each Private Investment Fund, such Private Investment Fund’s Interests and the Portfolio Securities including, without limitation, when to buy, sell and the price at which Portfolio Securities will be purchased and/or sold, and whether to have membership interests redeemed by the Company and/or sold to third parties, and, in such case, at what redemption and/or sale prices. It currently does not have discretion to invest in any Portfolio Securities without the approval of Investors since L3 Capital currently conducts closings of the purchase and sale of Interests of a particular Private Investment Fund concurrently with the purchases of Portfolio Securities by such Private Investment Fund; though L3 Capital may, in its sole discretion, elect to conduct closings of a particular Private Investment Fund at any time in which cleared funds and accepted subscriptions have been received from prospective Investors. In addition, L3 Capital currently undertakes to invest in all Portfolio Securities for a particular Issuer purchased on a particular date by way of a separate Series or sub-Series of membership interests of a particular Private Investment Fund.

L3 Capital currently intends to disburse any Portfolio Securities in a particular Series in a Private Investment Fund to Investors of such Series in the event of an initial public offering by an Issuer after the expiration of any applicable restriction period.

**General Risks associated with the Private Investment Funds**

**NO ASSURANCE OF PROFIT, CASH DISTRIBUTIONS OR APPRECIATION.** There can be no assurance that an investment in an Issuer and/or a Fund, once made by a Private Investment Fund, will be profitable or will have economic value. There can be no assurance that a Private Investment Fund’s investments will be profitable and there is a substantial risk that a Private Investment Fund’s losses and expenses will exceed its income and gains. Consequently, there can be no assurance that a Private Investment Fund’s investments will result in distributions to the Investors, or that a Private Investment Fund will be able to liquidate its investments on favorable terms.

**THERE CAN BE NO ASSURANCE THAT A PRIVATE INVESTMENT FUND WILL BE ABLE TO PURCHASE AND/OR SELL ISSUER SECURITIES AND/OR FUNDS AT ADVANTAGEOUS PRICES, IF AT ALL, OR THAT IT WILL ACHIEVE ITS INVESTMENT OBJECTIVE. INVESTORS MAY LOSE THEIR ENTIRE INVESTMENT.** There can be no assurance that a Private Investment Fund will be successful in purchasing and/or selling Portfolio Securities and/or Funds at advantageous prices, if at all, or that any investment by a Private Investment Fund in Portfolio Securities will prove to be profitable. Each Private Investment Fund is a newly formed entity with no performance record. Investors should be aware that there is a risk that a Private Investment Fund may not be able to locate and/or purchase Portfolio Securities at prices that are advantageous or at any price and they may lose their entire investment in a Private Investment Fund. If a Private Investment Fund does not make any investment in Portfolio Securities, a Private Investment Fund will dissolve in accordance with its applicable Operating Agreement. Moreover, even if a Private Investment Fund is able to purchase Portfolio

Securities, there can be no assurances it will be able to directly and/or indirectly sell such securities at prices above that paid by a Private Investment Fund, if at all. Accordingly, membership interests should represent only a small portion of an Investor's overall investment portfolio and net worth as the purchase of Member Interests is a highly risky investment and Investor could lose their entire investment.

**IF A PRIVATE INVESTMENT FUND ENTERS INTO ANY FORWARD CONTRACT(S) OR ECONOMIC INTEREST AGREEMENT(S) FOR THE PURCHASE OF PORTFOLIO SECURITIES, IT MAY EXPOSE US TO UNEXPECTED RISKS AND POTENTIAL LOSSES.** The purchase of any Portfolio Securities may be accomplished by means of a contract with a prospective seller for the purchase of any such Portfolio Securities at a future date, subject to the satisfaction of certain conditions, otherwise known as a "Forward Contract" or an "Economic Interest Agreement". The closing on any forward contract or economic interest agreement which a Private Investment Fund will enter into will typically require the satisfaction and removal of any transfer restrictions which any Portfolio Securities may be subject at the time of entering into the forward contract or economic interest agreement. Any forward contract or economic interest agreement a Private Investment Fund may enter into will be individually negotiated and non-standardized. Until such time as any Portfolio Securities subject to a forward contract or economic interest agreement are transferred, a Private Investment Fund is subject to default risk and, if an event of default occurs, we may have to incur additional costs to enforce the contract. These factors could subject us to increased costs and/or loss of an investment.

**BECAUSE NO PUBLIC MARKET EXISTS FOR THE INTERESTS OF EACH PRIVATE INVESTMENT FUND AND L3 CAPITAL HAS NO INTENTION OF SEEKING TO REGISTER SUCH INTERESTS OF ANY PRIVATE INVESTMENT FUND FOR RESALE OR APPLY FOR A LISTING OF THE INTERESTS ON A TRADING MEDIUM, IT WILL BE EXTREMELY DIFFICULT FOR INVESTORS TO RESELL THEIR INTERESTS OF ANY PRIVATE INVESTMENT FUND.** Because there is no public market for the Interests of any Private Investment Fund and no plan or intention for there to ever be one, the resale of the Interests of any Private Investment Fund is highly restricted and extremely limited and is further subject to the additional limitations and is governed by the terms of a Private Investment Fund's Operating Agreement, which must be carefully read and fully understood before purchasing Interests. No Investor should purchase Interests of any Private Investment Fund if such Investor cannot afford to hold the Interests indefinitely. Furthermore, if an Investor who purchases Interests of any Private Investment Fund should have a change in his or her liquidity requirements and be forced to have to seek to sell the Interests, it will be very difficult for such Investor to sell the Interests of any Private Investment Fund promptly, it at all, and the likely sale price one could expect to receive if a sale could be effectuated may be at a substantial discount to the purchase price paid for such Interests.

**CONCENTRATION OF INVESTMENT.** Each Private Investment Fund was formed for the purpose of purchasing Portfolio Securities without regard to excessive concentration, balance or other limitations normally associated with portfolio management practices. A Private Investment Fund may have all or a majority of its proceeds invested directly and/or indirectly in one or a limited number of Portfolio Securities. Given the potential concentration of a Private Investment Fund's investments, and the potential concentration of any Private Investment Fund's investments, the

value of an investment in a Private Investment Fund may be subject to greater volatility and may be more susceptible to any single economic, political or regulatory occurrence than would be the case if a Private Investment Fund's investments were more diversified.

**NO CONTROL OVER THE ISSUERS, ISSUER SECURITIES AND/OR ANY FUNDS OR THEIR RESPECTIVE CURRENT OR FUTURE VALUATIONS.** A Private Investment Fund will be an owner of restricted securities of the Issuers and/or Funds, and will have no control over any Issuers and/or any Funds. Further, the value of a Private Investment Fund's investment in any Issuer and/or Funds, will be dependent upon the performance of the Issuers. A Private Investment Fund does not receive any disclosure from the Issuers and it does not receive, nor does it have access to, any public or non-public, verifiable information that would allow it to justify the current or future valuations of any Portfolio Securities it purchases. A Private Investment Fund will not have any control over the management of any Issuer or any Fund, and the success of any investments it makes in Portfolio Securities depends, in large part, on the ability and success of the management of any Issuer and/or any Fund, in addition to economic and market factors. The Issuer's services or products that are not yet developed or ready to be marketed or that have no established market, may be operating at a loss or have significant fluctuations in operating results, may be engaged in a rapidly changing business, may require substantial additional capital to support their operations, to finance expansion or to maintain their competitive position, or otherwise may have a weak financial condition. There is a limited, negotiated market for Portfolio Securities. Accordingly, valuations may fluctuate considerably and the valuations of the Portfolio Securities that are negotiated by a Private Investment Fund may bear limited or no relationship to future valuations of such Portfolio Securities or the specific Issuer in any market that may develop for the Portfolio Securities, whether private or public.

**THE COMPETITION FOR INVESTMENT IN ISSUERS IS INTENSE.** A Private Investment Fund is aware that there are many other entities and persons that have invested and are seeking to raise capital to invest in Portfolio Securities, many of which have substantially more funds than a Private Investment Fund may have. Such competition may limit a Private Investment Fund's ability to acquire Issuer Securities at advantageous prices, if at all, which may, in turn, result in a reduction on the return on Investors' investments or a complete loss of the Investors' investments.

**LIMITED LIQUIDITY OF PORTFOLIO SECURITIES.** In the event that L3 Capital determines (in its sole discretion) to make distributions of Portfolio Securities (which such distribution shall be subject to and limited by federal and state securities laws), there is no current market through which the Portfolio Securities may be sold, and even if there were such a market, the transfer and/or sale of Portfolio Securities would be subject to significant restrictions. In addition, the Portfolio Securities will not be registered under Federal securities laws or qualified under any state securities law and are being sold in reliance upon exemptions under such laws. Unless the Portfolio Securities are registered for resale with the SEC and any required state authorities, or an appropriate exemption from registration is available, members who receive Portfolio Securities in any distribution by a Private Investment Fund may be unable to liquidate such securities, even though his or her personal financial condition may dictate such liquidation. Moreover, the resale of any Portfolio Securities following a distribution of Portfolio Securities will be subject to Rule 144 of the Securities Act and Members intending to sell Portfolio Securities distributed to them by a Private Investment Fund may be required to aggregate their sales of

Portfolio Securities with sales made by a Private Investment Fund and other Members for some period of time following the distribution of such securities by a Private Investment Fund. Therefore, prospective Investors who require liquidity in their investments should not invest in the Member Interests.

**NO ASSURANCE OF AN INITIAL PUBLIC OFFERING OR OTHER LIQUIDITY EVENT IN ANY PORTFOLIO SECURITIES.** Although investments in Portfolio Securities may offer the opportunity for gains, such investments involve a high degree of business and financial risk that can result in substantial losses. L3 Capital currently intends to disburse any Portfolio Securities in a particular Series to Members of such Series in the event of an initial public offering by an Issuer after the expiration of any applicable restriction period. However, no public market exists for any Portfolio Securities and no assurance can be given that an initial public offering or other liquidity event will be consummated by the Issuer in the future. If such an event does not occur, Investors may lose their entire investment.

**RELIANCE ON L3 CAPITAL; MEMBERS HAVE NO VOTING OR DISPOSITIVE POWER OVER THE ISSUER SECURITIES.** All decisions regarding management of a Private Investment Fund including, but not limited to, the purchase price of Portfolio Securities and which to sell and at what price the Portfolio Securities will be sold, will be made by and in the sole discretion of L3 Capital, and the Members will have no right to take part in the management of a Private Investment Fund. All rights, preferences, privileges and restrictions with respect to the Portfolio Securities, including registration rights and other decisions that holders of Portfolio Securities may have, will belong to a Private Investment Fund and will be the sole responsibility of and made by L3 Capital, in its sole discretion, and the Members will have no ability to make any decisions with respect thereto. No Member will have the right to either vote or dispose of any of the Portfolio Securities owned by a Private Investment Fund. The determination to make distributions, whether in cash, in kind, or a combination thereof, will be made at the sole discretion of L3 Capital, even if the Portfolio Securities have been registered for resale under the Securities Act. In addition, no Member will have the right to withdraw all or any amount of its investment in a Private Investment Fund (either in cash or in the form of Portfolio Securities) at any time without the prior consent of L3 Capital, which consent may be withheld for any reason or no reason. Accordingly, no party should make any investment in a Private Investment Fund unless such party is willing to entrust all aspects of a Private Investment Fund's management to L3 Capital.

**THE OPERATING AGREEMENT OF EACH PRIVATE INVESTMENT FUND CONTAINS RESTRICTIONS ON THE MEMBERS' RIGHTS TO WITHDRAW THEIR CAPITAL.** The Operating Agreement of each Private Investment Fund contains restrictions on the Members' rights to withdraw capital from their capital accounts. Members will not be permitted to withdraw capital without the prior consent of L3 Capital, which consent may be withheld for any reason or no reason in L3 Capital's sole discretion. Therefore, prospective Investors who require liquidity in their investments should not invest in the Interests of a particular Private Investment Fund.

## ITEM 9 –DISCIPLINARY INFORMATION

To the best of our knowledge, there are no legal or disciplinary events that are material to a client's or prospective client's or an Investor's or potential Investor's evaluation of L3 Capital's advisory business or the integrity of L3 Capital's management.

