# AMERICAN ARBITRATION ASSOCIATION

-----------------------------------------------------------------X

**In re: Dissolution of** **AAA Case # ____________**

**ALTERNATIVE GLOBAL MANAGEMENT, LLC,**
**a limited liability company.**

-----------------------------------------------------------------X

## VERIFIED PETITION FOR DISSOLUTION OF ALTERNATIVE GLOBAL MANAGEMENT, LLC, A LIMITED LIABILITY COMPANY

Petitioners David Feingold ("Feingold") and Michael Dazzo ("Dazzo") (collectively, "Petitioners"), hereby respectfully petition this Arbitration Panel to dissolve Alternative Global Management, LLC, a Delaware liability company ("AGM" or "LLC"), and for a declaration that, based on good cause shown, Petitioners may wind up the affairs of the LLC. Further, Petitioners request an **emergency interim award**, preliminary injunction and permanent injunction against Respondent Richard Cardinale ("Cardinale") restraining him from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies (defined below) without the prior written approval and authorization from Petitioners. The grounds for this Verified Petition are as follows:

## SUMMARY OF ACTION

1. AGM was formed in September 2019 as a Delaware limited liability company. Feingold, Dazzo and Cardinale are the individual managers and control members of AGM.

2. AGM is the ultimate manager and 100% owner of six entities – Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC and Alternative Global Six, LLC (collectively, as the "Alternative Numbered Entities" and with AGM the "Alternative Global Companies"). Feingold,

Dazzo and Cardinale each are also the one-third beneficial owners of the Alternative Numbered Entities as the Alternative Numbered Entities are owned by AGM. As described below, RMD Holdings, LLC is listed as the manager of AGM and Dazzo as the Manager of RMD Holdings, LLC.

3. Due to Cardinale's fraud and other misconduct and involvement in illegal activity, Feingold and Dazzo resigned from the Alternative Numbered Entities on January 28, 2022, but they did not resign from AGM. Shortly thereafter, on February 5, 2022, Feingold and Dazzo sued Cardinale (and his co-conspirator spouse and alter-ego entities) in Florida federal court for fraud and other misconduct relating to the Alternative Global Companies.

4. In response to that initial lawsuit, Cardinale began filing lawsuits on behalf of the Alternative Numbered Entities in courts in New York, South Carolina and Florida without the consent or approval of the manager or control members of AGM - Feingold and Dazzo - as required by the Amended and Restated Operating Agreement for AGM (the "AROA") which requires unanimous consent of Feingold, Dazzo and Cardinale or the manager noted therein. A copy of the AROA is annexed as **Exhibit A**.

5. Those lawsuits were filed by Cardinale with full knowledge that he did not have corporate authorization and solely in retaliation for Feingold and Dazzo's lawsuit against Cardinale and Cardinale has made it clear that he would continue to file multiple lawsuits, without any authorization, against Feingold and Dazzo and others until they dropped their pursuit of him which involves millions of dollars of ill-gotten gains.

6. Not only do those actions on behalf of AGM have no authorization to be filed as Feingold and Dazzo have never consented, but if any suit were prevailed upon, it would lead to the illogical result of AGM (or one of its wholly owned subsidiaries, the Alternative Numbered

Entities) suing and making a recovery that would ultimately be paid to Feingold and Dazzo (as Delaware law requires that payment to Feingold and Dazzo as the ultimate beneficial owners of all of the entities). Hence, further proof that not only were the lawsuits filed without consent, but that they were filed consistent with Cardinale's threats of continuously filing lawsuits until Feingold and Dazzo would agree to ultimately drop their lawsuit in Florida federal court which will ultimately require Cardinale and his family to return millions of dollars that they have misappropriated.

7. In addition, Cardinale, without authorization from Feingold and Dazzo, has misappropriated funds from the AGM bank account and has also blocked Feingold and Dazzo from accessing these accounts to discover the amount taken. Further, Cardinale is believed to have siphoned off at least $300,000 which benefited him and without approval by Petitioners in particular in one asset of AGM known as Alternative Spin and, upon information and belief, he is taking assets from the Alternative Numbered Entities (and hence AGM) without proper authorization and approval. Cardinale, even though he has seized control of AGM, has also not filed tax returns for AGM. Also, since Feingold and Dazzo resigned, upon information and belief and under the stewardship of Cardinale, the value of assets has dropped in half with Cardinale refusing to provide any records allowing Feingold and Dazzo to see what he is doing, where he is spending monies owed to Feingold and Dazzo and it has already been established that Cardinale has taken millions in violation of federal securities laws.

8. It is no longer possible to carry on the business of the LLC because, among other things: (i) Feingold and Dazzo are locked in litigation with Cardinale over the Alternative Global Companies; (ii) Cardinale has improperly usurped control over AGM and has and is freezing out Feingold and Dazzo from AGM; (iii) Cardinale's improper usurpation of management and control

over AGM, and other misconduct, violates the AROA; (iv) Cardinale has engaged in multiple acts of fraud, breach of duty and conversion in connection with AGM; (v) Cardinale has improperly usurped control over AGM's sole asset, the Alternative Numbered Entities, and is destroying the sole asset; (vi) Cardinale has and continues to misuse the assets of AGM for his sole benefit; (vii) Cardinale has commenced and is prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo and with the ultimate result of those entities which are pursuing claims having to pay Feingold and Dazzo, the ultimate owners of the same.

9. Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage AGM, its business and its assets and has even told multiple people that he would rather destroy everything and continue to litigate. Thus, (i) Cardinale has failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems, (ii) Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin with millions in misappropriations and losses, (iii) Cardinale has and continues to decimate the value of Alternative Global One, LLC's structured finance portfolio misappropriating and/or losing approximately half its value or about $25 million which losses he has also concealed from his investors, and (iv) Cardinale seemingly continues to support a lavish lifestyle while improperly charging AGM funds or assets for his own personal use and it is believed that he is continuing to do so even while he has also stated that his L3 Capital investors are being required to finance what he unilaterally decides is L3 litigation.

