**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 1:22-cv-20375-ALTMAN/REID**

DAVID FEINGOLD and MICHAEL DAZZO,

Plaintiffs,

vs.

RICHARD CARDINALE, VANIA CARDINALE,
RVCNY, LLC and RVCSI, LLC,

Defendants.
_____________________________________________/

# SECOND AMENDED COMPLAINT

Plaintiffs David Feingold and Michael Dazzo file this Second Amended Complaint for damages against Defendants Richard Cardinale, Vania Cardinale, RVCNY, LLC, and RVCSI, LLC, and state and allege as follows:

## NATURE OF THE ACTION

1. This is a civil action for failure to pay fair value for membership interests, breach of fiduciary duty, conversion, fraudulent misrepresentations, conspiracy to commit fraud, civil conspiracy, and aiding and abetting breach of fiduciary duty.

## PARTIES

2. Plaintiff David Feingold ("Feingold") is a citizen of Florida who resides in the Southern District of Florida.

3. Plaintiff Michael Dazzo ("Dazzo") is a citizen of Florida who resides in the Southern District of Florida.

4. Defendant Richard Cardinale ("Cardinale") is a citizen of New York who resides at 178 Benedict Road, Staten Island, New York.

5. Defendant Vania Cardinale is a citizen of New York who resides at 178 Benedict Road, Staten Island, New York. Cardinale and Vania Cardinale are married and have been married during the relevant period herein.

6. Defendant RVCNY, LLC is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCNY" stands for "Richard Vania Cardinale New York." Cardinale and Vania Cardinale, both citizens of New York, are claimed by Cardinale to be the only members of RVCNY, LLC. As detailed below, RVCNY, LLC is an alter-ego entity of Cardinale.

7. Defendant RVCSI, LLC is a limited liability company organized under the laws of the State of New York with its principal place of business in the State of New York. "RVCSI" stands for "Richard Vania Cardinale Staten Island." Cardinale is a citizen of New York and Cardinale claims to be the only member of RVCSI, LLC. As detailed below, RVCSI, LLC is an alter-ego entity of Cardinale.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1332(a)(1), because this is a civil action between citizens of Florida and citizens of New York, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9. This Court has personal jurisdiction over Defendants through Defendants transacting, doing, and soliciting business in this District, and because a substantial part of the events occurred in this District. This controversy also involves multiple limited liability companies with their main corporate offices and registered agents in this District. Each action is alleged to have taken place in this District or via electronic communications that either originated in or were received in this District.

10. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because Defendants transact business in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**FACTS SUPPORTING CLAIMS**

11. This Second Amended Complaint involves the actions of Cardinale hiding over ten million dollars of compensation from his investors in the L3 Capital Income Fund, in which he is the sole fund manager, as well as his fraudulent billings to Plaintiffs for services that Cardinale never performed and for which he has been claiming a lack of knowledge of substantially all businesses operations even though he was the highest compensated person with the responsibilities of manager, paid advisor, equity owner, fiduciary and paid consultant. Prior to providing testimony in this case, Cardinale has claimed, after many questions raised by his investors, that he has a complete lack of knowledge of not just the business operations but also no possession of critical business records for all businesses which he oversaw and was paid to oversee. Now Cardinale claims in testimony in this case that it was not his primary job or responsibility to oversee business operations, not his job to maintain the books and records and further admitted that he does not have the complete books and records that he was paid to keep and maintain. More than that, Cardinale has now further testified that he lacks an understanding of basic business and financial terms of common usage and that multiple representations that Cardinale made to his investors and to induce Plaintiffs are materially false and misleading.

12. The key facts begin on or about the first week of July 2019 when after numerous prior discussions, Cardinale asked Feingold and Dazzo to be co-managers of his investment fund he was forming, the L3 Capital Income Fund. Both Feingold and Dazzo rejected the proposal. Feingold and Dazzo told Cardinale they had no desire to be fund managers, that their offices were

not set up to service and administer a fund of retail investors, and that they had several outside businesses that would not allow them to devote the time necessary to be a fund manager and operate a fund.

13. Cardinale responded that he had operated nearly ten funds himself and already had a complete back office set up to operate a fund. Cardinale told Feingold and Dazzo he employed two administrative workers and one in-house attorney, and that he would provide all record keeping, reporting, due diligence, compliance and complete back-office services so both Feingold and Dazzo would not have to be responsible for any administrative services. Feingold and Dazzo still rejected the proposal.

14. In addition, Cardinale said that he had an advisory company, L3 Capital Advisors — a registered investment advisor ("RIA"). Cardinale also said that he was familiar with all legal requirements as his RIA held him to a higher standard and therefore, he was qualified to handle the services discussed. Feingold and Dazzo again advised Cardinale that they still were not interested in being managers of a fund.

15. Feingold and Dazzo conveyed that they were only looking for a source of non-recourse funding to pursue various businesses they were pursuing, including merchant cash advance and real estate. They advised Cardinale they could have their various businesses borrow money from Cardinale's fund, the L3 Capital Income Fund, and that they would pay above market interest rates if the money was loaned to them non-recourse and unsecured but they only wanted to find a lender, they were not interested in being fund managers and had never previously acted as fund managers and did not feel comfortable with such responsibilities or the back office and record keeping requirements and thereby Feingold and Dazzo rejected any proposal involving

responsibility for the L3 Capital Income Fund. Feingold and Dazzo were simply seeking a source of funding for the businesses that they wanted to pursue and were simply looking for a lender.

16. Cardinale said he would agree to having his fund, the L3 Capital Income Fund, be a lender to Feingold and Dazzo's intended business endeavors if he was made an equal equity owner in any borrowing business entity and could earn money from any monies generated from the borrowing business entities. These business entities eventually became Alternative Global One LLC (specializing in the merchant cash advance industry), Alternative Global Two LLC (seeking opportunities in infrastructure and real estate development), Alternative Global Three LLC (focusing on the debt-settlement industry), Alternative Global Four LLC (developing real estate), Alternative Global Five LLC (investing in the fast-food industry), and last, Alternative Global Six LLC (specializing in home building).

17. Cardinale, Feingold, and Dazzo agreed that another newly formed company, Alternative Global Management LLC, would receive all funds over any loan payments owed by Alternative Global One through Six (Alternative Global Management LLC and Alternative Global One through Six are hereinafter collectively referred to as the "Alternative Named Entities").

18. Eventually after further discussion, Feingold and Dazzo ultimately agreed that they would allow Cardinale as an equal member in the Alternative Named Entities if, and only if, (a) Cardinale disclosed all conflicts of interest and compensation to his clients and (b) if they could use L3 Capital Income Fund's back office administrative services, which included the entire staff of L3 Capital Income Fund to provide all record keeping, reporting, due diligence, compliance and complete back-office services and support for the Alternative Named Entities. This was all to be billed as administrative expenses.

19. Cardinale said that he would have himself and his entire back office provide such services for the Alternative Named Entities if the Alternative Named Entities paid all the administrative expenses of both the L3 Capital Income Fund and the Alternative Named Entities since it would all be the same staff for both the fund and Alternative Named Entities and Cardinale had already gone through the time and expense and had the experience of running complete back-office services. Hence, the Alternative Named Entities would pay all administrative expenses for themselves and the L3 Capital Income Fund in return for all of the back office, record keeping, due diligence, and compliance (which all were collectively referred to as the administrative expenses) which were to be provided in one spot, which was at the office location of Cardinale for not only the Alternative Named Entities but also the L3 Capital Income Fund.

20. This deal was beneficial for Feingold and Dazzo as they did not have to worry about any of the aforementioned administrative services for the Alternative Named Entities and this deal was also beneficial for Cardinale as all administrative services were paid for by the Alternative Named Entities with regards to Cardinale's operation of the L3 Capital Income Fund, the entity which he was the sole fund manager responsible to all of his retail investors. Therefore, Feingold and Dazzo would not have to worry about any administrative services and Cardinale would not have to worry about paying the administrative expenses for L3 Capital Income Fund.

21. Cardinale also represented to Feingold and Dazzo that he would solve all concerns about how he would make all conflict of interest and earnings disclosures as he was personally responsible for such disclosures anyway since he operated an RIA. See **Exhibit A**, p. 6. Thus, under law as an RIA, Cardinale was a fiduciary and would have to make all conflict-of-interest disclosures and complete and detailed compensation disclosures anyway and so the requirements of Feingold and Dazzo regarding disclosure would be met.

22. Cardinale also required that he be paid an advisory services fee through his RIA, L3 Capital Advisors, as he claimed to have the most real estate and financial experience, said he would oversee everything, and therefore he should earn even more fees for those additional services of overseeing all entities and providing what he described as his superior skills.

23. Cardinale boasted about his investment return history of 12-15% as well as his prior business endeavors throughout his business career. Cardinale repeated these lofty returns in the private placement memorandum he circulated for potential investors in the L3 Capital Income Fund and to Plaintiffs.

24. Cardinale made other representations in order to induce Plaintiffs to do business with him, including: (1) Cardinale represented he was a successful developer and largest developer in Leesburg, Florida and was making millions; (2) Cardinale represented he built 20 apartment buildings in New York; (3) Cardinale represented that he successfully developed a high-priced condo; (4) Cardinale represented that he had an unblemished record in finance and real estate; (5) Cardinale represented he had a gold fund where people made six times their money and it was going public; (6) Cardinale represented he raised over $30 million for a company called Graphoid where all investors made money and that company was going public; (7) Cardinale represented he produced a successful motion picture; (8) Cardinale represented that he successfully ran multiple debt settlement companies; (9) Cardinale represented he made significant returns in the payday lending business with Sky Capital; (10) Cardinale represented he had a successful sports bar operation in Leesburg, Florida; (11) Cardinale represented that he had a high-end, successful coffee shop in New York; (12) Cardinale represented he was opening tattoo parlors and acquired the equipment; (13) Cardinale represented he had a scrap metal operation in Brazil that was successful; (14) Cardinale represented he was a successful international developer including

successful development of townhomes in Brazil; and (15) Cardinale represented that in 2006 he made so much money as a real estate developer that he could retire and was only working because he enjoyed training young people.

25. As Plaintiffs would later learn, these representations to Plaintiffs were either false and/or could not be substantiated by Cardinale. These representations were made to induce the Plaintiffs to do business with Cardinale and continuously repeated to have the Plaintiffs continue to do business with Cardinale and consent to additional advisory fees and acquisition fees which only Cardinale received and for which Cardinale was paid millions and for which he conveniently and intentionally failed to in detail itemize to his investors that he made in excess of ten million dollars off of his investors.

26. Cardinale now had a multitude of roles and conflicts and sources of income as he now acted as the (1) Fund Manager of the lending entity, L3 Capital Income Fund, (2) an owner and (3) Manager of the borrowing Alternative Named Entities, (4) a paid advisor through L3 Capital Advisors, (5) the sole manager of the entity being paid to provide back-office services named L3 Capital Management, (6) the recipient of renumeration of millions of dollars from the debt settlement business he did not enumerate to his investors, and (7) acquisition fees totaling hundreds of thousands of dollars for his alleged business expertise. Thus, Cardinale had multiple sources of earnings, which had to be disclosed in detail to his investors with the complete detail enumerating the exact amounts he was being paid. In fact, Cardinale has never given such enumerated detail but rather now hides his enormous pay under the guise of following legal advice even though Cardinale operated nearly ten prior investment funds and is a fiduciary and certainly knows that he must give completely detailed disclosure to his investors. On the contrary, Dazzo and Feingold were simply part owners of the borrowers, the Alternative Named Entities.

27. Over the next two and a half years, Cardinale billed the Alternative Named Entities more than $1.3 million dollars. Feingold and Dazzo paid these amounts believing they were paying for all administrative expenses and Cardinale's continued promise he had maintained all the records, reporting, due diligence, and complete back-office services for the Alternative Named Entities.

28. Yet those promises were false. Still, Cardinale submitted monthly invoices and never once advised either Feingold or Dazzo that the services, which were being paid for every month, were not being done. See **Exhibit B** (voluminous bills submitted by Cardinale totaling over $1.3 million have been attached). Cardinale has now further confirmed that his promises were false, claiming that it was not his job to maintain all of the books and records for the Alternative Named Entities that he was paid to keep and maintain. Cardinale has testified that he received $1.6 million in administrative services payments but that his records are not complete and that even with the large sums of money that he received to keep all of the records, he claims to his investors that he cannot pay them because he does not have all records necessary yet he still issues them K-1s, he still issues them audited financials but when it comes to operating the businesses or paying his investors, Cardinale claims he is unable to make the payments because he does not have complete records. Cardinale and only Cardinale is mentioned as the sole Fund Manager of his investor's funds and his private placement memorandum lists the Fund Manager as the person with the sole and absolute discretion overseeing the investments, making the investments, operating the investments and performing all diligence on the investments. In fact, Cardinale's private placement memorandum makes reference to the Fund Manager (Cardinale) over 100 times with the risk factors specifying that Cardinale is the sole person responsible for all investment decisions and operation of the investments. Cardinale was absolutely required to have complete records not

only to comply with his paid obligations from Plaintiffs, but also his lawful obligations to his investors as per the private placement memorandum.

29. In some months, the bills Cardinale submitted to the Plaintiffs for administrative expenses exceeded one hundred thousand dollars and included charges from Cardinale's American Express "Black Card" where he was billing for travel and meals, all which he claimed were for the business and necessary as part of his due diligence and advisory and administrative services. Software related charges and office supply charges were also billed. Cardinale said these items were being billed because he was taking care of all the administrative services. Further, all Cardinale's employees' salaries and benefits were paid by the Alternative Named Entities, with the understanding and belief they were supplying the complete back-office services for those entities since neither Feingold nor Dazzo had any employees.

30. All told, Cardinale took more than $1.3 million from the Alternative Named Entities and an additional $620,000 in "advisory" fees under Feingold and Dazzo's reasonable belief that Cardinale was providing what he had promised.

31. For nearly two years, Feingold and Dazzo operated under the false assumption that the more than $1.3 million paid to Cardinale was for legitimate business expenses to support the back-office operations of the Alternative Named Entities. Now, upon information and belief, Cardinale fraudulently billed the Alternative Named Entities. For instance, travel and entertainment expenses were not for due diligence or advisory purposes and health insurance charges were not simply for the back-office staff, as it is believed that other persons besides Cardinale and his staff had their health insurance paid for and included in the administrative services bill. Further, the Alternative Named Entities paid for office space that had apparently

been closed at some point. Cardinale now operates the business out of a UPS storefront and there is no actual physical office in an office building.

32. In all, Cardinale billed more than $1.3 million for expenses and now it is learned that apparently Cardinale claims to only have some, incomplete back-office records and due diligence files (while previously claiming he had none), and that the substantial monies paid were not used as represented. Thus, Cardinale has now stated that he brought a lawsuit in Delaware Chancery Court for the books and records at issue "[b]ecause I don't have all of the books and records." Further, Cardinale's incredible view of due diligence files now seemingly includes texts, Skypes, certain PowerPoints and his own quarterly reports to investors, which can hardly be considered the proper due diligence files for the Alternative Named Entities.

33. At some points, Defendants even falsely represented to this Court that Plaintiffs stole Cardinale's computers from his offices in New York as well as Cardinale's QuickBooks, but have since avoided continuing to make such preposterous claims thus showing that depending on the audience, Cardinale changes his claims about his records from not having them when he wants to avoid paying his investors to claiming he has some records in order to avoid a situation where he is an investment manager breaching his ability to perform for his investors to claiming he had his computers stolen and making said statement in open court here in order to try to sway this Court.

