IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT IN AND FOR MIAMI-DADE COUNTY

COMPLEX BUSINESS DIVISION

CASE NO:

ALTERNATIVE GLOBAL THREE, LLC, a Delaware limited liability company,

Plaintiff,

vs.

DCG STATEN ISLAND, LLC, a Florida limited liability company, DCG BOCA, LLC, a Florida limited liability company, DCG NEW JERSEY, LLC, a Florida limited liability company, DCG NEW YORK, LLC, a Florida limited liability company, DCG FLORIDA, LLC, a Florida limited liability company, DCG TEXAS, LLC, a Florida limited liability company,

Defendants.

_______________________________________/

# COMPLAINT

Plaintiff, ALTERNATIVE GLOBAL THREE, LLC a Delaware limited liability company ("**Alternative Global**"), by and through its undersigned attorneys, as and for its Complaint against DCG STATEN ISLAND, LLC, a Florida limited liability company ("**DCG Staten Island**"), DCG BOCA, LLC, a Florida limited liability company ("**DCG Boca**"), DCG NEW JERSEY, LLC, a Florida limited liability company ("**DCG NJ**"), DCG NEW YORK, LLC, a Florida limited liability company ("**DCG NY**"), DCG FLORIDA, LLC, a Florida limited liability company ("**DCG FL**"), and DCG TEXAS, LLC, a Florida limited liability company ("**DCG TX**")(collectively, the "**DCG Entities**"), hereby alleges as follows:

## INTRODUCTION

Alternative Global is a member of the DCG Entities, each of which is governed by a respective operating agreement. Each of the DCG Entities' operating agreements provide, in relevant part, that each member is entitled to (1) access to the books and records of the respective DCG Entity; and (2) distributions at the end of each calendar quarter. Since January 2022, Alternative Global has neither been provided access to each of the respective DCG Entities' books and records, despite demand, nor received any distributions from the DCG Entities. Thus, pursuant to the terms of the respective DCG Entities' operating agreements, the DCG Entities are in breach thereof.

## THE PARTIES, JURISDICTION, AND VENUE

1. This is an action for damages in excess of $750,000, exclusive of attorneys' fees, interests, and costs, the threshold for this Court's Complex Business Litigation Division, and the subject matter in controversy and the amount in dispute meet the requirements of the Court's Administrative Order No. 17-11 §§ 3(A) and conform to the Complex Business Litigation Rules.

2. Alternative Global is a limited liability company formed under the laws of the State of Delaware.

3. The DCG Entities are each limited liability companies formed and organized under the laws of the State of Florida. According to the Florida Division of Corporations, the DCG Entities' respective principal places of business are located in Miami-Dade County, Florida.

4. The Court has personal jurisdiction over the DCG Entities because the DCG Entities are Florida entities and each breached a contract in Florida.

5. Venue is proper in Miami-Dade County, Florida pursuant to Florida Statute §

605.0411 and because the causes of action herein accrued in Miami-Dade County, Florida and the DCG Entities maintain their principal place of business in Miami-Dade County, Florida.

**FACTUAL ALLEGATIONS**

6. In or around August 2020, Alternative Global became a member of each of the DCG Entities. At that time, Alternative Global had three co-managing members: Richard Cardinale, David Feingold and Michael Dazzo.

7. In or around January 28, 2022, Feingold and Dazzo abruptly resigned as co-managers of Alternative Global after Cardinale made several requests for information and records that Feingold and Dazzo were maintaining, relating to, among other things, Alternative Global's investments in the DCG Entities. Following their resignation, Feingold and Dazzo refused to provide Alternative Global with any information regarding its investment in the DCG Entities.

8. From July 2020 through March 5, 2021, Alternative Global made a series of wire transfers to the DCG Entities totaling at least $3,658,000, as follows:

| Date | Transferee Entity | Amount of Wire Transfer |
|---|---|---|
| 7/23/2020 | DCG Boca | $140,000 |
| 7/23/2020 | DCG Staten Island | $140,000 |
| 7/31/2020 | DCG Boca | $105,000 |
| 7/31/2020 | DCG Staten Island | $105,000 |
| 8/06/2020 | DCG Boca | $70,000 |
| 08/07/2020 | DCG Staten Island | $105,000 |
| 8/07/2020 | DCG Staten Island | $375,000 |
| 8/12/2020 | DCG Boca | $70,000 |
| 8/14/2020 | DCG NJ | $235,000 |
| 9/04/2020 | DCG FL | $150,000 |
| 9/04/2020 | DCG Boca | $210,000 |
| 11/09/2020 | DCG Boca | $70,000 |
| 11/20/2020 | DCG Texas | $140,000 |
| 11/23/2020 | DCG Boca | $100,000 |
| 12/18/2020 | DCG New York | $100,000 |
| 12/29/2020 | DCG Boca | $100,000 |
| 12/29/2020 | DCG Staten Island | $140,000 |

| | | |
|---|---|---|
| 1/12/2021 | DCG Boca | $385,000 |
| 1/15/2021 | DCG Staten Island | $100,000 |
| 1/29/2021 | DCG Staten Island | $302,000 |
| 2/12/2021 | DCG Staten Island | $126,000 |
| 3/05/2021 | DCG Staten Island | $130,000 |
| 3/05/2021 | DCG NJ | $210,000 |
| TOTAL | | **$3,658,000** |

9. The DCG Entities' respective operating agreements provide, at Section 8.2:

> All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

True and correct copies of the DCG Entities' respective operating agreements are attached hereto as follows: DCG Staten Island, **Exhibit A** (the **"DCG Staten Island Operating Agreement**"); DCG Boca, **Exhibit B** (the **"DCG Boca Operating Agreement"**); DCG NJ, **Exhibit C** (the **"DCG NJ Operating Agreement"**); DCG NY, **Exhibit D** (the **"DCG NY Operating Agreement"**); DCG FL, **Exhibit E** (the "**DCG FL Operating Agreement"**); DCG TX, **Exhibit F** (the "**DCG TX Operating Agreement**") (collectively, the "**Operating Agreements**").

10. Moreover, Section 9.2 of the DCG Entities' Operating Agreements provides:

> Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any must be distributed to the Members, pro rata, in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

11. Finally, Section 12.3 of each of the DCG Entities' Operating Agreements provides:

> Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12. Since about January 28, 2022, each of the DCG Entities have refused to provide Alternative Global with access to information regarding each of the DCG Entities' books and records.

13. Beginning in February 2022, and continuing thereafter, Richard Cardinale, Alternative Global's sole Managing Member and Member, requested access to the books and records of the respective DCG Entities by telephone, text, and email. Despite such requests, the DCG Entities have failed to provide any information to Alternative Global or to Cardinale in his capacity as its sole Managing Member.

14. Finally, having not received access, on or about August 9, 2022, Alternative Global formally demanded through counsel that Michael Dazzo, as the sole manager of each of the DCG Entities, provide access to the respective books and records of each of the DCG Entities. True and correct copies of Alternative Global's records demands (collectively, the "**Records Demands**") are attached hereto as **Composite Exhibit G.**

15. On August 18, 2022, DCG Boca, DCG FL, DCG NJ, and DCG NY, through counsel, responded to the Records Demand, stating that Alternative Global had the same access to the books and records of the DCG Entities as the DCG Entities themselves through CRM software and that the DCG Entities are not managers of themselves, and Alternative Global should "obtain the records directly on their own". A true and correct copy of counsel's August 18, 2022 records demand response (the "**Response**") is attached hereto as **Exhibit H**. DCG Staten Island and DCG TX did not respond and instead ignored the respective Records Demands sent to them.

16. Alternative Global does not have access to any purported CRM software, the credentials to access any such purported software, nor any other mechanism by which to obtain the respective DCG Entities' books and records.

17. Thereafter, on several occasions, Alternative Global sought, via e-mail, to obtain information to be able to access the purported CRM software referenced in the Response, but to this day has not been provided with such access.

18. To date, the DCG Entities have failed to comply with Alternative Global's requests for access to their respective books and records.

19. The DCG Entities have also failed to make distributions to Alternative Global in contravention of Section 9.2 of each of the Operating Agreements. Notably, the distributions ceased, at least as of May 23, 2022, shortly after Michael Dazzo and David Feingold resigned as members and co-managers of Alternative Global, if not earlier.

20. Alternative Global has retained the law firm of Greenberg Traurig, P.A. and is obligated to pay it a reasonable hourly fee.

## CONDITIONS PRECEDENT

21. Alternative Global has fully performed under the DCG Entities' Operating Agreements.

22. All conditions precedent to the filing of this Complaint have been performed, occurred, met, satisfied, or otherwise been waived.

## COUNT ONE
## BREACH OF OPERATING AGREEMENT AGAINST DCG STATEN ISLAND

23. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

24. The DCG Staten Island Operating Agreement is the valid operating agreement that governs DCG Staten Island.

25. Alternative Global is a Member of DCG Staten Island, and thus, the terms of the DCG Staten Island Operating Agreement inure to its benefit.

26. Alternative Global has fully performed under the terms of the DCG Staten Island Operating Agreement.

27. DCG Staten Island has breached the DCG Staten Island Operating Agreement by failing to provide Alternative Global with access to the books and records of DCG Staten Island pursuant to Section 8.2 of the DCG Staten Island Operating Agreement.