## ITEM 10 – OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

Richard A. Cardinale, the managing member of L3 Capital (the "Managing Member") and Phillip McKie, the chief compliance officer of L3 Capital, are each a registered representative of PHX Financial, Inc., a FINRA-registered broker/dealer ("PHX") who has been engaged from time to time by each of the Private Investment Funds to provide various investment banking services in the ordinary course of business for which they have received and may continue to receive customary fees and commissions. In connection with any Offering undertaken by a Private Investment Fund, the Managing Member may receive a portion of any such fees received by such broker-dealer. Investors and prospective Investors should refer to the confidential private offering memorandum for the appropriate Private Investment Funds for a detailed description of the applicable fees payable to placement agent(s) for services rendered. Except as set forth above, neither L3 Capital nor its management persons are registered or have an application pending to register as a broker-dealer or registered representative of a broker-dealer.

Neither L3 Capital nor its management persons are registered or have an application pending to register as a futures commission merchant, commodity pool operator, commodity trading advisor, or an associated person of the foregoing entities.

L3 Capital, PHX and their respective affiliates may engage for their own accounts and/or for the accounts of others, including other Investors, in all aspects of the investment business, including, without limitation, making investments outside of the Private Investment Fund's in the same or other securities (on the same or different terms from those offered to a Private Investment Fund), establishing other investment funds, and/or the management of investments. L3 Capital, PHX and/or their respective affiliates may begin or continue such activities, individually, jointly with others, and/or as owners or managers of any person, regarding the same types of investments in which a Private Investment Fund may likewise be investing; may deal with a Private Investment Fund as counter-parties or through any other person in which they may be interested; may sell securities to or buy securities from a Private Investment Fund; may participate in other investment funds, as Investors or otherwise; and shall not be required to permit a Private Investment Fund or the Members to participate in any other funds or investments in which L3 Capital, PHX or any of their respective affiliates may be interested or share in any profits or other benefits therefrom. Therefore, situations may arise in which the interests of L3 Capital, PHX and/or their respective affiliates could conflict with the interests of a Private Investment Fund and/or its Members.

L3 Capital will manage each Private Investment Fund and L3 Capital and related parties to L3 Capital may manage other private investment funds, and/or provide investment advisory services to clients, each of which may seek to purchase and sell Issuer Securities. The Managing Member is also a registered representative at PHX and may engage in other activities and allocate his time, services and functions between various existing enterprises and future enterprises. This could detract from the time and attention necessary to operate L3 Capital and a Private Investment Fund.

The Managing Member may work with personnel at PHX as well as third-party providers to, among other related items, assist in certain management, administrative and investment decisions when and if applicable, although none of such providers will exercise control over a Private Investment Fund or L3 Capital. In addition, except for the Managing Member, neither PHX nor its registered representatives are and/or will be involved in or have any authority over the management of a Private Investment Fund and/or L3 Capital or in any investment decisions of L3 Capital. The relationships between the Managing Member, L3 Capital, a Private Investment Fund and PHX could create a conflict of interest between PHX and its affiliates, on the one hand, and the Investors in this offering, on the other hand. L3 Capital and related parties will seek to resolve these conflicts in as equitable a manner as possible under the prevailing facts and circumstances, but there is no assurance that any such conflicts will be resolved in a manner advantageous to a Private Investment Fund and the Investor. The Managing Member may engage in other activities and allocate its time, services and functions between various existing enterprises and future enterprises.

## ITEM 11 – CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

L3 Capital's Code of Ethics (the "Code") is designed to meet the requirements of Rule 204A-1 of the Investment Advisers Act of 1940 (the "Advisers Act"). The Code applies to L3 Capital's "Access Persons." Access Persons include, generally, any employee or other supervised person of L3 Capital who, in relation to L3 Capital's advisory clients, (1) has access to non-public information regarding any purchase or sale of securities, or non-public information regarding securities holdings, or (2) is involved in making securities recommendations, executing securities recommendations, or has access to such recommendations that are non-public. All L3 Capital employees are deemed to be Access Persons.

The Code sets forth a standard of business conduct that takes into account L3 Capital's status as a fiduciary and requires Access Persons to place the interests of the advisory clients and Investors above their own interests and the interests of L3 Capital. The Code requires Access Persons to comply with applicable federal securities laws. Further, Access Persons are required to promptly bring violations of the Code to the attention of L3 Capital's Chief Compliance Officer, Phillip McKie (the "Chief Compliance Officer" or his designee). All Access Persons are provided with a copy of the Code and are required to acknowledge receipt and understanding of the Code upon hire and on at least an annual basis thereafter.

The Code also sets forth certain reporting and pre-clearance requirements with respect to personal trading by Access Persons. Access Persons must provide the Chief Compliance Officer with a list of their personal accounts and an initial holdings report within 10 days of becoming an Access Person. In addition, Access Persons must provide annual holdings reports and quarterly transaction reports in accordance with Advisers Act Rule 204A-1.

The Code also seeks to ensure the protection of nonpublic information about the activities of the Advisory Clients. Investors or prospective Investors may obtain a copy of the Code by contacting the Chief Compliance Officer at (718) 607-7625.

L3 Capital and the Managing Member can be said to recommend interests in the Private Investment Funds to prospective Investors. L3 Capital and the Managing Member have a material financial interest with respect to fees paid by Investors. The Performance Fees described in Item 5, above, may create an incentive for L3 Capital to make investments that are riskier or more speculative than in the absence of such compensation.

# ITEM 12 – BROKERAGE PRACTICES

L3 Capital has authority to select the broker-dealer to be used in each transaction for the Private Investment Funds and for negotiating the fees to be paid to the broker-dealer in connection with such transactions. L3 Capital recognizes its duty to obtain "best execution." Consistent with such duty, in determining best execution, L3 Capital takes into account the full range and quality of a broker-dealer's services. L3 Capital does not select broker-dealers solely on the basis of lowest possible commission costs, but by the best qualitative execution.

Consideration is given to a variety of factors, including but not limited to the following:

- Commission rates
- Reliability
- Financial responsibility
- Strength of the broker and the ability of the broker to efficiently execute transactions
- The broker's facilities
- The broker's provision or payment of the costs of brokerage and research services that are of benefit to L3 Capital or its clients or affiliates

L3 Capital may consider a broker-dealer's ability to provide L3 Capital with the opportunity to participate in capital introduction events sponsored by the broker-dealer and to refer Investors to the Funds. It should be emphasized that L3 Capital does not select broker- dealers solely in return for referrals. L3 Capital recognizes that it may have an incentive to favor broker-dealers that provide capital introduction services to L3 Capital or refer Investors. L3 Capital receives asset-based fees and accordingly would receive a financial benefit from the increase in assets under management that result from capital introduction services and Investor referrals. Similarly, L3 Capital's affiliate receives a performance-based allocation and accordingly could receive a larger performance-based allocation in any given profit period as a result of an increase in assets under management that results from capital introduction services and Investor referrals. The potential for higher fees presents a potential conflict in that L3 Capital has an incentive to favor broker-dealers that provide services that have a direct impact on fees even if those broker-dealers rate unfavorably in other categories.

While L3 Capital's primary consideration in allocating portfolio transactions to broker-dealers is to obtain favorable prices and efficient executions, L3 Capital does not have an obligation to, and does not always seek to, obtain the lowest priced execution regardless of qualitative considerations.

It should be specifically noted that the Private Investment Funds do not typically invest in the types of securities that are traded on an exchange and do not generate commissions or "soft dollars."

L3 Capital does not have directed brokerage arrangements.

## ITEM 13 – REVIEW OF ACCOUNTS

The investment portfolios of the Funds are under constant review by L3 Capital's Managing Member. Such reviews include a review of adherence to the Funds' investment objective, strategies, target capacity and risk. Any proposed deviations from the Funds' investment guidelines or strategies will be discussed with the Chief Compliance Officer to determine if consent of the Private Investment Funds and/or Investors is necessary.

Investors in the Private Investment Funds receive annual audited financial statements within 90 days of the fiscal year-end. In addition, Private Investment Fund Investors receive tax reports relating to their investments.

## ITEM 14 – CLIENT REFERRALS AND COMPENSATION

L3 Capital is a party to written solicitation agreements with third party solicitors whereby solicitors may introduce prospective clients to L3 Capital. Under these agreements, L3 Capital agrees to pay the solicitor a portion or percentage of the performance fee L3 Capital may be entitled to receive from certain clients who invest in one of the Private Investment Funds during the term of the agreement. A solicitor may be subject to conflicts of interest arising from these arrangements, because the payments might induce the solicitor to recommend an investment manager to a client which the solicitor might not otherwise recommend if there was no payment. L3 Capital enters into solicitation agreements, and pays fees under these agreements, in accordance with Rule 206(4)-3 under the Advisers Act. L3 Capital and the solicitors are not affiliated persons as defined in the Advisers Act.

## ITEM 15 – CUSTODY

L3 Capital is deemed to have custody of Fund assets pursuant to Advisers Act Rule 206(4)-2 (the "Custody Rule"). As the Private Investment Funds invest all, or substantially all, of their assets in the Portfolio Securities of the Issuers, L3 Capital generally will be exempt from the requirement that securities be maintained with a "qualified custodian" for the Private Investment Funds. In the future, if the Private Investment Funds' investments in private and illiquid assets involve securities that are certificated, but also are (i) acquired from the issuer in a transaction or chain of transactions not involving any public offering and (ii) transferable only with prior consent of the issuer or holders of the outstanding securities of the issuer, L3 Capital will maintain such certificates with a qualified custodian.

To ensure compliance with the Custody Rule, L3 Capital arranges for the Private Investment Funds to be audited annually by an independent public accountant and distributes audited financial statements to all Investors within 90 days of the end of the Private Investment Funds' fiscal years. Investors should carefully review such audited financial statements.

## ITEM 16 – INVESTMENT DISCRETION

The terms and investment objectives and strategies applicable to the Private Investment Funds are set forth in a private placement memorandum provided to Investors prior to the time of an investment. While L3 Capital has sole discretion over all decisions regarding each Private Investment Fund, such Private Investment Fund's membership interests and the Portfolio Securities including, without limitation, when to buy, sell and the price at which Portfolio Securities will be purchased and/or sold, and whether to have membership interests redeemed by the Company and/or sold to third parties, and, in such event, at what redemption and/or sale prices, it does not have discretion to invest in various financial instruments and securities. L3 Capital currently conduct closings of the purchase and sale of Interests of a particular Private Investment Fund concurrently with the purchases of Portfolio Securities or of entities holding Portfolio Securities; though L3 Capital may, in its sole discretion, elect to conduct closings at any time in which cleared funds and accepted subscriptions have been received from prospective Investors. In addition, L3 Capital currently undertakes to invest in all Portfolio Securities for a particular Issuer purchased on a particular date by way of a separate Series or sub-Series of membership interests of a particular Private Investment Fund. Investors must execute a subscription agreement in which they make various representations, including representations regarding their suitability to invest in a high-risk investment pool.

## ITEM 17 – VOTING CLIENT SECURITIES

Based upon the Private Investment Funds' investment strategies (and lack of involvement in publicly-traded equities), it is unlikely that L3 Capital will need to vote proxies for the Private Investment Funds. If, in the future, it is contemplated that L3 Capital may exercise voting authority with respect to the Private Investment Funds securities, L3 Capital will create policies that are in the best interest of the respective Private Investment Funds and in accordance with the procedures as described to the Investors above.

## ITEM 18 – FINANCIAL INFORMATION

N/A. L3 Capital is not required to include a balance sheet for its most recent fiscal year, and is not aware of any financial condition that is reasonably likely to impair its ability to meet contractual commitments to advisory clients. In addition, L3 Capital has not been the subject of a bankruptcy petition at any time during the past ten years.