10. Petitioners seek dissolution of the LLC and request permission due to good cause shown to wind-up the affairs of the LLC. Further, Petitioners seek a preliminary and permanent

injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners (which the AROA requires) and an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies.

## JURISDICTION

11. There is jurisdiction over this matter and AGM, Feingold, Dazzo and Cardinale pursuant to the broad arbitration provision in the AROA. Thus, Section 10.07 of the AROA provides:

> (a) Dispute Resolution Process. In the event of **any claim, dispute, or controversy arising under, out of or relating to this Agreement**, or any breach or purported breach thereof (the "Dispute") which the Parties hereto have been unable to settle or agree upon in the normal course of business, the Parties shall follow the dispute resolution process as set forth herein.
>
> (b) Negotiations. The Parties shall attempt in good faith to resolve the Dispute promptly by negotiation between representatives who have authority to settle the Dispute and who are at a higher level of management than the persons with direct responsibility for administration of this Agreement. Either Party (in this context, the "Disputing Party") may give the other Party written notice of the existence of any such Dispute ("Dispute Notice"). Within fifteen (15) days after delivery of the Dispute Notice, the Party receiving the notice shall submit to the Disputing Party a written response. The Dispute Notice and the response shall each include: (i) a statement of the relevant Party's position and a summary of arguments supporting that position; and (ii) the name and title of the representative who will represent the Party in the negotiations and of any other person who will accompany such representative. Within thirty (30) days after delivery of the Dispute Notice, the representatives shall meet at a mutually acceptable time and place, and thereafter as often as they reasonably deem necessary, to attempt to resolve the Dispute ("Settlement Period"). However, this Settlement Period shall terminate no later than ninety (90) days after delivery of the Disputing Party's notice unless such period is extended by mutual written agreement of the Parties. All statements and/or negotiations pursuant to this Section are confidential and shall be treated as inadmissible compromise and settlement negotiations for purposes of all applicable state and/or federal rules of evidence.

(c) Arbitration. After, but only after, the Settlement Period set forth in Subsection (b) has terminated without a resolution, at the request of either Party to the Dispute, the Dispute shall be referred to and finally resolved by binding arbitration.

(i) **Any arbitration pursuant to this Section shall be administered by the American Arbitration Association (AAA)** using FINRA rules then in effect before a three member panel, with each Party selecting one arbitrator and the third arbitrator, who shall be the chairperson of the panel, being selected by the two Party-appointed arbitrators. The Party who initiates the arbitration process shall name its arbitrator in the demand for arbitration and the responding Party shall name its arbitrator within ten (10) days after receipt of the demand for arbitration. No arbitrator can be an employee, ex-employee, director, shareholder of record, Member, member, representative, or agent of such Party or its affiliates. The third arbitrator shall be named within ten (10) days after the appointment of the second arbitrator. If the two Party- appointed arbitrators are unable to agree upon the third arbitrator within that ten (10) day period, the third arbitrator shall be selected by the AAA. Each arbitrator shall be qualified by at least ten (10) years' experience in the corporate finance, private funds, and/or venture capital industry, and the chairperson of the arbitration panel shall be a licensed attorney whose primary area of practice for the preceding ten (10) years is in the corporate finance, private funds, and/or venture capital industry. If prior to the conclusion of the arbitration any arbitrator becomes incapacitated or otherwise unable to serve, then a replacement arbitrator shall be appointed in the applicable manner described above.

(ii) The arbitrators shall be bound by the terms and conditions of this Agreement, and any relevant evidence and testimony, and shall render their decision within thirty (30) calendar days following conclusion of the hearing. The award rendered by the arbitration panel shall be (i) in writing, signed by the arbitrators, stating the reasons upon which the award is based, (ii) rendered as soon as practicable after conclusion of the arbitration, and (iii) final and binding upon the Parties. Judgment on the award may be entered and enforced by any court of competent jurisdiction thereof. The Parties expressly invoke the provisions of the Federal Arbitration Act for purposes of confirmation, vacation or modification of the arbitration award (Title 9 U.S.C. §§ 9, 10 and 11). The preceding provisions of the Federal Arbitration Act are the sole and exclusive means by which an arbitration award can be reviewed, vacated or modified. The arbitrators shall, in any award, tax all of the arbitration fees (including arbitrators' fees) and costs of the arbitration (other than each Party's individual attorneys' fees and costs related to the Party's participation in the arbitration, which fees and costs shall be borne by such Party), against the losing Party. Until such award is made, however, the Parties shall share equally in paying the costs of the arbitration. Should

> it become necessary for the prevailing Party to seek judicial enforcement of the arbitration award, all attorneys' fees and costs associated with that effort shall be taxed against the losing Party.
>
> (iii) Only damages allowed pursuant to the terms of this Agreement may be awarded and, without limitation to the foregoing, the arbitrators shall have no jurisdiction to consider (i) any punitive, exemplary, special, indirect, incidental, consequential, or similar damages arising under, arising out of or related to this Agreement or damages beyond the limitations of liability contained in this Agreement, regardless of the legal theory under which such damages may be sought and even if the Parties have been advised of the possibility of such damages or loss, or (ii) any challenge to the validity of the limitation of liability provisions contained in this Agreement.
>
> (d) Exclusivity. **The procedures specified in this Section shall be the sole and exclusive procedures for the resolution of Disputes between the Parties arising out of or in connection with this Agreement**.
>
> (e) Tolling of Statute of Limitations. All applicable statutes of limitation and defenses based upon the passage of time shall be tolled during the Settlement Period while the procedures specified in this Section are pending. The Parties will take such action, if any, required to effectuate such tolling.