34. In addition, Plaintiffs now believe that Cardinale did not disclose millions of dollars in earnings he made from the Alternative Named Entities to his fund clients although he claimed that he would make such disclosures. As a fiduciary, Cardinale had to specifically itemize and disclose to his investors the actual monies he made, but he never did so. There is no record of Cardinale giving his investors any itemized disclosures as he hid the amounts he made from his

investors. Cardinale intentionally omitted to disclose to his fund clients what he was making even though he had to do so, not only because he was a fiduciary but also for conflict-of-interest purposes and he also agreed to do so in the private placement memorandum for the L3 Capital Income Fund and represented to Plaintiffs that he would do so. In fact, Cardinale himself could not now even say that he itemized all earnings quarterly for the investors of the L3 Capital Income Fund rather in his deposition here Cardinale feigned an inability to understand and could not speculate as to what simple words such as definitions of types of "fees" meant even though his own private placement memorandum used those exact words.

35. Not only does Cardinale now cutely claim he is unable to describe the simple terms such as fees and costs, he also claims confusion and reliance upon others in determining what to disclose when the plain fact is that he is a fund manager spanning at least ten funds as well as owning an RIA and he knows that he must give complete detail to his investors of what he earned and not fake that he is unable to understand terms such as "compensation," "fund manager," "fund advisor," "advisory," "management fee," "acquisition fee," "distribution," "supervisor," "hedge fund," "internal rate of return," "net income," and "fixed cost," as he stated in his deposition here that he could not speculate on the meaning of such terms.

36. Cardinale charged and earned what is estimated to be in excess of $10.8 million from his ownership in Alternative Global Management LLC, Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, Alternative Global Six LLC, L3 Capital Advisors for advisory services billed to the Alternative Named Entities, and additional compensation he took, such as in relation to debt settlement in Alternative Global Three LLC. That undisclosed compensation

related to debt settlement alone equated to approximately $2 million. In addition, further undisclosed monies were paid to L3 Capital Management.

37. There were over ten sources of earnings which would have required detailed disclosures to his investors, which Cardinale did not make. This was intentionally not disclosed by Cardinale who represented to Plaintiffs that as a fiduciary he knew what he was supposed to disclose. Yet he intentionally failed to do so. Now Cardinale claims it was not his job to keep records and he cannot speculate on what "compensation" means and he further claims reliance on others when he was supposedly the most skilled and experienced and highly compensated person due to his expertise, but now he is disclaiming all expertise and even disclaiming an understanding of simple finance terms that a seasoned fund manager making more than ten million dollars should know.

38. Upon further information and belief, for certain investments, Cardinale has had family members, such as his father, paid and returned capital ahead of other non-family member investors thereby showing improper preferences.

39. During the nearly two years of Feingold and Dazzo working with Cardinale, sometimes other persons in the financial community told stories of Cardinale's multiple misdeeds and acts of dishonesty including, but not limited to, falsification of investment success, falsification of deal performance, and arguing with colleagues.

40. Finally, by the end of 2021, Feingold and Dazzo realized that working with Cardinale was unwise. Even though Feingold and Dazzo were simply involved as borrowers from Cardinale's web of entities, it simply did not make sense to continue with a person who appeared to lie even while being caught in many contradictions. There was simply too much drama and too many people that had reasons to not like Cardinale and too many inconsistencies in his stories.

41. At first, Feingold approached Cardinale to discuss his concerns. Cardinale responded by referring to everyone else being a liar, being jealous of him because he was building a nearly $7 million home, had a multi-million-dollar beach house and a multi-million-dollar farm, and many luxury cars. In December of 2021, Cardinale travelled to Greenville, South Carolina for a group dinner and so many persons at the dinner simply ignored him due to their own issues with him that Cardinale claimed that he wanted to hold another meeting to cross examine nearly a dozen people who did not want to do business with him to prove their belief that he was dishonest and untrustworthy was really all about their jealousy of him and the enormous business success he claimed to have achieved and all of the assets he accumulated. Cardinale could not accept the fact that so many persons had tired of his lies and deceit and simply wanted nothing to do with him anymore.

42. Cardinale's explanations were not acceptable, and matters came to a head in January 2022, when Feingold sent a rather terse communication to Cardinale ceasing all relations. See **Exhibit C**.

43. Later in January 2022, both Feingold and Dazzo sent notice to Cardinale they were resigning from entities involving Cardinale. Feingold and Dazzo both had a lawful right to resign and disassociate themselves from Cardinale. The resignation was lawful and done in compliance with Delaware law.

44. Then Feingold and Dazzo sued Cardinale under Delaware law in this Court to receive their fair value of the assets they left behind upon their resignation and as permitted under Delaware law. See **Exhibit D**. ***After*** Feingold and Dazzo sued Cardinale in this Court, Cardinale sued Feingold and Dazzo in Delaware Court of Chancery seeking the same books and records he was paid to keep and maintain. In fact, Plaintiffs are aware that since that time Cardinale has

approached multiple persons for books and records that he promised he would keep and he was paid to keep in an effort to stuff his files to be able to say he complied with his representations to Plaintiffs.

45. For over two years, Feingold and Dazzo had Cardinale paid for all administrative expenses only to learn that Cardinale had claimed to have no records. That statement shows that Cardinale not only took monies for administrative services he did not perform, but also shows that Cardinale may have been claiming that he does not have records to avoid answering his investors' concerns.

46. Cardinale apparently represented to his investors as to their expected investment returns, telling some that they could expect to receive over 27% per year in returns (interest and profit distributions). When his income fund did not pay such returns, Cardinale, who is and has always been the sole manager, responded that he does not have the records so he cannot explain why the returns to some of his income investors have been lower than expected. As described, Cardinale has since testified in this case that it was not his job to keep those records, which is utterly false. Cardinale now claims he has *some* records, yet at times he has also claimed that his computers were stolen and that his QuickBooks was stolen and thereby he had no records. Amazingly, Cardinale keeps changing his story depending upon his audience.

47. When Cardinale could not meet the returns he told some of his investors, he, as sole manager, claimed ignorance and lack of possession or knowledge of records. However, by taking such a baseless stance, Cardinale has at a minimum admitted that he is not a fit fund manager. A person should not be permitted to manage a fund if they have no records and no proper due diligence files. Yet in an act of desperation, that is apparently the position Cardinale has been taking to avoid his investor's questions. Before his investors questioned him, Cardinale did not

make up excuses of not having records for over two years and before Feingold and Dazzo raised their concerns, Cardinale continued to take all his monies and represent to the world his key leadership role in all businesses and all decisions. Cardinale had consistent monthly payments to his L3 Capital Management entity for billed administrative expenses, and his billings to the entities for "advisory services" to oversee everything were always paid, and now miraculously he only complained about lack of knowledge and records ***after*** his being confronted about his multiple dishonest acts and inability to answer his investors about his promised returns to his investors in his fund which he is the sole fund manager. Cardinale was also paid acquisition fees in the businesses due to his professed incredible business skills. Yet now he claims difficulty in running the businesses and even claims difficulty in remembering if he got a business degree in college because it was so long ago that he cannot remember.

48. During the two years in which Cardinale received monies from the Alternative Named Entities, he never once claimed that he did not have records nor that he did not have due diligence. Rather, he not only kept receiving those monthly payments for expenses, but he also continued to bill an advisory fee claiming that he was providing advisory services overseeing the businesses under his many advisory contracts. See **Exhibit E** (advisory agreements that Cardinale had executed). In fact, Cardinale was also paid approximately $620,000 in advisory fees. He also billed acquisition fees to his fund again as a result of his professed business expertise and experience.

49. Once they became aware, Feingold and Dazzo complained and questioned Cardinale about these advisory services. Feingold and Dazzo have now learned that Cardinale, at other businesses and funds which he has operated, has employed a similar tactic of lack of knowledge, lack of records, and lack of understanding. For instance, Cardinale ran/runs a gold

fund where he advised certain investors they had made six times their money and that the fund was guaranteed to become publicly traded. But no such public offering happened, and no such returns have been experienced. Cardinale has now told investors that his long-time friend and business partner Robert L. Giardina ("Giardina") is running the gold fund for him and that they should address their gold fund questions to Giardina. Cardinale has taken the same tactic here that he has no knowledge and yet again at a fund where he is the manager.

50. Cardinale, when confronted at his deposition in this case about the advisory fees paid, and despite representing to Plaintiffs that he had been providing advisory services overseeing the businesses under his multiple advisory contracts, incredulously claimed that he was being paid under those agreements he signed not for advisory services (as the contracts state and he represented), but for purported "administrative expenses" and he refused to speculate on the meaning of "advisory." Yet again, Cardinale's promises and representations were false.

51. It was not until **after** Feingold and Dazzo put Cardinale on notice of the complaints against him and **after** Feingold and Dazzo resigned, that Cardinale, who is the sole Fund Manager of the L3 Capital Income Fund and the sole Manager of the Alternative Global numbered entities 1-6, miraculously claimed not only that he has no records but Cardinale also claimed he is unaware of business operations, and he cannot in detail explain the business to anyone even though he was the most highly compensated person with a full office and staff and multiple entities that he received earnings and compensation for his alleged expertise. Also, Cardinale participated in what is estimated to be more than one hundred conference calls on the businesses with Feingold and Dazzo and yet his claimed ignorance serves him well in avoiding questions by his investors and avoiding payment of large amounts of fair value admittedly owed to Plaintiffs.

52. Cardinale takes the position that the Plaintiffs know about all of his L3 business even though the Plaintiffs are not even mentioned once in the private placement memorandum and yet Cardinale as Fund Manager is mentioned more than 100 times. Feingold and Dazzo were nothing more than owners in the borrowing entities and had none of the legal obligations which Cardinale had and for which he had professed no knowledge or records to avoid the serious inquiries of his investors.

53. Cardinale's claims of prior outsized investment returns (12-15%) have now also been revealed false, as well. Cardinale now cannot substantiate these alleged prior investment returns. Cardinale made these false representations to induce potential investors to invest in the L3 Capital Income Fund. Cardinale also made these false representations to induce Plaintiffs to do business with him as he circulated the draft private placement memorandum of L3 Capital Income Fund to Plaintiffs, and Cardinale actively assisted in drafting the private placement memorandum but at no point did he remove his false investment history as he used that fake history of success as a way to keep the Plaintiffs doing business with him as well as inducing his investors. At the time, Plaintiffs were not aware that these material representations were, in fact, false. In fact, Cardinale now after this litigation has been filed describes himself as merely a passive investor in real estate.

54. Recently, Plaintiffs have also become aware that Cardinale has siphoned off nearly $300,000 if not more from "Alternative Spin," which is an account that holds separate funds of Alternative Global Management LLC.

55. Even more disturbing, in or about, May 2022, Cardinale learned that one of his business partners in the debt settlement business (which is also involved in Alternative Global Three), who had not signed a noncompete agreement, had left his business relationship with

Cardinale to pursue a competing enterprise. Cardinale apparently called this person impliedly threatening that something might happen to that person and which would be out of the control of Cardinale. Cardinale thus implied that something would be happening, an old-style gangster move of claiming that Cardinale would not be responsible for any unexplained events happening to the competitor. Shortly thereafter (within approximately one week), a group of people (including Giardina) showed up to the gated home of the competitor to harm and intimidate the competitor admitting that they intended to physically beat up the competitor. See **Exhibit F** (putting Cardinale on notice that the threat of physical violence has required the complete separation from Cardinale and that no further communications will be permitted).

56. This issue of violence is of such concern that a police report was made with the Boca Raton police department under case number 22-6838 by the victim who is not a party to this litigation (but a potential witness). There is also video and photos of the would-be attackers standing outside the competitor's home.

57. Cardinale was put on notice via email from the victim about the attempted attack. After receiving the email, Cardinale did not respond with shock or disgust as to what happened to the victim (a normal response by someone not involved) but simply ignored the email as if to send the message he knew what happened and was condoning such conduct by his silence to the events. See **Exhibit F** (email of the victim to Cardinale). The victim directly emailed Cardinale about the outrageousness of sending attackers to a home of a competitor to which Cardinale simply remained silent but later and likely after learning the police were involved, then claimed that he had no control over what his long-time business partner and close friend Giardina had done.

58. Because of the above, Feingold emailed to Cardinale advising him intimidation as a business tactic cannot be tolerated and used by Cardinale as a tool to achieve his desired goals and that no further contact would be continued with Cardinale. See **Exhibit G**.

59. Moreover, it has only now been revealed during Cardinale's testimony in this case that Giardina has been an owner of L3 Capital Advisors, but Cardinale did not disclose this to Plaintiffs at the time and there is no mention of Giardina being an owner in any of the RIA filings or the private placement memorandum for the L3 Capital Income Fund.

60. Giardina, Cardinale and another person have owned a merchant cash advance company that, with Giardina, is the subject of a recent Federal Trade Commission settlement and continuing action brought by the New York Attorney General. Giardina has repeatedly invoked the Fifth Amendment in response to questions concerning Cardinale's and others involvement with that business.

61. Giardina was also recently found liable under a civil RICO statute in connection with that same business owned with Cardinale in a case in the United States District Court for the Southern District of New York, where the court there recounted the FTC allegations that included **"threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements"** ("After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received.")("Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us.").

**FACTS RELATED TO**
**ALTER EGO - REVERSE PIERCING DOCTRINE**

62. Upon information and belief, Cardinale has formed and/or used RVCSI, LLC and RVCNY, LLC for the purpose of defrauding creditors and secreting assets in order to evade liability for preexisting personal liability, including in connection with the claims and liabilities at issue here.

63. Cardinale thoroughly dominates and controls these entities, and always has, to such an extent that, in reality, there is no separate existence and the entities were and are, in fact, alter egos of Cardinale.

64. Cardinale testified in this case that RVCNY, LLC is merely a "flow-through" entity that made two investments in 2007 and 2015 (in Richmond Capital Group LLC n/k/a RCG Advances LLC and Red Zone) and engages in no other activity or business even though he later claimed the entity was actually formed in 2016. He further testified that he took the Red Zone entity on just for structure as a "set aside corporation." Cardinale further testified that Cardinale and Vania Cardinale are the only owners ever of RVCNY, LLC and that Cardinale has been the only manager ever of RVCNY, LLC. However, in the Form ADV, Part 2B (Cardinale's Brochure Supplement), dated March 29, 2019, for Cardinale's L3 Capital Advisors RIA it states that:

> Mr. Cardinale receives substantial compensation in connection with his ownership of 50% of the outstanding membership interests in each of L3 Capital Management LLC, RVCNJ LLC and RVCNY LLC. Each of these entities invest hold passive investments in various businesses on behalf of Mr. Cardinale. Mr. Cardinale is not involved in the management of each of these entities. L3 Capital believes that these ownership interests do not pose any conflicts of interest to clients.

65. Thus, if Cardinale, as he represented in the Form ADV, is not involved in the management of each of these entities, including RVCNY, LLC and L3 Capital Management, for which Cardinale receives "substantial compensation," then Vania Cardinale, as the only other

owner ever in both of those entities, would naturally have those management duties, but Vania Cardinale testified in this case that she has no knowledge about anything concerning the affairs of RVCNY, LLC or L3 Capital Management. Further, Cardinale testified here that he has been the only manager ever of RVCNY, LLC, but his Form ADV claims he is "not involved in the management of each of these entities." In addition, Cardinale testified that he owns various DCG ("Dazzo Cardinale Giardina") entities via L3 Capital Management as well.

66. Cardinale further testified that RVCNY, LLC never had: any officers or directors, physical office space, computers, employees, independent contractors, dedicated email address, business, business operations, phone number, reports, research, marketing, analysis, member meetings, committee meetings, resolutions, members consents, W-2s or 1099s.

67. Cardinale testified in this case that RVCSI, LLC is merely a "flow-through" entity that was formed in 2020 solely to receive funds and money from Alternative Global Management LLC. Cardinale further testified to being the only owner and manager ever of RVCSI, LLC and that it never had: any officers or directors, physical office space, computers, employees, independent contractors, dedicated email address, business, business operations, phone number, reports, research, marketing, analysis, member meetings, committee meetings, resolutions, members consents, W-2s or 1099s.