28. DCG Staten Island has further breached the DCG Staten Island Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG Staten Island Operating Agreement.

29. Alternative Global has incurred damages proximately caused by DCG Staten Island's failure to provide Alternative Global with access to DCG Staten Island's books and records.

30. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG Staten Island Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

## COUNT TWO
## ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG STATEN ISLAND

31. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

32. Alternative Global is a Member of DCG Staten Island.

33. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG Staten Island's sole manager, DCG Staten Island was required to provide Alternative Global with access to its books and records.

34. To date, DCG Staten Island has failed to provide Alternative Global with access to its books and records.

35. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG Staten Island make its books and records available for inspection and copying at DCG Staten Island's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT THREE**
**BREACH OF OPERATING AGREEMENT AGAINST DCG BOCA**

36. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

37. The DCG Boca Operating Agreement is the valid operating agreement that governs DCG Boca.

38. Alternative Global is a Member of DCG Boca, and thus, the terms of the DCG Boca Operating Agreement inure to its benefit.

39. Alternative Global has fully performed under the terms of the DCG Boca Operating Agreement.

40. DCG Boca has breached the DCG Boca Operating Agreement by failing to provide Alternative Global with access to the books and records of DCG Boca pursuant to Section 8.2 of DCG Boca's Operating Agreement.

41. DCG Boca has further breached the DCG Boca Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG Boca Operating Agreement.

42. Alternative Global has incurred damages proximately caused by DCG Boca's failure to provide Alternative Global with access to DCG Boca's books and records.

43. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG Boca Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT FOUR**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG BOCA**

44. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

45. Alternative Global is a Member of DCG Boca.

46. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG Boca's sole manager, DCG Boca was required to provide Alternative Global with access to its books and records.

47. To date, DCG Boca has failed to provide Alternative Global with access to its books and records.

48. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG Boca make its books and records available for inspection and copying at DCG Boca's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

## COUNT FIVE
## BREACH OF OPERATING AGREEMENT AGAINST DCG NJ

49. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

50. The DCG NJ Operating Agreement is the valid operating agreement that governs DCG NJ.

51. Alternative Global is a Member of DCG NJ, and thus, the terms of the DCG NJ Operating Agreement inure to its benefit.

52. Alternative Global has fully performed under the terms of the DCG NJ Operating Agreement.

53. DCG NJ has breached the DCG NJ Operating Agreement by failing provide Alternative Global with access to the books and records of DCG NJ pursuant to Section 8.2 of the DCG NJ Operating Agreement.

54. DCG NJ has further breached the DCG NJ Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG NJ Operating Agreement.

55. Alternative Global has been incurred damages proximately caused by DCG NJ's failure to provide Alternative Global with access to DCG NJ's books and records.

56. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG NJ Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT SIX**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG NJ**

57. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

58. Alternative Global is a Member of DCG NJ.

59. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG NJ's sole manager, DCG NJ was required to provide Alternative Global with access to its books and records.

60. To date, DCG NJ has failed to provide Alternative Global with access to its books and records.

61. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG NJ make its books and records available for inspection and copying at DCG NJ's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT SEVEN**
**BREACH OF OPERATING AGREEMENT AGAINST DCG NY**

62. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

63. The DCG NY Operating Agreement is the valid operating agreement that governs DCG NY.

64. Alternative Global is a Member of DCG NY, and thus, the terms of the DCG NY Operating Agreement inure to its benefit.

65. Alternative Global has fully performed under the terms of the DCG NY Operating Agreement.

66. DCG NY has breached the DCG NY Operating Agreement by failing provide Alternative Global with access to the books and records of DCG NY pursuant to Section 8.2 of the DCG NY Operating Agreement.

67. DCG NY has further breached the DCG NY Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG NY Operating Agreement.

68. Alternative Global has incurred damages proximately caused by DCG NY's failure to provide Alternative Global with access to DCG NY's books and records.

69. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG NY Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

## COUNT EIGHT
## ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG NY

70. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

71. Alternative Global is a Member of DCG NY.

72. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG NY's sole manager, DCG NY was required to provide Alternative Global with access to its books and records.

73. To date, DCG NY has failed to provide Alternative Global with access to its books and records.

74. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG NY make its books and records available for inspection and copying at DCG NY's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii)

attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT NINE**
**BREACH OF OPERATING AGREEMENT AGAINST DCG FL**

75. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

76. The DCG FL Operating Agreement is the valid operating agreement that governs DCG FL.

77. Alternative Global is a Member of DCG FL, and thus, the terms of the DCG FL Operating Agreement inure to its benefit.

78. Alternative Global has fully performed under the terms of the DCG FL Operating Agreement.

79. DCG FL has breached the DCG FL Operating Agreement by failing provide Alternative Global with access to the books and records of DCG FL pursuant to Section 8.2 of the DCG FL Operating Agreement.

80. DCG FL has further breached the DCG FL Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG FL Operating Agreement.

81. Alternative Global has incurred damages proximately caused by DCG FL's failure to provide Alternative Global with access to DCG FL's books and records.

82. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG FL Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT TEN**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG FL**

83. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

84. Alternative Global is a Member of DCG FL.

85. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG FL's sole manager, DCG FL was required to provide Alternative Global with access to its books and records.

86. To date, DCG FL has failed to provide Alternative Global with access to its books and records.

87. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG FL make its books and records available for inspection and copying at DCG FL's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

**COUNT ELEVEN**
**BREACH OF OPERATING AGREEMENT AGAINST DCG TX**

88. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

89. The DCG TX Operating Agreement is the valid operating agreement that governs DCG TX.

90. Alternative Global is a Member of DCG TX, and thus, the terms of the DCG TX Operating Agreement inure to its benefit.

91. Alternative Global has fully performed under the terms of the DCG TX Operating Agreement.

92. DCG TX has breached the DCG TX Operating Agreement by failing provide Alternative Global with access to the books and records of DCG TX pursuant to Section 8.2 of the DCG TX Operating Agreement.

93. DCG TX has further breached the DCG TX Operating Agreement by failing to make distributions to Alternative Global since at least May 23, 2022, in violation of Section 9.2 of the DCG TX Operating Agreement.

94. Alternative Global has incurred damages proximately caused by DCG TX's failure to provide Alternative Global with access to DCG TX's books and records.

95. Moreover, Alternative Global has been damaged in an undetermined amount equal to the sums it was entitled to receive as distributions pursuant to the DCG TX Operating Agreement since May 23, 2022, which damages continue to accrue.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; and (iii) for such other and further relief as the Court deems just and proper.

**COUNT TWELVE**
**ACCESS TO BOOKS AND RECORDS PURSUANT TO FLA. STAT. § 605.0411 AGAINST DCG TX**

96. Plaintiff Alternative Global realleges and reasserts Paragraphs 1 through 22 above as though set forth fully herein.

97. Alternative Global is a Member of DCG TX.

98. Pursuant to Fla. Stat. § 605.0410(3)(a), within ten (10) days of Alternative Global's demand on August 9, 2022 to Michael Dazzo, DCG TX's sole manager, DCG TX was required to provide Alternative Global with access to its books and records.

99. To date, DCG TX has failed to provide Alternative Global with access to its books and records.

100. Accordingly, pursuant to Fla. Stat. § 605.0411, Alternative Global is entitled to an order directing that DCG TX make its books and records available for inspection and copying at DCG TX's expense.

**WHEREFORE**, Plaintiff Alternative Global respectfully requests entry of an award of (i) damages including prejudgment interest and post-judgment interest; (ii) an accounting; (iii) attorneys' fees and costs pursuant to Fla. Stat. § 605.0411(2) and (iv) for such other and further relief as the Court deems just and proper.

Dated: November 17, 2022

Respectfully submitted,

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard
Suite 2000
Fort Lauderdale, FL 33301
Telephone: (954) 765-0500
Facsimile: (954) 765-1477
**AVI BENAYOUN**
Florida Bar No. 0151696
BenayounA@gtlaw.com
YearginA@gtlaw.com
**JON L. SWERGOLD**
Florida Bar No. 108510
swergoldj@gtlaw.com
Anastasiya.Karant@gtlaw.com
**JOHN L. MCMANUS**
Florida Bar No. 0119423
mcmanusj@gtlaw.com
yeargina@gtlaw.com
Aanastasiya.Karant@gtlaw.com
**SABRINA D. NIEWIALKOUSKI**
Florida Bar No. 0123630
niewialkouskis@gtlaw.com
Anastasiya.Karant@gtlaw.com

s/ *Avi Benayoun*

**AVI BENAYOUN**
Florida Bar No. 0151696
BenayounA@gtlaw.com
YearginA@gtlaw.com

# EXHIBIT A

**OPERATING AGREEMENT**
**OF DCG STATEN ISLAND, LLC.**

The Members of DCG STATEN ISLAND, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

**ARTICLE I**

***INTRODUCTION***

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG STATEN ISLAND, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG STATEN ISLAND, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

## *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

### *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

### *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of ____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

### *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

# EXHIBIT B

# OPERATING AGREEMENT
# OF DCG BOCA, LLC.

The Members of DCG BOCA, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG BOCA, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG BOCA, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

## *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any distribution

in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument signed by all

Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate more than 50% of the Percentage Interests in the Company with respect to a matter within

the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s)

shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the

business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The

Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of _____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

**ARTICLE VIII**

### *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other

enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all

prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

[redacted]