# EXHIBIT B

Capital Management

**INVOICE #100**

**DATE: 10/1/2020**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For services rendered as per agreement with client.**

**TOTAL :** **$125,000.00**

L3 Capital Management

**INVOICE #101**

**DATE: 11/1/2020**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For services rendered as per agreement with client.**

| | |
|---|---|
| **TOTAL :** | **$125,000.00** |

**INVOICE #102**

**DATE: 12/1/2020**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

**INVOICE #103**

**DATE: 1/4/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

L3 Capital Management

**DATE: 1/7/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$22,000.00**

L3 Capital Management

**INVOICE #104**

**DATE: 2/2/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

**INVOICE #105**

**DATE: 3/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

Capital
Management

**INVOICE #106**

**DATE: 4/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

**INVOICE #107**

**DATE: 5/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$170,000.00**

L3 Capital Management

**INVOICE #108**

**DATE: 6/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$60,000.00**

L3 Capital Advisors

**INVOICE #109**

**DATE: 7/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO: Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**Total:** **$45,000.00**

L3 Capital Management

**INVOICE #110**

**DATE: 8/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL :** | **$45,000.00** |

Capital Management

**INVOICE #111**

**DATE: 9/3/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL :** | **$40,000.00** |

L3 Capital Management

**DATE: 10/5/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$40,000.00**

L3 Capital Management

**DATE: 11/5/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$40,000.00**

**L3 Capital Management**

**DATE: 12/3/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$20,000.00**

L3 Capital Management

**INVOICE #115**

**DATE: 1/7/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$22,000.00**

DEC.

L3 Capital Management

**DATE: 2/7/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL:** | **$19,000.00** |

JAN.

L3 Capital Management

DATE: 3/1/2022

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$17,000.00**

FEB.

Capital Management

**INVOICE #118**

**DATE: 4/1/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$18,000.00**

L3 Capital Management

**INVOICE #119**

**DATE: 5/1/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$22,000.00**

# EXHIBIT C

Wednesday

2:17 AM

Rich, I strongly urge you to read this message carefully as it will be the last communication that I will ever have with you. Do not call me, text me, email me or message me because there will be no response. From this point forward you are not permitted in any manner to mention my name, reference me or in any manner comment upon me other than to say "We have no personal or professional relationship anymore" and any words outside of that simple comment will be met with swift and aggressive legal action. I can assure you that my only comment to anyone who asks will likewise be the statement that we have no personal or professional relationship anymore. I am serious and I mean it. Anyone and I mean anyone who receives any form of comment from you outside of the aforementioned will certainly get back to me and then I will certainly take action which will unravel you (remember, I am aware of all of your illusions - graphoid, leesburg, efraim, claims of extensive real estate development experience, games with the operation of your debt settlement, the list goes on and on and really isn't necessary, you get the idea. Quite simply, I am tired of all of the lies, rumors, backstabbing, etc. . . The only drama I have had in my life in the last many many years has involved somehow either directly or indirectly around things involving you and I simply don't want that and don't want to see you, hear from you or in any way have anything to do with you. You have benefited immensely from my work and protection of you and you are going to pay me for that. You can figure out what is reasonable

for that. You can figure out what is reasonable and communicate through Mike and that is why he is copied on this. Any attempt to try to change history or spin the truth won't end well for you, so simply come up with something reasonable and we all go off into the sunset. I can assure you that I have no interest in ruining you but I can guarantee you that I will if it is necessary. So be adult, move on, come up with a reasonable separation and then we will never see or speak again. I can assure you that the very very large number of people that are constantly calling me and complaining to me about you will simply be told that I have no personal or professional relationship with you and I will not engage to listen to their long list of complaints about you as I have had to listen to those in the past. Life is too short and since I have nothing to do with you anymore, I simply don't want to hear about it. Be smart and come up with something fair and I can't stress enough again, take this one warning and don't you dare comment about me to anyone beyond what I have authorized you to say in this message. Be smart and put a civil end to this, I promise you, otherwise you won't like my aggressive side. I know my way around a court room really well and the mountains of evidence involving you aren't pretty. You have benefited greatly from my work, put the emotion you may now be feeling aside from my decision to separate from you and do the right thing. Good luck with your life. I will wait to hear from Mike as to your proposal.

# EXHIBIT D

[redacted]

[redacted]

---------- Forwarded message ---------
From: **David Feingold** <d[redacted]
Date: Fri, Jan 28, 2022 at 8:31 AM
Subject: URGENT/EMERGENCY/NOTICE OF RESIGNATION COMMUNICATION
To: <SCohen@s[redacted]
Cc: <l3capitalmanagement@g[redacted] Mike Dazzo [redacted]

Please consider this communication notice that Mr. David Feingold and Mr. Michael Dazzo, effective immediately, resign as managers and members of Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, and Alternative Global Six LLC (collectively "Alternative Global Numbered Entities").

As the operating agreements of the Alternative Global Numbered Entities provide that manager resignation is effective immediately, Mr. Cardinale solely is responsible for all operational duties as manager as well as all common law duties under Delaware law to all of the members of the Alternative Global Numbered Entities. He should strictly adhere to Delaware law when making any decisions and we ask that you counsel him accordingly due to the complex nature of matters and his fiduciary duties that he owes to the myriad of entities for which he now manages.

In addition, now that Mr. Feingold and Mr. Dazzo have resigned as members of the Alternative Global Numbered Entities, Mr. Feingold and Mr. Dazzo are entitled to the fair value of their interests. The operating documents of the Alternative Global Numbered Entities provide that membership resignation becomes effective upon six months notice, however, Delaware law is clear that Mr. Cardinale and his entities now lawfully owe Mr. Feingold and Mr. Dazzo compensation for the fair market value of all of their interests. This interest is to be based on their right to share in distributions from the Alternative Global Numbered Entities. See 6 Del.C. § 18-604.

Please review the statutes and case law as I urge you to have your client cooperate with settled law in Delaware involving compensation of members. He indisputably now

owes compensation to Mr. Feingold and Mr. Dazzo for the Alternative Global Numbered Entities.

Mr. Feingold's and Mr. Dazzo's resignations mean that Mr. Cardinale is now the sole manager of both a lender, L3 Capital Income Fund LLC, and the sole manager and voting member of various borrower transactions as may be applicable in the Alternative Global Numbered Entities.

Furthermore, Mr. Feingold and Mr. Dazzo are still managers and members of Alternative Global Management LLC, hence Mr. Cardinale may not make any distributions at all from that entity without approval and consent of Mr. Feingold and Mr. Dazzo and all receipts that said entity regularly receives must continue and not be disturbed or in any manner altered without the consent of Mr. Feingold and Mr. Dazzo.

I trust you will carefully counsel your client on his obligations under Delaware law. We expect payment arrangements to be made pursuant to Section 18-604. Any payments made to any others prior to these priority creditor rights would be unlawful pursuant to Delaware Law and void as Mr. Feingold and Mr. Dazzo are now first priority creditors with regards to each of the Alternative Global Numbered Entities and their payments are valued at time of resignation as provided under Delaware law.

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279
https://www.feingoldllc.com

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279

https://www.feingoldllc.com

# EXHIBIT E

**STRATEGIC ADVISORY AGREEMENT**

This Strategic Advisory Agreement (this "Agreement"), dated effective as of August 1, 2019 (the "Effective Date") is entered into by and between **Debt USA LLC**, a Delaware limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

**RECITALS**

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the alternative finance industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $20,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or

(e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

| | |
|---|---|
| To the Company: | Debt USA LLC<br>433 Plaza Real, Suite 375<br>Boca Raton, Florida 33432<br>Attn: Daniel Meeler, Manager<br>Phone: (800) 234-5678<br>Email: danm@lexingtondocprep.com |
| To Advisor: | L3 Capital Advisors, LLC<br>75 Wall Street, Suite 23R<br>New York, New York 10005<br>Attn: Richard Cardinale, Managing Member<br>Phone: (347) 223-7671<br>Email: rcardinale@l3capitaladvisors.com |

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**DEBT USA LLC**

By: ________________________________________
Name: Daniel Meeler
Title: Manager

**L3 CAPITAL ADVISORS, LLC**

By: ________________________________________
Name: Richard Cardinale
Title: Managing Member

**STRATEGIC ADVISORY AGREEMENT**

This Strategic Advisory Agreement (this "Agreement"), dated effective as of August 1, 2019 (the "Effective Date") is entered into by and between **Asheville Investment I Management LLC**, a Delaware limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

**RECITALS**

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the real estate investment industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $20,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or

(e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

| | |
|---|---|
| To the Company: | Asheville Investment I Management, LLC<br>75 Wall Street, Suite 23R<br>New York, NY 10005<br>Attn: Michael Dazzo, Authorized Person<br>Phone: (786) 512-8331<br>Email: daz1201@aol.com |
| To Advisor: | L3 Capital Advisors, LLC<br>75 Wall Street, Suite 23R<br>New York, New York 10005<br>Attn: Richard Cardinale, Managing Member<br>Phone: (347) 223-7671<br>Email: rcardinale@l3capitaladvisors.com |

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**ASHEVILLE INVESTMENT I MANAGEMENT LLC**

By: ________________________________________
Name: Michael Dazzo
Title: Authorized Person

**L3 CAPITAL ADVISORS, LLC**

By: ________________________________________
Name: Richard Cardinale
Title: Managing Member

## STRATEGIC ADVISORY AGREEMENT

This Strategic Advisory Agreement (this "Agreement"), dated effective as of August 1, 2019 (the "Effective Date") is entered into by and between **Residual Investment Group LLC**, a Florida limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the alternative finance industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

    a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
    b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
    c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
    d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $20,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or

(e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

| | |
|---|---|
| To the Company: | Residual Investment Group, LLC<br>14340 SW 82nd Avenue<br>Palmetto Bay, Florida 33158<br>Attn: Michael Dazzo, Manager<br>Phone: (786) 512-8331<br>Email: daz1201@aol.com |
| To Advisor: | L3 Capital Advisors, LLC<br>75 Wall Street, Suite 23R<br>New York, New York 10005<br>Attn: Richard Cardinale, Managing member<br>Phone: (347) 223-7671<br>Email: rcardinale@l3capitaladvisors.com |

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**RESIDUAL INVESTMENT GROUP LLC**

By: ______________________________
Name: Michael Dazzo
Title: Manager

**L3 CAPITAL ADVISORS, LLC**

By: ______________________________
Name: Richard Cardinale
Title: Managing Member

# STRATEGIC ADVISORY AGREEMENT

This Strategic Advisory Agreement (this "Agreement"), effective as of December 1, 2019 (the "Effective Date") is entered into by and between **Alternative Global Management, LLC**, a Delaware limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties"

## RECITALS

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the alternative finance industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly

authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $10,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena

or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or (e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

| | |
|---|---|
| To the Company: | Alternative Global Management, LLC<br>75 Wall Street, Suite 23R<br>New York, NY 10005<br>Attn: Michael Dazzo, Manager<br>Phone: (786) 512-8331<br>Email: daz1201@aol.com |
| To Advisor: | L3 Capital Advisors, LLC<br>75 Wall Street, Suite 23R<br>New York, New York 10005<br>Attn: Richard Cardinale, Managing Member<br>Phone: (347) 223-7671<br>Email: rcardinale@l3capitaladvisors.com |

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder.

any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

- Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

- Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

- Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

- Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**ALTERNATIVE GLOBAL MANAGEMENT, LLC**

| | | |
|---|---|---|
| By: | Michael Dazzo | |
| Name: | Michael Dazzo | |
| Title: | Manager | |

**L3 CAPITAL ADVISORS, LLC**

| | | |
|---|---|---|
| By: | R Cardinale | |
| Name: | Richard Cardinale | |
| Title: | Managing Member | |

# EXHIBIT F

Gmail [redacted]

[redacted]

1 me age

[redacted]

**From:** admin@debtleader.com
**Date:** May 24, 2022 at 7:25:18 PM EDT
**To:** Robert Giardina <[redacted] Richard Cardinale <[redacted]
c[redacted]
**Cc:** [redacted] danm@debtleader.com, matth@debtleader.com
**Subject: Continuing Threats**

The fact that you threatened me on the phone recently was bad enough, but coming to my house with another guy and waiting out ide for 20 min to try and intimidate me and my family i the la t traw I have video of it from my house and from several of my neighbors, I am also getting more information and videos from my community. I have saved your threatening text and photo you sent me showing you were at my house. My wife has now filed a police report. I will be ceasing any contact with you from here on. If you contact or threaten me or my family any more I will pur ue further mea ure Thi will be my final word to you.