Emphasis added.

12. Utilizing the pre-arbitration dispute resolution procedures would be futile since Feingold, Dazzo and Cardinale are currently locked and embroiled in multiple litigations and do not speak and have no interest in speaking, and they previously attempted to resolve disputes including by way of court ordered mediation without any success at all. Also, Cardinale has disavowed the AROA. Further, the pre-arbitration dispute resolution procedures are too vague and uncertain to be enforceable.

13. Petitioners select New York County as the place for the live evidentiary hearings as Respondent Cardinale resides in the State of New York at 178 Benedict Road, Staten Island, New York and Cardinale has testified that he runs the Alternative Global Companies out of his Staten Island residence and a local UPS store.

## FACTUAL BACKGROUND

14. We are dealing here with three individuals, Feingold, Dazzo and Cardinale. Beginning in 2019 and thereafter, they set up six entities, the Alternative Numbered Entities, through which they conducted various business, but the Alternative Numbered Entities took nothing, acted as a conduit and the monies flowed up to a seventh entity, AGM, which 100% owns and ultimately manages the Alternative Numbered Entities (as demonstrated in AGM's redated tax returns which show that AGM owns all of the Alternative Numbered Entities 100% with no other owners having any interest, **Exhibit B**).

**AGM, Alternative Numbered Entities and the AROA**

15. AGM is the initial entity formed by Feingold, Dazzo and Cardinale in connection with the Alternative's business, and the initial AGM Operating Agreement, signed by Feingold, Dazzo and Cardinale is annexed as **Exhibit C**.

16. AGM was formed in order to manage the Alternative Numbered Entities and collect from them the proceeds of their business endeavors and then those proceeds would be first used to pay back amounts owed to Cardinale's L3 Capital Income Fund, LLC ("L3 Capital") investors with amounts above and beyond to be split equally between Feingold, Dazzo and Cardinale. Thus, AGM is essential to the proper functioning of the entirety of the Alternatives' business. Further, the Alternative Numbered Entities take nothing as part of this process as those entities are merely a conduit for distribution to AGM, as they are simply entities that reflect the source of various monies, *i.e.*, specialty finance, real estate, debt settlement, homebuilding, and restaurants in order to keep track of sources of divisions but thereafter all monies and management flow up to AGM. Simply put, the Alternative Numbered Entities do not exist without AGM, Feingold, Dazzo and Cardinale.

17. In or about February 2021, Cardinale himself determined to engage in a restructuring of AGM to allow for certain of his investors to own Class B Units in AGM (non-voting), which resulted in the AROA. Cardinale sent dozens of emails to the Class B investors announcing the AROA and announcing the binding terms of the AROA to the entire AGM business.

18. The AROA, along with a confirming letter that Cardinale sent to each of his investors advising them of the operation of the business under said document, provides that the management and control of the business and affairs of AGM is vested in the Manager. *See* definition of "Manager" at p. 3, § 6.01. **Exhibit A**. This management and control of the business and affairs of AGM includes the business and affairs of AGM's only asset - - the Alternative Numbered Entities - - and the term "Affiliates" (which includes the Alternative Numbered Entities) is repeatedly used throughout the document (*See* definition of Permitted Transferee, 6.01(b), 6.01(c), 6.01(e), 6.10, 6.11(b), 6.12(a), 6.12(b), 6.12(c). 10.07(c)(i), 10.08, 10.16, 10.19, ).[1]

19. The initial manager of AGM is listed as RMD Holdings, LLC [standing for **R**ichard (Cardinale), **M**ichael (Dazzo) and **D**avid (Feingold)](at page 3) and Dazzo as the Manager of RMD, but Cardinale has secreted certain RMD related materials (and others). Originally, in Federal Court in Florida, Cardinale claimed that his computers were stolen and he had no documents and hence refused to make the AROA and RMD documents available, but now he is selectively making documents available and has miraculously changed his story that all of his computers were stolen,

[1] "Affiliate" is defined at page 1 and means: "with respect to any specified Person or entity, any Person or entity that directly or indirectly controls, is controlled by, or is under common control with such specified Person or entity and, with respect to a specified Person that is an individual, such Person's Immediate Family Members. For purposes of this definition, "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise."

yet he only makes that claim when it is beneficial to him. Nonetheless, it is irrefutable that the AROA requires the unanimous consent of the managers (if multiple managers are appointed) or the unanimous consent of Feingold, Dazzo and Cardinale to take any action. *See* Cardinale letter ("Class A Units will be the only class of interests in the Company that will have voting rights"), and §§ 6.02, 6.05, 9.01. Cardinale, Feingold and Dazzo agreed to be bound by this subsequent LLC agreement for AGM - the AROA - and each of Feingold, Dazzo and Cardinale individually signed member consents for this action pursuant to the initial AGM Operating Agreement between and among them.

20. It cannot be emphasized enough that Cardinale originally claimed in Federal Court in Florida that his computers were stolen and dubiously that the books and records involving AGM were missing. Cardinale now miraculously claims that he has certain documents, even though his alleged books and records were supposedly stolen, but miraculously, only the documents which in any way support Feingold and Dazzo have been claimed to be stolen and yet any document that might arguably help Cardinale, he is able to miraculously produce those documents even though all of his computers and records were miraculously stolen. This miraculous theft corresponds with a Federal District Judge taking the unusual step of having Cardinale and his wife appear for depositions before any other parties in the Initial Florida Federal Case (discussed below).

21. While Cardinale will likely object in this case and change his story once again about how he now continues to find documents, what is completely uncontradicted by all parties is that this AGM relationship is broken beyond repair and that the operation of AGM simply cannot continue as the owners of the same simply cannot continue working together in any manner, especially in light of the fact that one owner, Cardinale, continues to file lawsuits without the

express consent of the other two owners, Feingold and Dazzo, and Cardinale has multiple businesses already in severe trouble as discussed below.