68. Cardinale could not articulate any legitimate purpose for the entities. Vania Cardinale's initials have been used in each of the Defendant entities and as Cardinale admitted to Feingold, he keeps all of the original books of said entities and he has a practice of switching original documents depending on the circumstance as an asset protection measure. In particular, with one company, the original books and records including the operating agreement signature page was often switched depending on the situation in order to shield Cardinale as this is his regular

practice of not holding corporate meetings or formalities or regular minutes or notes so that he can easily switch out and remove himself or his wife or add them or other entities. Likewise, Cardinale openly admitted to Feingold that one of his asset protection strategies was to selectively claim his wife was involved in his companies if it allowed him to make the company look like a multi-member LLC for multi-member protections, but in other instances he would change her involvement if her not being involved was to his benefit. In fact, Cardinale with the assistance of his wife intentionally kept no books and records nor resolutions nor corporate minutes of the two Defendant entities including as admitted in his wife's deposition, no formal meetings or records of the same and as she further showed in her deposition she was not even able to explain what the businesses did as they operated with no corporate formalities so that they could easily change records or claim to not have records in order to avoid liability and collectability depending on the circumstance.

69. Vania Cardinale could not articulate any legitimate purpose for the entities. Vania Cardinale repeatedly stated during her deposition in this case that she did not know anything about the entities, and that she would just sign any paperwork Cardinale would put in front of her even though Cardinale has also admitted it was possible that Vania Cardinale had signing authority over RVCNY, LLC bank accounts, had authority to sign agreements for RVCNY, LLC and it was possible that Vania Cardinale could log into bank accounts for RVCSI, LLC.

70. Vania Cardinale further testified at her deposition in this case to a complete lack of knowledge or understanding as to her involvement of her participation in these entities except for the obvious purpose of using her as a shield against creditors that she agreed to and that she is also the Trustee for the RVC L3 Family Trust but does not know what her duties are nor has she

participated in any meetings or any formalities thus showing the entities are frauds as real entities with real business purposes would follow the required business formalities.

71. Moreover, earlier, in 2019, Cardinale conveyed to Feingold that Cardinale used his entities and often included Vania Cardinale as a fake participant to protect himself as she had a past which would not provide any rationale to have her involved in businesses as she had no education or training in operating businesses and her work experience did not make her an appropriate candidate for anything other than using her name as a straw person. At one point, a clearing firm even raised an issue regarding Vania Cardinale being titled on an account as it appeared inappropriate, and which Cardinale reacted about the clearing firm comment and claimed that they should butt out of his personal affairs as the way he used his wife's name was for asset protection, that everyone knew she really had no business involvement other than Cardinale using her name as an asset protection ploy and that he felt it was a smart asset protection practice to use his wife's name in businesses. In fact, Vania Cardinale was getting paid compensation through an account normally only permitted to be paid to a licensed person being on such an account and Cardinale admitted to Feingold in multiple conversations regarding Vania Cardinale's usage in Cardinale's myriad of businesses including the example above. There were additional conversations between Feingold and Cardinale during which Cardinale stated that he used Vania Cardinale as a straw person to hide and protect assets and which others warned Cardinale that such conduct was troublesome. Further, Feingold is aware that RVCNY, LLC has changed its members/managers depending on the assets as Cardinale has admitted.

72. Cardinale has been aware of the Plaintiffs questioning his representations to them at least since 2021 and prior to the Plaintiffs questioning him, Cardinale also became concerned that other lawsuits and claims against him might be arising as stories in the press about one

business, Richmond Capital Group LLC (n/k/a RCG Advances LLC), began to arise indicating potential liabilities. Cardinale was and is an owner Richmond Capital Group LLC (n/k/a RCG Advances LLC) and has now taken to completely distance himself from that entity with the potential exposure arising from that entity from the FTC action, NY Attorney General action and other matters. Further, Cardinale also became aware of a number of his other investments not performing well, including his ventures in such businesses as real estate development, stocks such as Graphoid and individual businesses and he recognized that he might become the subject of lawsuits or government actions and hence he created transfers to fake entities that had no business purpose in order to avoid claims of creditors.

73. Cardinale has undergone a fraudulent practice of fraudulently conveying his assets as well as assets of Alternative Global Management LLC to RVCSI, LLC and RVCNY, LLC. Thus, for instance, Alternative Global Management LLC made management fee payments to RVCSI, LLC (between July 24, 2020 and April 8, 2022) of $3,263,055.05, and at his deposition Cardinale testified that RVCSI, LLC "received compensation" that was sent to it. Thus, Cardinale's dominated and controlled entities assisted Cardinale in diverting investor funds and/or payments which should have been paid to investors as part of their return on investment by accepting funds from L3 and/or Cardinale directly. As such, they are required to return the money received from the fraudulent activity.

74. In addition to the above-described acts, Cardinale paid unsubstantiated compensation to Vania Cardinale, and made unsubstantiated payments to other entities Cardinale created to assist in hiding the fraudulent activity described herein, including RVCNY, LLC and RVCSI, LLC.

75. Furthermore, Cardinale was aware of the fraudulent activity he engaged in herein, his breaches of fiduciary duty, his conversion and other improper conduct, and liability to the Plaintiffs, and has continued to use throughout RVCNY, LLC and RVCSI, LLC to defraud creditors and secret assets in order to evade liability to the Plaintiffs.

76. RVCNY, LLC and RVCSI, LLC are part and parcel to the activities of Cardinale, and his alter egos, and assisted Cardinale in committing the fraudulent and improper activities described herein and they are liable to the same extent as Cardinale for the damages of the Plaintiffs because they are merely alter egos of Cardinale.

77. **All conditions precedent to the filing of this action have been met, waived and/or excused.**

**COUNT I**
**PAYMENT OF FAIR VALUE**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC Under 6 Del. C. § 18-604)

78. Plaintiffs repeat and reallege the allegations in Paragraphs 1–77 as if fully stated herein.

79. On January 28, 2022, Feingold and Dazzo resigned as members and managers of Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, and Alternative Global Six LLC.

80. With that resignation, Plaintiffs demanded the fair value of their interest in these entities under Delaware law.

81. Cardinale received and acknowledged the resignations and the demands for the fair value of Plaintiffs' interests.

82. Cardinale has refused to comply with Delaware law and pay Plaintiffs fair value for their interests while admitting in open court here that Plaintiffs are owed their fair value.

83. Cardinale has taken complete control over the Alternative Named Entities, including all assets, records and bank accounts. Cardinale further refuses to pay fair value as required under Delaware law which said fair value would ultimately be paid directly to Plaintiffs if Cardinale had not completely seized control of all of the Alternative Named Entities and is thereby depriving Plaintiffs of their statutory mandated payment of fair value.

84. Upon information and belief, Cardinale is making payments out of the Alternative Named Entities without proper corporate approvals and treating all of said entities as his own when, in fact, any actions to be taken involving the Alternative Named Entities require corporate formalities and approvals which are being completely disregarded.

85. As a direct and proximate result of Cardinale's violation of his lawful obligations, Feingold and Dazzo have been damaged to the full extent of the fair value required to be paid under Delaware Code § 18-604 and additional damages incurred.

**COUNT II**
**BREACH OF FIDUCIARY DUTY**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC)

86. Plaintiffs repeat and reallege the allegations in Paragraphs 1–85 as if fully stated herein.

87. As a manager of the Alternative Named Entities, Cardinale owes both members and fellow managers of these entities the basic fiduciary duties of care and loyalty, which includes good faith, oversight, and disclosure.

88. Cardinale breached his fiduciary duties by, among other things, failing to do the tasks which he represented that he was providing, failing to make material disclosures, concealment and by putting his personal interests above the interests of the entities or its members.

Case 1:22-cv-20375-RKA Document 75-4 Filed 05/13/24 Page 28 of 123



89. Cardinale further breached his fiduciary duty by, among other things, misappropriating funds from Alternative Global Management LLC.

90. Cardinale's breach of fiduciary duties proximately caused damages to Plaintiffs in an amount to be determined at trial.

**COUNT III**
**CONVERSION**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC)

91. Plaintiffs repeat and reallege the allegations in Paragraphs 1–90 as if fully stated herein.

92. Feingold and Dazzo remain as managers and members of Alternative Global Management LLC. As managers and members of that entity, Feingold and Dazzo have an equal ownership right and equal rights to access the bank accounts and all assets of that entity. Still, Cardinale, without authorization from Feingold and Dazzo, has taken funds from this account. Cardinale has also blocked Feingold and Dazzo from accessing these accounts to discover the amount taken.

93. Further, Cardinale is believed to have siphoned off at least $300,000 which benefited him and without approval by Plaintiffs in particular in one asset of Alternative Global Management LLC known as Alternative Spin and, upon information and belief, he is taking assets from the Alternative Numbered Entities without proper authorization and approval.

94. Cardinale has thus permanently deprived Feingold and Dazzo of these funds and any assets related thereto. This deprivation conflicts with Plaintiffs' ownership interests in the account and any assets related thereto.

95. Cardinale's conversion of these funds and any assets related thereto has proximately caused damages to Plaintiffs in an amount to be determined at trial.

**COUNT IV**
**FRAUDULENT MISREPRESENTATION**
(Against Richard Cardinale, RVCSI, LLC and RVCNY LLC)

96. Plaintiffs repeat and reallege the allegations in Paragraphs 1–95 as if fully stated herein.

97. By stating to Feingold and Dazzo he had properly disclosed his conflicts of interest and his compensation and monetary benefits from the Alternative Named Entities with his investors in L3 Capital Income Fund, Cardinale made a false statement about a material fact.

98. When Cardinale made these false statements to Feingold and Dazzo, Cardinale intended that his false statement would induce Feingold and Dazzo to allow Cardinale to be a manager and member of the Alternative Named Entities.

99. In 2019, and right before incorporating Alternative Global Management LLC, a discussion was had between Plaintiffs and Cardinale about concerns that Cardinale would be a manager of Alternative Named Entities and a manager of L3 Capital Income Fund besides all of his various sources of compensation discussed and there were legal disclosures he needed to make. Cardinale stated that he knew his disclosure obligations, intended to make detailed disclosures, and that all of his roles and compensation would be disclosed to his investors in his income fund.

100. As described, Cardinale represented that he knew his disclosure obligations, and that he would make detailed disclosures, and that all his roles, compensation and monetary benefits would be properly disclosed to his L3 investors.

101. Now that litigation has begun, it has now been discovered that Cardinale never made such lawfully required disclosures and he misrepresented that he disclosed to keep Feingold and Dazzo as his co-managers in the Alternative Named Entities. Had Feingold and Dazzo known about Cardinale's material misrepresentations, as described herein, they would have never

commenced or continued to do any business with Cardinale as it is believed his failed disclosures are civil violations, if not worse.

102. In order to fraudulently induce Plaintiffs, Cardinale represented he was a successful real estate developer and largest developer in Leesburg, Florida and was making millions, when, in reality, Cardinale made no money in Leesburg, Florida.

103. In order to fraudulently induce Plaintiffs, Cardinale represented that he developed 20 apartment buildings in New York, when, in reality, he simply bought twenty low rent apartments and did not do any development.

104. In order to fraudulently induce Plaintiffs, Cardinale represented that he successfully developed a high-priced condo, when, in reality, Cardinale made no money, and was not successful.

105. In order to fraudulently induce Plaintiffs, Cardinale represented that he had an unblemished record in finance/real estate, when, in fact, Cardinale was sued about a failed real estate deal and has had constant issues with clients and parties in the brokerage community throughout his career.

106. In order to fraudulently induce Plaintiffs, Cardinale represented that he has a gold fund where people made six times their money and it was going public, when, in reality, no one has made money but Cardinale charging fees and the fund never went public. Nearly one year after this lawsuit has been filed, the gold fund still had not gone public (missing many promised dates of public filing) even though nearly two years before this lawsuit, Cardinale claimed that some investors had already six-timed their money.

107. In order to fraudulently induce Plaintiffs, Cardinale claimed he raised over $30 million for a company called Graphoid where all investors made money and that the company was

going public, when, in reality company never went public, he made money on the fees and his investors did not even make back their investment.

108. In order to fraudulently induce Plaintiffs, Cardinale claimed he produced a successful motion picture, when, in reality, no one made money but him for the fees he charged to raise the money.

109. In order to fraudulently induce Plaintiffs, Cardinale claimed he successfully ran multiple debt settlement companies, when, in reality, he made fees charging people to participate and raising money but the companies showed significant losses.

110. In order to fraudulently induce Plaintiffs, Cardinale claimed he made significant returns in the payday lending business with Sky Capital, when, in reality he lost millions, did not disclose the losses to his investors and paid money back to investors with returns from other deals in order to hide losses.

111. In order to fraudulently induce Plaintiffs, Cardinale claimed he had a successful sports bar operation in Leesburg, Florida, when, in reality, the business lost money and was shut down.

112. In order to fraudulently induce Plaintiffs, Cardinale claimed he had a high-end successful coffee shop in New York, when, in reality, the business never even opened and money was lost.

113. In order to fraudulently induce Plaintiffs, Cardinale claimed he was opening tattoo parlors and acquired the equipment, when, in reality, he was unable to open a single parlor.

114. In order to fraudulently induce Plaintiffs, Cardinale claimed he had a scrap metal operation in Brazil that was successful, when, in reality, it generated no profits.

115. In order to fraudulently induce Plaintiffs, Cardinale claimed he was a successful international developer including successful development of townhomes in Brazil, when, in reality, he did not make any money on the project.

116. In order to fraudulently induce Plaintiffs, Cardinale claimed that in 2006 he made so much money as a real estate developer that he could retire and was only working because he enjoyed training young people, when, in reality, he did not have enough success in real estate industry which would allow him to retire in 2006.

117. In order to fraudulently induce Plaintiffs, Cardinale also falsely represented his previous investment track record of investment returns as well as other investment returns, he was able to obtain. Cardinale also made this materially false representation with the intent of obtaining additional compensation for his purported investment expertise.

118. Cardinale made all these representations beginning in or about July 2019 and through November 2019, knowing they were false, with the intent of Plaintiffs relying on these representations with the objective to induce them into and continue the business relationship with Cardinale described herein.

119. Had Plaintiffs known about Cardinale's material misrepresentations they would have never commenced or continued to do any business with Cardinale as described herein and they would not have ceded a one-third interest in the Alternative Named Entities to him.

120. Feingold and Dazzo have been injured and damaged by justifiably relying on Cardinale's material misrepresentations and omissions in an amount to be determined at trial.

**COUNT V**
**FRAUDULENT MISREPRESENTATIONS**
(Against Richard Cardinale, RVCSI, LLC and RVCNY, LLC)

121. Plaintiffs repeat and reallege the allegations in Paragraphs 1–120 as if fully stated herein.

122. Feingold and Dazzo allowed Cardinale to be paid for administrative support for the Alternative Named Entities. Feingold and Dazzo allowed to be paid the monthly administrative expenses from L3 Capital Management with the understanding that all back-office services for the Alternative Named Entities were to be performed by Cardinale.

123. In addition, Cardinale received an advisory fee because of his representations of extensive business experience and success and oversight overall of all businesses through L3 Capital Advisors. Feingold and Dazzo allowed this "advisory fee" to cover Cardinale's claimed additional services. All the extra fees were a sham and Cardinale's representations of extensive business success were false.

124. Cardinale did not act as an advisor as he had agreed and he submitted false and inflated expenses to allow him to use an American Express Black Card and pay other personal expenses, none of which were for the Alternative Named Entities. Instead, the submitted expenses were for his personal expenses or expenses for his L3 Capital Income Fund which were not proper business expenses. In addition, Cardinale apparently did not use the billed administrative expenses to do all the books and records and services represented.