# EXHIBIT C

**OPERATING AGREEMENT**
**OF DCG NEW JERSEY, LLC.**

The Members of DCG NEW JERSEY, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG NEW JERSEY, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG NEW JERSEY, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of _____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

### *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

# EXHIBIT D

**OPERATING AGREEMENT**
**OF DCG NEW YORK, LLC.**

The Members of DCG NEW YORK, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG NEW YORK, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG NEW YORK, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

### *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; <u>provided, however,</u> that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of _____________, ____, among ________________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

### *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

[redacted]

[redacted]

# EXHIBIT E

# OPERATING AGREEMENT
# OF DCG FLORIDA, LLC.

The Members of DCG FLORIDA, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

## ARTICLE I

## *INTRODUCTION*

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG FLORIDA, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG FLORIDA, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

### *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

### *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of ____________, ____, among ______________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

## *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

### *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

### *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;

(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;

(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

**EXHIBIT A**

[redacted]

[redacted]

# EXHIBIT F

**OPERATING AGREEMENT**
**OF DCG TEXAS, LLC.**

The Members of DCG TEXAS, LLC. (the "Company"), a limited liability company created under the state of Florida Limited Liability Company Act (the "Act"), hereby adopt the following Operating Agreement (the "Agreement") in order to regulate the Company's affairs, conduct its business, and establish the relations of its members; and for these purposes the Members agree as follows:

**ARTICLE I**

***INTRODUCTION***

1.1 Formation of Limited Liability Company. The Members have formed the Limited Liability Company by filing Articles of Organization (the "Articles") with the Department of State. The Company's business is conducted under the name DCG TEXAS, until such time as all the Members designate otherwise and file amendments to the Articles in accordance with applicable law.

This Agreement is subject to, and governed by, the Act and the Articles. In the event of a direct conflict between the provisions of this Agreement and the provisions of the Act or the provisions of the Articles, such provisions of this Agreement, as the case may be, are controlling.

1.2. Defined Terms. The following terms used in this Agreement with their initial letters capitalized, unless the context requires otherwise or unless otherwise expressly provided in these Operating Agreement, have the meanings specified in this Section 1.2. The singular includes the plural and vice versa, as the context requires. When used in these Operating Agreement, the following terms have the meanings set forth below:

(a) "Act" means the Florida Limited Liability Company Act, as it may be amended from time to time.

(b) "Additional Member" means any person or Entity admitted as a Member pursuant to Section 2.8 of these Operating Agreement.

(c) "Affiliate" means any individual, partnership, corporation, limited liability company, trust, or other Entity or association, directly or indirectly, through one or more intermediaries, controlling, controlled by, or under common control with a Member. The term "control", as used in the immediately preceding sentence, means, with respect to a corporation the right to exercise, directly or indirectly, more than 50 percent of the voting rights attributable to the controlled corporation, and, with respect to any individual, partnership, trust, other Entity or association, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of the controlled Entity.

(d) "Available Cash" of the Company means all cash funds of the Company on hand from time to time (other than cash funds obtained as contributions to the capital of the Company by the Members and cash funds obtained from loans to the Company) after (i) payment of all operating expenses of the Company as of such time, (ii) provision for payment of all outstanding and unpaid current obligations of the Company as of such time, and (iii) provision for a working capital reserve in accordance with Section 5.2 below.

(e) "Bankruptcy" means, and a Member shall be deemed a "Bankrupt Member" on (i) the entry of a decree or order for relief against the member by a court of competent jurisdiction in any involuntary case brought against the Member under any bankruptcy, insolvency, or other similar law (collectively, "Debtor Relief Laws") generally affecting the rights of creditors and relief of debtors now or hereafter in the rights of creditors and relief of debtors now or hereafter in effect, (ii) the appointment of a receiver, liquidation, assignee, custodian, trustee, sequestrator or other similar agent under applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property. (iii) the ordering of the winding up or liquidation of the Member's affairs, (iv) the filing of a petition in any such involuntary bankruptcy case that remains undismissed or suspended pursuant to Section 305 of the Federal Bankruptcy Code (or any corresponding provision of any future Untied States bankruptcy law), (v) the commencement by the Member of a voluntary case under any applicable Debtor Relief Law now or hereafter in effect, (vi) the consent by the Member to the entry of an order for relief in an involuntary case under any such law or to the appointment of or the taking of possession by a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar agent under any applicable Debtor Relief Laws for the Member or for any substantial part of its assets or property, or (vii) the making by a Member of any general assignment for the benefit of its creditors.

(f) "Capital Account" means the individual accounts established and maintained pursuant to Section 2.6 (b) of these Operating Agreement.

(g) "Capital Contribution" means the total value of cash and agreed fair market value of property contributed and agreed to be contributed to the Company by each Member, as shown in Exhibit A, as the same may be amended from time to time. Any reference in this Agreement to the Capital Contribution of a then Member includes a Capital Contribution previously made by any prior Member for the interest of such then Member, reduced by any distribution to such Member in return of "Capital Contribution" as contemplated herein. Additional Capital Contribution may be made only by a Member with [his or her] consent and with the consent of all other Members.

(h) "Code" means the Internal Revenue Code of 1986, as amended. All references herein to sections of the Code include any corresponding provision or provisions of succeeding law.

(i) "Company" refers to DCG TEXAS, LLC..

(j) "Entity" means any association, corporation, general partnership, limited partnership, limited liability company, joint stock association, joint venture, firm, trust, business trust, cooperative, and foreign associations of like structure.

(k) "Interest" in the Company means the entire ownership interest of a Member in the Company at any particular time, including the right to such Member to any and all benefits to which a Member may be entitled as provided in this Agreement and under the Act, together with the obligations of such Member to comply with all of the terms and provisions of these Operating Agreement.

(l) "Manager" means and individual appointed by consent of all Members having the authority set out in Section 3.3.

(m) "Percentage Interests" of a Member means the percentage of such Member set forth opposite the name of such Member under the column "Percentage Interest" in Exhibit A, as such percentage may be adjusted from time to time.

(n) "Principal Office" means the office of the Agent as shown in the Articles, or such other address as may be established pursuant to Section 2.1 (b) hereof.

(o) "Operating Agreement" means this Operating Agreement, as originally executed and as amended from time to time, and the terms "hereof," "hereby," and "hereunder," when used with reference to this Operating Agreement, refer to this Agreement as a whole, unless the context otherwise requires.

(q) "Share" refers to an interest in the Company representing a contribution to capital, to be measured in such units as may be established pursuant to Section 2.4. Whenever reference is made to "Percentage Interest," a Share may be converted into the same by dividing a Member's number of Shares by the total of all Shares outstanding.

(s) "Substitute Member" means any person or Entity who or which is admitted into Membership on the written consent of all Members pursuant to section 6.4.

1.3. Company Purpose. The general purposes of the Company are as set forth in the Articles. The Company may exercise all powers reasonable or necessary to pursue its purpose. In addition, the Company may engage in and do any act concerning any or all lawful businesses for which limited liability companies may be organized according to the Act which purposes have been specifically authorized by all Members.

## ARTICLE II

## *MEMBERS; MEMBERSHIP INTERESTS*

2.1. Names, Addresses and Initial Capital Contributions of Members. Members, their respective addresses, their initial Capital Contributions to the Company, and their respective Percentage Interest in the Company are set forth on Exhibit A, attached and

made a part of these Operating Agreement. Each Member agrees to make the initial contribution set out in Exhibit A within 10 days. This Company shall have two classes of equity ownership consisting of a Class A – voting class and a Class B – non-voting class. All of the Class B shares shall have no further rights as reflected in this Operating Agreement and provided for hereafter except that one hundred percent (100%) of any dividend, distribution or consideration received from the sale of any equity by the Company from it's Class A shares shall be provided to the Class B owners based on percentage of ownership. Class B owners shall have no further rights, duties, responsibilities or claims to any management or operation in the Company unless specified by separate resolution of the Company and executed by the unanimous consent of the Class A voting members. Class A members shall have all of the rights attributed in this Agreement and when this Agreement uses the defined term Member(s) that shall only mean the Class A voting members. In the event of any ambiguity or inconsistency in this Agreement, the interpretation most favorable to Class A voting members shall control and each party waives any right to challenge said interpretation.

2.2. Future Contributions. Subsequent contributions must be in such amounts and may be in any type of property as is agreed on by all of the Members. No Member is required to make any Capital Contribution to the Company other than the Capital Contribution required to be made by such Member under Section 2.1 without the Member's prior express consent.

2.3. Member Loans or Services. Loans or services by any Member to the Company may not be considered to be contribution to the capital of the company.

2.4. Shares of Membership Interests. The membership interests of the Company may be divided into Shares, each Shares to represent such amount of capital contributed as the Members unanimously determine.

2.5. Certificates for Membership Interests. The Shares of a Member or the Member's Interest in the Company may be represented by a Certificate of Membership. The exact contents of a Certificate of Membership is determined by the Members.

2.6. Capital and Capital Accounts.

(a) The initial Capital Contribution of each Member is as set forth on Exhibit A. No interest may be paid on any Capital Contribution.