# EXHIBIT G

[redacted]

[redacted]

---------- Forwarded message ---------
From: **David Feingold** [redacted]
Date: Wed, May 25, 2022 at 1:04 PM
Subject: Important Issues for You to Think About
To: Rich Cardinale <[redacted]

Rich, I know that we have had our differences in the past and I have really tried to put all of that behind us for the benefit of business. The contents of this email are just for you and I as discussing this on the telephone or a zoom might lead to shouting and I am simply done shouting and arguing with you. So when you read this email please imagine me conveying this information to you in the most respectful tone possible because that is the intent. No raised voice, just pure professionalism is meant by this communication.

You have been manager of L3 and had a full staff of three back office people including two full time administrators and a lawyer and yet three years later you are now claiming no knowledge or records nor understanding of deals and rather than exacerbate and challenge your positions, I have been accommodating because I do have a financial interest in the success of the endeavor and litigation is simply a waste of time, money and resources. Neither of us win on that front. I recognize claiming no knowledge certainly is a position to take to avoid liability in the event of losses but I don't think it is honest or realistic.

Your staff was paid regularly and handsomely and yet now there are no documents, no records and no knowledge of anything. In addition, you were paid probably one million extra dollars for advisory services (what was being advised if you knew nothing?) and rent (which continues even though the office was closed) and insurance (somehow $7k per month).

There were literally hundreds of conference calls and video calls over the last three years including the regular weekly update of every business unit and multiple trips to Greenville, I think you did 5 plus your calls with all of those people. Assuming its true that you have no records or knowledge, which I can't accept, the fact that you now claim to not understand any businesses or deals, if true, would mean that you should not be managing L3 because your management duties legally require you to know this information. Again, I am being factual and not personally attacking you. Factually, this is your legal duty and you ran approximately ten prior funds including funds that had SEC audits and FINRA audits and so you clearly know what books and records you need and what level of knowledge you need of the deals. You used the exact same administrators and lawyers for all of your prior funds that passed SEC and FINRA audits. There was no change at all in the staffing. This was simply not your first fund. Again, not criticizing you, just being purely factual.

Another pure fact is that I do not work for you. I simply have a financial interest in a business

that owes money to your hedge fund and has involvement in similar business lines. I do not run your hedge fund and the individual operating business lines are not my daily job. I have tried to go out of my way to be helpful to you because I do not want to see anyone lose money and I would like to make money on our endeavor. Again, we can disagree but as long as we treat each other professionally and at the end of the day give our complete effort to make a profit then at least we gave it a valiant effort.

Again, whether I believe the positions you are now taking is immaterial, I am just stating pure facts so that it is clear, putting our differences aside has always been for the greater good of the success of the business and people can disagree and still have a business succeed. Rather than fight with your positions that I found untenable, I have just tried to ignore them for the greater good of the business success. There are now literally 14 people who have had a similar experience with you and who refuse to speak with you and again I have put that behind me just to focus on making our endeavor successful and I think in your heart you know that to be true. I did lose my temper with you in the past because at some points the drama between you and others simply became too much for me. I know you know in your heart I have always tried my hardest in fact on the multiple occasions you went to Greenville you saw that I never got drunk and was there to do business meetings and check on the progress of business lines. My function has been pure business. I don't buy people gifts, immerse myself in people's families, bring my family on trips with business people or try to make friendship bonds with people just to protect our business, I understand that you think that is smart business and that works for you, however, my way is just to work like hell and make things successful. We have disagreed immensely and tried to put that behind us and I do appreciate that.

Again, we can disagree on many things and yet still have a successful endeavor. In other words, everything that I have just said can be handled and still have an endeavor that works and makes money for everyone. I literally was willing to put all of that behind us. With all of that being said, there is one thing that I cannot put up with and that is violence and/or threats of violence. The recent events of yesterday are simply the final straw for me that cannot allow me to turn my back.

I know that you are embroiled in a business dispute with Darren regarding debt settlement and now I find out that Rob and another person showed up at Darren's home yesterday to beat him up because of your business dispute with Darren. You and Rob have always been partners in that business and in my experience with you all, everything that Rob does has always been with your full knowledge and support and so I cannot overlook threats of harm, which are real threats to someone because you disagree with them in business.

In addition to the threats to Darren, threats were made to harm his wife and children and Rob brought someone with him, sat outside of Darren's house and texted a photo to Darren to let him know that they knew where he lives and had access to his family even though they live in a gated community. This is simply unacceptable to me. Even worse, I learned that Darren sent an email to all of you and you did not even respond denying involvement or knowledge. Apparently your all position is that if Darren doesn't give you a piece of his new business that he and his family will experience violence. This is simply horrible.

I know that you are going to say that you knew nothing of any of this and quite frankly at this point it is not my job to prove or disprove your knowledge. However, what I do know is that I never had to deal with such circumstances in my life. I do know you told Darren that you were going to let Rob handle this in his own way if Darren did not include you all in his new

business and I can infer what that means. I can't allow this type of stuff in my life, I really can't. I would rather lose money than deal with this, it is so opposite of everything that I have ever done or believed in for my entire life.

So here is my respectful proposal to you that will solve your issues of making sure your investors get all of their money back and then we see some money at the end once the investors are being paid and allow us to not to have to deal with each other because I just can't proceed in a situation of violence, I simply cannot. I propose either:

1. You could liquidate the L3 Fund, the cash would be a cash distribution to each investor (MCA portfolio as it runs off pays all investors) and then they will receive "in kind" share certificates for all remaining businesses and as those businesses are sold, they will get cash and thereby once all investors are paid, we then can take the monies that would be owed to us. An in kind distribution will allow the investors to have share ownership and deal directly with business lines, no offense but no one is going to deal with you after this entire violence issue; or

2. You could pursuant to the PPM documents announce a freezing of all interest payments or a reduction of interest payments, then have all of the MCA portfolio spin, reinvest and grow and in approximately three years it should grow to the size of all original money taken in, then do a cash distribution and do an "in kind" distribution of the remaining businesses to the investors as described above. This again would allow excess monies to revert to us at the end after all payments to investors.

Choice one is an immediate partial cash distribution and choice two is a cash distribution after the MCA portfolio grows to the original value of the entire fund. Remaining assets are all "in kind" distributions as the PPM permits.

Again, the above would allow all investors to get back all of their money, just in different time frames. I can assure you that the people that operate all of the different business lines will not in any way deal with you once they learn of this violence issue and quite frankly they might all have already heard.

Please think in an unemotional manner of the two proposals above. I have no idea what you have said to your L3 investors in terms of the returns you told them that they would get or how you arrived at the valuations that you gave them as manager of L3, but what I do know is that this violence issue is completely unacceptable to me. Please do not send me a long email back as I will not read it because I do not want to get in an email war with you. You do not need to respond and I will not read the response if you make one. I simply cannot continue with you in any manner, I have thought about all options and these are the only two that make sense. If you decide to proceed and not pursue these options, obviously as fund manager, that is your choice. It also goes without saying, I don't want any direct or indirect threats made to me, the police are already involved with the matters above and apparently a detective has already been assigned.

Thank you for understanding my position. If the true goal is get investors back their money, make them some profits and then at the end we can make our money after all of the investors get theirs then these solutions solve that issue. No drama please, just think about this. If you do not want the above then I wish you luck, as manager, it is ultimately your decision.

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279
https://www.feingoldllc.com

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279
https://www.feingoldllc.com

For Release

# FTC Action Results in Ban for Richmond Capital and Owner From Merchant Cash Advance and Debt Collection Industries and Return of More Than $2.7M to Consumers

## RCG Advances, LLC and Robert Giardina Lied About Terms and Fees and Threatened Customers

June 6, 2022

**Tags:** Consumer Protection | Bureau of Consumer Protection | Credit & Loan Offers | deceptive/misleading conduct | Finance | Credit and Finance | Credit and Loans | Debt | Debt Collection | Small Business

The Federal Trade Commission's lawsuit against RCG Advances, LLC and Robert Giardina has led to a court order that permanently bans the company and owner from the merchant cash advance industry for deceiving and threatening small businesses and their owners. The FTC alleged that th scheme's operators lied to small business owners about terms and fees for their financing, and threatened them with violence when they were unable to pay. In addition, the court ordered RCG Advances and Giardina to make an upfront payment of $1.5 million and subsequent payment of mc than $1.2 million to refund consumers.

Give Feedback

"These defendants lied to small businesses about financing, stole money from their accounts, made violent threats, and gave false documents to the courts," said Samuel Levine, the Director of the FTC's Bureau of Consumer Protection. "This order bans them from the merchant cash advance business and requires them to return money to the businesses they cheated."

RCG Advances and Giardina, along with the other defendants in the FTC's case, operated a merchant cash advance scheme since at least 2015, the agency alleged. Merchant cash advances are a type of alternative small business financing. Generally speaking, merchant cash advance companies provide funds to businesses in exchange for a percentage of the businesses' revenue, which typically are paid through daily withdrawals from the business's bank account.

The FTC's investigation found that the defendants in the case, including RCG Advances and Giardina, lied to small businesses about numerous elements of the financing agreements before they were signed, and broke the law in their communications with businesses and their owners after the fact. The harms to small businesses and their owners were extensive, including:

- **Deceiving consumers about personal guarantees**: The defendants' websites falsely claimed that their cash advances required "no personal guaranty of collateral from business owners," meaning that the people obtaining financing on behalf of companies would not have their personal possessions treated as collateral. In fact, their contracts did include those requirements.

- **Forcing consumers and businesses into confessions of judgment**: The defendants also required businesses and their owners to sign confessions of judgment, which allow the defendants to immediately obtain an uncontested judgment in case of an alleged default. The complaint alleges that the defendants illegally and unfairly used these confessions of judgment to unexpectedly and improperly seize consumers' personal and business assets.

- **Providing less funding than promised:** The complaint alleges that when businesses received their funding from the defendants, it was often thousands of dollars less than promised. The shortfall was due to large supposed fees that were not disclosed to the business owners. This happened despite the defendants marketing promises of "no upfront fees."

- **Threatening consumers and businesses:** The complaint alleges that the defendants made threatening calls to consumers, including telling one man that they would "break his jaw" if he did not make his payments and, in another case, threatening to ruin a consumer's reputation by falsely accusing him of being a child molester if he did not pay.

Give Feedback

## Enforcement Action

Under a court order agreed to by the defendants in order to settle the case, they will be:

- **Permanently banned from the business financing and debt collection industries.**
- **Required to vacate judgments and liens:** The defendants are being ordered to vacate any judgments against their former customers and to release any liens against their customers' property.
- **Prohibited from misleading consumers:** The defendants will be prohibited from misleading consumers about any key facts about any good or service, including any fees, the total cost of the product, and other facts that reflect their deceptions in this case.
- **Pay more than $2.7 million:** The defendants are being ordered to pay more than $2.7 million, which will be used to provide refunds to consumers harmed by their actions.

The FTC previously obtained a court order in settlement with defendants RAM Capital Funding, LLC and Tzvi Reich. The FTC's case against remaining defendant Jonathan Braun is still under way.

The Commission vote approving the stipulated final order was 4-0-1, with Commissioner Alvaro M. Bedoya not participating. The FTC filed the proposed order in the U.S. District Court for the Southern District of New York.

NOTE: Stipulated final orders or injunctions have the force of law when approved and signed by the District Court judge.

The Federal Trade Commission works to promote competition and protect and educate consumers. The FTC will never demand money, make threats, tell you to transfer money, or promise you a prize. Learn more about consumer topics at consumer.ftc.gov, or report fraud, scams, and bad business practices at ReportFraud.ftc.gov. Follow the FTC on social media, read consumer alerts and the business blog, and sign up to get the latest FTC news and alerts.