22. Cardinale has unilaterally taken multiple improper actions, including freezing out Feingold and Dazzo, converting and destroying assets, and the filing of unauthorized lawsuits, without Feingold's and Dazzo's approval or consent. Significantly, in the multiplicity of litigations (described below), Cardinale has scrupulously avoided AGM because he is well aware that it is the 100% owner and ultimate manager of the Alternative Numbered Entities and that his improper unilateral acts and conduct, without Feingold's and Dazzo's approval, violate the AROA.

23. Cardinale's purported amnesia about AGM is startling. In fact, Cardinale's L3 entity *invoiced AGM* for over $1.3 million and was paid *by AGM* over $1.3 million for administrative services he claimed he had provided (but did not) for the Alternative Global Companies (*see* Exhibit D below, Second Amended Complaint, and Exhibit B thereto for those invoices) and Cardinale further received, among other things, a one-third profit split, amounting to approximately $3.3 million, *from AGM*.[2] This profit split occurred at the AGM level, the Alternative Numbered Entities *keep nothing*, and is for the amounts above and beyond those owing to the L3 Capital investors. Cardinale has already testified and admitted in a court ordered

[2] Cardinale recently testified about this structure in the Initial Florida Federal Case that:

Were there monthly invoices that were sent to Alternative Global Management, LLC? A. Yes.

Q. **So you've received nothing personally or to an entity that you own or controlled from Alternative Global Management, LLC** MR. BENAYOUN: Object to the form of the question. A. **I'm saying I have**. Several times. BY MR. WELTZ: Q. I thought you said you received those from L3. I'm going to ask this a different way. How about this, what is the total compensation that you received directly or indirectly as an advisory fee, a management fee, an acquisition fee, and a total compensation? MR. BENAYOUN: Object to the form of the question. A. Okay. So I received over time a $1.6 million acquisition fee, L3 Capital Management received roughly 1.5 million, give or take in fees, administrative fees of which 700,000 was Titan Communications invoicing L3 Capital Management and the balance went to administrative costs. Any other disbursements that were made to David Feingold, Michael Dazzo and Richard Cardinale totaling about 8 -- 6.8 million, 6.9 million. **And those were disbursements which were above the 12 and 15 percent returns that -- with the targeted returns to the investors in the fund.** (emphasis supplied).

deposition of him that he was paid $1.6 million (that is the number he admits to), yet he claims ignorance and stolen books and records even though there are no police reports, insurance claims, no written complaints or evidence of those alleged thefts. Only after Feingold and Dazzo sued Cardinale did Cardinale first claim his books and records were stolen (those same books and records that could be used against him to prove his multi-million dollar scam) and the same books and records which he accepted $1.6 million in fees as he always represented that he earned the fees by keeping all of the books and records.

24. Cardinale now conveniently forgets about AGM and the process that was followed, and that he was paid L3 acquisition fees of $1,598,601.81; L3 advisory fees of $620,000; Alternative Global Management, LLC payments to DZ Squared (between December 1, 2020 and January 1, 2021) of which Cardinale received $2,987,000; Alternative Global Management, LLC management fee payments to RVCSI, LLC (an entity controlled by Cardinale) (between July 24, 2020 and April 8, 2022) of $3,263,055.05; debt settlement payments to Cardinale (between October 19, 2020 and January 28, 2022) of $1,935,000; $410,000 on closing fees paid to L3 Capital Management, LLC; and the in excess of $1.3 million (that Cardinale testified is $1.6 million) paid to Cardinale for claiming to maintain the books and records of the Alternative Global Companies. All of these payments to Cardinale are set forth above to show that someone that received nearly $11 million in total compensation and $1.6 million in specific payments for keeping the same books and records that he claims are now missing which would prove his fraud, should at a minimum show this Arbitration Panel that the suspicious nature of his handling of critical documents in combination with the obvious acrimonious nature of relationship amongst the owners shows that AGM cannot proceed, is irrevocably broken and should be dissolved quickly.

**<u>Feingold and Dazzo Resign From the Alternative Numbered Entities</u>**

25. On January 28, 2022, Feingold and Dazzo resigned from the Alternative Numbered Entities, but not AGM, due to Cardinale's fraud and misconduct in connection with the Alternative Global Companies. Feingold and Dazzo stayed in AGM knowing it is the ultimate owner and control party because its value is enormous, millions of dollars were made from the business and by resigning Feingold and Dazzo were immediately entitled to the payment of the fair value of their interests in the business as codified under Delaware law. In short, Delaware law requires the payment of the fair value of the business to any LLC Members that resign and hence millions are owed to Feingold and Dazzo upon their resignation from the Alternative Numbered Entities. Thus, they removed themselves from involvement with Cardinale but did not remove themselves from the right to receive Delaware law mandated payments from him.

26. Feingold and Dazzo could simply no longer maintain a relationship with Cardinale due to dozens of complaints of fraud and dishonesty by investors against Cardinale and their desire to disassociate from him and they also learned of his organized crime ties, including conduct such as being involved in sending thugs to a competitor's home residence to threaten and beat that person. Feingold and Dazzo simply could not be involved with a person whose method of business involved such tactics.

**<u>The Initial Florida Federal Case</u>**

27. On February 5, 2022, Feingold and Dazzo sued Cardinale and others in the pending action styled *David Feingold and Michael Dazzo v. Richard Cardinale, Vania Cardinale, RVCNY, LLC and RVCSI, LLC*, U.S.D.C. Southern District of Florida, Case No. 1:22-cv-20375-RKS/LMR (referred to herein as the "Initial Florida Federal Case"), wherein the plaintiffs there (Feingold and Dazzo) assert claims against Cardinale (and others) for various misconduct including claims for

breach of fiduciary duty, conversion and fraudulent misrepresentation in connection with the Alternative Global Companies. A copy of the operative complaint, the Second Amended Complaint, is annexed hereto as **Exhibit D**.