125. When Cardinale represented to Feingold and Dazzo these charges were for legitimate administration costs and legitimate advisory services, Cardinale knew these representations were false. Cardinale intended these false representations would induce Feingold and Dazzo to allow these illegitimate payments. Each month, Cardinale submitted a request for his fees and expense reimbursements and those reimbursements were materially false and used in part to defray his personal, non-business expenses.

126. In addition, Cardinale received an advisory fee through L3 Capital Advisors which was to compensate him for advising and operating the Alternative Named Entities operations and investments, among other fees, because of his false representations of extensive business experience and success and oversight over all the businesses, however, Cardinale now claims that he was not involved with the day-to-day operations, or "advising," and his role was to "raise capital."

127. Cardinale further omitted material facts related to his past experience with investors, business partners and in the financial industry. Indeed, Cardinale omitted the fact that he has received numerous complaints from customers, clients and business partners. Cardinale went even further to conceal these material omissions by stating that he had a "spotless record."

128. Feingold and Dazzo have suffered damages in justifiable reliance on Cardinale's material misrepresentations and omissions in an amount to be determined at trial.

**COUNT VI**
**CONSPIRACY TO COMMIT FRAUD**
(Against Richard Cardinale and Vania Cardinale)

129. Plaintiffs repeat and reallege the allegations in Paragraphs 1-128 as if fully stated herein.

130. Cardinale and Vania Cardinale agreed to perpetrate a fraud on Plaintiffs and agreed to a conspiracy to do an unlawful act or to do a lawful act by unlawful means.

131. Cardinale's participation in the conspiracy, overt acts in pursuit of the conspiracy and his various misrepresentations and omissions, are described herein.

132. Vania Cardinale was aware of some or all of Cardinale's false representations and omissions alleged herein in furtherance of the conspiracy.

133. Vania Cardinale participated in the conspiracy as well as personally benefiting thereby by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of over $1.3 million to L3 Capital Management and over $3 million to RVCSI, LLC ("Richard Vania Cardinale Staten Island") from Alternative Global Management LLC and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY, LLC and access to bank accounts for RVCSI, LLC.

134. Vania Cardinale engaged in overt acts in pursuit of the conspiracy as described herein, including, but not limited to, her actions and conduct in furtherance of Cardinale's sham entities described above, one of which received millions of dollars from Alternative Global Management LLC and another over $3 million, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the fraud and conspiracy, in which Cardinale directed funds from the Alternative Named Entities to be directed to, as well as receiving funds from various entities involved in this matter without providing services to, or on behalf of, such entities.

135. Feingold and Dazzo have suffered damages due to the acts performed by Cardinale and Vania Cardinale in an amount to be determined at trial.

**COUNT VII**
**CIVIL CONSPIRACY**
(Against Richard Cardinale and Vania Cardinale)

136. Plaintiffs repeat and reallege the allegations in Paragraphs 1-135 as if fully stated herein.

137. Cardinale and Vania Cardinale agreed to a conspiracy to do an unlawful act or to do a lawful act by unlawful means as described herein, including breaching the fiduciary duties alleged herein, conversion and other improper conduct alleged herein.

138. Cardinale's participation in the conspiracy, overt acts in pursuit of the conspiracy and his various breaches, conversion and other improper conduct, are described herein.

139. Vania Cardinale participated in the conspiracy as well as personally benefiting thereby by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of over $1.3 million to L3 Capital Management and over $3 million to RVCSI, LLC ("Richard Vania Cardinale Staten Island") from Alternative Global Management LLC and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY, LLC and access to bank accounts for RVCSI, LLC.

140. Vania Cardinale engaged in overt acts in pursuit of the conspiracy as described herein, including, but not limited to, her actions and conduct in furtherance of Cardinale's sham entities described above, one of which received millions of dollars from Alternative Global Management LLC and another over $3 million, awareness of her role was part of an overall improper activity, assisting in concealment, executing documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the breaches and conspiracy, in which Cardinale directed funds from the Alternative Named Entities to be directed to, as well as receiving funds from various entities involved in this matter without providing services to, or on behalf of, such entities.

141. Feingold and Dazzo have suffered damages due to the conspiracy and the acts performed in furtherance of it in an amount to be determined at trial.

## COUNT VIII
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
(Against Vania Cardinale)

142. Plaintiffs repeat and reallege the allegations in Paragraphs 1-141 as if fully stated herein.

143. Cardinale owed a fiduciary duty to Plaintiffs by virtue of being a member and manager of the Alternative Names Entities.

144. Cardinale breached his fiduciary duties by, among other things, failing to do the tasks which he represented that he was providing, failing to make material disclosures, concealment and by putting his personal interests above the interests of the entities or its members.

145. Cardinale further breached his fiduciary duty by, among other things, misappropriating funds from Alternative Global Management LLC and the assets that Alternative Global Management LLC is entitled to.

146. Vania Cardinale had knowledge of these breaches as well as personally benefiting from them by virtue of, among other things, her ownership in the various entities described herein, her managerial role according to Cardinale's Form ADV, payments of over $1.3 million to L3 Capital Management and over $3 million to RVCSI, LLC ("Richard Vania Cardinale Staten Island") from Alternative Global Management LLC and her apparent signing authority over RVCNY, LLC bank accounts, authority to sign agreements for RVCNY, LLC and access to bank accounts for RVCSI, LLC.

147. Vania Cardinale substantially assisted the wrongdoing, by among other things, awareness of her role was part of an overall improper activity, assisting in concealment, executing

documents on behalf of entities since she would "just sign things" that Cardinale asked her to sign, as well as receiving funds for which she did not provide any services, in furtherance of the breaches and scheme, in which Cardinale directed funds from the Alternative Named Entities to be directed to.

148. Feingold and Dazzo have suffered damages due to Vania Cardinale's aiding and abetting Cardinale's breach of fiduciary duty to Plaintiffs in an amount to be determined at trial.

**DEMAND FOR JURY TRIAL**

149. Under Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial on all issues so triable.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs demand judgment against Defendants as follows:

A. Entering a judgment according to the relief sought;

B. Awarding Plaintiffs their monetary damages;

C. Awarding Plaintiffs their consequential damages;

D. Awarding Plaintiffs punitive damages;

E. Awarding Plaintiffs their costs and interest at the highest rate allowable under law; and

F. Entering such other further relief to which Plaintiffs may be entitled as a matter of law or equity, or which the Court determines to be just and proper.

Dated: February 3, 2023

RESPECTFULLY SUBMITTED,

**DANIELS, RODRIGUEZ, BERKELEY, DANIELS & CRUZ P.A.**

By: *\/s/ Lorne E. Berkeley*
Lorne E. Berkeley, Esq.
Florida Bar No. 146099

4000 Ponce De Leon Blvd., #800
Coral Gables, Florida 33146
Telephone: (305) 448-7988
Facsimile: (305) 448-7978
LBerkeley@drbdc-law.com

**BROZYNSKI & DALTON, PC**
By:___*/s/ Bart Dalton*___________
Bart Dalton, Esq. (Pro Hac Vice)
Texas Bar No.: 24043418
5700 Tennyson Parkway, Suite 300
Plano, Texas 75024
Telephone: (972)371-0679
Facsimile: (972) 637-9185
bart@bdlegalgroup.com

**WELTZ KAKOS GERBI WOLINETZ VOLYNSKY LLP**
By:___*/s/ Irwin Weltz*___________
Irwin Weltz, Esq. (Pro Hac Vice)
Thomas Scot Wolinetz, Esq.
Florida Bar No. 1001160
170 Old Country Road, Suite 310
Mineola, New York 11501
(516) 506-0561
Irwin@weltz.law
twolinetz@weltz.law

*Attorneys for Plaintiffs*
David Feingold and Michael Dazzo

# EXHIBIT A

**PART 2A OF FORM ADV: FIRM BROCHURE**

**L3 CAPITAL ADVISORS LLC**
**75 WALL STREET, SUITE 23R**
**NEW YORK, NEW YORK 10005**

**March 29,2019**

**This brochure provides information about the qualifications and business practices of L3 Capital Advisors LLC ("L3 Capital"). If you have any questions about the contents of this brochure, please contact us at (347) 223-7671. The information in this brochure has not been approved or verified by the United States Securities and Exchange Commission ("SEC") or by any state securities authority.**

**Additional information about L3 Capital is also available on the SEC's website at www.adviserinfo.sec.gov.**

**L3 Capital is registered as an investment adviser with the SEC under the U.S. Investment Advisers Act of 1940, as amended (the "Advisers Act"). SEC registration does not imply a certain level of skill or training.**

## ITEM 2 – MATERIAL CHANGES

Except as described below, there have been no material changes made to the Brochure since L3 Capital's filing of its Brochure on March 30, 2018, however, L3 Capital has made some routine updates and clarifying changes to the Brochure, including those related to changes to the business of L3 Capital.

### Item 14 – Client Referrals and Compensation

Item 14 was revised to add the following disclosure:

L3 Capital is a party to written solicitation agreements with third party solicitors whereby solicitors may introduce prospective clients to L3 Capital. Under these agreements, L3 Capital agrees to pay the solicitor a portion or percentage of the performance fee L3 Capital may be entitled to receive from certain clients who invest in one of the Private Investment Funds during the term of the agreement. A solicitor may be subject to conflicts of interest arising from these arrangements, because the payments might induce the solicitor to recommend an investment manager to a client which the solicitor might not otherwise recommend if there was no payment. L3 Capital enters into solicitation agreements, and pays fees under these agreements, in accordance with Rule 206(4)-3 under the Advisers Act. L3 Capital and the solicitors are not affiliated persons as defined in the Advisers Act.

## ITEM 3 - TABLE OF CONTENTS


| | |
|---|---|
| ITEM 2: MATERIAL CHANGES | 1 |
| ITEM 3: TABLE OF CONTENTS | 2 |
| ITEM 4: ADVISORY BUSINESS | 3 |
| ITEM 5: FEES AND COMPENSATION | 5 |
| ITEM 6: PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT | 8 |
| ITEM 7: TYPES OF CLIENTS | 9 |
| ITEM 8: METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS | 10 |
| ITEM 9: DISCIPLINARY INFORMATION | 15 |
| ITEM 10: OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS | 16 |
| ITEM 11: CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING | 18 |
| ITEM 12: BROKERAGE PRACTICES | 19 |
| ITEM 13: REVIEW OF ACCOUNTS | 20 |
| ITEM 14: CLIENT REFERRALS AND OTHER COMPENSATION | 21 |
| ITEM 15: CUSTODY | 22 |
| ITEM 16: INVESTMENT DISCRETION | 23 |
| ITEM 17: VOTING CLIENT SECURITIES | 24 |
| ITEM 18: FINANCIAL INFORMATION | 25 |

# ITEM 4 – ADVISORY BUSINESS

L3 Capital Advisors LLC, a Delaware limited liability company ("L3 Capital") was founded in 2015 by Richard A. Cardinale to provide non-discretionary investment advisory services to the Private Investment Funds (as defined below).

Richard A. Cardinale is the sole owner and managing member of L3 Capital. As of December 31, 2018, L3 Capital manages regulatory assets under management of approximately $170,325,624, all on a non-discretionary basis.

L3 Capital is the managing member of and provides non-discretionary investment services to: L3 Cubed LLC, a Delaware limited liability company, launched in 2013 ("Private Investment Fund I"); Advanced Technology Select Fund LLC, a Delaware limited liability company, launched in 2015 ("Private Investment Fund II"); and Advanced Technology Select Fund II LLC, a Delaware limited liability company, launched in 2015 ("Private Investment Fund III"), Advanced Technology Select Fund III LLC, a Delaware limited liability company, launched in 2017 ("Private Investment Fund IV"), Advanced Technology Select Fund IV LLC, a Delaware limited liability company, launched in 2017 ("Private Investment Fund V"), Advanced Technology Select Fund V LLC, a Delaware limited liability company, launched in 2018 ("Private Investment Fund VI"), Advanced Technology Select Fund VI LLC, a Delaware limited liability company, launched in 2018 ("Private Investment Fund VII") and Advanced Technology Select Fund VII LLC, a Delaware limited liability company, launched in 2019 ("Private Investment Fund VIII"). L3 Capital is also the investment manager and provides non-discretionary investment advice to Mogo Industries LLC, a Delaware limited liability company, launched in 2013 ("Private Investment Fund IX") and Advanced Technology Fund LLC, a Delaware limited liability company, launched in 2014 ("Private Investment Fund X"; and together with Private Investment Fund I, Private Investment Fund II, Private Investment Fund III, Private Investment Fund IV, Private Investment Fund V, Private Investment Fund VI and Private Investment Fund VII, Private Investment Fund VIII and Private Investment Fund IX (the "Private Investment Funds"));

L3 Capital invests the net proceeds raised from the sale of membership interests (the "Interests") in the Private Investment Funds in equity securities of private companies located in the United States. L3 Capital concentrates largely on certain sectors, including the global technology, software and services sectors, but it has the option to invest in any company or companies that L3 Capital shall determine, in its sole discretion (all such securities are collectively referred to as "Issuer Securities" and the issuers thereof are collectively referred to as the "Issuers"). Such purchases may be accomplished through direct purchases from the holders thereof, through investments in various funds, limited liability companies, limited partnerships or other entities, or the Issuers, if possible (collectively, "Funds," and collectively with the Issuer Securities, the "Portfolio Securities"), and/or any other means that L3 Capital, in its sole discretion, so determines, including, but not limited to, through the entry of a forward contract or economic interest agreement with the holder(s) of any Portfolio Securities, without regard to excessive concentration or balance.

L3 Capital does not tailor its advisory services to the individual needs of investors in the Private Investment Funds ("Investors"). The terms and investment objectives and strategies applicable to the Private Investment Funds are set forth in a private placement memorandum provided to Investors or prospective Investors prior to the time of an investment.

L3 Capital has sole discretion over all decisions regarding each Private Investment Fund, such Private Investment Fund's Interests and the Portfolio Securities including, without limitation, when to buy, sell, and the price at which, Portfolio Securities will be purchased and/or sold, and whether to have membership interests redeemed by the Company and/or sold to third parties, and, in such case, at what redemption and/or sale prices. It currently does not have discretion to invest in any Portfolio Securities without the approval of Investors since L3 Capital currently conduct closings of the purchase and sale of Interests of a particular Private Investment Fund concurrently with the purchases of Portfolio Securities; though L3 Capital may, in its sole discretion, elect to conduct closings of a particular Private Investment Fund at any time in which cleared funds and accepted subscriptions have been received from prospective Investors. In addition, L3 Capital currently undertakes to invest all Portfolio Securities for a particular Issuer purchased on a particular date in a separate Series or sub-Series of Interests of a particular Private Investment Fund. See the discussion in Item 8, Methods of Analysis, Investment Strategies and Risk of Loss. The Private Investment Funds are open only to certain financially sophisticated and high net-worth individuals and entities, as more fully discussed in Item 7, Types of Clients.

# ITEM 5 – FEES AND COMPENSATION

The Private Investment Funds offer interests only to certain qualified investors and admission to these Private Investment Funds is not open to the general public. Investors in each Private Investment Fund generally must be "accredited investors" under Rule 501 of Regulation D of the Securities Act of 1933, as amended, and either "qualified clients" as such term is defined in Rule 205-3 promulgated under the Investment Advisers Act of 1940, as amended (the "Advisers Act") or "qualified purchasers" as such term is defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "Investment Company Act"). Investors and prospective Investors should refer to the confidential private offering memorandum for the appropriate Private Investment Funds for a detailed description of the applicable investor qualifications and fees.

L3 Capital receives a management fee for the Private Investment Funds it acts as a manager equal to two percent (2%) of the gross proceeds received from Investors, including additions to capital over the life of a Private Investment Fund (the "Management Fee"). The Management Fee is payable in advance upon closing of the sale of Interests in a Private Investment Fund to the Investors. L3 Capital does not receive any Management Fee for any services provided to Private Investment Fund IX and Private Investment Fund X, however, the Managing Member (as defined herein) receives such fees as part of his ownership interest in each of the respective managers of such entities.