(b) An individual capital account (the "Capital Account") must be established and maintained on behalf of each Member, including any additional or substituted Member who shall hereafter receive an Interest in the Company, in accordance with the rules of Treas. Reg. § 1.704-1(b)(2)(iv). Except as otherwise provided in Treas. Reg. § 1.704-1(b)(2)(iv), each Member's Capital Account shall initially consist of such Member's Capital Contribution and shall be further credited with each Member's additional Capital Contributions and allocable share of the Company's income, as determined in Section 2.6(c) below, and shall be debited by all distributions made by the Company to a Member together

with each such Member's allocable share of the Company's losses, as determined in Section 2.6(c) below. In the event that the Company, in conformity with the above Operating Agreement, has property on its books at a value ("book value") greater than or less than its adjusted tax basis, the Members' Capital Accounts shall be adjusted to reflect only allocations to them of depreciation, amortization and gain or loss as computed for book purposes (and not for tax purposes) with respect to such property. In such event, items of book depreciation, amortization and gain or loss shall be calculated in conformity with the rules of Treas. Reg. § 1.704-1(b)(2)(iv)(g).

(c) Allocation of Income and Losses.

(i) All items of income and loss incurred by the Company shall be allocated to the Members in accordance with their respective Interest;

(ii) All items of income incurred by the Company shall be allocated to the Members in an amount equal to the losses previously allocated to them pursuant to Section 2.6(c)(iii) of this Operating Agreement, less income allocated to the Members under this Section 2.6(c)(ii);

(iii) All items of loss incurred by the Company shall be allocated to the Members to the extent of income previously allocated to the Members pursuant to Section 2.6(c)(ii) of this Operating Agreement, less losses previously allocated to the Members pursuant to this Section 2.6(c)(iii);

(iv) For purposes hereof, the Company's income or loss, as the case may be, for each fiscal year of the Company shall be the federal taxable income or loss for such year. Such federal taxable income or taxable loss shall be computed by including all ordinary income, capital gain and loss, and deductions, allowances and credits of the Company. For the purposes of this Section 2.6(c), the Company's income shall also include: (x) income of the Company which is exempt from tax; and (y) the excess of the deductions for depletion over the basis of the property subject to depletion. Similarly, for the purposes of this Section 2.6(c), the Company's losses shall include expenditures of the Company which are not deductible in computing its taxable income and are not properly chargeable to a capital account; and

(d) Principles of Allocation. It is the intention of the Members that the allocations of income and losses hereunder have substantial economic effect in accordance with the tests therefor set forth in the Treasury Operating Agreement under Section 704(b) of the Internal Revenue Code. Accordingly, allocations not specifically provided for in this Agreement shall be made in such a manner as shall conform to the allocation rules and principles as set forth in such Operating Agreement as in effect from time to time, and the Capital Accounts of the Members shall be maintained in accordance with the provisions hereof construed and interpreted in the light of such Operating Agreement.

(e) No Member has the right to withdraw his Capital Contribution or to demand and receive property of the Company or to demand and receive property or any

distribution in return for his Capital Contribution, except as may be specifically provided in this Agreement or required by law. No Member may receive out of Company property any part of his Capital Contribution until (i) liabilities of the Company, except liabilities to Members on account of their loans have been paid or sufficient Company property remains to pay them, and (ii) all Members consent, unless the return of the Contribution to Capital is rightfully demanded as provided in the Act.

(f) Subject to the provisions of subsection (e) of this section, a Member may rightfully demand the return of his or its Capital Contribution (i) on the dissolution of the Company, or (ii) as may otherwise be provided in the Act. A Member may demand and receive only cash in return for the Member's Capital Contribution.

(g) Except as is specifically provided otherwise in this Agreement as provided in Section 2.6 hereinabove, or in the Act, no Member has any liability or obligation to restore a negative or deficit balance in such Member's Capital Account.

2.7. Admission of Additional Capital. Additional capital may be contributed to the Company, but only on the written consent of all Members.

2.8. Admission of Additional Members. As provided in the Articles, (i) the Members may admit to the Company additional Member(s) to participate in the profits, losses, available cash flow, and ownership of the assets of the Company on such terms as are determined by all of the Members, (ii) admission of any such Additional Member(s) requires written consent of all Members then having any Interest in the Company, and (iii) any Additional Members are allocated gain, loss, income or expense by the method provided in these Operating Agreement, and if no method is specified, then as may be permitted by Section 706(d) of the Code.

2.9. Limitation on Liability. No Member is liable under a judgment, decree or order of the court, or in any other manner, for a debt, obligation or liability of the Company, except as provided by law. No Member is required to loan any funds to the Company. Except as may be expressly provided otherwise herein, no Member is required to make any contribution to the Company by reason of any negative balance in his capital account, nor does any negative balance in a Member's capital account create any liability on the part of the Member to any third party.

2.10. No additional Authority. Unless expressly provided in Article III, no Member, acting alone, has any authority to act for, or to undertake or assume, any obligation, debt, duty or responsibility on behalf of, any other Member or the Company.

2.11. No Member Responsible for Other Member's Commitment. In the event that a Member (or a Members' shareholder, partners, members, owners, or Affiliates) has incurred any indebtedness or obligation prior to the date hereof that relates to or otherwise affects the Company, neither the Company nor any other Member has any liability or responsibility with respect to such indebtedness or obligation unless such indebtedness or obligation is assumed by the Company pursuant to a written instrument

signed by all Members. Furthermore, neither the Company nor any Member is responsible or liable for any indebtedness or obligation that is hereafter incurred by any other Member (or a Member's shareholder, partners, members, owners, or Affiliates). In the event that a Member (or a Members' shareholders, partners, members, owners, or Affiliates (collectively, the "liable Member"), whether prior to or after the date hereof, incurs (or has incurred) any debt or obligation that neither the Company nor any of the other Members is to have any responsibility or liability for, the liable Member must indemnify and hold harmless the Company and the other Members from any liability or obligation they may incur.

## ARTICLE III

## *MANAGEMENT AND CONTROL OF BUSINESS*

3.1. Overall Management is vested in Manager(s).

(a) As expressly provided in the Articles of Organization, management of the Company is vested in the Manager(s). Provided however, that in the event that a vacancy will occur as to the Manager position, the management of the Company shall be vested in the Members in proportion to their initial Capital Contributions. The Members or any of their Affiliates may engage in other activities of any nature.

(b) Meetings of the Members.

(i) As provided in subsection (b) (ii) of this Article III, meetings of Members may be called by Members representing in the aggregate more than 70% of the Percentage Interests in the Company.

(ii) The Company shall deliver or mail written notice stating the date, time, and place of any meeting of Members and, when otherwise required by law, a description of the purposed for which the meeting is called, to each Members of record entitled to vote at the meeting, at such address as appears in the records of the Company, such notice to be mailed at least 10, but not more than 30, days before the date and time of the meeting. A Member may waive notice of any meeting, before or after the date of the Meeting, by delivering a signed waiver to the Company for inclusion in the minutes of the Company. A Member's attendance at any meeting, in person or by proxy (i) waives objection to lack of notice or defective notice of the meeting, unless the Member at the beginning of the meeting objects to holding the meeting or transacting business at the meeting, and (ii) waives objection to consideration of a particular matter at the meeting that is not within any purposes described in the meeting notice, unless the Member objects to considering the matter when it is presented.

(iii) The record date for the purpose of determining the Members entitled to notice of a Members' meeting, for demanding a meeting, for voting, or for taking any other action shall be the tenth (10th) day prior to the date of the meeting or other action.

(iv) A Member may appoint a proxy to vote or otherwise act for the Member pursuant to a written appointment form executed by the Member or the Member's duly authorized attorney-in-fact. An appointment of a proxy is effective when received by the Company. The general proxy of a fiduciary is given the same effect as the general proxy of any other Member. A proxy appointment is valid for 2 months unless otherwise expressly stated in the appointment form.

(v) At any meeting of Members, each Member entitled to vote shall have a number of votes equal to the number of Shares issued to the Member pursuant to Section 2.4., if any, and if none, to the product of (i) his Percentage Interest as set forth on Exhibit A, as the same may be amended from time to time, times (ii) one hundred (100). At any meeting of Members, presence of Members entitled to cast at least 51 percent of the total votes of all members entitled to vote at such meeting constitutes a quorum. Action on a matter is approved if the matter receives approval by at least 51 percent of the total number of votes entitled to be cast by all Members in the Company entitled to vote at such meeting or such greater number as may be required by law or the Articles for the particular matter under consideration. On the occurrence of a Dissolution Event (as defined herein), a Former Member is not entitled to vote in determining whether the Company will purchase the interest of such Former Member as permitted in Section 6.1. Also, any assignee of a Member's Interest in the Company is not entitled to vote or participate on any matter at any meeting unless such assignee becomes a Substitute Member as contemplated in Section 6.4.

(vi) Subject to subsection (c)(ii) of this Article and the applicable laws of the State of incorporation, any action required or permitted to be taken at a Members' meeting may be taken without a meeting if the action is taken by all of the Members entitled to vote on the action. The action must be evidenced by one or more written consents describing the action to be taken, signed by all the Members entitled to vote on the action, and delivered to the Company for inclusion in the minutes. The record date for determining Members entitled to take action without a meeting is the first date a Member signs the consent to such action.

(vii) At any Member's meeting the Members must appoint a person to preside at the meeting and a person to act as secretary of the meeting. The secretary of the meeting must prepare minutes of the meeting which are placed in the minute books of the Company.