Give Feedback

### Press Release Reference

New York-Based Finance Companies Deceived Small Businesses, Non-Profits and Seized Their Personal and Business Assets, FTC Alleges

Merchant Cash Advance Providers Banned from Industry, Ordered to Redress Small Businesses

# Contact Information

## Contact for Consumers

FTC Consumer Response Center
877-382-4357
https://reportfraud.ftc.gov

## Media Contact

Jay Mayfield
Office of Public Affairs
202-326-2656

Give Feedback

EXHIBIT "F"

IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY

COMPLEX BUSINESS DIVISION

CASE NO:

ALTERNATIVE GLOBAL THREE, LLC, a Delaware limited liability company,

Plaintiff,

vs.

DCG STATEN ISLAND, LLC, a Florida limited liability company, DCG BOCA, LLC, a Florida limited liability company, DCG NEW JERSEY, LLC, a Florida limited liability company, DCG NEW YORK, LLC, a Florida limited liability company, DCG FLORIDA, LLC, a Florida limited liability company, DCG TEXAS, LLC, a Florida limited liability company,

Defendants.

_______________________________________/

**COMPLAINT**

Plaintiff, ALTERNATIVE GLOBAL THREE, LLC a Delaware limited liability company ("**Alternative Global**"), by and through its undersigned attorneys, as and for its Complaint against DCG STATEN ISLAND, LLC, a Florida limited liability company ("**DCG Staten Island**"), DCG BOCA, LLC, a Florida limited liability company ("**DCG Boca**"), DCG NEW JERSEY, LLC, a Florida limited liability company ("**DCG NJ**"), DCG NEW YORK, LLC, a Florida limited liability company ("**DCG NY**"), DCG FLORIDA, LLC, a Florida limited liability company ("**DCG FL**"), and DCG TEXAS, LLC, a Florida limited liability company ("**DCG TX**")(collectively, the "**DCG Entities**"), hereby alleges as follows:

## INTRODUCTION

Alternative Global is a member of the DCG Entities, each of which is governed by a respective operating agreement. Each of the DCG Entities' operating agreements provide, in relevant part, that each member is entitled to (1) access to the books and records of the respective DCG Entity; and (2) distributions at the end of each calendar quarter. Since January 2022, Alternative Global has neither been provided access to each of the respective DCG Entities' books and records, despite demand, nor received any distributions from the DCG Entities. Thus, pursuant to the terms of the respective DCG Entities' operating agreements, the DCG Entities are in breach thereof.

## THE PARTIES, JURISDICTION, AND VENUE

1. This is an action for damages in excess of $750,000, exclusive of attorneys' fees, interests, and costs, the threshold for this Court's Complex Business Litigation Division, and the subject matter in controversy and the amount in dispute meet the requirements of the Court's Administrative Order No. 17-11 §§ 3(A) and conform to the Complex Business Litigation Rules.

2. Alternative Global is a limited liability company formed under the laws of the State of Delaware.

3. The DCG Entities are each limited liability companies formed and organized under the laws of the State of Florida. According to the Florida Division of Corporations, the DCG Entities' respective principal places of business are located in Miami-Dade County, Florida.

4. The Court has personal jurisdiction over the DCG Entities because the DCG Entities are Florida entities and each breached a contract in Florida.

5. Venue is proper in Miami-Dade County, Florida pursuant to Florida Statute §

605.0411 and because the causes of action herein accrued in Miami-Dade County, Florida and the DCG Entities maintain their principal place of business in Miami-Dade County, Florida.

## FACTUAL ALLEGATIONS

6. In or around August 2020, Alternative Global became a member of each of the DCG Entities. At that time, Alternative Global had three co-managing members: Richard Cardinale, David Feingold and Michael Dazzo.

7. In or around January 28, 2022, Feingold and Dazzo abruptly resigned as co-managers of Alternative Global after Cardinale made several requests for information and records that Feingold and Dazzo were maintaining, relating to, among other things, Alternative Global's investments in the DCG Entities. Following their resignation, Feingold and Dazzo refused to provide Alternative Global with any information regarding its investment in the DCG Entities.

8. From July 2020 through March 5, 2021, Alternative Global made a series of wire transfers to the DCG Entities totaling at least $3,658,000, as follows:

| Date | Transferee Entity | Amount of Wire Transfer |
|---|---|---|
| 7/23/2020 | DCG Boca | $140,000 |
| 7/23/2020 | DCG Staten Island | $140,000 |
| 7/31/2020 | DCG Boca | $105,000 |
| 7/31/2020 | DCG Staten Island | $105,000 |
| 8/06/2020 | DCG Boca | $70,000 |
| 08/07/2020 | DCG Staten Island | $105,000 |
| 8/07/2020 | DCG Staten Island | $375,000 |
| 8/12/2020 | DCG Boca | $70,000 |
| 8/14/2020 | DCG NJ | $235,000 |
| 9/04/2020 | DCG FL | $150,000 |
| 9/04/2020 | DCG Boca | $210,000 |
| 11/09/2020 | DCG Boca | $70,000 |
| 11/20/2020 | DCG Texas | $140,000 |
| 11/23/2020 | DCG Boca | $100,000 |
| 12/18/2020 | DCG New York | $100,000 |
| 12/29/2020 | DCG Boca | $100,000 |
| 12/29/2020 | DCG Staten Island | $140,000 |

| | | |
|---|---|---|
| 1/12/2021 | DCG Boca | $385,000 |
| 1/15/2021 | DCG Staten Island | $100,000 |
| 1/29/2021 | DCG Staten Island | $302,000 |
| 2/12/2021 | DCG Staten Island | $126,000 |
| 3/05/2021 | DCG Staten Island | $130,000 |
| 3/05/2021 | DCG NJ | $210,000 |
| TOTAL | | **$3,658,000** |

9. The DCG Entities' respective operating agreements provide, at Section 8.2:

> All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

True and correct copies of the DCG Entities' respective operating agreements are attached hereto as follows: DCG Staten Island, **Exhibit A** (the **"DCG Staten Island Operating Agreement"**); DCG Boca, **Exhibit B** (the **"DCG Boca Operating Agreement"**); DCG NJ, **Exhibit C** (the **"DCG NJ Operating Agreement"**); DCG NY, **Exhibit D** (the **"DCG NY Operating Agreement"**); DCG FL, **Exhibit E** (the "**DCG FL Operating Agreement"**); DCG TX, **Exhibit F** (the "**DCG TX Operating Agreement**") (collectively, the "**Operating Agreements**").

10. Moreover, Section 9.2 of the DCG Entities' Operating Agreements provides:

> Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any must be distributed to the Members, pro rata, in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

11. Finally, Section 12.3 of each of the DCG Entities' Operating Agreements provides:

> Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12. Since about January 28, 2022, each of the DCG Entities have refused to provide Alternative Global with access to information regarding each of the DCG Entities' books and records.

13. Beginning in February 2022, and continuing thereafter, Richard Cardinale, Alternative Global's sole Managing Member and Member, requested access to the books and records of the respective DCG Entities by telephone, text, and email. Despite such requests, the DCG Entities have failed to provide any information to Alternative Global or to Cardinale in his capacity as its sole Managing Member.

14. Finally, having not received access, on or about August 9, 2022, Alternative Global formally demanded through counsel that Michael Dazzo, as the sole manager of each of the DCG Entities, provide access to the respective books and records of each of the DCG Entities. True and correct copies of Alternative Global's records demands (collectively, the "**Records Demands**") are attached hereto as **Composite Exhibit G.**

15. On August 18, 2022, DCG Boca, DCG FL, DCG NJ, and DCG NY, through counsel, responded to the Records Demand, stating that Alternative Global had the same access to the books and records of the DCG Entities as the DCG Entities themselves through CRM software and that the DCG Entities are not managers of themselves, and Alternative Global should "obtain the records directly on their own". A true and correct copy of counsel's August 18, 2022 records demand response (the "**Response**") is attached hereto as **Exhibit H**. DCG Staten Island and DCG TX did not respond and instead ignored the respective Records Demands sent to them.

16. Alternative Global does not have access to any purported CRM software, the credentials to access any such purported software, nor any other mechanism by which to obtain the respective DCG Entities' books and records.

17. Thereafter, on several occasions, Alternative Global sought, via e-mail, to obtain information to be able to access the purported CRM software referenced in the Response, but to this day has not been provided with such access.

18. To date, the DCG Entities have failed to comply with Alternative Global's requests for access to their respective books and records.

19. The DCG Entities have also failed to make distributions to Alternative Global in contravention of Section 9.2 of each of the Operating Agreements. Notably, the distributions ceased, at least as of May 23, 2022, shortly after Michael Dazzo and David Feingold resigned as members and co-managers of Alternative Global, if not earlier.

20. Alternative Global has retained the law firm of Greenberg Traurig, P.A. and is obligated to pay it a reasonable hourly fee.

## CONDITIONS PRECEDENT

21. Alternative Global has fully performed under the DCG Entities' Operating Agreements.

22. All conditions precedent to the filing of this Complaint have been performed, occurred, met, satisfied, or otherwise been waived.

## COUNT ONE
## BREACH OF OPERATING AGREEMENT AGAINST DCG STATEN ISLAND

23. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

24. The DCG Staten Island Operating Agreement is the valid operating agreement that governs DCG Staten Island.

25. Alternative Global is a Member of DCG Staten Island, and thus, the terms of the DCG Staten Island Operating Agreement inure to its benefit.

26. Alternative Global has fully performed under the terms of the DCG Staten Island Operating Agreement.

27. DCG Staten Island has breached the DCG Staten Island Operating Agreement by failing to provide Alternative Global with access to the books and records of DCG Staten Island pursuant to Section 8.2 of the DCG Staten Island Operating Agreement.

28. DCG Staten Island has further breached the DCG Staten Island Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG Staten Island Operating Agreement.

29. Alternative Global has incurred damages proximately caused by DCG Staten Island's failure to provide Alternative Global with access to DCG Staten Island's books and records.

30. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG Staten Island Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

## COUNT TWO
## ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG STATEN ISLAND

31. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

32. Alternative Global is a Member of DCG Staten Island.

33. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG Staten Island's sole manager, DCG Staten Island was required to provide Alternative Global with access to its books and records.

34. To date, DCG Staten Island has failed to provide Alternative Global with access to its books and records.

35. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG Staten Island make its books and records available for inspection and copying at DCG Staten Island's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

## COUNT THREE
## BREACH OF OPERATING AGREEMENT AGAINST DCG BOCA

36. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

37. The DCG Boca Operating Agreement is the valid operating agreement that governs DCG Boca.

38. Alternative Global is a Member of DCG Boca, and thus, the terms of the DCG Boca Operating Agreement inure to its benefit.

39. Alternative Global has fully performed under the terms of the DCG Boca Operating Agreement.

40. DCG Boca has breached the DCG Boca Operating Agreement by failing to provide Alternative Global with access to the books and records of DCG Boca pursuant to Section 8.2 of DCG Boca's Operating Agreement.

41. DCG Boca has further breached the DCG Boca Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG Boca Operating Agreement.

42. Alternative Global has incurred damages proximately caused by DCG Boca's failure to provide Alternative Global with access to DCG Boca's books and records.

43. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG Boca Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT FOUR**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG BOCA**

44. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

45. Alternative Global is a Member of DCG Boca.

46. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG Boca's sole manager, DCG Boca was required to provide Alternative Global with access to its books and records.

47. To date, DCG Boca has failed to provide Alternative Global with access to its books and records.

48. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG Boca make its books and records available for inspection and copying at DCG Boca's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT FIVE**
**BREACH OF OPERATING AGREEMENT AGAINST DCG NJ**

49. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

50. The DCG NJ Operating Agreement is the valid operating agreement that governs DCG NJ.

51. Alternative Global is a Member of DCG NJ, and thus, the terms of the DCG NJ Operating Agreement inure to its benefit.

52. Alternative Global has fully performed under the terms of the DCG NJ Operating Agreement.

53. DCG NJ has breached the DCG NJ Operating Agreement by failing provide Alternative Global with access to the books and records of DCG NJ pursuant to Section 8.2 of the DCG NJ Operating Agreement.

54. DCG NJ has further breached the DCG NJ Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG NJ Operating Agreement.

55. Alternative Global has been incurred damages proximately caused by DCG NJ's failure to provide Alternative Global with access to DCG NJ's books and records.

56. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG NJ Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT SIX**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG NJ**

57. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

58. Alternative Global is a Member of DCG NJ.

59. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG NJ's sole manager, DCG NJ was required to provide Alternative Global with access to its books and records.

60. To date, DCG NJ has failed to provide Alternative Global with access to its books and records.

61. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG NJ make its books and records available for inspection and copying at DCG NJ's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT SEVEN**
**BREACH OF OPERATING AGREEMENT AGAINST DCG NY**

62. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

63. The DCG NY Operating Agreement is the valid operating agreement that governs DCG NY.

64. Alternative Global is a Member of DCG NY, and thus, the terms of the DCG NY Operating Agreement inure to its benefit.

65. Alternative Global has fully performed under the terms of the DCG NY Operating Agreement.

66. DCG NY has breached the DCG NY Operating Agreement by failing provide Alternative Global with access to the books and records of DCG NY pursuant to Section 8.2 of the DCG NY Operating Agreement.

67. DCG NY has further breached the DCG NY Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG NY Operating Agreement.

68. Alternative Global has incurred damages proximately caused by DCG NY's failure to provide Alternative Global with access to DCG NY's books and records.

69. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG NY Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

## COUNT EIGHT
## ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG NY

70. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

71. Alternative Global is a Member of DCG NY.

72. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG NY's sole manager, DCG NY was required to provide Alternative Global with access to its books and records.

73. To date, DCG NY has failed to provide Alternative Global with access to its books and records.

74. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG NY make its books and records available for inspection and copying at DCG NY's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii)

attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT NINE**
**BREACH OF OPERATING AGREEMENT AGAINST DCG FL**

75. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

76. The DCG FL Operating Agreement is the valid operating agreement that governs DCG FL.

77. Alternative Global is a Member of DCG FL, and thus, the terms of the DCG FL Operating Agreement inure to its benefit.

78. Alternative Global has fully performed under the terms of the DCG FL Operating Agreement.

79. DCG FL has breached the DCG FL Operating Agreement by failing provide Alternative Global with access to the books and records of DCG FL pursuant to Section 8.2 of the DCG FL Operating Agreement.

80. DCG FL has further breached the DCG FL Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG FL Operating Agreement.

81. Alternative Global has incurred damages proximately caused by DCG FL's failure to provide Alternative Global with access to DCG FL's books and records.

82. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG FL Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT TEN**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG FL**

83. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

84. Alternative Global is a Member of DCG FL.

85. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG FL's sole manager, DCG FL was required to provide Alternative Global with access to its books and records.

86. To date, DCG FL has failed to provide Alternative Global with access to its books and records.

87. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG FL make its books and records available for inspection and copying at DCG FL's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT ELEVEN**
**BREACH OF OPERATING AGREEMENT AGAINST DCG TX**

88. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

89. The DCG TX Operating Agreement is the valid operating agreement that governs DCG TX.

90. Alternative Global is a Member of DCG TX, and thus, the terms of the DCG TX Operating Agreement inure to its benefit.

91. Alternative Global has fully performed under the terms of the DCG TX Operating Agreement.

92. DCG TX has breached the DCG TX Operating Agreement by failing provide Alternative Global with access to the books and records of DCG TX pursuant to Section 8.2 of the DCG TX Operating Agreement.

93. DCG TX has further breached the DCG TX Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG TX Operating Agreement.

94. Alternative Global has incurred damages proximately caused by DCG TX's failure to provide Alternative Global with access to DCG TX's books and records.

95. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG TX Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT TWELVE**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG TX**

96. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

97. Alternative Global is a Member of DCG TX.

98. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG TX's sole manager, DCG TX was required to provide Alternative Global with access to its books and records.

99. To date, DCG TX has failed to provide Alternative Global with access to its books and records.

100. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG TX make its books and records available for inspection and copying at DCG TX's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

Dated: November 17, 2022

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477
**AVI BENAYOUN**
Florida Bar No. 0151696
BenayounA@gtlaw.com
YearginA@gtlaw.com
**JON L. SWERGOLD**
Florida Bar No. 108510
swergoldj@gtlaw.com
Anastasiya.Karant@gtlaw.com
**JOHN L. MCMANUS**
Florida Bar No. 0119423
mcmanusj@gtlaw.com
yeargina@gtlaw.com
Aanastasiya.Karant@gtlaw.com
**SABRINA D. NIEWIALKOUSKI**
Florida Bar No. 0123630
niewialkouskis@gtlaw.com
Anastasiya.Karant@gtlaw.com

s/ *Avi Benayoun*

**AVI BENAYOUN**
Florida Bar No. 0151696
BenayounA@gtlaw.com
YearginA@gtlaw.com

# EXHIBIT A

**OPERATING AGREEMENT**
**OF DCG STATEN ISLAND, LLC.**

The Members of DCG STATEN ISLAND, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

**ARTICLE I**

***INTRODUCTION***

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG STATEN ISLAND, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG STATEN ISLAND, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

## *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

### *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

## *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of ____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

# EXHIBIT B

# OPERATING AGREEMENT
# OF DCG BOCA, LLC.

The Members of DCG BOCA, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG BOCA, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG BOCA, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any distribution

in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument signed by all

Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate more than 50% of the Percentage Interests in the Company with respect to a matter within

the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

### *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s)

shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the

business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The

Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of _____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

**ARTICLE VIII**

*ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

**ARTICLE IX**

*ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other

enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term “expenses” includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term “liability” means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term “party” includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term “proceeding” means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual’s service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all

prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

[redacted]

# EXHIBIT C

**OPERATING AGREEMENT**
**OF DCG NEW JERSEY, LLC.**

The Members of DCG NEW JERSEY, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG NEW JERSEY, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG NEW JERSEY, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

## *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of ____________, ____, among ______________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

# EXHIBIT A

[redacted]

[redacted]

# EXHIBIT D

# OPERATING AGREEMENT
# OF DCG NEW YORK, LLC.

The Members of DCG NEW YORK, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG NEW YORK, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG NEW YORK, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

## *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; <u>provided, however,</u> that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of ____________, ____, among _______________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

### *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

### *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

[redacted]

[redacted]

# EXHIBIT E

# OPERATING AGREEMENT
# OF DCG FLORIDA, LLC.

The Members of DCG FLORIDA, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG FLORIDA, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG FLORIDA, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; <u>provided, however,</u> that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of ____________, ____, among ______________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

## *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

# EXHIBIT F

# OPERATING AGREEMENT OF DCG TEXAS, LLC.

The Members of DCG TEXAS, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG TEXAS, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG TEXAS, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

### *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the “Delivering Member(s)”) shall have the right at any time to send to the other Member(s) (the “Receiving Member(s)”) a written notice (a “Buy/Sell Notice”) specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of _____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

### *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

### *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

# EXHIBIT A

[redacted]

[redacted]

[redacted]

# COMPOSITE EXHIBIT G

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Boca, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG Boca, LLC ("DCG Boca"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG Boca dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG Boca, LLC dated November 16, 2018 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year."

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG Boca's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Florida, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG Florida, LLC ("DCG Florida"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG Florida dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG Florida, LLC dated September 16, 2016 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG Florida's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG New Jersey, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG New Jersey, LLC ("DCG NJ"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG NJ dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG New Jersey, LLC (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG NJ's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG New York, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG New York, LLC ("DCG NY"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG NY dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG New York, LLC, dated September 16, 2016 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG NY's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Staten Island, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG Staten Island, LLC ("DCG Staten Island"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG Staten Island dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG Staten Island, LLC, dated May 1, 2018 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

> 8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG Staten Island's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Texas, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent L3 Capital Management LLC ("L3 Management") who is a Member of DCG Texas, LLC ("DCG Texas"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Operating Agreement of DCG Texas, LLC (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

> 8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each

fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management demands immediate access to all of DCG Texas's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

# EXHIBIT H

DANIELS · RODRIGUEZ
BERKELEY · DANIELS · CRUZ
ATTORNEYS AT LAW

MIAMI / FT LAUDERDALE / TAMPA

Reply to: Lorne E. Berkeley
LBerkeley@drbdc-law.com

August 18, 2022

Avi Benayoun
Benayouna@gtlaw.com
333 S. E. 2nd Ave.,
Suite 4400
Miami Florida 33131

Re: Your August 9 Letters Directed to DCG Boca, LLC; DCG Florida, LLC; DCG New Jersey, LLC; DCG New York, LLC

Dear Mr. Benayoun:

The law firm of Daniels, Rodriguez, Berkeley, Daniels & Cruz, PA by and through the undersigned represents the interests of the above entities. In accordance with that representation, I have been provided a copy of your Demand for Inspection of Books and Records as it pertains to each entity listed above.

Your clients L3 Capital Management, LLC and Alternative Global Three, LLC are members of the entities from which they seek records. Your client's membership is the same membership as my clients. My clients despite your client's belief are not managers of the entities to which your client seek records. They are members just as your clients.

These entities and your client's entities use the same accountant, your clients have login into the CRM software to access accounts and clients just as mine do, and as such have equal access to the books and records. At no time were my clients managers nor did my clients maintain the books and records as your letter asserts.

Based upon the foregoing, your demand for inspection of books and records and the basis to which the demand is made is not well taken. Your clients should obtain the records directly on their own.

Should you have any questions concerning the foregoing please do not hesitate to reach out to me.

Very truly yours,
/s/Lorne E. Berkeley, Esq
Signed Electronically to Avoid Delay
Lorne E. Berkeley, Esq.
For the Firm

EXHIBIT "G"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

DCG Boca, LLC, et. al.

Debtor.
_______________________________/

Case No. 24-10601-EPK
(Jointly Administered)
Chapter 7

**DECLARATION[1] OF JARED BIRKHOLZ**

Jared Birkholz, CPA declares as follows:

1. I am a Certified Public Accountant (CPA) and previously served as the accountant for the following entities while these entities were operational: DCG Boca, LLC; DCG Florida, LLC; DCG New Jersey, LLC; DCG New York, LLC; DCG Staten Island, LLC; and DCG Texas, LLC (collectively, the "DCG Entities").

2. I provided accounting services to the DCG Entities through the Wolfson CPA Firm located at 2801 N. University Dr., Ste 306, Coral Springs, FL 33065.

3. In connection with the state court case that was filed by Alternative Global Three, LLC ("AG 3") against the DCG Entities, I sat for a deposition by AG 3 on May 24, 2023. I was deposed in both my individual capacity and as the records custodian for the Wolfson CPA Firm.

4. Also in connection with the state court case that was filed by AG 3 against the DCG Entities, I and the Wolfson CPA Firm produced the following documents to AG 3: bank statements, bank reconciliations from DCG QuickBooks, batch payments for monies that left the DCG Entities, including identities of payees and dates of payment, full access to DCG QuickBooks, including all disposition of assets and all financial statements for the DCG

[1] This Declaration is being made pursuant to 28 U.S.C. § 1746.

Entities, such as balance sheets, income statements, statements of cash flows, members' equity statements, a full schedule of expenses included within the income statements, the general ledger, and all journal entries, tax returns (state and federal), K-1 statements for the partners of DCGs, all internal work papers, and all emails with the accountant related to DCG.

5. Individually, and on behalf of the Wolfson CPA Firm, I object to having to produce documents to AG 3 in the DCG Entities' bankruptcy cases, and I object to having to sit for deposition by AG 3 in the DCG Entities' bankruptcy cases, because I already produced to AG 3 all of the documents that either I or the Wolfson CPA Firm has that are relevant to the provision of accounting services to the DCG Entities and to the financial affairs of the DCG Entities, and because I've already been deposed by AG 3 on those subjects, both in my individual capacity, and as the records custodian for the Wolfson CPA Firm.

6. Neither I nor the Wolfson CPA Firm has provided accounting services to the DCG Entities since the period ended May 31, 2022.

*I declare under penalty of perjury that the foregoing is true and correct.*

*Executed on*

____________________________
Jared Birkholz, CPA

EXHIBIT "H"

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:

DCG Boca, LLC, et. al.

Debtor.
_______________________________/

Case No. 24-10601-EPK
(Jointly Administered)
Chapter 7

**DECLARATION[1] OF MATT WEINER**

Matt Weiner, declares as follows:

1. I am, or was, the principal and sole owner of Doctor Media, LLC, DR Media, LLC, DRM Marketing, LLC, and Second Chance Advocate, LLC.