28. The Second Amended Complaint in that Initial Florida Federal Case includes allegations and evidence that Cardinale, and his long-time business associate, Robert L. Giardina ("Giardina") (his partner of nearly 25 years as they conducted businesses together out of Staten Island), recently engaged in gangster-like tactics to try to force a competitor to give over his business to them.[3] (Exhibit D, at ¶¶ 55-62).

29. Feingold and Dazzo also allege that Cardinale was paid over $1.3 million to maintain books and records that he did not maintain (Cardinale verbally admits it to be $1.6 million), paid additional fees for non-existent advisory services, converted bank account funds and assets and failed to properly disclose the in excess of $10.8 million that Cardinale took from the investors in L3 Capital, an investment fund solely managed by Cardinale. It should be noted that those L3 Capital investors now have taken their own actions against Cardinale and demanded of him in his separate business that they too want to disassociate from him and have basically sought

[3] Cardinale, Giardina, and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement (see FTC press release annexed hereto as **Exhibit E)** and continuing action brought by the New York Attorney General (NYAG Complaint annexed hereto as **Exhibit F**). Giardina has also invoked the Fifth Amendment in response to questions concerning his own and Cardinale's involvement with that business. *See* portions of Giardina's deposition and court decision annexed hereto as **Exhibit G**. Giardina was also recently found liable under a civil RICO statute in connection with that business in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included "threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements." ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us."). *See Fleetwood Servs., LLC v. Ram Capital Funding, LLC*, 2022 US Dist. LEXIS 100837, at *16-18 (SDNY June 6, 2022). The similarity between these recent improper tactics and the ones used by Cardinale/Giardina's merchant cash advance company cannot be overstated. It has now further come to light that Giardina has been a secret owner of Cardinale's RIA, L3 Capital Advisors, LLC.

to redeem the overwhelming majority of their own fund money from Cardinale. Feingold and Dazzo also seek additional substantial damages against Cardinale and his alter-ego entities for the fair value of their membership interests in the Alternative Numbered Entities as mandated by Delaware law.

30. In the Initial Florida Federal Case, Feingold and Dazzo made a motion to require that Cardinale and the other defendants be deposed prior to their obtaining other discovery based upon concerns that Cardinale would fabricate testimony and the court granted that sequencing motion, finding (**Exhibit H** hereto, at 3-4):

> **Plaintiffs [Feingold and Dazzo] sufficiently allege the presence of unique circumstances that generate a concern that Defendants [including Cardinale] may tailor their testimony. *See Brown*, Case No. 15-21732-CV. These unique circumstances include the intricate structure of the investment funds and Cardinale's multiple roles in the companies.**

31. As the Initial Florida Federal Case shows, there are a litany of problems which Cardinale has created for himself including that Cardinale had a multitude of roles and conflicts and sources of income as, among other things, he acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Numbered Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise. Cardinale wore many hats in many businesses, much of which was not properly disclosed to his investors while he took millions for himself.

32. Not surprisingly, the court in the Initial Florida Federal Case has already quashed two and severely limited another of Cardinale's multiplicity of endless subpoenas seeking, among

other things, confidential and proprietary business information from non-parties. *See* **Exhibit I** the Order quashing subpoena to Davick Capital, LLC and **Exhibit J** the Orders quashing and then severely limiting subpoenas to Titan Communications. As set forth in the opposition declarations, those non-parties objected to handing over confidential and proprietary business records to Cardinale, an avowed competitor. In Titan Communication's opposition to the subpoena, its owner recounted yet additional wrongful conduct by Cardinale. *See* **Exhibit K** hereto (without exhibits) ( at ¶ 2) (Sanders terminated relationship with Cardinale "after discovery of what I believed to be unethical and illegal behavior by Cardinale including his attempts at overbilling his own hedge fund clients and improperly failing to pay me in a timely manner.").

33. Cardinale also issued bogus subpoenas to Blackstream, LLC, Durham Homes, LLC and Broadstreet, Inc, all South Carolina businesses, seeking confidential and proprietary business information. Those entities moved to quash those subpoenas and the subpoena actions are pending in Federal District Court in South Carolina in matters styled as *Ex. Parte: Blackstream, LLC*, 6:22-cv-03390-TMC; *Ex Parte: Broadstreet Inc.*, 6:22-cv-03365-TMC and *Ex Parte: Durham Homes LLC*, 6:22-cv-03366-TMC. As set forth in the opposition declarations there, these entities have grave concerns about giving over their business records to Cardinale, an avowed competitor, and properly objected to doing so. *See e.g.* **Exhibit L** hereto (at ¶ 2, and ¶¶ 8, 9, 16, 17, 30)("[N]one of the Alternative Global entities invested with Blackstream, LLC. In short, Blackstream, LLC has had absolutely nothing to do with them in any manner except for the fact that the firm is owned by myself, a duly licensed attorney in the State of south Carolina, and Mr. Ford Elliott, and we have a professional relationship with Mr. David Feingold.").

**<u>Cardinale Responds With Multiplicity of Unauthorized, Meritless Litigation</u>**

34. In response to Feingold and Dazzo's Initial Florida Federal Case, which has exposed to the world the extent of Cardinale's wrongful business practices and legal violations, Cardinale responded with a slew of phony cases for public relations purposes and to continue to defraud his L3 Capital investors, often using the Alternative Numbered Entities as the purported plaintiff without Feingold's or Dazzo's approval or consent as required. Notably, approximately 70% of Cardinale's investors in his L3 Capital business have sought redemptions from him, thus indicating the entire business community besides his family and associates like Giardina have learned of Cardinale's associations and multiple business failures which were fraudulently hidden from the business community and they too have determined to remove themselves from Cardinale.