L3 Capital is also eligible to receive a performance-based fee (the "Performance Fee") from the Investors in Private Investment Fund I, Private Investment Fund II and Private Investment Fund III, Private Investment Fund IV, Private Investment Fund V, Private Investment Fund VI, Private Investment Fund VII and Private Investment Fund VIII, equal to 10% of profits, subject to the general requirement that an amount in excess of 100% of the Investor's capital contributions be received prior to any Performance Fee being paid. The Performance Fee, if any, will be determined as of the time any distributions are made to the Investors. The calculation of the Performance Fee is complex, and Investors and prospective Investors should carefully review the more detailed terms of the Performance Fee set forth in the relevant Private Investment Fund's offering and governing documents. L3 Capital does not receive any Performance Fee for any services provided to Private Investment Fund VIX and Private Investment Fund VX, however, the Managing Member (as defined herein) receives such fees as part of his ownership interest in each of the respective managers of such entities.

The portions of the Management Fees and Performance Fees borne by Investors are deducted from Investor assets in the respective Private Investment Fund. Investors do not have the ability to choose to be billed directly for fees incurred.

Management Fees and Performance Fees are not negotiable but may be waived or modified in the sole discretion of L3 Capital, in the case of Private Investment Fund I, Private Investment Fund II Private Investment Fund III, Private Investment Fund IV, Private Investment Fund V, Private Investment Fund VI, Private Investment Fund VII and Private Investment Fund VIII and the applicable investment manager of Private Investment Fund VIX and Private Investment Fund VX.

L3 Capital is also entitled to the reimbursement of various expenses paid on behalf of each Private Investment Fund, which include, but are not limited to, investment expenses (e.g. brokerage commissions, clearing and settlement expenses, custodial fees), legal expenses, internal and external accounting, audit and tax preparation expenses, costs of printing and mailing reports and notices to Investors, costs of third party administrators, consultants, and extraordinary expenses, if any ("Administrative Fees"). Expenses of between $50,000-$75,000 per year are anticipated per Series (including all sub-Series) in each Private Investment Fund, and L3 Capital typically creates a reserve per Series (including any sub-Series) sufficient to cover expenses for a period of two (2) years to cover Administrative Fees. If there is more than one purchase of Portfolio Securities (as defined herein) per Issuer (as defined herein) in a particular Private Investment Fund which results in the creation of a sub-Series, all such sub-Series of such Private Investment Fund associated with a single Issuer will have a combined maximum expense of between $50,000 and $75,000 per year per Series. In the event a liquidity event does not occur within 24 months and a Private Investment Fund does not use all of the reserves set aside to cover the Administrative Fees during this two year period, L3 Capital intends to use any excess reserves to cover any additional Administrative Fees which a Private Investment Fund may occur until a liquidity event takes place. In the event a liquidity event occurs for a particular Series (or any sub-Series) of a Private Investment Fund and such Private Investment Fund has not used all of the reserves previously set aside to cover Administrative Fees, such reserves will be returned to the Investors of a Series in a Private Investment Fund on a pro rata basis upon such liquidity event. Amounts reserved for Administrative Fees will not be available for the purchase of Portfolio Securities. Each Private Investment Fund is obligated to pay out of the gross proceeds of any offering of Interests (each, an "Offering") the fees and expenses of the Offering, including initial legal expenses (excluding any fees payable for the registration or qualification of the Interests being sold thereunder). Such fees and expenses will be paid out of the gross proceeds of any amounts raised and accordingly, such funds will not be available to purchase Portfolio Securities. A Private Investment Fund may incur additional legal costs in the future, including any costs associated with the acquisition of Portfolio Securities by a Series (or Sub-Series) of a Private Investment Fund. There can be no assurance that a Private Investment Fund will be able to earn sufficient income to offset these charges.

The Managing Member is also a registered representative at a registered broker-dealer who has been engaged from time to time by each of the Private Investment Funds to provide various investment banking services in the ordinary course of business, for which such registered broker-dealer received and may continue to receive customary fees and commissions. In connection with any Offering undertaken by a Private Investment Fund, the Managing Member may receive a portion of any such fees received by such broker-dealer. Investors and prospective Investors should refer to the confidential private offering memorandum for the appropriate Private Investment Funds for a detailed description of the applicable fees payable to placement agent(s) for services rendered. Please refer to Item 10 of this Brochure for a description of L3 Capital's other financial industry activities and affiliations.

L3 Capital recognizes that it is a fiduciary and as such must act in the best interests of its clients. Further, L3 Capital recognizes that it must treat all clients fairly and must refrain from favoring one client's interests over another's. L3 Capital regularly assesses the allocation of its resources, including investment personnel, among its clients to ensure adherence to its fiduciary duties.

**IT IS CRITICAL THAT INVESTORS REFER TO THE RELEVANT OFFERING AND PRIVATE INVESTMENT FUND GOVERNING DOCUMENTS FOR A COMPLETE UNDERSTANDING OF APPLICABLE FEES AND EXPENSES. THE INFORMATION CONTAINED HEREIN IS A SUMMARY ONLY AND IS QUALIFIED IN ITS ENTIRETY BY SUCH DOCUMENTS.**

## ITEM 6 – PERFORMANCE-BASED FEES AND SIDE-BY-SIDE MANAGEMENT

As described in Item 5 above and in the relevant Private Investment Fund's offering and governing documents, L3 Capital is eligible to receive performance-based compensation from the Private Investment Funds. It should be noted that such a compensation arrangement may create an incentive for L3 Capital to make investments that are riskier or more speculative than would be the case if such arrangements were not in effect.

L3 Capital presently provides investment advisory services only to the Private Investment Funds and each is subject to a performance-based fee. As such, the conflict of interest related to managing accounts that charge performance-based fees alongside accounts that do not charge performance-based fees does not currently apply to L3 Capital.

## ITEM 7 – TYPES OF CLIENTS

L3 Capital manages and provides investment advisory services to the Private Investment Funds. Investors must meet the eligibility provisions outlined in Item 5, above. Any initial and additional subscription minimums in an Offering conducted by any particular Private Investment Fund are disclosed in the relevant offering documents.

## ITEM 8 – METHODS OF ANALYSIS, INVESTMENT STRATEGIES, AND RISK OF LOSS

The investment strategies, methods of analysis and material risks applicable to an investment in the Private Investment Funds are set forth in detail in a confidential private placement memorandum or similar document provided to prospective Investors. A brief summary is provided below.

**AN INVESTMENT IN A PRIVATE INVESTMENT FUND MAY BE DEEMED SPECULATIVE AND IS NOT INTENDED AS A COMPLETE INVESTMENT PROGRAM. SUCH INVESTMENTS ARE APPROPRIATE FOR ONLY EXPERIENCED AND SOPHISTICATED PERSONS WHO MEET CERTAIN ELIGIBILITY CRITERIA, ARE ABLE TO BEAR THE RISK OF LOSS OF SOME OR ALL OF AN INVESTMENT, AND HAVE A LIMITED NEED FOR LIQUIDITY.**

Each Private Investment Fund is a special purpose investment vehicle organized to purchase restricted securities issued by Issuers. Such purchases may be accomplished through direct purchases from the holders thereof, through investments in the purchases of various funds, limited liability companies, limited partnerships or other entities, or the Issuers, if possible (collectively, "Funds," and collectively with the Issuer Securities, the "Portfolio Securities"), and/or any other means L3 Capital, in its sole discretion, so determines, including, but not limited to, through the entry of a forward contract or an economic interest agreement with the holder(s) of any Portfolio Securities, without regard to excessive concentration or balance, and may, in its sole discretion, pursue opportunities for liquidity in the Portfolio Securities by any method available, including but not limited to, redemption or sale of the Interests of a particular Private Investment Fund, individually or as a group, a sale of the entire Private Investment Fund or by any other methodology (the "Investment Objective"). Each Private Investment Fund may invest the net proceeds in any Offering of Interests in Portfolio Securities directly or through the use of financial intermediaries (including other broker dealers) and pay fees and commissions on a case-by-case basis, in L3 Capital's discretion. The fees payable to any financial intermediary may be built into the purchase price of any Portfolio Securities to be purchased by a Private Investment Fund.

The membership interests of a particular Private Investment Fund are issued in one or more series (each, a "Series") or sub-Series. Each Private Investment Fund is organized as a series limited liability company, such that a prospective Investor may purchase membership interests in separate Series or sub-Series created by L3 Capital from time-to-time that are established to hold separate and distinct investments. Each Series shall invest in Portfolio Securities of one Issuer and shall not hold any other securities of a different Issuer. In addition, L3 Capital may, from time-to-time, establish additional Series for the purpose of making separate and distinct investments in specific companies identified by L3 Capital or to purchase securities in such companies from secondary sources, or to invest in interests of investment funds whose portfolios are comprised of companies consistent with a Private Investment Fund's Investment Objective, each of which Series will each remain segregated from one another. The books and records of each Series (and the purchases and sales of Portfolio Securities and related gains and/or losses that are reflected therein) will be maintained separately for each Series of Interests. In the event that a Private Investment Fund purchases Portfolio Securities in same Issuer represented by a particular Series at different prices,

or in a manner inconsistent in any way whatsoever with a prior purchase, a Private Investment Fund may create additional "sub-Series" which will be treated as unique Series for the purposes of profits, losses, tax treatment, and all other legal benefits afforded to a Series under Delaware law.

L3 Capital has sole discretion over all decisions regarding each Private Investment Fund, such Private Investment Fund's Interests and the Portfolio Securities including, without limitation, when to buy, sell and the price at which Portfolio Securities will be purchased and/or sold, and whether to have membership interests redeemed by the Company and/or sold to third parties, and, in such case, at what redemption and/or sale prices. It currently does not have discretion to invest in any Portfolio Securities without the approval of Investors since L3 Capital currently conducts closings of the purchase and sale of Interests of a particular Private Investment Fund concurrently with the purchases of Portfolio Securities by such Private Investment Fund; though L3 Capital may, in its sole discretion, elect to conduct closings of a particular Private Investment Fund at any time in which cleared funds and accepted subscriptions have been received from prospective Investors. In addition, L3 Capital currently undertakes to invest in all Portfolio Securities for a particular Issuer purchased on a particular date by way of a separate Series or sub-Series of membership interests of a particular Private Investment Fund.

L3 Capital currently intends to disburse any Portfolio Securities in a particular Series in a Private Investment Fund to Investors of such Series in the event of an initial public offering by an Issuer after the expiration of any applicable restriction period.

**General Risks associated with the Private Investment Funds**

**NO ASSURANCE OF PROFIT, CASH DISTRIBUTIONS OR APPRECIATION.** There can be no assurance that an investment in an Issuer and/or a Fund, once made by a Private Investment Fund, will be profitable or will have economic value. There can be no assurance that a Private Investment Fund's investments will be profitable and there is a substantial risk that a Private Investment Fund's losses and expenses will exceed its income and gains. Consequently, there can be no assurance that a Private Investment Fund's investments will result in distributions to the Investors, or that a Private Investment Fund will be able to liquidate its investments on favorable terms.

**THERE CAN BE NO ASSURANCE THAT A PRIVATE INVESTMENT FUND WILL BE ABLE TO PURCHASE AND/OR SELL ISSUER SECURITIES AND/OR FUNDS AT ADVANTAGEOUS PRICES, IF AT ALL, OR THAT IT WILL ACHIEVE ITS INVESTMENT OBJECTIVE. INVESTORS MAY LOSE THEIR ENTIRE INVESTMENT.** There can be no assurance that a Private Investment Fund will be successful in purchasing and/or selling Portfolio Securities and/or Funds at advantageous prices, if at all, or that any investment by a Private Investment Fund in Portfolio Securities will prove to be profitable. Each Private Investment Fund is a newly formed entity with no performance record. Investors should be aware that there is a risk that a Private Investment Fund may not be able to locate and/or purchase Portfolio Securities at prices that are advantageous or at any price and they may lose their entire investment in a Private Investment Fund. If a Private Investment Fund does not make any investment in Portfolio Securities, a Private Investment Fund will dissolve in accordance with its applicable Operating Agreement. Moreover, even if a Private Investment Fund is able to purchase Portfolio

Securities, there can be no assurances it will be able to directly and/or indirectly sell such securities at prices above that paid by a Private Investment Fund, if at all. Accordingly, membership interests should represent only a small portion of an Investor's overall investment portfolio and net worth as the purchase of Member Interests is a highly risky investment and Investor could lose their entire investment.

**IF A PRIVATE INVESTMENT FUND ENTERS INTO ANY FORWARD CONTRACT(S) OR ECONOMIC INTEREST AGREEMENT(S) FOR THE PURCHASE OF PORTFOLIO SECURITIES, IT MAY EXPOSE US TO UNEXPECTED RISKS AND POTENTIAL LOSSES.** The purchase of any Portfolio Securities may be accomplished by means of a contract with a prospective seller for the purchase of any such Portfolio Securities at a future date, subject to the satisfaction of certain conditions, otherwise known as a "Forward Contract" or an "Economic Interest Agreement". The closing on any forward contract or economic interest agreement which a Private Investment Fund will enter into will typically require the satisfaction and removal of any transfer restrictions which any Portfolio Securities may be subject at the time of entering into the forward contract or economic interest agreement. Any forward contract or economic interest agreement a Private Investment Fund may enter into will be individually negotiated and non-standardized. Until such time as any Portfolio Securities subject to a forward contract or economic interest agreement are transferred, a Private Investment Fund is subject to default risk and, if an event of default occurs, we may have to incur additional costs to enforce the contract. These factors could subject us to increased costs and/or loss of an investment.

**BECAUSE NO PUBLIC MARKET EXISTS FOR THE INTERESTS OF EACH PRIVATE INVESTMENT FUND AND L3 CAPITAL HAS NO INTENTION OF SEEKING TO REGISTER SUCH INTERESTS OF ANY PRIVATE INVESTMENT FUND FOR RESALE OR APPLY FOR A LISTING OF THE INTERESTS ON A TRADING MEDIUM, IT WILL BE EXTREMELY DIFFICULT FOR INVESTORS TO RESELL THEIR INTERESTS OF ANY PRIVATE INVESTMENT FUND.** Because there is no public market for the Interests of any Private Investment Fund and no plan or intention for there to ever be one, the resale of the Interests of any Private Investment Fund is highly restricted and extremely limited and is further subject to the additional limitations and is governed by the terms of a Private Investment Fund's Operating Agreement, which must be carefully read and fully understood before purchasing Interests. No Investor should purchase Interests of any Private Investment Fund if such Investor cannot afford to hold the Interests indefinitely. Furthermore, if an Investor who purchases Interests of any Private Investment Fund should have a change in his or her liquidity requirements and be forced to have to seek to sell the Interests, it will be very difficult for such Investor to sell the Interests of any Private Investment Fund promptly, it at all, and the likely sale price one could expect to receive if a sale could be effectuated may be at a substantial discount to the purchase price paid for such Interests.

**CONCENTRATION OF INVESTMENT.** Each Private Investment Fund was formed for the purpose of purchasing Portfolio Securities without regard to excessive concentration, balance or other limitations normally associated with portfolio management practices. A Private Investment Fund may have all or a majority of its proceeds invested directly and/or indirectly in one or a limited number of Portfolio Securities. Given the potential concentration of a Private Investment Fund's investments, and the potential concentration of any Private Investment Fund's investments, the

value of an investment in a Private Investment Fund may be subject to greater volatility and may be more susceptible to any single economic, political or regulatory occurrence than would be the case if a Private Investment Fund's investments were more diversified.