(c) Except as provided in Section 3.2 below, all powers of the Company are exercised by or under the authority of the members and the business and affairs of the Company are managed under the direction of the Members.

3.2. Members to Make Joint Decisions.

(a) Major Decisions. No act shall be taken, sum expended, decision made or obligation incurred by the Company except by Members representing in the aggregate

more than 50% of the Percentage Interests in the Company with respect to a matter within the scope of any of the major decisions enumerated below (the "Major Decisions"). The Major Decisions include (i) the sale of all or substantially all assets of the Company, (ii) a mortgage or encumbrance on all or substantially all assets of the Company, (iii) any matter which could result in a change in the amount or character of the Company's contributions to capital, (iv) a change in the character of the business of the Company, (v) borrowing of money, (vi) commission of any act which would make it impossible for the Company to carry on its ordinary business.

(b) Deadlock: In the event the Member(s) are unable to reach agreement on any proposal, action or matter and are unable after good faith efforts to resolve such dispute, any Member may initiate the buy-sell procedure set forth in Article IV below.

(c) Alteration of Management Responsibilities. Management responsibilities as set forth in this Section 3.2 shall not be altered except by the action of a majority in interest of all Members at a meeting duly called on written notice expressly describing such as one of the purposes of the meeting.

(d) Managing Members Compensation. Members providing management services may receive such compensation as shall be determined by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. In all events Members shall be reimbursed for all expenses advanced by the Members on behalf of the Company.

3.3. Power of Members and Managers.

(a) Except as expressly provided in Section 3.2 above, and in the event that the Members employ a competent person to be a Manager of the Company, the Manager will have all necessary powers to carry out the purposes, business, and objectives of the Company, which powers will be better specified in a certain separate agreement to be entered upon by the Company and the Manager.

(b) The Manager shall be responsible for: authenticating the records of the Company, including keeping correct and complete books on account which show accurately at all times the financial condition of the Company, safeguarding all funds, notes, securities, and other valuables which may from time to time come into possession of the Company, depositing all funds of the Company with such depositories as the Members shall designate. Each Manager has such other duties as the Members may from time to time jointly prescribe, under no circumstances does such employee have any of the rights, powers, responsibilities or duties of a Member of the Company as prescribed herein or by law.

(c) Manager(s) may be removed only by Members representing in the aggregate more than 50% of the Percentage Interests in the Company. Manager(s) may resign at any time by delivering written notice to Members of the Company. Such a

resignation is effective when the notice is delivered unless a later effective date is specified in said notice.

(d) Every contract, deed, mortgage, lease and other instrument executed by a Manager is conclusive evidence in favor of every person relying on or claiming under the fact that at the time of delivery (i) the Company is in existence (ii) neither this Agreement nor the Articles is amended in any manner to restrict the delegation of authority among the Members and/or Manager and (iii) the execution and delivery of such instrument is duly authorized by the Members. Any person may always rely on a certificate addressed to him and signed by any Member and/or Manager hereunder regarding (i) who are the Members of the Company; (ii) the existence or non-existence of any fact that constitutes a condition precedent to acts by the Member or in any other manner germane to the affairs of the Company; (iii) who is authorized to execute and deliver any instrument or document of the Company; (iv) the authenticity of any copy of the Articles, these Operating Agreement, amendments and any other documents relating to the conduct of the affairs of the Company; and (v) any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member in the capacity as a Member of the Company.

3.4. Reimbursement of Expenses. Each Member is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Member on behalf of the Company. Each Manager is entitled to reimbursement from the Company of all expenses of the Company reasonably incurred and paid by such Manager on behalf of the Company pursuant to a certain agreement to be entered between the Company and the Manager.

3.5. Organization Expenses. The Company must pay all expenses incurred in the organization of the Company.

## ARTICLE IV

## *DEADLOCK PROVISIONS*

4.1 Buy--Sell Procedure.

**Russian Roulette.**

(a) In addition to the rights provided above, any Member(s) (the "Delivering Member(s)") shall have the right at any time to send to the other Member(s) (the "Receiving Member(s)") a written notice (a "Buy/Sell Notice") specifying a price and other terms upon which the Delivering Member(s) would be willing to purchase the shares of the Receiving Member(s) or to have the Receiving Member(s) purchase his Interest. Upon receipt of a Buy/Sell Notice, the Receiving Member(s) shall have 30 days within which to elect to sell his Interest or to purchase the Interest of the Delivering Member(s), in accordance with the terms and conditions of the Buy/Sell Notice, which election shall be made in writing and shall impose a binding obligation upon the parties

to purchase and sell such shares in accordance with the terms and conditions of the Buy/Sell Notice.

(b) If the Receiving Member(s) fails to make an election within such 30-day period, the Delivering Member(s) shall have the right to elect to purchase the Receiving Member(s)' Interest on the terms at the price set forth in the Buy/Sell Notice.

(c) The closing on the sale and purchase shall take place within 30 days after the expiration of the initial 30-day period, at which the selling Member(s) shall deliver the certificate(s) representing his Interest duly endorsed with documentary stamps affixed thereto [together with a general release of the Company and the purchasing Member(s)], and the purchasing Member(s) shall deliver the purchase price.

(d) If more than one Buy/Sell Notice is delivered, only the first such notice so delivered shall be effective.

(d) Within thirty (30) days after either bidder has forfeited its right to make a bid, the shares to be sold shall be transferred to the other bidder against payment of the purchase price.

## ARTICLE V

## *TRANSFER RESTRICTIONS*

5.1 Transfer Restrictions. Except as otherwise provided in this Article V, the Member(s) agree not to sell, assign, transfer, mortgage, pledge or otherwise encumber, or contract to do or permit any of the foregoing as to any or all of their Interests to any person, corporation or other entity (other that an entity one hundred percent (100%) or more owned or effectively controlled, directly or indirectly by the transferor).

5.2 Right of First Refusal.

(a) Should any Member desire to sell or received and desire to accept a bona fide offer to purchase his Interest (the "selling Member(s)"), he shall deliver a written notice (a "Sales Notice") to the Company and the other Member(s), describing in full detail the terms and conditions of such bona fide offer, including, without limitation, (i) the percentage of interest proposed to be purchased pursuant to the offer, (ii) the identity of the proposed purchaser(s), (iii) the price per share at which the Interest are proposed to be purchased, and (iv) the terms on which such purchase may be made.

(b) Upon receipt of the sales Notice, the Company shall have the right to take one of the following actions within 60 days there after, provided that the Selling Member(s) shall abstain from voting as either a Member(s) or manager on such matter: (I) deliver to the Selling Member(s) a written notice (the "Company Purchase Notice"), committing the Company to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sales Notice, and representing that the Company is permitted to acquire all such Interest under the law of the state of incorporation's general limited liability company act (the "Company GCA")] and that the Company has the funds available therefor or has obtained a commitment or made arrangements for the financing thereof; or, if the Company should decide not to exercise its right of first refusal, (ii) delivery to the Selling Member(s) and the other Member(s) (the "Electing Member(s)") a written notice (the "Refusal Notice"), notifying the Member(s) of such decision, in which event, the procedures set forth in subsection (c) below shall be followed.

(c) Upon receipt of the Refusal Notice, the Electing Member(s) shall have the right to take one of the following actions within 30 days thereafter: (i) Deliver to the Selling Member(s) a written notice (the "Member(s) Purchase Notice"), committing the Electing Member(s) to purchase from the Selling Member(s) all of the Interest proposed to be sold pursuant to, and on the terms specified in, the Sale Notice, and representing that he has obtained a commitment or made arrangements for the financing thereof; or (ii), if the Company has determined not to purchase the Interest, deliver to the Selling Member(s) a written notice (the "Joint Sales Notice") specifying as such and thereby the sale may proceed.

5.3 First Refusal Procedure:

(a) If the selling Member(s) receives a Company Purchase Notice within the 60-day period and/or, in the event the Company elects not to purchase all of such Interest, a Member(s) Purchase Notice within the 90-day period, covering all of the Interest to be sold, he shall terminate his arrangements to sell the Interest to the person(s) specified in the Sales Notice, and the Company or the Electing Member(s), as the case may be, shall become obligated to purchase such Interest at the price and on the terms specified in the Sales Notice. The closing of the purchase of the Interest by the Company or by the Electing Member(s), as the case may be, shall occur at such place and time reasonable acceptable to the parties, but in no event later than 30 days after receipt by the Selling Member(s) of either the Company Purchase Notice or the Member(s) Purchase Notice; provided, however, that if such closing has not taken place on or before such 30-day period through no fault of the Selling Member(s), the Selling Member(s) may treat such failure as a decision on the part of the Company or the Electing Member(s), as the case may be, not to purchase the Interest listed in the Sales Notice and may sell such Interest to the purchaser and on such terms and conditions as are set forth in the Sales Notice, provided that the purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that if such sale is not consummated within 30 days thereafter, the Interest shall again be subject to

the provisions of this Article II. Not with-standing the foregoing, any sale to a third party as provided above shall not be deemed a waiver of any right the Selling Member(s) may have against the Company or the Electing Member(s) for failure to complete the purchase of the Interest.