2. I have not been personally served with a subpoena in the above-captioned bankruptcy case. A subpoena duces tecum addressed to DRM Marketing, LLC ("DRM") was mailed to DRM's UPS box, and DRM retained Wernick Law to represent DRM in the above-captioned bankruptcy case.

3. Second Chance Advocate, LLC has nothing to do with the debt settlement business and has never had any relationship, transaction, or interaction whatsoever with any entity named in the subpoena duces tecum that was mailed to DRM, including, without limitation, DCG Boca LLC, DCG Florida LLC, DCG New Jersey LLC, DCG New York LLC, DCG Staten Island LLC, or DCG Texas LLC (collectively, the "DCG Entities"), Consumer Law Relief, LLC d/b/a Helbing Law Group, LLC, or CLR Admin Services, LLC.

4. DRM Marketing, LLC performed marketing services designed to generate client leads for Helbing Law Group, LLC. Doctor Media, LLC and DR Media, LLC are the predecessor

[1] This Declaration is being made pursuant to 28 U.S.C. § 1746.

entities to DRM Marketing, LLC ("DRM"). In and around 2020, DRM succeeded to Doctor Media, LLC and DRM Marketing, LLC.

5. DRM received funds from the DCG Entities that financed DRM's marketing services, and DRM returned to the DCG Entities substantially more money than the amount of money that the DCG Entities transferred to DRM.

6. In connection with the state court case that was filed by Alternative Global Three, LLC ("AG 3") against the DCG Entities, DRM produced to AG 3 records of every transaction between DRM and the DCG Entities from August 2020 forward (the "DRM Transactions"). According to the state court subpoena, AG 3 became a member of the DCG Entities in or around August 2020. DRM also produced to AG 3 bank statements that substantiate each of the DRM Transactions.

7. The DRM Transactions show that, from August 2020 forward, the DCG Entities transferred approximately $2,098,000 to DRM, and DRM transferred approximately $13,828,377 back to the DCG Entities.

8. On behalf of DRM, I object to DRM's having to produce documents to AG 3 in the DCG Entities' bankruptcy cases because DRM already produced to AG 3 all of the documents that DRM has that are relevant to the DRM Transactions and the business relationship between DRM and the DCG Entities.

*I declare under penalty of perjury that the foregoing is true and correct.*

*Executed on*

__________________________

Matt Weiner

EXHIBIT "I"

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 22-CV-20375-ALTMAN/REID

DAVID FEINGOLD, *et al*,

Plaintiff,

v.

RICHARD CARDINALE, *et al*,

Defendants.
_______________________________/

**ORDER GRANTING PLAINTIFFS' MOTION FOR ORDER CONCERNING TIMING AND SEQUENCE OF DISCOVERY UNDER FED. R. CIV. P. 26(d)(3)**

This matter is before the Court on Plaintiffs' Motion for Order Concerning Timing and Sequence of Discovery Under Rule 26(d)(3). [ECF No. 41]. The Court heard from the parties on September 13, 2022, and then ordered Plaintiffs to file a written motion regarding their request to sequence discovery. Plaintiffs have requested to sequence discovery to depose Defendants Richard Cardinale, Vania Cardinale, and corporate representatives from RVCNY, LLC and RVCSI, LLC, before any documents are produced through requests for production and nonparty subpoenas. The Court requested Defendants file a written response to the motion and include in their response an alternative schedule for the proposed discovery and arguments regarding the relevance of the nonparty subpoenas. [ECF No. 33]. The motion is now ripe for review.

## I. Background

Plaintiffs David Feingold and Michael Dazzo and Defendant Richard Cardinale were co-managing members of six special purpose investment funds collectively known as Alternative

Global Companies. [ECF No. 4 at 4]. According to Plaintiffs, Cardinale agreed to maintain the books and records of these companies. [*Id.*]. Plaintiffs allege they withdrew from the companies in January 2022 and demanded the fair value of their membership interests from Cardinale. [*Id.*] To this day, Plaintiffs allege, they have not received their interest in the companies and are thus suing Cardinale for breach of fiduciary duty, conversion, and fraudulent misrepresentation. [*Id.*] Cardinale moved to dismiss the Complaint, and that motion is pending before the district court. [ECF No. 9].

Plaintiffs now seek an order from this Court that would allow them to depose the Defendants before any other discovery is served. [ECF No. 41]. Cardinale, in turn, has served nonparty subpoenas on Davick Capital LLC and Titan Communications Group, LLC. *See* [ECF No. 30, 34]. Cardinale argues Alternative Global Companies transferred funds to Samson Funding LLC, which in turn, transferred funds to an entity managed by Plaintiff Feingold—Davick Capital. [ECF No. 48]. As to Titan Communications, Cardinale argues that the latter secured investors for L3 Capital Income Fund, LLC, an entity related to Alternative Global Companies; and documents obtained from Titan Communications will challenge Plaintiffs' allegation that Cardinale billed Alternative Global Companies for fraudulent administrative expenses. [ECF No. 47]. Davick Capital and Titan Communications have moved the Court to quash the subpoenas or issue a protective order, arguing the subpoenas for depositions and document production are meant to harass Plaintiffs and their business associates. [*Id.*]

Plaintiffs argue in their sequencing motion that if they are not allowed to depose the Defendants first, Cardinale will gain a tactical advantage and will tailor his testimony to documents obtained through requests for production and nonparty subpoenas. [ECF No. 41 at 2]. Essentially, Plaintiffs claim that Cardinale cannot account for the disbursements of funds and will attempt to

substantiate these with business records belonging to other parties. [*Id.*].

Defendants respond that Plaintiffs' sequencing motion should be denied as it amounts to a game of "I'll show my cards, if you'll show yours" and is based on the wrong premise that Cardinale alone was responsible for bookkeeping. [ECF No. 49]. Cardinale adds that Plaintiffs agreed in their joint scheduling report that phased discovery was unnecessary; Plaintiffs have sought none of this information through other discovery; and Plaintiffs will likely ambush Cardinale with unknown information and documents. [*Id.*] Further, Cardinale argues, the Rules of Procedure allow both parties to utilize the discovery process and granting Plaintiffs' motion would result in irremediable prejudice. [*Id.*].

## II. Discussion

"Federal Rule of Civil Procedure 26(d) grants the Court broad discretion to decide the timing and sequence of discovery." *Parks v. NCL (Bahamas) Ltd.*, 285 F.R.D. 674, 675 (S.D. Fla. 2012). The general rule is that parties may use discovery methods in any sequence. *Brown v. Ncl (Bahamas), Ltd.*, Case No. 15-21732-CV, 2015 WL 6673700 at *3 (S.D. Fla. Oct. 30, 2015). But courts retain discretion to control the timing of discovery for the parties' and witnesses' convenience and in the interests of justice. *See Terman v. NCL (Bahamas), Ltd.*, No. 14-24727-CV, 2015 WL 3892508 at *1 (S.D. Fla. June 16, 2015).

Since the parties dispute the sequencing of discovery in this case, the Court must resolve the dispute. The Court agrees with Plaintiffs that Defendants should be required to give their deposition testimony based on their own documentation and recollection of the facts. Plaintiffs sufficiently allege the presence of unique circumstances that generate a concern that Defendants may tailor their testimony. *See Brown*, Case No. 15-21732-CV. These unique circumstances include the intricate structure of the investment funds and Cardinale's multiple roles in the

Case 24-10001-EPK Doc 607-5 Filed 05/13/24 Page 347 of 364

companies.

Defendants have not shown prejudice irremediable prejudice, as they will have an opportunity to conduct their own discovery. Discovery cut-off in this case is March 21, 2023. Also, Defendants' concerns that they may miss the November 8 deadline to amend pleadings or to add parties can be remedied. The deadline can be extended for good cause. Defendants are reasonably concerned that allowing Plaintiffs to depose Defendants first will result in repeated depositions after Plaintiffs obtain more information from interrogatories and requests for productions of documents. Plaintiffs should not be able to subject Defendants to repeated depositions on the same subject matter. That strategy would unnecessarily increase the time and expense of litigation. Since Plaintiffs have chosen to depose Defendants first, any additional depositions of Defendants would be governed by Fed. R. Civ. P. 30(b)(2).

Finally, to avoid further unnecessary delay in the discovery process, Defendants shall provide Plaintiff with six dates within the next four weeks for each of the Defendants' availability for deposition. As Plaintiffs have requested, and to further prevent unnecessary costs and delay, the depositions shall be conducted by Zoom or other electronic means. The parties and their counsel must also be mindful of their obligations to facilitate the efficient progress of this case. The Introductory Statement of the Local Rules provides that "it is a fundamental tenet of this Court that attorneys in this District be governed at all times by a spirit of cooperation, professionalism, and civility . . . [and] [i]t remains the Court's expectation that counsel will seek to accommodate their fellow practitioners, including in matters of scheduling, whenever reasonably possible and that counsel will work to eliminate disputes by reasonable agreement to the fullest extent permitted by the bounds of zealous representation and ethical practice."

With regard to the pending motions to quash filed by Davick Capital and Titan

Communications, the Court will enter a separate order.

Accordingly, it is hereby **ORDERED** that Plaintiffs' Motion for Order Concerning Timing and Sequence of Discovery Under Fed. R. Civ. P. 26(d)(3) [ECF No. 41] is **GRANTED**. Plaintiffs may conduct the depositions of Defendants before other discovery is produced.

**DONE AND ORDERED** in Chambers at Miami, Florida this 18th day of October 2022.

LISETTE M. REID
UNITED STATES MAGISTRATE JUDGE

cc: **All Counsel of Record**

IN THE CIRCUIT COURT OF THE
11TH JUDICIAL CIRCUIT IN AND
FOR MIAMI-DADE COUNTY, FLORIDA

CASE NO. 2022-022016-CA-01

ALTERNATIVE GLOBAL THREE, LLC, a Delaware limited liability company,

Plaintiff,

vs.

DCG STATEN ISLAND, LLC, a Florida limited liability company, DCG BOCA, LLC, a Florida limited liability company, DCG NEW JERSEY, LLC, a Florida limited liability company, DCG NEW YORK, LLC, a Florida limited liability company, DCG FLORIDA, LLC, a Florida limited liability company, DCG TEXAS, LLC, a Florida limited liability company,

Defendants.
________________________________/

Via Zoom
Tuesday, October 24, 2023
10:05 a.m. - 4:45 p.m.

VIDEOTAPED DEPOSITION OF MICHAEL DAZZO

Taken before Mary Ann Collier, a Court Reporter and Notary Public for the State of Florida at Large, pursuant to Notice of Taking Deposition filed in the above cause.

Q. Let's go to 69. Okay. This is the last one here that I'm going to talk to you about for right now. This is April 21st of 2022, and this is from you to Todd Sanders. Who is Todd Sanders?
A. Todd Sanders is a friend of mine.
Q. And what does he do?
A. He works at Broad Street.
Q. How is he involved here?
A. He might have been investing in another venture that we have.
Q. And who's Darren? Darren Silverman?
A. I assume Darren Silverman.
Q. Okay. So is there another debt settlement company that Mr. Silverman is involved with?
A. Yes, there is. A different model, since that model doesn't exist anymore.
Q. What's the name of that company?
A. Again, you guys asked me this last time. I don't think it's relevant here.
Q. Well, I'm going to ask you the questions and I'm going to ask you to just identify the name.
A. Not going to do it.
MR. SWERGOLD: Judge.
MR. BERKELEY: This was an issue that was raised in the federal case. Again, you know,

there are several other cases involving the same parties, Judge, and my client files one case and they've had approximately 13 cases filed against them, all in an effort to start rulings by other courts and it's gamesmanship.

So, with all due respect, in accordance with the federal court ruling, which is the first filed ruling, where my client was not obligated to answer this question according to the magistrate judge, we are going to assert that same here. Because, again, this is nothing more than gamesmanship, trying to cert a federal court's magistrate judge's ruling.

So, with all due respect, we would take this issue to, presumably, Judge Walsh and/or the magistrate judge in the federal case.