35. **<u>Cardinale's Failed Delaware Action</u>**. *After* the filing of the Initial Florida Federal Case, Cardinale ran to Delaware Chancery Court to purportedly obtain the books and records that he was paid over $1.3 million to keep and maintain. Critically, Cardinale himself strenuously refused to produce any documents in that case. The Delaware Chancery Court in *Cardinale v. Feingold, et al.*, C.A. No. 2022-0133-LWW, recently dismissed Cardinale's efforts to obtain the books and records he was paid over $1.3 million to keep and maintain. *See* Vice Chancellor Lori W. Will's decision, dated January 10, 2023, annexed hereto as **<u>Exhibit M</u>**. As outrageous as it sounds, Cardinale sued claiming his books and records were stolen but refused to enumerate in that action (or ever) what books or records were stolen. Yet again, an example of Cardinale filing one of many illogical actions and all to distract from his horrific line of lies about his business successes and to try to hide his true business failures which he had defrauded his investors for so many years. In short, Cardinale relied upon fake business performance for years in order to solicit investors. In reality, no matter what Cardinale now says, it is uncontroverted that AGM simply

cannot operate with so much controversy and lack of corporate authorization and thereby it should be dissolved.

36. **Cardinale's New York State Case**: On or about October 17, 2022, Cardinale commenced a case in New York State Court styled *Alternative Global Six, LLC v. Durham Homes LLC,* Index No. 653837/2022 (Sup. Ct., NY Cty). This pending case involves Cardinale's breach of his agreement to fund Durham Homes LLC, among his other misconduct, and failure to abide by an arbitration agreement to arbitrate disputes. Cardinale had no authority to commence this case for Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

37. **Cardinale's Florida State Case I**: On or about November 17, 2022, Cardinale commenced a case in Florida State Court styled *Alternative* Global *Three, LLC v. DCG Staten Island, LLC, DCG Boca, LLC, DCG New Jersey, LLC, DCG New York, LLC, DCG Florida, LLC, DCG Texas, LLC,* Case No. 2022-022016-CA-01 (11th Judicial Circuit, Miami-Dade County Florida). This pending case is Cardinale essentially suing himself as he is one of the owners of the various "DCG" entities (standing for "Dazzo," "Cardinale," and "Giardina"). However, Cardinale in his investor "update" made it seem to his L3 Capital investors that suing himself actually accomplished something. Cardinale had no authority to commence this case for Alternative Global Three, LLC as it was done without the approval or consent of Feingold and Dazzo.

38. **Cardinale's South Carolina Federal Case**: On or about December 14, 2022, Cardinale commenced a case in South Carolina Federal Court styled *Alternative* Global *Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC v. Blackstream Development LLC*, Civil Action No. 6-22-cv-4501-TMC (D. South Carolina). This pending case involves Cardinale's claim that Blackstream Development, LLC, a large South Carolina real estate developer, somehow

owes the Alternative Number Entity plaintiffs there a fiduciary duty and an accounting even though Cardinale failed to present any written agreement and there is no basis for finding a fiduciary duty or for an accounting. Blackstream Development, LLC made a pre-answer motion to dismiss Cardinale's Complaint (which is pending). Cardinale had no authority to commence this case for Alternative Global Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC as it was done without the approval or consent of Feingold and Dazzo.

39. **Cardinale's Florida State Case II**: On or about January 17, 2023, Cardinale commenced a case in Florida State Court styled *Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, Alternative Global Six, LLC v. David Feingold and Michael Dazzo,* Case No. 2023-000688-CA-01, Section CA43 (11th Judicial Circuit, Miami-Dade County Florida). This pending case involves Cardinale's purported and false claims against Feingold and Dazzo in connection with the Alternative Global Companies. This case was filed not long after Cardinale was deposed in the Initial Florida Federal Case wherein he disputed his own allegations in this case. Cardinale had no authority to commence this case for Alternative Global One, LLC, Alternative Global Two, LLC, Alternative Global Three, LLC, Alternative Global Four, LLC, Alternative Global Five, LLC, and Alternative Global Six, LLC as it was done without the approval or consent of Feingold and Dazzo.

40. **Cardinale's Florida JAMS Arbitration**: On or about February 17, 2023, Cardinale commenced a JAMS Arbitration styled *L3 Capital Management, LLC v. RIG Select Ventures, LLC*, claiming, among other things, he needs books and records that he apparently already had, has or should have access to.

**Cardinale Opposes Efforts to Assist His L3 Capital Investors**

41. Not surprisingly, in January 2023, Cardinale reported he "**has received redemption requests for more than $58 million, which is more than 70% of the total capital contributed**" by his L3 Capital investors. *See* **Exhibit N** hereto (at 2), a recent letter, dated January 25, 2023, from Cardinale to his L3 Capital investors. Plainly, Cardinale's L3 Capital investors also want to get away from him as quickly as possible. In that same letter, Cardinale also told his L3 Capital investors that L3 Capital's attorneys' fees will "be paid out of Income Fund assets" (at 1).

42. On January 17, 2023, Broadstreet New York Inc. commenced an interpleader action in New York State Court styled *Broadstreet New York Inc. v. L3 Capital Income Fund, LLC and Alternative Global Management, LLC*, Index No. 650218/2023 (Sup. Ct NY Cty), primarily to insure that the investors in Cardinale's L3 Capital receive appropriate distributions *without* Cardinale's interference or attempt at taking monies or continuing to use these dissatisfied investors' monies to pay his own attorneys' fees. The Verified Interpleader Complaint is annexed hereto as **Exhibit O**.