**NO CONTROL OVER THE ISSUERS, ISSUER SECURITIES AND/OR ANY FUNDS OR THEIR RESPECTIVE CURRENT OR FUTURE VALUATIONS.** A Private Investment Fund will be an owner of restricted securities of the Issuers and/or Funds, and will have no control over any Issuers and/or any Funds. Further, the value of a Private Investment Fund's investment in any Issuer and/or Funds, will be dependent upon the performance of the Issuers. A Private Investment Fund does not receive any disclosure from the Issuers and it does not receive, nor does it have access to, any public or non-public, verifiable information that would allow it to justify the current or future valuations of any Portfolio Securities it purchases. A Private Investment Fund will not have any control over the management of any Issuer or any Fund, and the success of any investments it makes in Portfolio Securities depends, in large part, on the ability and success of the management of any Issuer and/or any Fund, in addition to economic and market factors. The Issuer's services or products that are not yet developed or ready to be marketed or that have no established market, may be operating at a loss or have significant fluctuations in operating results, may be engaged in a rapidly changing business, may require substantial additional capital to support their operations, to finance expansion or to maintain their competitive position, or otherwise may have a weak financial condition. There is a limited, negotiated market for Portfolio Securities. Accordingly, valuations may fluctuate considerably and the valuations of the Portfolio Securities that are negotiated by a Private Investment Fund may bear limited or no relationship to future valuations of such Portfolio Securities or the specific Issuer in any market that may develop for the Portfolio Securities, whether private or public.

**THE COMPETITION FOR INVESTMENT IN ISSUERS IS INTENSE.** A Private Investment Fund is aware that there are many other entities and persons that have invested and are seeking to raise capital to invest in Portfolio Securities, many of which have substantially more funds than a Private Investment Fund may have. Such competition may limit a Private Investment Fund's ability to acquire Issuer Securities at advantageous prices, if at all, which may, in turn, result in a reduction on the return on Investors' investments or a complete loss of the Investors' investments.

**LIMITED LIQUIDITY OF PORTFOLIO SECURITIES.** In the event that L3 Capital determines (in its sole discretion) to make distributions of Portfolio Securities (which such distribution shall be subject to and limited by federal and state securities laws), there is no current market through which the Portfolio Securities may be sold, and even if there were such a market, the transfer and/or sale of Portfolio Securities would be subject to significant restrictions. In addition, the Portfolio Securities will not be registered under Federal securities laws or qualified under any state securities law and are being sold in reliance upon exemptions under such laws. Unless the Portfolio Securities are registered for resale with the SEC and any required state authorities, or an appropriate exemption from registration is available, members who receive Portfolio Securities in any distribution by a Private Investment Fund may be unable to liquidate such securities, even though his or her personal financial condition may dictate such liquidation. Moreover, the resale of any Portfolio Securities following a distribution of Portfolio Securities will be subject to Rule 144 of the Securities Act and Members intending to sell Portfolio Securities distributed to them by a Private Investment Fund may be required to aggregate their sales of

Portfolio Securities with sales made by a Private Investment Fund and other Members for some period of time following the distribution of such securities by a Private Investment Fund. Therefore, prospective Investors who require liquidity in their investments should not invest in the Member Interests.

**NO ASSURANCE OF AN INITIAL PUBLIC OFFERING OR OTHER LIQUIDITY EVENT IN ANY PORTFOLIO SECURITIES.** Although investments in Portfolio Securities may offer the opportunity for gains, such investments involve a high degree of business and financial risk that can result in substantial losses. L3 Capital currently intends to disburse any Portfolio Securities in a particular Series to Members of such Series in the event of an initial public offering by an Issuer after the expiration of any applicable restriction period. However, no public market exists for any Portfolio Securities and no assurance can be given that an initial public offering or other liquidity event will be consummated by the Issuer in the future. If such an event does not occur, Investors may lose their entire investment.

**RELIANCE ON L3 CAPITAL; MEMBERS HAVE NO VOTING OR DISPOSITIVE POWER OVER THE ISSUER SECURITIES.** All decisions regarding management of a Private Investment Fund including, but not limited to, the purchase price of Portfolio Securities and which to sell and at what price the Portfolio Securities will be sold, will be made by and in the sole discretion of L3 Capital, and the Members will have no right to take part in the management of a Private Investment Fund. All rights, preferences, privileges and restrictions with respect to the Portfolio Securities, including registration rights and other decisions that holders of Portfolio Securities may have, will belong to a Private Investment Fund and will be the sole responsibility of and made by L3 Capital, in its sole discretion, and the Members will have no ability to make any decisions with respect thereto. No Member will have the right to either vote or dispose of any of the Portfolio Securities owned by a Private Investment Fund. The determination to make distributions, whether in cash, in kind, or a combination thereof, will be made at the sole discretion of L3 Capital, even if the Portfolio Securities have been registered for resale under the Securities Act. In addition, no Member will have the right to withdraw all or any amount of its investment in a Private Investment Fund (either in cash or in the form of Portfolio Securities) at any time without the prior consent of L3 Capital, which consent may be withheld for any reason or no reason. Accordingly, no party should make any investment in a Private Investment Fund unless such party is willing to entrust all aspects of a Private Investment Fund's management to L3 Capital.

**THE OPERATING AGREEMENT OF EACH PRIVATE INVESTMENT FUND CONTAINS RESTRICTIONS ON THE MEMBERS' RIGHTS TO WITHDRAW THEIR CAPITAL.** The Operating Agreement of each Private Investment Fund contains restrictions on the Members' rights to withdraw capital from their capital accounts. Members will not be permitted to withdraw capital without the prior consent of L3 Capital, which consent may be withheld for any reason or no reason in L3 Capital's sole discretion. Therefore, prospective Investors who require liquidity in their investments should not invest in the Interests of a particular Private Investment Fund.

## ITEM 9 –DISCIPLINARY INFORMATION

To the best of our knowledge, there are no legal or disciplinary events that are material to a client's or prospective client's or an Investor's or potential Investor's evaluation of L3 Capital's advisory business or the integrity of L3 Capital's management.

# ITEM 10 – OTHER FINANCIAL INDUSTRY ACTIVITIES AND AFFILIATIONS

Richard A. Cardinale, the managing member of L3 Capital (the "Managing Member") and Phillip McKie, the chief compliance officer of L3 Capital, are each a registered representative of PHX Financial, Inc., a FINRA-registered broker/dealer ("PHX") who has been engaged from time to time by each of the Private Investment Funds to provide various investment banking services in the ordinary course of business for which they have received and may continue to receive customary fees and commissions. In connection with any Offering undertaken by a Private Investment Fund, the Managing Member may receive a portion of any such fees received by such broker-dealer. Investors and prospective Investors should refer to the confidential private offering memorandum for the appropriate Private Investment Funds for a detailed description of the applicable fees payable to placement agent(s) for services rendered. Except as set forth above, neither L3 Capital nor its management persons are registered or have an application pending to register as a broker-dealer or registered representative of a broker-dealer.

Neither L3 Capital nor its management persons are registered or have an application pending to register as a futures commission merchant, commodity pool operator, commodity trading advisor, or an associated person of the foregoing entities.

L3 Capital, PHX and their respective affiliates may engage for their own accounts and/or for the accounts of others, including other Investors, in all aspects of the investment business, including, without limitation, making investments outside of the Private Investment Fund's in the same or other securities (on the same or different terms from those offered to a Private Investment Fund), establishing other investment funds, and/or the management of investments. L3 Capital, PHX and/or their respective affiliates may begin or continue such activities, individually, jointly with others, and/or as owners or managers of any person, regarding the same types of investments in which a Private Investment Fund may likewise be investing; may deal with a Private Investment Fund as counter-parties or through any other person in which they may be interested; may sell securities to or buy securities from a Private Investment Fund; may participate in other investment funds, as Investors or otherwise; and shall not be required to permit a Private Investment Fund or the Members to participate in any other funds or investments in which L3 Capital, PHX or any of their respective affiliates may be interested or share in any profits or other benefits therefrom. Therefore, situations may arise in which the interests of L3 Capital, PHX and/or their respective affiliates could conflict with the interests of a Private Investment Fund and/or its Members.

L3 Capital will manage each Private Investment Fund and L3 Capital and related parties to L3 Capital may manage other private investment funds, and/or provide investment advisory services to clients, each of which may seek to purchase and sell Issuer Securities. The Managing Member is also a registered representative at PHX and may engage in other activities and allocate his time, services and functions between various existing enterprises and future enterprises. This could detract from the time and attention necessary to operate L3 Capital and a Private Investment Fund.

The Managing Member may work with personnel at PHX as well as third-party providers to, among other related items, assist in certain management, administrative and investment decisions when and if applicable, although none of such providers will exercise control over a Private Investment Fund or L3 Capital. In addition, except for the Managing Member, neither PHX nor its registered representatives are and/or will be involved in or have any authority over the management of a Private Investment Fund and/or L3 Capital or in any investment decisions of L3 Capital. The relationships between the Managing Member, L3 Capital, a Private Investment Fund and PHX could create a conflict of interest between PHX and its affiliates, on the one hand, and the Investors in this offering, on the other hand. L3 Capital and related parties will seek to resolve these conflicts in as equitable a manner as possible under the prevailing facts and circumstances, but there is no assurance that any such conflicts will be resolved in a manner advantageous to a Private Investment Fund and the Investor. The Managing Member may engage in other activities and allocate its time, services and functions between various existing enterprises and future enterprises.

## ITEM 11 – CODE OF ETHICS, PARTICIPATION OR INTEREST IN CLIENT TRANSACTIONS AND PERSONAL TRADING

L3 Capital's Code of Ethics (the "Code") is designed to meet the requirements of Rule 204A-1 of the Investment Advisers Act of 1940 (the "Advisers Act"). The Code applies to L3 Capital's "Access Persons." Access Persons include, generally, any employee or other supervised person of L3 Capital who, in relation to L3 Capital's advisory clients, (1) has access to non-public information regarding any purchase or sale of securities, or non-public information regarding securities holdings, or (2) is involved in making securities recommendations, executing securities recommendations, or has access to such recommendations that are non-public. All L3 Capital employees are deemed to be Access Persons.

The Code sets forth a standard of business conduct that takes into account L3 Capital's status as a fiduciary and requires Access Persons to place the interests of the advisory clients and Investors above their own interests and the interests of L3 Capital. The Code requires Access Persons to comply with applicable federal securities laws. Further, Access Persons are required to promptly bring violations of the Code to the attention of L3 Capital's Chief Compliance Officer, Phillip McKie (the "Chief Compliance Officer" or his designee). All Access Persons are provided with a copy of the Code and are required to acknowledge receipt and understanding of the Code upon hire and on at least an annual basis thereafter.

The Code also sets forth certain reporting and pre-clearance requirements with respect to personal trading by Access Persons. Access Persons must provide the Chief Compliance Officer with a list of their personal accounts and an initial holdings report within 10 days of becoming an Access Person. In addition, Access Persons must provide annual holdings reports and quarterly transaction reports in accordance with Advisers Act Rule 204A-1.

The Code also seeks to ensure the protection of nonpublic information about the activities of the Advisory Clients. Investors or prospective Investors may obtain a copy of the Code by contacting the Chief Compliance Officer at (718) 607-7625.

L3 Capital and the Managing Member can be said to recommend interests in the Private Investment Funds to prospective Investors. L3 Capital and the Managing Member have a material financial interest with respect to fees paid by Investors. The Performance Fees described in Item 5, above, may create an incentive for L3 Capital to make investments that are riskier or more speculative than in the absence of such compensation.

## ITEM 12 – BROKERAGE PRACTICES

L3 Capital has authority to select the broker-dealer to be used in each transaction for the Private Investment Funds and for negotiating the fees to be paid to the broker-dealer in connection with such transactions. L3 Capital recognizes its duty to obtain "best execution." Consistent with such duty, in determining best execution, L3 Capital takes into account the full range and quality of a broker-dealer's services. L3 Capital does not select broker-dealers solely on the basis of lowest possible commission costs, but by the best qualitative execution.

Consideration is given to a variety of factors, including but not limited to the following:

- Commission rates
- Reliability
- Financial responsibility
- Strength of the broker and the ability of the broker to efficiently execute transactions
- The broker's facilities
- The broker's provision or payment of the costs of brokerage and research services that are of benefit to L3 Capital or its clients or affiliates

L3 Capital may consider a broker-dealer's ability to provide L3 Capital with the opportunity to participate in capital introduction events sponsored by the broker-dealer and to refer Investors to the Funds. It should be emphasized that L3 Capital does not select broker- dealers solely in return for referrals. L3 Capital recognizes that it may have an incentive to favor broker-dealers that provide capital introduction services to L3 Capital or refer Investors. L3 Capital receives asset-based fees and accordingly would receive a financial benefit from the increase in assets under management that result from capital introduction services and Investor referrals. Similarly, L3 Capital's affiliate receives a performance-based allocation and accordingly could receive a larger performance-based allocation in any given profit period as a result of an increase in assets under management that results from capital introduction services and Investor referrals. The potential for higher fees presents a potential conflict in that L3 Capital has an incentive to favor broker-dealers that provide services that have a direct impact on fees even if those broker-dealers rate unfavorably in other categories.

While L3 Capital's primary consideration in allocating portfolio transactions to broker-dealers is to obtain favorable prices and efficient executions, L3 Capital does not have an obligation to, and does not always seek to, obtain the lowest priced execution regardless of qualitative considerations.

It should be specifically noted that the Private Investment Funds do not typically invest in the types of securities that are traded on an exchange and do not generate commissions or "soft dollars."

L3 Capital does not have directed brokerage arrangements.

## ITEM 13 – REVIEW OF ACCOUNTS

The investment portfolios of the Funds are under constant review by L3 Capital's Managing Member. Such reviews include a review of adherence to the Funds' investment objective, strategies, target capacity and risk. Any proposed deviations from the Funds' investment guidelines or strategies will be discussed with the Chief Compliance Officer to determine if consent of the Private Investment Funds and/or Investors is necessary.

Investors in the Private Investment Funds receive annual audited financial statements within 90 days of the fiscal year-end. In addition, Private Investment Fund Investors receive tax reports relating to their investments.

## ITEM 14 – CLIENT REFERRALS AND COMPENSATION

L3 Capital is a party to written solicitation agreements with third party solicitors whereby solicitors may introduce prospective clients to L3 Capital. Under these agreements, L3 Capital agrees to pay the solicitor a portion or percentage of the performance fee L3 Capital may be entitled to receive from certain clients who invest in one of the Private Investment Funds during the term of the agreement. A solicitor may be subject to conflicts of interest arising from these arrangements, because the payments might induce the solicitor to recommend an investment manager to a client which the solicitor might not otherwise recommend if there was no payment. L3 Capital enters into solicitation agreements, and pays fees under these agreements, in accordance with Rule 206(4)-3 under the Advisers Act. L3 Capital and the solicitors are not affiliated persons as defined in the Advisers Act.

## ITEM 15 – CUSTODY

L3 Capital is deemed to have custody of Fund assets pursuant to Advisers Act Rule 206(4)-2 (the "Custody Rule"). As the Private Investment Funds invest all, or substantially all, of their assets in the Portfolio Securities of the Issuers, L3 Capital generally will be exempt from the requirement that securities be maintained with a "qualified custodian" for the Private Investment Funds. In the future, if the Private Investment Funds' investments in private and illiquid assets involve securities that are certificated, but also are (i) acquired from the issuer in a transaction or chain of transactions not involving any public offering and (ii) transferable only with prior consent of the issuer or holders of the outstanding securities of the issuer, L3 Capital will maintain such certificates with a qualified custodian.

To ensure compliance with the Custody Rule, L3 Capital arranges for the Private Investment Funds to be audited annually by an independent public accountant and distributes audited financial statements to all Investors within 90 days of the end of the Private Investment Funds' fiscal years. Investors should carefully review such audited financial statements.