5.4 Non-Exercise of Rights: If the selling Member(s) receives neither a Company Purchase Notice from the Company nor a Member(s) Purchase Notice from the Electing Member(s) within the 60-day period or the 90-day period, respectively, or if the Company or the Electing Member(s) elects to purchase only a portion of such Interest, then the Selling Member(s) shall be free to sell the Interest listed in the Sales Notice or the balance of such Interest not to be purchased by the Company or the Electing Member(s), as the case may be, to the purchaser and at the price and on the terms listed in the Sales Notice, but not otherwise, provided that purchaser agrees in a writing satisfactory to the Company and the other Member(s) to be bound by the terms and conditions of this Operating Agreement, and further provided that, if such sale is not consummated within 30 days after the initial 60-day period in the case of the Company, or 90-day period in the case of the Electing Member(s), the Interest shall again be subject to the provisions of this Article V.

5.5 Purported Transfers Void: Any purported transfer or pledge in violation of this Agreement shall be void and ineffective, shall not operate to transfer any interest or title in the purported transferee, and shall grant the other Member(s) in the manner and upon the terms and conditions set forth in this Article V.

5.6 Indemnification: A Member(s) who transfers or pledges Interest in violation of this Agreement shall indemnify the hold the Company and/or the other Member(s) harmless from all costs and expenses, including reasonable attorneys' fees and court costs, incurred by such other Member(s) as a result of any breach of this Article V.

5.7 Further Restrictions on Transfer. No Member may assign, convey, sell, encumber or in any way alienate all or any part of his Interests in the Company: (i) without registration under applicable federal and state securities laws, or unless he delivers an opinion of counsel satisfactory to the Company that registration under such laws is not required; or (ii) if the Interest to be sold or exchanged in the preceding 6 consecutive months, would result in the termination of the Company under Section 708 of the Code.

5.8 Substitute Members. A transferee may become a substitute Member if (i) the requirements of Sections 6.2 and 6.3 are met, (ii) such person executes an instrument satisfactory to the remaining Members accepting and adopting the terms and provisions of these Operating Agreement, and (iii) such persons pays all reasonable expenses in connection with his admission as a remaining Member.

5.9 Effect of Transfer.

(a) Any permitted transfer of all or any portion of a Member's Interest in the Company takes effect on the first day of the month following receipt by the Members of

written notice of transfer. Any transferee of an Interest in the Company takes subject to the restrictions on transfer imposed by these Operating Agreement.

(b) On a transfer of a Member's Interest in the Company in violation of these Operating Agreement, the transferee has no right to participate in the management of the business and affairs of the Company or to become a Member, but such transferee are entitled only to receive the share of profits or other compensation by way of income and the return of contributions to which the transferor of such Interest in the Company would otherwise be entitled.

## ARTICLE VI

### *PURCHASE OF SHARES UPON OCCURRENCE OF CERTAIN EVENTS*

6.1 Required Purchase:

(a) Purchase of Interest by Company. Upon the (i) death, or (ii) permanent disability (as hereinafter defined) of a Member(s) (the "Retiring Member(s)") during the term of this Operating Agreement, the Company shall be required to purchase and the Retiring Member(s) or the Member(s) Representative (as hereinafter defined), as the case may be, shall be required to sell, all of such Retiring Member(s)' Interest at the price and on the terms and conditions set forth in this Article VI, unless the Company is prohibited from acquiring such Interest, or a portion thereof, under the Act.

For the purposes hereof the term "permanent disability" shall have the meaning contained in any disability insurance policy currently in effect on the Retiring Member(s) or, in the absence thereof, shall mean the inability of the Member(s) to perform his duties substantially as required as a manager of the Company, continuing for a period of any four (4) consecutive months, due to illness, accident or any other physical or mental incapacity as determined by an independent physician selected by the Company's auditors.

(b) Purchase of Interest by Member(s): In the event that the Company is prohibited from purchasing all or any part of the Interest of the Retiring Member(s) pursuant to the Act, the other Member(s) (the "Purchasing Member(s)") shall be required to purchase and the Retiring Member(s) or the Member(s) Representative, as the case may be, shall be required to sell all or any portion of the Interest not purchased by the Company at the price and on the terms and conditions specified in this Article VI.

6.2 Insurance: For purposes of funding the acquisition of Interest by the Company pursuant to the provisions hereof, the Company may obtain life insurance policies on each of the Member(s) The Company hereby agrees that it will maintain such policies or comparable policies in full force and effect until the earlier of the termination of this

Agreement or, with respect to each Member(s), the death of such Member(s) or the sale of such Member(s)' Interest. The Company further agrees that it will not exercise any powers of ownership by canceling any such policy, by changing the named beneficiary, by assigning ownership or by otherwise changing the nature or value of the policies without the prior written consent of the Member(s). The Company shall pay the premiums on all such policies within 30 days after each such premium shall become due and payable. The Company may, in its discretion, apply any dividends declared on the policies to the payment of premiums. If the Company shall obtain such policies, the proceeds therefrom shall be used by the Company to finance the purchase of the Retiring Member(s)' Interest upon the death of such Member(s) pursuant to paragraph (a) of Section 6.1 above, in which event the procedures of Article VI shall only apply if the proceeds are insufficient to pay the purchase price. The excess of such proceeds, if any, shall be the property of the Company.

6.3 Notice: The Retiring Member(s) or the Member(s)' Representative, as the case may be, shall deliver to the Company and/or the Purchasing Member(s), notice of the death or permanent disability of the Retiring Member(s) within 30 days thereof, provided that the failure to give such notice shall not otherwise impair the obligations under this Article VI.

6.4 Restrictions on Company's Rights: So long as any part of the Purchase Price due from the Company remains unpaid, the Company shall not declare or pay dividends on its Interest or reorganize its capital structure, and the retiring Member(s) or Member(s)' Representative, as the case may be, shall have the right to examine the books and records of the Company from time to time in a reasonable manner and to receive copies of all accounting reports and tax returns prepared for or on behalf of the Company.

6.5 Proxy: The provisions hereof shall be binding upon the parties hereto and their respective heirs, legatees, executors, administrators and assigns. In furtherance thereof, each of the Member(s) shall maintain in effect at all times a will directing his personal representative to carry out this Agreement and to execute all documents and take all steps necessary or desirable to effectuate the provisions hereof, including, but not limited to, the delivery to the Purchasing Member(s) of an irrevocable proxy coupled with an interest (substantially in the form of Exhibit B hereto) to be voted on any matter presented to the Member(s) of the Company for a vote, such proxy to be effective from the date of the death or certification of permanent disability of the Retiring Member(s) through the closing as to the sale of shares held by the Retiring Member(s) or the Member(s) Representative, as the case may be, to the Company and/or Purchasing Member(s). The Member(s) shall currently take such steps as are required to ensure that such irrevocable proxy shall be duly executed and delivered, when and if required hereunder, and to ensure that their respective legal representatives, guardians, administrators, conservators and/or executors, as the case may be, shall agree to execute any additional instruments or to take such action as may be necessary to evidence such proxy and to effectuate any such vote.

6.6 Further Assurances: The Member(s) Representative or the Retiring Member(s), as the case may be, shall cooperate to effectuate the purpose and intent of this Operating Agreement, and shall execute any and all documents and take any and all steps deemed necessary and desirable to carry out such purpose and intent.

## ARTICLE VII

## *PURCHASE PRICE*

7.1 Whenever this Agreement refer to Purchase Price, the following provisions shall apply:

(a) The Purchase Price for purpose of this Article VII shall be the last Agreed Purchase Price plus interest at a rate of ten percent (10%) per annum as accrued from the date of the last annual Member(s) meeting.

(b) The Member(s) may meet from time to time, and shall meet prior to December 31, 2013 and prior to December 31 annually thereafter, to re-determine a fair and reasonable Purchase Price (the "amended Purchase Price").

7.2 Payment of Purchase Price:

(a) On the Closing Date, as hereinafter defined, the Company and/or Purchasing Member(s) shall each deliver to the Retiring Member(s) or the Member(s) Representative, or the Selling Member(s), as the case may be (i) certified or official bank check(s) equal to one-fifth of their respective aggregate Purchase Prices, and (ii) promissory note(s) (the "Note(s)")with respect to the balance thereof (the "Principal Remaining Balance"), secured by the Stock so purchased, as evidenced by any Pledge Agreement.

(b) Subject to the provisions of paragraph (d) of this Section 7.2, the obligation to pay the Purchase Prices hereunder is individual to the Company and to the Purchasing Member(s), and no party shall be liable for the failure of the other party to pay their respective Purchase Price in accordance herewith.

7.3 Closing: The closing of the purchase of the Interest by the Company and/or the Purchasing Member(s) shall take place at the offices of the Company, at a date and time agreed upon by the parties thereto (the "Closing Date"), but in no event shall such closing take place more than 120 days after the occurrence of the event giving rise to the Company's and/or Purchasing Member(s)' obligation to purchase such Interest.

7.4 Restrictive Legend: The Company shall cause the following legend to be placed on each certificate representing the Member(s)' Interest, including, without limitation, any certificate(s) hereafter acquired by such Member(s) and, upon request of the other

Member(s) at any time, shall provide the other Member(s) with satisfactory evidence that such legend has been placed on each such certificate:

The Interest represented by this certificate are subject to certain restrictions and agreements contained in, and are transferable only upon compliance with the provisions of certain Agreement dated as of _____________, ____, among _______________, and the Company. Copies of this Agreement are on file in the office of the manager of Company.