MR. SWERGOLD: Judge, there's no such limitation.

SPECIAL MAGISTRATE FINE: Before you argue, let me just hear the question back, please, and I will try to put it in context, because you're taking Mr. Dazzo's deposition as a non-party --

MR. SWERGOLD: I understand.

SPECIAL MAGISTRATE FINE: -- in the currently pending case.

(The question referred to was read by the reporter as above recorded.)

SPECIAL MAGISTRATE FINE: So the question has to do with identifying the name of a debt settlement service company that's not a party -- well, I don't know if it's a party or not until it's named, to this case.

MR. BERKELEY: Yes, judge. It is a subsequent company that has nothing to do with these particular parties. It's a separate and distinct unrelated business.

And the pattern throughout the litigation is opposing counsel and his client get the name of my clients' businesses, they then sue the businesses, issue subpoenas to them to disrupt my clients' business income. And they are now competitors to Mr. Cardinale, who is opposing counsel's client.

Hence, this question being asked in the federal court matter and not being answered in the federal court matter, as per the magistrate judge's findings, because she recognizes the pattern.

So, again, my client is a not a party to this case. He's not here to divulge information about

other businesses that are unrelated, especially when a federal magistrate judge has not required him to do so.

MR. SWERGOLD: This is a totally different case. My client is Alternative Global Three. I'm entitled to trace funds. I asked the name of the company. I haven't asked anything further.

You know, first he says that -- he said it in the other case, which, frankly, I don't know how good or bad his memory is about what he was asked and what he wasn't, if he tells me the name and it lines up with something in the other case, that's going to be the end of it. If he tells me a different company, then that's a different story and we'll have to figure it out from there.

But then I thought I heard counsel arguing that a magistrate said he didn't have to answer it in a different case. So which one is it? He either answered it in the other one or he didn't.

At the end of the day, I represent Alternative Global Three. This case is about Alternative Global Three. This case is about Alternative Global Three's right to trace the money and what happened.

We've just been through a whole series of

messages which show that the business was increasing significantly toward the end of 2021 and then, suddenly, shut down in 2022 and the money dried up.

I want to know where it went. I'm entitled to find out if there's another entity that's been started and the business has been shifted over there.

You had 5,000 customers. They didn't just all go away overnight and they didn't all just go away without having to pay any fees.

THE WITNESS: We have 13,000 customers.

SPECIAL MAGISTRATE FINE: Hold on, everybody. Hold on. I may have misunderstood, but what I heard the witness say is not that he answered it in the other case, but he was asked it in the other case.

MR. SWERGOLD: No. All the more reason that we're entitled to it, because Judge Walsh ruled that we're entitled to ask whatever we want, with the only limitation that you expressly read onto the record earlier, judge, which says we can't ask anything that was asked in the other case.

It doesn't say you can't ask anything that was not asked in the other case, because the

judge ruled X, Y or Z. That's not what the ruling was by Judge Walsh. That's who I'm appearing in front of and that's who this case is in front of.

SPECIAL MAGISTRATE FINE: Hold on. Let me ask you to give me a little bit more background about this case. This is not a proceeding supplementary. Right?

MR. SWERGOLD: It is heading in that direction, and I made that very clear on the record multiple times with Judge Walsh.

MR. BERKELEY: It is not right now.

SPECIAL MAGISTRATE FINE: Hold on. Let me inquire of plaintiff's counsel here.

As I understand it, the plaintiff has acquired a default against the corporate defendants, and this case is proceeding in order to determine the amount of damages and that's all that this case is at this time. Is that right or wrong?

MR. SWERGOLD: You are correct in that. And the only way that I can determine the damages, because heretofore I have been unable to obtain information pertaining to the integration and involvement of each of these entities, which we

have now learned today how tied together and closely knit they were.

And if money has moved and these entities have put assets into a different business, that would absolutely account for my damage and allow me to calculate my damage. And I can't go get that information without knowing, you know, where to look.

SPECIAL MAGISTRATE FINE: If you have the name, what is it that you would be doing?

MR. SWERGOLD: Well, it depends what the name is. If it's a name that already -- that has been covered previously, that's going to be the end of the questioning.

We have spent now all this time discussing this. I could have gotten the name and that would have been the end of it. But it may well be that I have to serve a subpoena on that company to obtain information that would relate to its interactions with CLR and DRM and how all of this mess that we're trying to unwind in this web of companies, what happened. Where did the money go?

Because the issue here is, as you will see -- we will see shortly, there's -- it's 33 -- $33

million tail in fees are anticipated. They're gone. We never got them. And so that's what we're trying to track down and trace and we're entitled to that.

SPECIAL MAGISTRATE FINE: Your client's interest in the defendant entities was what percentage?

MR. SWERGOLD: Your Honor, off the top of my head, I don't know, but I don't think it makes a darn bit of difference whether it's one percent or 100 percent. We're entitled to the information, because we did have an interest in those entities. We are a plaintiff in a lawsuit.

We have -- by virtue of the default, there's a finding of liability here already and an acknowledgment by the defendants, whether they litigate it or not, as to the allegations in the complaint, which include, but are not limited to, that this was a thriving business and then it all just disappeared. So I'm entitled to pursue that.

SPECIAL MAGISTRATE FINE: Okay. So in order to avoid doing potential harm to something that would be confidential, what I'm going to do is require the witness to answer the questions

without identifying a company.

Well, so that there's no mistake, you will call it Company X for the moment, but I need you to put with your attorney what Company X is, Mr. Dazzo, but it doesn't go on the record for the moment, but this information, you know, both sides have a right to appeal any decisions I make to Judge Walsh.

So, you know, this one, you can pursue the line of questioning that you were going to pursue without knowing the identity for the time being.

MR. BERKELEY: Okay. Understanding what you ruled, just so you know, you can look on page 196 of the federal court deposition when the question is asked "What debt settlement company are you currently invested in?"

I mean, I don't even know if that's relevant. And then the question is asked, "Just the name." "I'd rather not give it." "You're going to refuse not to answer that question?"

SPECIAL MAGISTRATE FINE: So here's the thing. I've already ruled and, you know, you don't want to snatch defeat out of the jaws of victory, Mr. Berkeley.

So you don't have -- the witness does not

have to identify the company, but there may be questions that could be relevant to this case about that company. And so for the time being, I'm just saying the name of the company doesn't go on the record, but plaintiff's counsel can inquire.

MR. SWERGOLD: Your Honor, respectfully, I think we have an issue here. We didn't ask him does he have an ownership interest in the -- in the -- we didn't ask him if he has an ownership interest in the debt settlement company. I didn't ask that. That's not what the question was and that's not what I'm pursuing.

I'm pursuing the flow of funds, not the ownership of the company. I think there's a pretty big distinction between those two features. I would ask you to think about that and consider whether this is an appropriate question.

I know it's easy to lose the context with all the back and forth.

SPECIAL MAGISTRATE FINE: So, you haven't convinced me to change my mind, so just go ahead with the rest of your questions and, you know, if something happens to change my mind, I'll let you

know.

BY MR. SWERGOLD:

Q. Did any deals from or clients of CLR, DRM, Helbing or the DCGs get transferred to Company X?

A. Absolutely not.

Q. What is Debt USA?

A. So Debt USA --

MR. BERKELEY: Objection. You already asked that in the federal court matter. I will give you the page number.

MR. SWERGOLD: I will move on.

BY MR. SWERGOLD:

Q. What is Second Chance Initiative?

A. No idea. Never heard of it.

Q. I'm sorry. Second Chance Advocates.

A. Never heard of it.

Q. You have no affiliation with them?

A. No, not that I know of.

Q. Is Company X Debt USA or a different company?

A. Different company. I want to answer what Debt USA is, if you guys don't mind.

Q. We don't need to at this point.

MR. SWERGOLD: Let's go off the record, please. It's 3:33.

THE VIDEOGRAPHER: Going off the record at

3:33 p.m.
(Thereupon, a brief recess was taken, after which the following proceedings were had:)
THE VIDEOGRAPHER: Going back on the record at 3:43 p.m.
BY MR. SWERGOLD:
Q. All right. Let's get started.
Mr. Dazzo, did any fees owing to DRM, CLR or DCG get transferred to Company X?
A. No.
Q. Did any assets belonging to DRM, CLR, DCG get transferred to Company X?
A. No.
Q. Does Company X operate out of any of the same offices where DCG, DRM or CLR have ever operated?
A. No.
Q. Who's email is Admin@debtleader.com?
A. I believe the operators could be Brenner and Silverman and Meeler. They could all have access to it.
Q. All the same ones?
A. Correct.
Q. All the same emails. They don't have separate emails?
A. They might, but they might all have access to

**admin@debtleader.com**

**From:** Richard Cardinale <l3capitalmanagement@gmail.com>
**Sent:** Thursday, January 6, 2022 4:59 PM
**To:** admin@debtleader.com
**Cc:** robert@crgny1027.com; daz1201@aol.com
**Subject:** Re: Draft Idea
**Attachments:** CaliforniaAssemblyBill1405.pdf; Untitled attachment 00825.htm

Thank you Darren let's jump on a quick call tomorrow morning to tweak just a few subtle things if possible.

Sent from my iPhone

> On Jan 6, 2022, at 3:27 PM, admin@debtleader.com wrote:
>
> Dear ,,,,
>
> I hope this email finds you well and safe in the New Year.
>
> In October, California passed a new bill (see attached) greatly affecting the clients that use the marketing we create. There are multiple items in the bill that has caused the elimination of doing business in the state. Since California has 39 million people and is a large percentage of most debt businesses without doing business in this state would be detrimental to the company. We waited to see if there was any pushback from associations to delay or challenge the bill but there has been none. Therefore, unfortunately, we are shutting down the operations going forward. As we wind down we will be making payments of the net receivables as they come in with the goal of having your Return of Capital account paid in full.

**admin@debtleader.com**

**From:** admin@debtleader.com
**Sent:** Friday, January 7, 2022 2:14 PM
**To:** 'Richard Cardinale'; robert@crgny1027.com; daz1201@aol.com
**Cc:** admin@debtleader.com
**Subject:** DCG new draft
**Attachments:** CaliforniaAssemblyBill1405.pdf

RC and I tweeked the letter a little to make it a little softer. See draft:

Dear ,,,,

I hope this email finds you well and safe in the New Year.

The reason for sending this letter with a phone call to follow is to let you know sometime in October 2021, the state of California passed a new bill (please see attached) which greatly affects the industry we market in. There are multiple items in the bill that has caused us to stop business in the state effective January 1st, 2022. Since California has 39 million people and is a large percentage of most debt businesses out there, losing business in this state is detrimental to the company. We waited to see if there was any pushback from associations to delay or challenge the bill as there has been in years past, but there has been none. Therefore, in the best interest of the company and everyone involved, we need to cease operations going forward. As we wind down the companies, we will be making payments of the net receivables as they come in with the goal of having your Return of Capital account paid in full.

**admin@debtleader.com**

| | |
|---|---|
| **From:** | Robert Giardina <robert@crgny1027.com> |
| **Sent:** | Monday, January 10, 2022 1:22 PM |
| **To:** | admin@debtleader.com |
| **Cc:** | Richard Cardinale; daz1201@aol.com |
| **Subject:** | Re: DCG new draft |

Looks good

On Friday, January 7, 2022, <admin@debtleader.com> wrote:

> RC and I tweeked the letter a little to make it a little softer. See draft:
>
> Dear ,,,,
>
> I hope this email finds you well and safe in the New Year.
>
> The reason for sending this letter with a phone call to follow is to let you know sometime in October 2021, the state of California passed a new bill (please see attached) which greatly affects the industry we market in. There are multiple items in the bill that has caused us to stop business in the state effective January 1st, 2022. Since California has 39 million people and is a large percentage of most debt businesses out there, losing business in this state is detrimental to the company. We waited to see if there was any pushback from associations to delay or challenge the bill as there has been in years past, but there has been none. Therefore, in the best interest of the company and everyone involved, we need to cease operations going forward. As we wind down the companies, we will be making payments of the net receivables as they come in with the goal of having your Return of Capital account paid in full.

--
Best Regards,
Robert Giardina