43. Cardinale has engaged in extreme gamesmanship in this interpleader case (and the others), thwarting the interpleader, and using L3 Capital, whose investors are seeking to cut ties with him, and Alternative Global Two, LLC, Alternative Global Four, LLC and Alternative Global Five, LLC as "proposed intervenors" there, to further his own selfish goals and motivations. In a Decision and Order, dated March 15, 2023, the court there rejected Cardinale's shenanigans. *See* Decision and Order attached as **Exhibit P**. Cardinale had no authority to seek to intervene in this case for Alternative Global Two, LLC, Alternative Global Four, LLC, and Alternative Global Five, LLC, as it was done without the approval or consent of Feingold and Dazzo.

44. In truth, Cardinale's unauthorized conduct and litigations is merely a continuation of Cardinale's specious efforts to try to destroy Feingold's business and relationships as he promised he would do when Feingold refused to accede to Cardinale's threats. *See* **Exhibit Q** hereto, declarations of Feingold (at ¶ 45) and Dazzo (at ¶¶ 4-6) submitted in the Initial Florida Federal Case. Those filings were accepted by the court in the Initial Florida Federal Case who then ordered Cardinale (and the other defendants) to sit for depositions before they obtained discovery due to concerns that Cardinale (and defendants) would tailor his testimony.

**There Exists Serious Concerns About Cardinale**

45. There are numerous issues of serious concern about Cardinale. Cardinale has lied about his background and past investment success (claiming an operational history of enormous investor returns yet unable to point to a single tax return or document to substantiate the fraudulent returns he claimed in order to induce his investors which are now redeeming), failed to detail his fees and earnings of in excess of $10.8 million made off his L3 Capital investors, has recently engaged in gangster-like activity against a potential witness and is an owner of another company that recently settled with the Federal Trade Commission for engaging in gangster-like conduct as well as a pending New York Attorney General action. Feingold has also recently uncovered additional evidence that Cardinale's claim that he never had any customer complaints against him is also untrue. There, in fact, are dozens of people with circumstances of negative issues with Cardinale.

46. Cardinale is also currently subject to pending litigation and substantial liability for his fraud and misappropriations.

47. Cardinale has also improperly seized control over AGM, wrongfully frozen out Feingold and Dazzo, and engaged and continues to engage in other improper and unapproved activity with AGM's assets and funds.

**Cardinale Lies to His Investors and Feingold and Dazzo**

48. Cardinale is clearly in trouble. In Cardinale's private placement memorandum for L3 Capital, it sets forth Cardinale's substantial investment experience and acumen, including:

> Richard Cardinale, having built and/or invested in companies that are non-bank providers of alternative financial services - from "concept" through exit - has a deep understanding of the challenges such businesses face, as well as what is needed from the management team to ensure a business can evolve and grow through its evolutionary challenges.
>
> Through his career, Mr. Cardinale has developed an extensive network of contacts in the start-up and growth-phase business communities across geographies and business segments, particularly with AFSPs.
>
> Mr. Cardinale has served as a managing member of the Manager since its inception. The Manager has served as the manager of other private funds which invest in late state pre-IPO companies. Mr. Cardinale has approximately 20 years' experience in the financial services industry with broad experience in stocks, bonds, options, fixed income investments and private placements. Mr. Cardinale was a registered representative at PHX Financial, Inc., a registered broker-dealer from February 2013 through September 2019. From 2007 until 2013, Mr. Cardinale was also a registered representative at Empire Asset Management Company, as well as National Securities Corporation from 2002 until 2007, and Joseph Stevenson & Company Inc from 1994 to 2002. In each of these positions, Mr. Cardinale acted in a sales capacity where he maintained his own retail business with a clientele consisting of both retail and high net worth individuals. **Mr. Cardinale is also a managing member of various real estate investment companies.** The Manager attended St. John's University from 1990 to 1993.

See L3 PPM, at 26, annexed hereto as **Exhibit R**.

49. The private placement memorandum for L3 Capital (at 5 and 21) also sets forth Cardinale's purported stellar track record of making outsized returns for his investors, as follows:

> The Manager is targeting for the Fund to make an annual return of between twelve (12%) to fifteen (15%) percent with payments made to Investors

> quarterly [footnote omitted]. The Manager believes that such return is achievable due to the structure of the Investments intended to be made and **the returns that the principal of the Manager has experienced previously in the non-traditional finance industry.**
>
> The principal of the Manager and his affiliates have invested their own capital in a number of different non-bank providers of alternative financial services for approximately the past ten years and have experienced returns on their investments that are consistent with the returns that the Fund is seeking to target for prospective investors in the Fund. The Fund seeks to achieve its investment objective by investing substantially all of its assets in Investments selected by the Manager based on the investment experience of the principal of the Manager in the alternative finance sector.

50. It turns out that Cardinale lied to investors in the private placement memorandum concerning his background and purported stellar track record of making outsized returns for his investors and in his recent deposition testimony in the Initial Florida Federal Case he could not substantiate those private placement memorandum representations and suddenly claimed that he, a purported fund manager, is unable to understand basic business terms. Thus, Cardinale, an investment fund manager with due diligence obligations, testified that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," as he stated in his deposition that he could not speculate on the meaning of such basic business terms.

## EMERGENCY RELIEF IS REQUIRED

51. In view of the irreconcilable differences between Petitioners Feingold and Dazzo on the one hand and Cardinale on the other hand, and the other continuing improper conduct and pending lawsuits by Cardinale in relation to AGM and its assets, AGM should be dissolved and its affairs wound up as quickly as possible. Emergency relief is required.

52. Cardinale has not only improperly usurped control over AGM and the Alternative Global Companies, but he is also engaging in acts and conduct designed to irrevocably damage

AGM and its assets. He has even told multiple people that he would rather destroy everything and continue to litigate.

53. Cardinale has even failed to file tax returns for AGM putting AGM at serious risk of penalties and IRS problems. *See* **Exhibit S**.