## ITEM 16 – INVESTMENT DISCRETION

The terms and investment objectives and strategies applicable to the Private Investment Funds are set forth in a private placement memorandum provided to Investors prior to the time of an investment. While L3 Capital has sole discretion over all decisions regarding each Private Investment Fund, such Private Investment Fund's membership interests and the Portfolio Securities including, without limitation, when to buy, sell and the price at which Portfolio Securities will be purchased and/or sold, and whether to have membership interests redeemed by the Company and/or sold to third parties, and, in such event, at what redemption and/or sale prices, it does not have discretion to invest in various financial instruments and securities. L3 Capital currently conduct closings of the purchase and sale of Interests of a particular Private Investment Fund concurrently with the purchases of Portfolio Securities or of entities holding Portfolio Securities; though L3 Capital may, in its sole discretion, elect to conduct closings at any time in which cleared funds and accepted subscriptions have been received from prospective Investors. In addition, L3 Capital currently undertakes to invest in all Portfolio Securities for a particular Issuer purchased on a particular date by way of a separate Series or sub-Series of membership interests of a particular Private Investment Fund. Investors must execute a subscription agreement in which they make various representations, including representations regarding their suitability to invest in a high-risk investment pool.

## ITEM 17 – VOTING CLIENT SECURITIES

Based upon the Private Investment Funds' investment strategies (and lack of involvement in publicly-traded equities), it is unlikely that L3 Capital will need to vote proxies for the Private Investment Funds. If, in the future, it is contemplated that L3 Capital may exercise voting authority with respect to the Private Investment Funds securities, L3 Capital will create policies that are in the best interest of the respective Private Investment Funds and in accordance with the procedures as described to the Investors above.

# ITEM 18 – FINANCIAL INFORMATION

N/A. L3 Capital is not required to include a balance sheet for its most recent fiscal year, and is not aware of any financial condition that is reasonably likely to impair its ability to meet contractual commitments to advisory clients. In addition, L3 Capital has not been the subject of a bankruptcy petition at any time during the past ten years.

# EXHIBIT B

Capital
Management

**INVOICE #100**

**DATE: 10/1/2020**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For services rendered as per agreement with client.**

**TOTAL :** **$125,000.00**

L3 Capital Management

**INVOICE #101**

**DATE: 11/1/2020**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For services rendered as per agreement with client.**

**TOTAL :** **$125,000.00**

L3 Capital Management

**INVOICE #102**

**DATE: 12/1/2020**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

**INVOICE #103**

**DATE: 1/4/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL :** | **$125,000.00** |

Capital Management

**DATE: 1/7/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$22,000.00**

L3 Capital Management

**INVOICE #104**

**DATE: 2/2/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL :** | **$125,000.00** |

**INVOICE #105**

**DATE: 3/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

L3 Capital Management

**INVOICE #106**

**DATE: 4/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$125,000.00**

**INVOICE #107**

**DATE: 5/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL :** | **$170,000.00** |

**INVOICE #108**

**DATE: 6/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$60,000.00**

**L3 Capital Advisors**

**<u>INVOICE #109</u>**

**DATE: 7/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO: Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **Total:** | **$45,000.00** |

**INVOICE #110**

**DATE: 8/1/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

| | |
|---|---|
| **TOTAL :** | **$45,000.00** |

**INVOICE #111**

**DATE: 9/3/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL :** **$40,000.00**

**DATE: 10/5/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$40,000.00**

L3 Capital Management

**DATE: 11/5/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$40,000.00**

L3 Capital Management

**DATE: 12/3/2021**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL: $20,000.00**

L3 Capital Management

**INVOICE #115**

**DATE: 1/7/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$22,000.00**

DEC.

Capital Management

DATE: 2/7/2022

L3 Capital Management, LLC
Richard Cardinale
75 Wall Street, 23R
New York, NY 10005
RichardC@L3capitalmanagement.com

TO:
Alternative Global Management
13650 SW 82nd Court
Palmetto Bay, FL 33158

For Administrative Expenses

TOTAL: $19,000.00

JAN.

L3 Capital Management

**DATE: 3/1/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$17,000.00**

FEB.

**INVOICE #118**

**DATE: 4/1/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$18,000.00**

**INVOICE #119**

**DATE: 5/1/2022**

**L3 Capital Management, LLC**
**Richard Cardinale**
**75 Wall Street, 23R**
**New York, NY 10005**
**RichardC@L3capitalmanagement.com**

**TO:**
**Alternative Global Management**
**13650 SW 82nd Court**
**Palmetto Bay, FL 33158**

---

**For Administrative Expenses**

**TOTAL:** **$22,000.00**

# EXHIBIT C

Wednesday

2:17 AM

Rich, I strongly urge you to read this message carefully as it will be the last communication that I will ever have with you. Do not call me, text me, email me or message me because there will be no response. From this point forward you are not permitted in any manner to mention my name, reference me or in any manner comment upon me other than to say "We have no personal or professional relationship anymore" and any words outside of that simple comment will be met with swift and aggressive legal action. I can assure you that my only comment to anyone who asks will likewise be the statement that we have no personal or professional relationship anymore. I am serious and I mean it. Anyone and I mean anyone who receives any form of comment from you outside of the aforementioned will certainly get back to me and then I will certainly take action which will unravel you (remember, I am aware of all of your illusions - graphoid, leesburg, efraim, claims of extensive real estate development experience, games with the operation of your debt settlement, the list goes on and on and really isn't necessary, you get the idea. Quite simply, I am tired of all of the lies, rumors, backstabbing, etc. . . The only drama I have had in my life in the last many many years has involved somehow either directly or indirectly around things involving you and I simply don't want that and don't want to see you, hear from you or in any way have anything to do with you. You have benefited immensely from my work and protection of you and you are going to pay me for that. You can figure out what is reasonable

for that. You can figure out what is reasonable and communicate through Mike and that is why he is copied on this. Any attempt to try to change history or spin the truth won't end well for you, so simply come up with something reasonable and we all go off into the sunset. I can assure you that I have no interest in ruining you but I can guarantee you that I will if it is necessary. So be adult, move on, come up with a reasonable separation and then we will never see or speak again. I can assure you that the very very large number of people that are constantly calling me and complaining to me about you will simply be told that I have no personal or professional relationship with you and I will not engage to listen to their long list of complaints about you as I have had to listen to those in the past. Life is too short and since I have nothing to do with you anymore, I simply don't want to hear about it. Be smart and come up with something fair and I can't stress enough again, take this one warning and don't you dare comment about me to anyone beyond what I have authorized you to say in this message. Be smart and put a civil end to this, I promise you, otherwise you won't like my aggressive side. I know my way around a court room really well and the mountains of evidence involving you aren't pretty. You have benefited greatly from my work, put the emotion you may now be feeling aside from my decision to separate from you and do the right thing. Good luck with your life. I will wait to hear from Mike as to your proposal.

# EXHIBIT D

[redacted]

[redacted]

---------- Forwarded message ---------
From: **David Feingold** <[redacted]
Date: Fri, Jan 28, 2022 at 8:31 AM
Subject: URGENT/EMERGENCY/NOTICE OF RESIGNATION COMMUNICATION
To: <SCohen@s[redacted]
Cc: <l3capitalmanagement@g[redacted] Mike Dazzo [redacted]

Please consider this communication notice that Mr. David Feingold and Mr. Michael Dazzo, effective immediately, resign as managers and members of Alternative Global One LLC, Alternative Global Two LLC, Alternative Global Three LLC, Alternative Global Four LLC, Alternative Global Five LLC, and Alternative Global Six LLC (collectively "Alternative Global Numbered Entities").

As the operating agreements of the Alternative Global Numbered Entities provide that manager resignation is effective immediately, Mr. Cardinale solely is responsible for all operational duties as manager as well as all common law duties under Delaware law to all of the members of the Alternative Global Numbered Entities. He should strictly adhere to Delaware law when making any decisions and we ask that you counsel him accordingly due to the complex nature of matters and his fiduciary duties that he owes to the myriad of entities for which he now manages.

In addition, now that Mr. Feingold and Mr. Dazzo have resigned as members of the Alternative Global Numbered Entities, Mr. Feingold and Mr. Dazzo are entitled to the fair value of their interests. The operating documents of the Alternative Global Numbered Entities provide that membership resignation becomes effective upon six months notice, however, Delaware law is clear that Mr. Cardinale and his entities now lawfully owe Mr. Feingold and Mr. Dazzo compensation for the fair market value of all of their interests. This interest is to be based on their right to share in distributions from the Alternative Global Numbered Entities. See 6 Del.C. § 18-604.

Please review the statutes and case law as I urge you to have your client cooperate with settled law in Delaware involving compensation of members. He indisputably now

owes compensation to Mr. Feingold and Mr. Dazzo for the Alternative Global Numbered Entities.

Mr. Feingold's and Mr. Dazzo's resignations mean that Mr. Cardinale is now the sole manager of both a lender, L3 Capital Income Fund LLC, and the sole manager and voting member of various borrower transactions as may be applicable in the Alternative Global Numbered Entities.

Furthermore, Mr. Feingold and Mr. Dazzo are still managers and members of Alternative Global Management LLC, hence Mr. Cardinale may not make any distributions at all from that entity without approval and consent of Mr. Feingold and Mr. Dazzo and all receipts that said entity regularly receives must continue and not be disturbed or in any manner altered without the consent of Mr. Feingold and Mr. Dazzo.

I trust you will carefully counsel your client on his obligations under Delaware law. We expect payment arrangements to be made pursuant to Section 18-604. Any payments made to any others prior to these priority creditor rights would be unlawful pursuant to Delaware Law and void as Mr. Feingold and Mr. Dazzo are now first priority creditors with regards to each of the Alternative Global Numbered Entities and their payments are valued at time of resignation as provided under Delaware law.

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279
https://www.feingoldllc.com

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279

https://www.feingoldllc.com

# EXHIBIT E

**STRATEGIC ADVISORY AGREEMENT**

This Strategic Advisory Agreement (this "Agreement"), dated effective as of August 1, 2019 (the "Effective Date") is entered into by and between **Debt USA LLC**, a Delaware limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

**RECITALS**

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the alternative finance industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $20,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or

(e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

| | |
|---|---|
| To the Company: | Debt USA LLC<br>433 Plaza Real, Suite 375<br>Boca Raton, Florida 33432<br>Attn: Daniel Meeler, Manager<br>Phone: (800) 234-5678<br>Email: danm@lexingtondocprep.com |
| To Advisor: | L3 Capital Advisors, LLC<br>75 Wall Street, Suite 23R<br>New York, New York 10005<br>Attn: Richard Cardinale, Managing Member<br>Phone: (347) 223-7671<br>Email: rcardinale@l3capitaladvisors.com |

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**DEBT USA LLC**

By: ________________________________________
Name: Daniel Meeler
Title: Manager

**L3 CAPITAL ADVISORS, LLC**

By: ________________________________________
Name: Richard Cardinale
Title: Managing Member

# STRATEGIC ADVISORY AGREEMENT

This Strategic Advisory Agreement (this "Agreement"), dated effective as of August 1, 2019 (the "Effective Date") is entered into by and between **Asheville Investment I Management LLC**, a Delaware limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the real estate investment industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $20,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or

(e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

| | |
|---|---|
| To the Company: | Asheville Investment I Management, LLC<br>75 Wall Street, Suite 23R<br>New York, NY 10005<br>Attn: Michael Dazzo, Authorized Person<br>Phone: (786) 512-8331<br>Email: daz1201@aol.com |
| To Advisor: | L3 Capital Advisors, LLC<br>75 Wall Street, Suite 23R<br>New York, New York 10005<br>Attn: Richard Cardinale, Managing Member<br>Phone: (347) 223-7671<br>Email: rcardinale@l3capitaladvisors.com |

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**ASHEVILLE INVESTMENT I MANAGEMENT LLC**

By: ____________________________________
Name: Michael Dazzo
Title: Authorized Person

**L3 CAPITAL ADVISORS, LLC**

By: ____________________________________
Name: Richard Cardinale
Title: Managing Member

# STRATEGIC ADVISORY AGREEMENT

This Strategic Advisory Agreement (this "Agreement"), dated effective as of August 1, 2019 (the "Effective Date") is entered into by and between **Residual Investment Group LLC**, a Florida limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties."

## RECITALS

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the alternative finance industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $20,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or

(e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

To the Company:

Residual Investment Group, LLC
14340 SW 82nd Avenue
Palmetto Bay, Florida 33158
Attn: Michael Dazzo, Manager
Phone: (786) 512-8331
Email: daz1201@aol.com

To Advisor:

L3 Capital Advisors, LLC
75 Wall Street, Suite 23R
New York, New York 10005
Attn: Richard Cardinale, Managing member
Phone: (347) 223-7671
Email: rcardinale@l3capitaladvisors.com

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**RESIDUAL INVESTMENT GROUP LLC**

By: ______________________________
Name: Michael Dazzo
Title: Manager

**L3 CAPITAL ADVISORS, LLC**

By: ______________________________
Name: Richard Cardinale
Title: Managing Member

# STRATEGIC ADVISORY AGREEMENT

This Strategic Advisory Agreement (this "Agreement"), effective as of December 1, 2019 (the "Effective Date") is entered into by and between **Alternative Global Management, LLC**, a Delaware limited liability company (herein referred to as the "Company") and **L3 Capital Advisors, LLC** (herein referred to as the "Advisor"). Advisor and the Company are sometimes referred to herein individually as a "Party," and collectively as the "Parties"

## RECITALS

**WHEREAS**, Advisor, through its affiliates, has experience in strategic planning and overall business development in the alternative finance industry; and

**WHEREAS**, the Company desires to engage the services of Advisor to provide the services outlined below.

**NOW THEREFORE**, in consideration of the promises and the mutual covenants and agreements hereinafter set forth, the Parties hereto covenant and agree as follows:

1. Term of Consultancy. The Company hereby engages Advisor on a non-exclusive basis for the Term, as defined below, to provide the Services defined below. The Company hereby agrees to retain Advisor in a consulting capacity, upon the terms and conditions set forth herein, for a term of one (1) year from the Effective Date (the "Initial Term"). Thereafter, this Agreement shall automatically renew for successive one-year periods, unless either the Company or Advisor provides written notice to the other at least thirty (30) days prior to the termination of the Initial Term or any renewal period stating said party's desire to terminate this Agreement. The Initial Term and any extension or renewal thereof shall be referred to herein together as the "Term". Notwithstanding anything to the contrary contained herein, the Term is subject to termination pursuant to Article 16 hereof.

2. Duties of Advisor. Advisor shall, on a non-exclusive basis, serve as an advisor and provide the Company with the following services (collectively, the "Services") during the Term hereof:

   a. Consult with and assist the Company in identifying and evaluating the most appropriate strategic and business plans to develop and commercialize its products and/or technologies;
   b. Make himself reasonably available, at the Company's request, to attend meetings or for conversations to discuss the business of the Company with potential investors and/or strategic partners;
   c. At the Company's request, review business plans, strategies, mission statements, budgets, proposed transactions and other plans for the purpose of advising the Company on the most viable avenues for growth and business development; and
   d. Advise the Company as requested in any other area where Advisor may be able in order to help the Company execute its business plan.

The Services shall not extend to the day-to-day business or operations of the Company and shall not include any services provided by managers, officers or employees in their respective capacity at the Company.

3. Allocation of Time and Energies. Advisor hereby promises to perform and discharge faithfully the responsibilities which may be assigned to Advisor from time to time by the officers and duly

authorized representatives of the Company in connection with the conduct of its activities herein, so long as such activities are in compliance with applicable securities laws and regulations.

4. Advisory Fee. As consideration for the Services to be provided hereunder, and for other good and valuable consideration, the receipt of which is acknowledged, the Company shall pay Advisor a monthly fee of $10,000.00, payable in advance on or prior to the 10th day of each month.