## ARTICLE VIII

## *ACCOUNTING AND RECORDS*

8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

8.4 Accounting Decisions. All decisions regarding accounting matters, except as otherwise specifically set forth herein, must be made by the Members. The Members may rely on the advice of their accountants as to whether such decisions are in accordance with accounting methods followed for federal and state income tax purposes.

8.5. Income Tax Elections. The Company may make all elections for federal and state income tax purposes, including, but not limited to, the following:

(a) To the extent permitted by applicable law and Operating Agreement, elect to use and accelerated depreciation method on any depreciable unit of the assets of the Company; and

(b) In case of transfer of all or part of the Company Interest of any Member, the Company may elect, pursuant to Sections 734, 743 and 754 of the Code, as amended (or corresponding provisions of future law) to adjust the basis of the assets of the Company.

## ARTICLE IX

### *ALLOCATIONS, DISTRIBUTIONS, AND INTERESTS*

9.1 Allocation of Net Income, Net Loss or Capital Gains. Except as may be expressly provided otherwise in this Article V, and subject to the provisions of Section 704 (c) of the Code, the net income, net loss or capital gains of the Company for each fiscal year of the Company is allocated to the Members, pro rata in accordance with their Percentage Interest.

9.2 Distribution of Available Cash. Periodically, but not less frequently than at the end of each calendar quarter, the Available Cash of the Company, if any, must be distributed to the Members, pro rata in accordance with their Percentage Interest. For any calendar quarter, Available Cash of the Company need not to be distributed to the extent that such cash is required for a reasonable working capital reserve for the Company, the amount of such reasonable working capital reserve to be determined by the Members.

9.3 Allocation of Income and Loss and Distributions in Respect of Interests Transferee.

(a) If any Interest in the Company is transferred, or is increased or decreased by reason of the admission of a new Member or otherwise, during any fiscal year of the Company, each item of income, gain, loss, deduction, or credit of the Company for such fiscal year must be assigned pro rata to each day in the particular period of such fiscal year to which such item is attributable (i.e., the day on or during which it is accrued or otherwise incurred) and the amount of each such item so assigned to any such day shall be allocated to the Member based on his respective Interest in the Company at the close of such day. For the purposed of accounting convenience and simplicity, the Company may treat a transfer of, or an increase or decrease in, an Interest in the Company which occurs at any time during a semi-monthly period including the date hereof) as having been consummated on the first day of such semi-monthly period, regardless of when during such semimonthly period such transfer, increase, or decrease actually occurs (i.e., sales and dispositions made during the first 15 days of any month are deemed to have been made on the 16th day of the month).

(b) Distributions of Company assets in respect of an Interest in the Company shall be made only to the Members who, according to the books and records of the company, are the holders of record of the Interests in respect of which such distributions are made on the actual date of distribution. Neither the Company nor any Member incurs

any liability for making distributions in accordance with the provisions of the preceding sentence, whether or not the Company or the Member has knowledge or notice of any transfer or purported transfer of ownership of Interest in the Company which has not been approved by unanimous vote of the Members. Notwithstanding any provision above the contrary, gain or loss of the Company realized in connection with a sale or other disposition of any of the assets of the Company must be allocated solely to the parties owning Interests in the Company as of the date such sale or other disposition occurs.

## ARTICLE X

## *DISSOLUTION*

10.1 Dissolution of the Company.

(a) The Company is dissolved, its assets are disposed of, and its affairs wound up on the first to occur of the following occurrences:

(i) a determination by Members owing more than 50 percent of the interests in the Company that the Company should be dissolved;

(ii) the expiration of the Company term as stated in its Articles; or

(iii) at such earlier time as may be provided by applicable law.

(b) In settling accounts of the Company after dissolution, the liabilities of the Company must be paid in the following order, all as required by the Act:

(i) those owed to creditors, in the order of priority as provided by law, except those to Members of the Company on account of their contributions;

(ii) those owed to Members of the Company in respect of their share of the profits and other compensation by way of income on their contributions; and

(iii) those owed to Members of the Company in respect of their contribution to capital.

## ARTICLE XI

## *INDEMNIFICATION*

11.1 Indemnification of Managers and Members.

(a) To the greatest extent not inconsistent with the laws and public policies of Florida the Company will indemnify, as a matter of right, any Manager or Member (any such Manager or Member who is a person, and any responsible officers, partners, shareholders, directors, or managers of such Manager or Member which is an Entity, hereinafter being referred to as the indemnified "individual") made a party to any proceeding because [he or she] is or was a Member or Manager, against all liability incurred by such individual in connection with any proceeding; provided that it is determined in the specific case according to subsection (d) of Article XI that indemnification of such individual is permissible in the circumstances because the individual has met the standard of conduct for indemnification set forth in subsection (c) of this Section. The Company will pay for or reimburse the reasonable expenses incurred

by a Member in connection with any such proceeding in advance of final deposition thereof, if:

(i) The individual furnishes the Company a written affirmation of the individual's good faith belief that he has met the standard of conduct for indemnification described in subsection (c) of this Section;
(ii) The individual furnished the Company a written undertaking, executed personally or on such individual's behalf, to repay the advance if it is ultimately determined that such individual did not meet such standard of conduct;
(iii) A determination is made in accordance with subsection (d) that based on facts then known to those making the determination, indemnification would not be precluded under this Section.

The undertaking described in subsection (a) (ii) above must be a general obligation of the individual, subject to such reasonable limitation as the Company may permit, but need not be secured and may be accepted without reference to financial ability to make repayment. The Company must indemnify a Member or Manager who is wholly successful, on the merits or otherwise, in the defense of any such proceeding, as a matter of right, against reasonable expenses incurred by the individual in connection with the proceeding without the requirement of a determination as set forth in subsection (c) of this Section. On demand by a Member or Manager for indemnification or advancement of expenses, the Company must expeditiously determine whether the Member is entitled to indemnification in accordance with this Section. The indemnification and advancement of expenses provided for under this section is applicable to any proceeding arising from acts or omissions occurring before or after the adoption of this Section.

(b) The Company has the power, but not the obligation, to indemnify any individual who is or was an employee or agent of the Company to the same extent as if such individual was a Member.

(c) Indemnification of an individual is permissible under this in every circumstance possible so long as subparagraph (d) below is followed.

(d) The determination whether indemnification or advancement of expenses is permissible must be made in either of the following manners: (i) by a majority vote of the Members who are not parties to the proceeding, or (ii) by special legal counsel selected by a majority vote of the Members who are not parties to the proceeding.

(e) A Member or Manager of the Company who is a party to a proceeding may apply for indemnification from the Company to the court, if any, that is conducting the proceeding or to another court of competent jurisdiction. On receipt of an application, the court, after giving all required notice, may order indemnification if it determines (i) in a proceeding in which the Member or Manager is entitled to indemnification under this Section, in which case the court shall order the Company to pay the individual reasonable expenses incurred to obtain such court ordered indemnification; or (ii) that the individual is fairly and reasonably entitled to

indemnification in view of all relevant circumstances, whether or not the individual met the standard of conduct set forth in subsection (c) of this Section.

(f) Indemnification must also be provided for an individual's conduct with respect to an employee benefit plan if the individual reasonably believed he acted in the interest of the participants in and beneficiaries of the plan.

(g) This Agreement does not limit or preclude the exercise or exclude any right under the law, by contract or otherwise, relating to indemnification of or advancement of expenses to any individual who is or was a Member or Manager of the Company or is or was serving at the Company's request as a director, officer, partner, manager, trustee, employee, or agent of another foreign or domestic company, partnership, association, limited liability company, corporation, joint venture, trust, employee benefit plan, or other enterprise whether for-profit or not. Nothing contained in this Agreement limits the ability of the Company to otherwise indemnify or advance expenses to any individual. The intent of the parties making this Agreement is to provide indemnification to Members and Managers to the fullest extent now or hereafter permitted by the law consistent with the terms and conditions of this Section. Indemnification is provided in accordance with this, without regard of the nature of the legal or equitable theory on which a claim is made including without limitation negligence, breach of duty, mismanagement, waste, breach of contract, breach of warranty, strict liability, violation of federal or state securities law, violation of the federal or state securities law, violation of the Employee Retirement Income Security Act of 1974, as amended, or violation of any other state or federal law.

(h) For purposes of this section:

(i) The term "expenses" includes all direct and indirect costs (including without limitation counsel fees, retainers, court costs, transcripts, fees of experts, witness fees, travel expenses, duplicating costs, printing and binding costs, telephone charges, postage, delivery service fees and all other disbursements or out-of-pocket expenses) actually incurred in connection with the investigation, defense, settlement or appeal of a proceeding or establishing or enforcing a right to indemnification under this Section, applicable law or otherwise.

(ii) The term "liability" means the obligation to pay a judgment, settlement, penalty, fine, excise tax (including an excise tax assessed with respect to an employee benefit plan), or reasonable expenses incurred with respect to a proceeding.

(iii) The term "party" includes an individual who was, is or is threatened to be made a named defendant or respondent in a proceeding.

(iv) The term "proceeding" means any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative and whether formal or informal.

(v) The Company may purchase and maintain insurance for its benefit, the benefit of any individual who is entitled to indemnification under this section, or both, against any liability asserted against or incurred by such individual in any capacity or arising out of such individual's service with the Company, whether or not the Company would have the power to indemnify such individual against such liability.