54. Cardinale has also taken control of and continues to decimate an AGM portfolio known as Alternative Spin. Thus, it was conveyed to Feingold that Cardinale unilaterally removed Feingold and Dazzo from Alternative Spin and other portfolios, and locked them out. Upon information and belief, Alternative Spin is worth less than half of its value since the time of Feingold and Dazzo's resignation from the Alternative Numbered Entities in January 2022, meaning multiple millions of dollars have vanished - - Cardinale has misappropriated some these funds and lost or misappropriated others, but either way he is running this AGM asset into the ground.

55. In addition, upon information and belief, the value of Alternative Global One, LLC's structured finance portfolio has been cut in half since Feingold and Dazzo resigned meaning that about $25 million has disappeared. Cardinale has either lost or misappropriated these funds, but either way he is running this AGM asset into the ground. Ultimately, this structured finance portfolio is needed to first pay back loans from Cardinale's L3 investors, but Cardinale has insufficient funds to pay back his redeeming investors as the current redemption demands are believed to exceed $58 million. Thus, Cardinale's continuing fraud and misconduct here threatens any recovery for AGM as well. Not surprisingly, Cardinale has also hidden these massive losses from his L3 Capital investors.

56. Furthermore, as alleged in the Second Amended Complaint, Cardinale has improperly charged AGM funds for his own personal use and it is believed that he is continuing

to do so even while he has also stated that his L3 Capital investors are being required to finance what he considers L3 litigation. All the while, Cardinale seemingly continues to support a lavish lifestyle that includes a Staten Island mansion, a New Jersey farm and a pricey beach home next to Giardina's beach home along with expensive cars, jewelry, restaurants and home furnishings.

57. Moreover, as described, Cardinale has launched and continues to prosecute multiple litigations by the Alternative Numbered Entities without the consent or approval of Feingold and Dazzo while it also remains unclear who is paying for all these litigations. Regardless, as stated, these litigations are not authorized and left in Cardinale's stewardship are certain to cause further damage to AGM.

58. Feingold and Dazzo are also not on speaking terms with Cardinale, and Feingold and Dazzo detest Cardinale.

59. It is imperative that Cardinale be immediately restrained from taking any unilateral action by or on behalf of the Alternative Global Companies to avoid further and additional irreparable injury to the Alternative Global Companies by Cardinale.

**COUNT I**
**DISSOLUTION OF THE LLC**

60. The individual managers and control members of the LLC are unable to agree on carrying on the LLC's business pursuant to the terms of the AROA or otherwise and are not on speaking terms.

61. Cardinale has and continues to engage in acts and conduct designed to destroy the business of AGM and its sole asset, the Alternative Numbered Entities.

62. Cardinale's fraudulent and improper conduct in, among other things (i) improperly usurping control over AGM and freezing out Feingold and Dazzo from AGM; (ii) improperly usurping management and control over AGM, and other misconduct, violating the AROA and

applicable law; (iii) engaging in multiple acts of fraud and conversion in connection with AGM; (iv) improperly usurping control over AGM's sole asset, the Alternative Numbered Entities, and destroying the sole asset; and (v) commencing and currently prosecuting multiple lawsuits purportedly in the name of the Alternative Numbered Entities without the required approval of Feingold and Dazzo, establishes that it is impossible to carry on the business of the LLC.

63. Accordingly, the LLC should be dissolved.

**COUNT II**
**PETITION TO WIND UP AFFAIRS**

64. The foregoing facts satisfy any requirement to permit Petitioners to wind up the affairs of the LLC.

65. Accordingly, the LLC should be wound up by Petitioners or other suitable person that is not Cardinale.

**COUNT III**
**EMERGENCY INTERIM RELIEF AND PRELIMINARY/PERMANENT INJUNCTION**

66. Petitioners seek a preliminary and permanent injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners and an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners.

67. The foregoing facts demonstrate that Petitioners will likely succeed on the merits, there will be irreparable injury if the provisional relief is not granted, and the balance of the equities favor Petitioners.

* * *

**PRAYER FOR RELIEF**

**WHEREFORE**, Petitioners respectfully request that this Arbitration Panel issue and Award:

**A.** dissolving the LLC;

**B.** declaring that Petitioners may wind up the LLC's affairs;

**C.** issuing a preliminary and permanent injunction against Cardinale restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners;

**D.** issuing an emergency interim award immediately restraining Cardinale from taking any action or conduct, directly or indirectly, by or on behalf of the Alternative Global Companies without the prior written approval and authorization from Petitioners;

**E.** requiring reimbursement of Petitioners' attorneys' fees and other expenses incurred by Petitioners regarding the dissolution, including this Arbitration; and,

**F.** awarding such other relief in Petitioners' favor as may be just and appropriate.

Dated: May 21, 2023
Mineola, New York

Respectfully submitted,

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**

By: /s/ *Irwin Weltz*
Irwin Weltz
Thomas Scot Wolinetz
170 Old Country Road, Suite 310
Mineola, New York 11501
Telephone: (516) 506-0561
Irwin@weltz.law
twolinetz@weltz.law

*Attorneys for Petitioners*
David Feingold and Michael Dazzo

**VERIFICATION**

STATE OF FLORIDA )
) ss:
COUNTY OF MIAMI-DADE)

David Feingold, being duly sworn, deposes and says:

I am one of the Petitioners in this matter. I have read the foregoing Verified Petition and know its contents. The Verified Petition is true to my knowledge, except as to matters alleged on information and belief, and as to those matters, I believe them to be true.

[signature]

David Feingold

State of Florida County of Broward
The foregoing instrument was acknowledged before me via ☐ physical presence OR ☑ online notarizations this 22 day of May, 20 23.
By David Feingold
Personally known ✓ OR produced identification ______
Type of identification produced ______
Marisela Cusati
NOTARY NAME HERE, Notary Public
My Commission Expires 01/12/2024

MARISELA CUSATI
Notary Public-State of Florida
Commission # GG 925765
My Commission Expires
January 12, 2024