5. Successors and Assigns. This Agreement shall bind and inure to the benefit of Advisor, the Company, the Indemnified Persons and any successors to or assigns of Advisor and the Company; provided, however, that this Agreement may not be assigned by the Company without the prior written consent of Advisor.

6. Expenses. The Company shall be responsible for all expenses relating to Advisor's Services under this Agreement as may be incurred from time to time, subject to pre-approval by the Company.

7. Indemnification. The Company will indemnify and hold harmless Advisor and each Advisor Person (as defined below) and(each such person, an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses, whether joint or several (the "Liabilities"), related to, arising out of or in connection with this Agreement or the Services contemplated by this Agreement or the engagement of Advisor pursuant to, and the performance by Advisor of the Services contemplated by this Agreement, whether or not pending or threatened, whether or not an Indemnified Party is a party, whether or not resulting in any liability and whether or not such action, claim, suit, investigation or proceeding is initiated or brought by or on behalf of the Company. The Company will reimburse any Indemnified Party for all reasonable costs and expenses (including attorneys' fees and expenses) as they are incurred in connection with investigating, preparing, pursuing, defending or assisting in the defense of any action, claim, suit, investigation or proceeding for which the Indemnified Party would be entitled to indemnification under the terms of the previous sentence, or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto. The Company will not be liable under the foregoing indemnification provision with respect to any particular Liability of an Indemnified Party solely to the extent that such is determined by a court, in a final judgment from which no further appeal may be taken, to have resulted primarily from the gross negligence or willful misconduct of such Indemnified Party. The attorneys' fees and other expenses of an Indemnified Party shall be paid by the Company as they are incurred upon receipt of an agreement by or on behalf of the Indemnified Party to repay such amounts if it is finally judicially determined that the Liabilities in question resulted primarily from the gross negligence or willful misconduct of such Indemnified Party.

8. Accuracy of Information. The Company shall furnish or cause to be furnished to Advisor such information as Advisor believes reasonably appropriate in connection with providing the services contemplated by this Agreement (all such information so furnished, the "Information"). The Company recognizes and confirms that Advisor (a) will use and rely primarily on the Information and on information available from generally recognized public sources in performing the services contemplated by this Agreement without independent verification, (b) does not assume responsibility for the accuracy or completeness of the Information and such other information and (c) is entitled to rely upon the Information without independent verification.

9. Confidential Information. Advisor agrees to maintain the confidentiality of the Confidential Information (as defined below), except that Advisor may disclose Confidential Information (a) to its partners, members, directors, officers, employees and advisors (and those of its Affiliates), including accountants, legal counsel and other advisors (it being understood that the person to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (b) to the extent required by any subpoena

or similar legal process, (c) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (d) with the consent of the Company, or (e) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Agreement, or (ii) becomes available to Advisor on a non-confidential basis from a source other than the Company. For the purposes of this Agreement, "Confidential Information" means all non-public information received from the Company relating to the Company or its business, other than any such information that is available to Advisor on a non-confidential basis from a source other than the Company.

10. Representation. The Company and Advisor represent to one another that each has consulted with independent legal counsel and/or tax, financial and business advisors, or was given an adequate opportunity to do so prior to the execution of this Agreement, to the extent deemed necessary.

11. Status as Independent Contractor. Advisor's engagement pursuant to this Agreement shall be as independent contractor, and not as an employee, officer or other agent of the Company. Neither Party to this Agreement shall represent or hold itself out to be the employer or employee of the other. Neither the Company nor Advisor possesses the authority to bind each other in any agreements without the express written consent of the entity to be bound.

12. Attorney's Fee. If any proceeding is brought for the enforcement or interpretation of this Agreement, or because of an alleged dispute, breach, default or misrepresentation in connection with or related to this Agreement, the successful or prevailing Party shall be entitled to recover reasonable attorneys' fees and other costs in connection with that action or proceeding, in addition to any other relief to which it or they may be entitled.

13. Waiver. The waiver by either Party of a breach of any provision of this Agreement by the other Party shall not operate or be construed as a waiver of any subsequent breach by such other Party.

14. Notices. All notices, requests, and other communications hereunder shall be deemed to be duly given if sent by U.S. mail, postage prepaid, addressed to the other Party at the address as set forth herein below:

To the Company:

Alternative Global Management, LLC
75 Wall Street, Suite 23R
New York, NY 10005
Attn: Michael Dazzo, Manager
Phone: (786) 512-8331
Email: daz1201@aol.com

To Advisor:

L3 Capital Advisors, LLC
75 Wall Street, Suite 23R
New York, New York 10005
Attn: Richard Cardinale, Managing Member
Phone: (347) 223-7671
Email: rcardinale@l3capitaladvisors.com

15. Governing Law. This Agreement shall be governed by and construed solely in accordance with the laws of the State of New York, without giving effect to the conflict or choice of law principles thereof.

16. Termination. This Agreement may be terminated by either Party on Thirty (30) days written notice to the other party at any time without prejudice to any other rights or remedies either Party may have.

17. Arbitration. Any controversy or claim arising out of or relating to this Agreement, or the alleged breach thereof, or relating to activities or remuneration under this Agreement, shall be settled by binding arbitration in New York, whether commenced by the Company or Advisor, in accordance with the applicable rules of the American Arbitration Association, Commercial Dispute Resolution Procedures, and judgment on the award rendered by the arbitrator(s) shall be binding on the Parties and may be entered in any court having jurisdiction.

18. Entire Agreement; Amendments. This Agreement contains the entire understanding of the parties with respect to its subject matter and supersedes any and all prior agreements, and neither it nor any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

19. Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

20. Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

21. Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

22. Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder.

any part of it may in any way be altered, amended, extended, waived, discharged or terminated except by a written agreement that specifically references this Agreement and the provisions to be so altered, amended, extended, waived, discharged or terminated is signed by each of the parties hereto and specifically states that it is intended to alter, amend, extend, waive, discharge or terminate this agreement or a provision hereof.

- Other Activities. This Agreement shall not prohibit, restrict or limit in any manner Advisor or any of its partners or affiliates or any director, officer, partner or employee of Advisor or any of its members, officers, managers, advisors or affiliates (collectively, "Advisor Persons") from engaging in other activities, whether or not competitive with any business of the Company or any of its respective subsidiaries or Affiliates. This Agreement shall not require Advisor or any Advisor Person to make available to the Company any investment or investment opportunity about which Advisor or any Advisor Person shall become aware.

- Waiver of Damages. In the event the Company is dissatisfied in any manner with the Services provided by Advisor hereunder or with Advisor's performance under this Agreement, the Company's sole remedy shall be to terminate this Agreement. Under no circumstances shall the Company have any claim for damages against Advisor or any Advisor Person arising out of or relating to this Agreement.

- Counterparts. This Agreement may be executed and delivered (including by facsimile or electronic transmission) in any number of counterparts, and each such counterpart shall be deemed to be an original instrument, but all such counterparts together shall constitute but one agreement. This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by the other party hereto.

- Further Assurances. The Company and Advisor shall execute such documents and other papers and take such further actions as the other may reasonably request in order to carry out the provisions hereof and provide the services hereunder.

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the day and year first above written.

**ALTERNATIVE GLOBAL MANAGEMENT, LLC**

| | | |
|---|---|---|
| By: | Michael Dazzo | |
| Name: | Michael Dazzo | |
| Title: | Manager | |

**L3 CAPITAL ADVISORS, LLC**

| | | |
|---|---|---|
| By: | R Cardinale | |
| Name: | Richard Cardinale | |
| Title: | Managing Member | |

# EXHIBIT F

Gmail [redacted]

[redacted]

1 me age

[redacted]

**From:** admin@debtleader.com
**Date:** May 24, 2022 at 7:25:18 PM EDT
**To:** Robert Giardina <[redacted] Richard Cardinale <[redacted]
c[redacted]
**Cc:** [redacted] danm@debtleader.com, matth@debtleader.com
**Subject: Continuing Threats**

The fact that you threatened me on the phone recently was bad enough, but coming to my house with another guy and waiting out ide for 20 min to try and intimidate me and my family i the la t traw I have video of it from my house and from several of my neighbors, I am also getting more information and videos from my community. I have saved your threatening text and photo you sent me showing you were at my house. My wife has now filed a police report. I will be ceasing any contact with you from here on. If you contact or threaten me or my family any more I will pur ue further mea ure Thi will be my final word to you.

# EXHIBIT G

[redacted]

[redacted]

---------- Forwarded message ---------
From: **David Feingold** [redacted]
Date: Wed, May 25, 2022 at 1:04 PM
Subject: Important Issues for You to Think About
To: Rich Cardinale <[redacted]

Rich, I know that we have had our differences in the past and I have really tried to put all of that behind us for the benefit of business. The contents of this email are just for you and I as discussing this on the telephone or a zoom might lead to shouting and I am simply done shouting and arguing with you. So when you read this email please imagine me conveying this information to you in the most respectful tone possible because that is the intent. No raised voice, just pure professionalism is meant by this communication.

You have been manager of L3 and had a full staff of three back office people including two full time administrators and a lawyer and yet three years later you are now claiming no knowledge or records nor understanding of deals and rather than exacerbate and challenge your positions, I have been accommodating because I do have a financial interest in the success of the endeavor and litigation is simply a waste of time, money and resources. Neither of us win on that front. I recognize claiming no knowledge certainly is a position to take to avoid liability in the event of losses but I don't think it is honest or realistic.

Your staff was paid regularly and handsomely and yet now there are no documents, no records and no knowledge of anything. In addition, you were paid probably one million extra dollars for advisory services (what was being advised if you knew nothing?) and rent (which continues even though the office was closed) and insurance (somehow $7k per month).

There were literally hundreds of conference calls and video calls over the last three years including the regular weekly update of every business unit and multiple trips to Greenville, I think you did 5 plus your calls with all of those people. Assuming its true that you have no records or knowledge, which I can't accept, the fact that you now claim to not understand any businesses or deals, if true, would mean that you should not be managing L3 because your management duties legally require you to know this information. Again, I am being factual and not personally attacking you. Factually, this is your legal duty and you ran approximately ten prior funds including funds that had SEC audits and FINRA audits and so you clearly know what books and records you need and what level of knowledge you need of the deals. You used the exact same administrators and lawyers for all of your prior funds that passed SEC and FINRA audits. There was no change at all in the staffing. This was simply not your first fund. Again, not criticizing you, just being purely factual.

Another pure fact is that I do not work for you. I simply have a financial interest in a business

that owes money to your hedge fund and has involvement in similar business lines. I do not run your hedge fund and the individual operating business lines are not my daily job. I have tried to go out of my way to be helpful to you because I do not want to see anyone lose money and I would like to make money on our endeavor. Again, we can disagree but as long as we treat each other professionally and at the end of the day give our complete effort to make a profit then at least we gave it a valiant effort.

Again, whether I believe the positions you are now taking is immaterial, I am just stating pure facts so that it is clear, putting our differences aside has always been for the greater good of the success of the business and people can disagree and still have a business succeed. Rather than fight with your positions that I found untenable, I have just tried to ignore them for the greater good of the business success. There are now literally 14 people who have had a similar experience with you and who refuse to speak with you and again I have put that behind me just to focus on making our endeavor successful and I think in your heart you know that to be true. I did lose my temper with you in the past because at some points the drama between you and others simply became too much for me. I know you know in your heart I have always tried my hardest in fact on the multiple occasions you went to Greenville you saw that I never got drunk and was there to do business meetings and check on the progress of business lines. My function has been pure business. I don't buy people gifts, immerse myself in people's families, bring my family on trips with business people or try to make friendship bonds with people just to protect our business, I understand that you think that is smart business and that works for you, however, my way is just to work like hell and make things successful. We have disagreed immensely and tried to put that behind us and I do appreciate that.

Again, we can disagree on many things and yet still have a successful endeavor. In other words, everything that I have just said can be handled and still have an endeavor that works and makes money for everyone. I literally was willing to put all of that behind us. With all of that being said, there is one thing that I cannot put up with and that is violence and/or threats of violence. The recent events of yesterday are simply the final straw for me that cannot allow me to turn my back.

I know that you are embroiled in a business dispute with Darren regarding debt settlement and now I find out that Rob and another person showed up at Darren's home yesterday to beat him up because of your business dispute with Darren. You and Rob have always been partners in that business and in my experience with you all, everything that Rob does has always been with your full knowledge and support and so I cannot overlook threats of harm, which are real threats to someone because you disagree with them in business.

In addition to the threats to Darren, threats were made to harm his wife and children and Rob brought someone with him, sat outside of Darren's house and texted a photo to Darren to let him know that they knew where he lives and had access to his family even though they live in a gated community. This is simply unacceptable to me. Even worse, I learned that Darren sent an email to all of you and you did not even respond denying involvement or knowledge. Apparently your all position is that if Darren doesn't give you a piece of his new business that he and his family will experience violence. This is simply horrible.

I know that you are going to say that you knew nothing of any of this and quite frankly at this point it is not my job to prove or disprove your knowledge. However, what I do know is that I never had to deal with such circumstances in my life. I do know you told Darren that you were going to let Rob handle this in his own way if Darren did not include you all in his new

business and I can infer what that means. I can't allow this type of stuff in my life, I really can't. I would rather lose money than deal with this, it is so opposite of everything that I have ever done or believed in for my entire life.

So here is my respectful proposal to you that will solve your issues of making sure your investors get all of their money back and then we see some money at the end once the investors are being paid and allow us to not to have to deal with each other because I just can't proceed in a situation of violence, I simply cannot. I propose either:

1. You could liquidate the L3 Fund, the cash would be a cash distribution to each investor (MCA portfolio as it runs off pays all investors) and then they will receive "in kind" share certificates for all remaining businesses and as those businesses are sold, they will get cash and thereby once all investors are paid, we then can take the monies that would be owed to us. An in kind distribution will allow the investors to have share ownership and deal directly with business lines, no offense but no one is going to deal with you after this entire violence issue; or

2. You could pursuant to the PPM documents announce a freezing of all interest payments or a reduction of interest payments, then have all of the MCA portfolio spin, reinvest and grow and in approximately three years it should grow to the size of all original money taken in, then do a cash distribution and do an "in kind" distribution of the remaining businesses to the investors as described above. This again would allow excess monies to revert to us at the end after all payments to investors.

Choice one is an immediate partial cash distribution and choice two is a cash distribution after the MCA portfolio grows to the original value of the entire fund. Remaining assets are all "in kind" distributions as the PPM permits.

Again, the above would allow all investors to get back all of their money, just in different time frames. I can assure you that the people that operate all of the different business lines will not in any way deal with you once they learn of this violence issue and quite frankly they might all have already heard.

Please think in an unemotional manner of the two proposals above. I have no idea what you have said to your L3 investors in terms of the returns you told them that they would get or how you arrived at the valuations that you gave them as manager of L3, but what I do know is that this violence issue is completely unacceptable to me. Please do not send me a long email back as I will not read it because I do not want to get in an email war with you. You do not need to respond and I will not read the response if you make one. I simply cannot continue with you in any manner, I have thought about all options and these are the only two that make sense. If you decide to proceed and not pursue these options, obviously as fund manager, that is your choice. It also goes without saying, I don't want any direct or indirect threats made to me, the police are already involved with the matters above and apparently a detective has already been assigned.

Thank you for understanding my position. If the true goal is get investors back their money, make them some profits and then at the end we can make our money after all of the investors get theirs then these solutions solve that issue. No drama please, just think about this. If you do not want the above then I wish you luck, as manager, it is ultimately your decision.

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279
https://www.feingoldllc.com

--
David Feingold
Feingold LLC
4440 PGA Blvd. Suite 600
Palm Beach Gardens, Fl 33410
(561) 515-7279
https://www.feingoldllc.com