## ARTICLE XII

## *MISCELLANEOUS*

12.1 Complete Agreement. This Agreement and the Articles constitute the complete and exclusive statement of agreement among the Members with respect to the subject matter described. This Agreement and the Articles replace and supersede all prior agreements by and among the Members of any of them. This Agreement and the Articles supersede all prior written and oral statements and no representation, statement or condition or warranty not contained in this Agreement or the Articles is binding on the Members or has any force or effect whatsoever.

12.2 Governing Law. This Agreement and the rights of the parties hereunder are governed by, interpreted, and enforced in accordance with the laws of the State of incorporation of this limited liability company.

12.3 Binding Effect. Subject to the provisions of this Agreement relating to transferability, this Agreement is binding on and inures to the benefit of the Members, and their respective distributes, successors and assigns.

12.4 Terms. Common nouns and pronouns refer to the singular and plural, identity of the person or persons, firm or corporation as the context requires. Any reference to the code or other statutes or laws will include all amendments, modifications, or replacements of the specific sections and provisions concerned.

12.5 Headings. All headings herein are inserted only for convenience and case of reference and are not to be considered in the construction or interpretation of any provision of these Operating Agreement.

12.6 Severability. If any provision of this Agreement is held to be illegal, invalid, or unenforceable under the present or future laws effective during the term of these Operating Agreement, such provision is fully severable, this Agreement is construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part of these Operating Agreement; and the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision, there will be added automatically as part of this Agreement a provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible and be legal, valid and enforceable.

12.7 Multiple Counterparts. This Agreement may be executed in several counterparts, each of which is deemed an original but all of which constitute one and the same instrument. However, in making proof only one copy signed by the party to be charged is required.

12.8 Additional Documents and Acts. Each Member agrees to execute and deliver additional documents and instruments and to perform all additional acts necessary or appropriate to effectuate, carry out and perform all of the terms, provisions, and conditions of this Agreement and the transactions contemplated hereby.

12.9 No Third Party Beneficiary. This Agreement is made solely and specifically among and for the benefit of the members and their respective successor and assigns subject to the express provisions hereof relating to successors and assigns, and no other person has or will have any rights, interest, or claims hereunder or be entitled to any benefits under or on account of this Agreement as a third party beneficiary or otherwise.

12.10 References to these Operating Agreement. Numbered or lettered articles, sections and subsections in this Agreement refer to articles, sections and sub sections of this Agreement unless otherwise expressly stated.

12.11 Notices. Any notice to be given or to be served on the Company or any party in connection with this Agreement must be in writing and is deemed to have been given and received when delivered to the address specified by the party and receive the notice. Such notices must be given to a Member at the address specified in Exhibit A. Any Member or the Company, may, at any time, designate any other address in substitution of the foregoing address to which such notice will be given by giving written notice to their other Members and the Company 30 days prior to the date of delivery of the notice.

12.12 Amendments. All amendments to this Agreement must be in writing and signed by all the Members.

12.13 Title to Company Property. Legal title to all property of the Company must be held and conveyed in the name of the Company.

12.14 Reliance on Authority of Person Signing Operating Agreement. In the event that a Member is not a natural person, neither the Company nor any Member will (a) be required to determine the authority of the individual signing this Agreement to make any commitment or undertaking on behalf of such Entity or to determine any fact or circumstance bearing on the existence of the authority of such individual or (b) be required to see the application or distribution of proceeds paid or credited to individuals signing this Agreement on behalf of such Entity.

IN WITNESS WHEREOF, the undersigned have executed this Operating Agreement, to be effective as of the date the Articles of Organization of the Company are accepted for filing by the Department of State.

# EXHIBIT A

[redacted]

[redacted]

[redacted]

# COMPOSITE EXHIBIT G

GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Boca, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG Boca, LLC ("DCG Boca"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG Boca dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG Boca, LLC dated November 16, 2018 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year."

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG Boca's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Florida, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG Florida, LLC ("DCG Florida"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG Florida dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG Florida, LLC dated September 16, 2016 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG Florida's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG New Jersey, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG New Jersey, LLC ("DCG NJ"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG NJ dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG New Jersey, LLC (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG NJ's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG New York, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG New York, LLC ("DCG NY"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG NY dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG New York, LLC, dated September 16, 2016 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG NY's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GT GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Staten Island, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent Alternative Global Three, LLC ("AG Three") and L3 Capital Management LLC ("L3 Management") each of whom are Members of DCG Staten Island, LLC ("DCG Staten Island"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Membership Interest Purchase Agreement between AG Three and DCG Staten Island dated August 2020 (the "MIPA") and that certain Operating Agreement of DCG Staten Island, LLC, dated May 1, 2018 (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management and AG Three demand immediate access to all of DCG Staten Island's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's and AG Three's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Alternative Global Three, LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

GreenbergTraurig

Avi Benayoun
Tel 954.768.8254
benayouna@gtlaw.com

August 9, 2022

**VIA UPS NEXT DAY AIR**

Michael Dazzo
Manager
DCG Texas, LLC
13650 SW 82nd Ct.
Palmetto Bay, FL 33158

**Re: Demand For Inspection of Books and Records**

Dear Mr. Dazzo:

We represent L3 Capital Management LLC ("L3 Management") who is a Member of DCG Texas, LLC ("DCG Texas"). All capitalized terms not otherwise defined in this letter shall have the meaning set forth in that certain Operating Agreement of DCG Texas, LLC (the "Operating Agreement").

Section 8.1 of the Operating Agreement provides as follows:

> 8.1 Records and Accounting. The books and records of the Company must be kept, and the financial position and the results of its operations recorded, in accordance with the accounting methods elected to be followed by the Company for federal and state income tax purposes. The books and records of the Company must reflect all Company transactions and must be appropriate and adequate for the Company's business. The fiscal year of the Company for financial reporting and for federal income tax purposes is the calendar year.

Sections 8.2 and 8.3 of the Operating Agreement each provide, respectively, as follows:

> 8.2 Access to Accounting Records. All books and records of the Company must be maintained at any office of the Company or at the Company's principal place of business, and each Member, and his duly authorized representative, must have access to them at such office of the Company and the right to inspect and copy them at reasonable times.

> 8.3 Annual and Tax Information. The Members must use their best efforts to cause the Company to deliver to each Member, within 60 days after the end of each

fiscal year, all information necessary for the preparation of such Member's federal income tax return. The Members must also use their best efforts to cause the Company to prepare, within 60 days after the end of each fiscal year a financial report of the Company for such fiscal year, which shall contain a balance sheet as of the last year then ended, an income statement for the year then ended, a statement of sources and applications of funds, and a statement of reconciliation of the Capital Accounts of the Members.

**Demand to Inspect and Copying of Books and Records**

Pursuant to section 8.2 of the Operating Agreement, L3 Management demands immediate access to all of DCG Texas's books and records including, without limitation, all of the materials set forth in Sections 8.1 and 8.3 of the Operating Agreement.

HOW TO COMPLY: Please plan to receive our client or the clients' designated representative on Monday, August 15, 2022 at 9 a.m. (the "Original Date") for the purpose of inspecting and copying the records. In the event the above date is not available for the inspection, please state in writing the reason such inspection may not occur on the Original Date and state an alternative date for the inspection. The alternative date must be within 5 days of the Original Date. In the event you fail to respond to this letter by August 11, 2022, we will conclude that you agreed to the Original Date.

This demand is made with all rights reserved and without waiver of or prejudice to any of L3 Management's rights and remedies at law or in equity all of which are expressly reserved.

Sincerely,

*Avi Benayoun*

Avi Benayoun

cc: L3 Capital Management LLC
Michael N. Kreitzer, Esq.
John L. McManus, Esq.

# EXHIBIT H

DANIELS · RODRIGUEZ
BERKELEY · DANIELS · CRUZ
ATTORNEYS AT LAW

MIAMI / FT LAUDERDALE / TAMPA

Reply to: Lorne E. Berkeley
LBerkeley@drbdc-law.com

August 18, 2022

Avi Benayoun
Benayouna@gtlaw.com
333 S. E. 2nd Ave.,
Suite 4400
Miami Florida 33131

Re: Your August 9 Letters Directed to DCG Boca, LLC; DCG Florida, LLC; DCG New Jersey, LLC; DCG New York, LLC

Dear Mr. Benayoun:

The law firm of Daniels, Rodriguez, Berkeley, Daniels & Cruz, PA by and through the undersigned represents the interests of the above entities. In accordance with that representation, I have been provided a copy of your Demand for Inspection of Books and Records as it pertains to each entity listed above.

Your clients L3 Capital Management, LLC and Alternative Global Three, LLC are members of the entities from which they seek records. Your client's membership is the same membership as my clients. My clients despite your client's belief are not managers of the entities to which your client seek records. They are members just as your clients.

These entities and your client's entities use the same accountant, your clients have login into the CRM software to access accounts and clients just as mine do, and as such have equal access to the books and records. At no time were my clients managers nor did my clients maintain the books and records as your letter asserts.

Based upon the foregoing, your demand for inspection of books and records and the basis to which the demand is made is not well taken. Your clients should obtain the records directly on their own.

Should you have any questions concerning the foregoing please do not hesitate to reach out to me.

Very truly yours,
/s/Lorne E. Berkeley, Esq
Signed Electronically to Avoid Delay
Lorne E. Berkeley, Esq.
For the Firm