**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

In re:

DCG Boca, LLC, *et al.*,

Debtors.,
_______________________________________/

Case No. 24-10601-EPK
(Jointly Administered)
Chapter 7

**RESPONSE IN OPPOSITION TO MOTION TO QUASH DISCOVERY REQUESTS OR, IN THE ALTERNATIVE, TO STAY DISCOVERY AND FOR A PROTECTIVE ORDER**

Creditor Alternative Global Three, LLC ("**AG3**") responds in opposition to the *Motion to Quash Discovery Requests, or in the Alternative, to Stay Discovery and for a Protective Order* ("**Motion to Quash**")[1] filed by Michael Dazzo, CLR Admin Services, LLC, Daniel Meeler, Darren Silverman, Matthew Brenner, DRM Marketing, LLC, Consumer Law Relief, LLC d/b/a Helbing Law Group, LLC, and Erik Helbing (collectively, the "**Movants**") as follows:[2]

## SUMMARY OF THE ARGUMENT

The DCGs were investment vehicles for the Debt Settlement Business (defined below). AG3 invested in the DCGs. The Movants seeking to quash all Rule 2004 discovery are among the individuals and entities associated with the Debt Settlement Business (the "**Conspirators**") who are believed to have defrauded the DCGs when they converted the Debt Settlement Business's funds for use in a new debt settlement venture in which the DCGs have no interest. AG3 was uncovering that fraud and establishing the DCGs' entitlement to recover misappropriated funds when the Conspirators filed bankruptcy petitions for the DCGs. Now, they hope to misdirect the Court, avoid detection, and escape with their ill-gotten gains. The Movants state that this is a no-

---

[1] [ECF No. 75].

[2] Any references to dockets other than the lead case are identified as "DCG _ Bankr., No. _."

asset case, yet suggest that the Trustee, with almost no cash available, should be the sole party entitled to investigate the claims of the DCGs' bankruptcy estates. Thus, Movants seek to thwart AG3's efforts to assist the estate in recovering on the estates' only asset: the claims against the Conspirators. The requested relief flies in the face of the language and purpose of Rule 2004, which clearly allows examinations by any "party in interest," and should be denied.

AG3 sued the DCGs in Miami-Dade County after they, without warning, deprived AG3 of access to their books and records and ceased making distributions to AG3. *Alternative Global Three, LLC v. DCG Staten Island, LLC et al.*, No. 2022-022016-CA-01 (Fla. 11th Cir. Ct.) ("**State Court Action**"). Through the State Court Action, AG3 discovered the Debt Settlement Business wrongfully converted $33 million (the "**Tail**")—funds owed to it by its existing customers—for use in a new debt settlement venture in which the DCGs had no interest.

The Conspirators are:

(1) Michael Dazzo ("**Dazzo**"), the former manager of the DCGs, a former member and manager of AG3, and a current member of CLR Admin Services, LLC ("**CLR**");

(2) CLR, the alleged majority member of the DCGs and the entity responsible for the non-legal, administrative work in the Debt Settlement Business;

(3) Daniel Meeler ("**Meeler**"), the manager of CLR;

(4) Darren Silverman ("**Silverman**"), a member and "operator" of CLR;

(5) Matthew Brenner ("**Brenner**"), a member and "operator" of CLR;

(6) DRM Marketing, LLC ("**DRM**"), the entity responsible for marketing the Debt Settlement Business and referring potential clients to the Debt Settlement Business;

(7) Matt Weiner ("**Weiner**"), the sole member and manager of DRM;

(8) Consumer Law Relief, LLC d/b/a Helbing Law Group, LLC ("**Helbing Law**"), a Pennsylvania-based law firm that performed legal services for the Debt Settlement Business; and

(9) Erik Helbing, Esq. ("**Helbing**"), the principal of Helbing Law.[3]

Despite six failed motions to quash/for protective order by certain of the Movants[4] and a failed motion to intervene by CLR, AG3 successfully deposed the DCGs' former accountant and Dazzo, and was also finally able to schedule the following depositions in the State Court Action:

(1) Silverman: January 30, 2024

(2) Brenner: February 2, 2024

(3) Meeler: February 16, 2024

(4) DRM: February 19, 2024

(5) Weiner: February 19, 2024

Additionally, Judge Lisa Walsh ("**Judge Walsh**") authorized AG3 to depose Consumer Law Relief d/b/a Helbing Law Group, LLC ("**Helbing Law**") and Erik Helbing, Esq. ("**Helbing**") all in the State Court Action.[5]

On January 23, 2024, to thwart AG3's efforts to uncover what happened to the Tail and prevent the depositions of CLR, DRM, Helbing Law, and their key operators, Meeler and Silverman—who have never had any identifiable management or control authority over the DCGs—caused the DCGs to file their bankruptcy petitions ("**Petitions**"). ***Now, the Movants seek to have this Court relitigate what Judge Walsh already determined: that inquiry into the Debt Settlement Business and what happened to the funds comprising the Tail is necessary to***

[3] The Movants are the Conspirators, except for Weiner who does not join the Motion to Quash.

[4] The above number does not include: (1) Dazzo's failed emergency motion seeking reconsideration of Judge Walsh's order denying his third motion to quash; (2) Wolfson CPA Firm's ("**Wolfson**"), the DCGs and the Debt Settlement Business's former accountants, failed motion to quash; (3) motions to quash by ASC Advisors, LLC ("**ASC**") and Gabriel Alvarez ("**Alvarez**"), the DCGs and the Debt Settlement Business's current accountants; (4) CLR's objection to AG3's request to obtain CLR's bank records related to the Debt Settlement Business from Bank of America ("**BOA Motion**"); and (5) Silverman's motion for extension of time to respond and produce documents, which was never heard.

[5] Helbing and Helbing Law were not served and did not file any motions in the State Court Action.

***determine the assets to which the DCGs are entitled and assess what its investors, including AG3, are entitled to receive.***

AG3 is a party in interest authorized under Fed. R. Bankr. 2004 to inquire into the property and financial condition of the DCGs. Such inquiry includes establishing what the DCGs own, the claims against the Movants/Conspirators, and the value of the same. AG3's requests fall squarely within the plain meaning and purpose of Fed. R. Bankr. P. 2004(b). This Court should not allow the targets of Rule 2004 examinations to foil AG3's efforts to investigate valuable estate claims.

## BACKGROUND

### I. Introduction to the DCGs and the Debt Settlement Business

1. DCG Boca, LLC ("**DCG Boca**"), DCG Florida, LLC ("**DCG FL**"), DCG New Jersey, LLC ("**DCG NJ**"), DCG New York, LLC ("**DCG NY**"), DCG Staten Island, LLC ("**DCG SI**"), and DCG Texas, LLC ("**DCG TX**") (collectively, "**DCGs**" or "**Debtors**") are funding vehicles for a joint venture debt settlement enterprise ("**Debt Settlement Business**").

2. The Debt Settlement Business includes:

a. The DCGs, as the funders of the Debt Settlement Business;

b. DRM, which marketed the Debt Settlement Business to generate leads;

c. Helbing Law, which performed legal services and was the law firm retained by clients of the Debt Settlement Business; and

d. CLR, which performed all non-legal, administrative work for the Debt Settlement Business.

3. **DCGs**: The DCGs are managed by Dazzo. Dazzo's home in Palmetto Bay, Florida has been the DCGs' principal address, mailing address, and registered agent address for the DCGs since their inception.[6] According to Dazzo, the DCGs are passive funding entities, that—since

[6] The DCGs' Sunbiz reports are attached as **Composite Exhibit 1**.

2019—have rented a single desk at an unnamed accounting firm based in Boca Raton, Florida for $4,500 per month.[7] Dazzo previously testified that the Debt Settlement Entities drafted a *pro forma* detailing how profits would be shared among them.[8] No such document has ever been produced.

4. **CLR**: CLR is a Nevada limited liability company. Though it operates exclusively in Florida, and has done so since 2016, it did not obtain a license to do business in Florida until June 2023.[9] CLR is the purported majority member of each of the DCGs.[10] The key individuals associated with CLR are: (i) Meeler, (ii) Silverman, (iii) Brenner, and (iv) Dazzo.[11] Meeler is CLR's manager.[12] CLR's registered address in Nevada is an abandoned shack in the Nevada desert.[13] CLR's principal address, mailing address, and registered agent address is a UPS Store mailbox in Boca Raton, Florida located across from Mizner Park.[14]

5. **DRM**: DRM is a Florida limited liability company managed by Weiner.[15] DRM shared office space with CLR and its key members, primarily Silverman, would often intimately

---

[7] **Exhibit 2** ("**341 Meeting**"), 13:16-14:17, 31:4-34:4.

[8] **Exhibit 3** ("**Dazzo Depo.**"), 14:4-15.

[9] CLR's Sunbiz report is attached as **Exhibit 4**.

[10] ECF No. 10; DCG FL Bankr. No. 10; DCG NJ Bankr. No. 10; DCG NY Bankr. No. 8; DCG SI Bankr. No. 10; DCG TX Bankr. No. 10. No document has ever been produced establishing CLR's ownership interest in the DCGs. Rather, CLR's claims are based on its purported ownership interest in the DCGs based upon tax returns that Dazzo and CLR's cohorts arranged to be prepared.

[11] Dazzo Depo., 22:20-23, 39:3-40:13, 47:24-48:16.

[12] Ex. 4.

[13] CLR's address is 1170 E. 10th St., Silver Springs, NV 89429. Silver Springs, NV is listed as a "census-designated place" by the United States Census Bureau, which is an "unincorporated communit[y] that do[es] not have a legally defined boundary or an active, functioning governmental structure." CLR's SilverFlume (Nevada's business portal) page, screenshots of CLR's listed street address, and the Census.gov pages for Silver Springs, NV and "census-designated places" are attached as **Composite Exhibit 5**.

[14] Ex. 4.

[15] DRM's Sunbiz report is attached as **Exhibit 6**.

involve themselves in DRM's business.[16] Just like CLR, DRM lists a UPS mailbox in Boca Raton, Florida (at the same UPS store as CLR) as its principal address, mailing address, and registered agent address.[17] DRM and its predecessor entities were

> NOT used solely for marketing. Far from it. Every investor monies goes there plus front end payroll and payroll taxes, rent, food for reps, telemarketing fees, and license and more in Boca and 10k a month in Staten Island to cover their bills … We now use DRM Marketing since mid-January and moved all reps over and got new bond and telemarketing license, etc.[18]

6. **Helbing Law**: Helbing Law is a law firm operated by Erik Helbing in Pennsylvania. Helbing and his law firm were recently the subject of two separate actions, one by the Virginia State Bar[19] and one by the Commonwealth of Pennsylvania,[20] concerning their debt settlement activities.

7. The flow of funds in the Debt Settlement Business operated as follows:

a. The DCGs received investment capital from, among others, AG3;

b. The DCGs funded the Debt Settlement Business by depositing funds into DRM's bank account;

c. DRM used a portion of the funds received from the DCGs to generate leads, and sent the rest of the funds to CLR;

d. Clients of the Debt Settlement Business paid their fees into bank accounts owned and controlled by CLR at Bank of America;

e. CLR sent distributions and fees to Helbing Law and DRM; and

---

[16] Dazzo Depo., 30:1-6.

[17] Ex. 6.

[18] **Exhibit 7**.

[19] *In re Erik M. Helbing*, No. 23-032-128108 (Va. St. Bar 3d Dist. Nov. 16, 2023), https://vsbwebstorage.blob.core.windows.net/$web/actions/Helbing-111723.pdf.

[20] *Commonwealth of Pa. v. Helbing Law, LLC*, Assurance of Voluntary Compliance (Jan. 24, 2024), https://www.attorneygeneral.gov/wp-content/uploads/2024/01/2024-01-24-AVC-Helbing-Law.pdf.

f. DRM's distributions include a portion owed for the DCGs share of profits.[21]




8. In short, the DCGs funded the entire Debt Settlement Business, including operations of DRM and CLR. The revenue generated by the Debt Settlement Business, to which the DCGs were entitled to share, ran through CLR.

## II. <u>Introduction to AG3</u>

9. Richard Cardinale ("**Cardinale**") is a New York-based securities investor. In 2019, Cardinale conceived of a pooled investment fund, the L3 Capital Income Fund, LLC ("**Income Fund**"), to invest in—among other things—the debt settlement industry. Cardinale approached his childhood friend with significant experience in debt settlement, Dazzo, to discuss the potential venture.

[21] This flow of funds is supported by CLR's 2019-2022 General Ledger, which is attached as **<u>Exhibit 8</u>**. Individuals and entities associated with the Debt Settlement Business have repeatedly and consistently misrepresented the flow of funds to avoid tracing monies that came in or out of the Debt Settlement Business. Dazzo Depo., 13:19-14:3, 21:16-22, 33:18-34:1, 36:21-37:1.

10. Dazzo then introduced Cardinale to David Feingold ("**Feingold**").[22] Feingold, a licensed Florida attorney, designed the legal structure of the proposed investment fund, and specifically suggested using the Income Fund to act as a vehicle for raising capital from individual investors, which capital would be loaned to various investment vehicles ("**Alternative Global Entities**") to use as investments in alternative business ventures and income streams in specific industries.

11. Cardinale's primary role was to raise money for the venture through the Income Fund. Dazzo and Feingold's primary role was to identify investment opportunities and manage the day-to-day operations of the Alternative Global Entities, including by maintaining their books and records of the investment vehicles and their investments.

12. Primarily through Cardinale's family, friends, and professional relationships, the Income Fund raised more than $81 million from ***more than 100 investors***. The Income Fund then loaned money to the Alternative Global Entities.

13. AG3 is one of the Alternative Global Entities. According to AG3's Operating Agreement, Cardinale, Feingold, and Dazzo served as AG3's co-managers and held equal membership interests (33.33%) in AG3.[23] According to the Income Fund's private placement memorandum ("**PPM**"), which Dazzo and Feingold helped prepare, AG3 was designed to invest in the debt settlement industry.[24]

---

[22] Feingold represented Silverman and Brenner as counsel in an SEC enforcement action against them for a myriad of violations under the Securities Act of 1933. With the help of an expert report from Soneet Kapila and based on their improper disbursement of funds prior to filing bankruptcy on behalf of certain entities, Silverman and Brenner were generally barred from "violating Section 5 of the Securities Act . . . by, directly or indirectly, in the absence of any applicable exemption" buying and selling securities, were fined and ordered to disgorge fees. **Composite Exhibit 9**.

[23] AG3's operating agreement is attached as **Exhibit 10**.

[24] The Income Fund's September 2019 PPM is attached as **Exhibit 11**, at 5, 9, 21, & 24. The Income Fund's amended October 2020 PPM is attached as **Exhibit 12**, at 5, 9, 21, & 24.

14. Between 2020 and 2021, AG3, at Dazzo and Feingold's direction, invested more than $3.5 million on behalf of AG3 into the DCGs.

## III. Destruction of the Debt Settlement Business and the Alternative Global Venture

15. Until the end of 2021, the Debt Settlement Business was largely successful. The DCGs, and AG3 as an investor, received returns from the Debt Settlement Business. As of November 2021, the Debt Settlement Business reported a tail of approximately $33 million owed to the Debt Settlement Business.[25]

16. Unfortunately, the relationship between Cardinale, Feingold, and Dazzo deteriorated precipitously beginning in the fourth quarter of 2021 when Cardinale requested more details from Dazzo and Feingold about the financial status of the Alternative Global Entities, including AG3, and their investments. In December 2021, after Cardinale asked Dazzo and Feingold for a comprehensive update on the Alternative Global Entities, Dazzo and Feingold refused to provide the same and, instead, presented Cardinale with an unsupported valuation of the Alternative Global Entities and demanded that Cardinale buy out their membership interests. Cardinale refused Dazzo and Feingold's demand.

17. Suddenly, on December 19, 2021, the Debt Settlement Business announced it would be pivoting to a new entity, Debt USA, LLC ("**Debt USA**").[26] The Debt Settlement Business regularly transferred funds into Debt USA long before the transition.[27]

18. On January 28, 2022, Dazzo and Feingold provided Cardinale with written notice that they were resigning as managers and withdrawing as members of the Alternative Global

---

[25] **Exhibit 13**.

[26] **Exhibit 14**.

[27] *See* Ex. 8.

Entities, including AG3.[28] In their notice, Dazzo and Feingold expressly stated that Cardinale was the sole remaining member and manager of the Alternative Global Entities.

19. When Dazzo and Feingold resigned, the Alternative Global Entities—including AG3—demanded that Feingold and Dazzo return the Alternative Global Entities' books and records. Dazzo and Feingold refused.

20. Nearly simultaneous with Dazzo and Feingold's blocking AG3's access to its own books and records, the DCGs blocked and ignored AG3's demand for access to the DCGs' books and records. In May 2022, the DCGs ceased making distributions to investors, including AG3. The Debt Settlement Business, however, remains operational and continues to serve its existing customers.[29]

## IV. <u>The State Court Action</u>

21. On November 17, 2022, AG3 filed the State Court Action against the DCGs in the Miami-Dade County Circuit Court seeking access to their books and records and damages for breach of the DCGs' operating agreements for failing to make distributions to AG3.[30]

22. Dazzo was served as manager of the DCGs. A short time later, Dazzo resigned and refused to turn over the DCGs' books and records.

23. On February 16, 2023, Judge Lisa Walsh entered a partial final judgment in the State Court Action in favor of AG3 and against the DCGs ("**Partial Final Judgment**").[31] The

---

[28] Dazzo and Feingold's notice of withdrawal as members and resignation as managers from the Alternative Global Entities is attached as **<u>Exhibit 15</u>**. Contrary to the statements in the Motion to Quash, the notice further evidences that Alternative Global Management, LLC ("**AGM**") does not own or manage AG3.

[29] Indeed, as of October 2023, the Debt Settlement Business was servicing approximately 5,000 clients, with an average indebtedness of $20,000 in debt, each of whom pay about $400 per month to the Debt Settlement Business. Dazzo Depo., 59:14-23, 81:9-82:24, 180:4-23.

[30] The Complaint in the State Court Action is attached as **<u>Exhibit 16</u>**.

[31] The Partial Final Judgment is attached as **<u>Exhibit 17</u>**.

Partial Final Judgment determined that AG3 was entitled to access to the DCGs' books and records and to damages for breach of contract in an amount to be determined. The Partial Final Judgment requires the DCGs and their agents to, among other things, give AG3 access to "any books and records" of the DCGs and prohibits the DCGs and their agents from omitting, destroying, or discarding relevant documents.[32]

24. At the time of filing the State Court Action, AG3 incorrectly presumed the DCGs had continued to receive profit distributions from the Debt Settlement Business but had not remitted funds to AG3. Over the course of the State Court Action, after AG3 ceased receiving distributions, AG3 discovered the DCGs had not been paid their share of the $33 million Tail. Since that discovery, AG3 has focused its investigation into what happened to the $33 million Tail and the DCGs' share of the same that the DCGs are entitled to, but did not, receive.

25. Neither the DCGs nor their agents—including the Conspirators—complied with the Partial Final Judgment. Indeed, the Conspirators' entire strategy throughout the State Court Action (apparently carried into this jointly administered bankruptcy case) is to continue their obfuscation and delay in hopes of preventing exposure of their fraud.

**A. Dazzo's Delay Tactics**

26. On February 20, 2023, four days after the Partial Final Judgment, Dazzo moved for a protective order as to the Partial Final Judgment accusing Cardinale of secretly controlling the DCGs and "in essence su[ing] himself" to harass and abuse Dazzo ("**Dazzo's First MPO**").[33]

---

[32] Partial Final Judgment, ¶¶ 10-11.

[33] Dazzo's First MPO is attached as **Exhibit 18**.

27. Several days later, Dazzo's counsel appeared at the initial status conference ("**Initial CMC**") at which he tried to derail the proceedings despite Dazzo lacking standing to appear as a non-party.[34] Dazzo's counsel represented that the DCGs' financial records were in the Debt Settlement Business's Client Relation Manager ("**CRM**") software[35] and that Dazzo resigned as manager of the DCGs.[36] Judge Walsh declined to "deal with" Dazzo's First MPO on motion calendar, and instead directed Dazzo to provide AG3 with the credentials for the CRM. If necessary, Judge Walsh indicated that AG3 could return to seek additional information.[37] Contrary to Dazzo and his counsel's representations, the CRM contains nothing but personal information about the Debt Settlement Business's customers; it provides no information about the DCGs books and records or DCGs' rights or interests in the Debt Settlement Business.

28. The day after the Initial CMC, AG3 issued a notice of deposition to Wolfson CPA Firm ("**Wolfson**"), the DCGs' long-time accountants. Dazzo, who purportedly resigned as manager of the DCGs, moved for another protective order to prevent Wolfson's deposition and

[34] The transcript from the February 23, 2023, status conference is attached as **Exhibit 19**.

[35] Dazzo Depo., 50:24-51:6, 89:4-90:22. A CRM software does not maintain corporate books and records. It is "a tool used for contact management, sales management, [and] agent productivity" to "help [a business] manage customer relationships across the enter customer lifecycle[.]" SALESFORCE WHAT IS CRM?, https://www.salesforce.com/eu/learning-centre/crm/what-is-crm/ (last visited May 20, 2024); *see also* DEBTPAYPRO DEBT SETTLEMENT SOFTWARE, https://www.debtpaypro.com/debt-settlement-crm-software/ (last visited May 20, 2024) (showing industry-specific debt settlement software). CLR used "Debttrakker" and "Debtmanager" as the CRM platform for the Debt Settlement Business. Dazzo Depo., 136:21–137:9; *see also* DEBTTRAKKER BY LEADSCONNECTION, LINKEDIN, https://www.linkedin.com/showcase/debttrakker/about/ (last visited May 20, 2024) ("DebTtrakker.Net is a Multi-Industry Web Based CRM that allows your representatives to organize, disposition, track and enroll all prospective clients in a single and easy to use interface!"); C&R Software, Debt Manager, https://www.crsoftware.com/solutions/debt-manager/ (last visited May 20, 2024) ("Debt Manager, the world's leading cloud-native collections and recovery platform, simplifies and streamlines your collections process.").

[36] Ex. 19, 9:23-11:4, 15:9-20:11; Dazzo Depo., 50:24-51:8, 105:24-106:25. Dazzo's providing access to CLR's CRM software is particularly curious in light of the Movants' assertion that the DCGs were invested in DRM only, not the Debt Settlement Business.

[37] Ex. 19, 11:10-23:6.

disclosure of documents ("**Dazzo's Second MPO**").[38] AG3 opposed Dazzo's Second MPO, arguing that it was entitled to the DCGs' financial information under the Partial Final Judgment, that such financial information continued to be withheld, that Dazzo and his counsel lied to Judge Walsh about the contents of the CRM, and that no relevant privilege existed.[39]

29. Following a hearing on March 27, 2023, Judge Walsh denied Dazzo's Second MPO and ordered Wolfson to produce documents and sit for a deposition.[40] In doing so, Judge Walsh noted that AG3 (a) only had to seek documents from the accountants because Dazzo and the DCGs failed to provide the documents upon request, and (b) still needed to understand the flow of funds into and out of the DCGs.[41]

30. On May 24, 2023, AG3 deposed Wolfson's corporate representative, Jared Birkholz ("**Birkholz**").[42] Although Dazzo was not a party to the State Court Action and purportedly resigned as the DCGs' manager, his counsel appeared at Birkholz's deposition and raised meritless objections at every opportunity, especially as to any question pertaining to the Debt Settlement Business and the flow of funds to the DCGs.[43] AG3 has since learned such information is necessary and relevant to establish the DCGs' rights and interests due to the failure of the DCGs to receive their share of the $33 million Tail. Birkholz testified, among other things, that the DCGs were joint venturers in the Debt Settlement Business, that Dazzo managed the

---

[38] Dazzo's Second MPO is attached as **Exhibit 20**.

[39] AG3's opposition to Dazzo's Second MPO is attached as **Exhibit 21**.

[40] Judge Walsh's order denying Dazzo's Second MPO is attached as **Exhibit 22**. The March 27, 2023, hearing transcript is attached as **Exhibit 23**. *See* Ex. 23, 3:21–11:15.

[41] Ex. 23, 11:19-19:15.

[42] Birkholz's deposition is attached as **Exhibit 24** ("**Birholz Depo.**").

[43] Birkholz Depo., 20:1-23:5, 30:22-35:10, 80:6-83:5, 84:21-85:8, 87:5-88:6, 116:17-118:119:11, 121:19-122:12, 126:14-18, 153:12-155:1, 156:3-157:21, 158:15-161:9.

DCGs, and that most of the information he received about the DCGs came from Dazzo and, on occasion, Silverman.[44]

31. On April 25, 2023, following Judge Walsh's denial of Dazzo's Second MPO, AG3 issued a notice of deposition for Dazzo. On May 4, 2023, Dazzo filed his ***third*** motion for protective order to avoid being deposed and having to produce documents, arguing that he had previously been deposed and produced documents in other cases involving Cardinale and/or his entities ("**Dazzo's Third MPO**").[45]

32. Following a hearing on June 13, 2023, Judge Walsh ordered Dazzo to produce documents and sit for a deposition except to the extent that, if he produced relevant documents in the other pending actions, he could identify those documents and where they were produced in a written response to the subpoena.[46]

33. On August 14, 2023, Dazzo responded to AG3's subpoena ("**Dazzo's Discovery Objections**").[47] Dazzo's Discovery Objections failed to comply with Judge Walsh's order denying Dazzo's Third MPO. Specifically, Dazzo responded to every request with boilerplate, unsubstantiated objections claiming he produced responsive documents as part of "the 768,993 pages of documents previously produced" in other actions related to the Alternative Global Entities. Dazzo did not identify or produce any documents.

34. AG3 reviewed the nearly 800,000 pages of documents referenced in Dazzo's Discovery Objections. Less than 1% of Dazzo's production (approximately 2,300 documents) hits

---

[44] Birkholz Depo., 15:21-16:3, 18:24-19:4, 25:20-27:20, 29:16-21, 30:22-31:5, 36:22-24, 39:15-19, 60:14-61:5, 63:2-9, 69:2-70:16, 97:21-98:2, 108:3-109:11, 114:16-21, 125:6-15, 133:11-134:11, 169:13-174:6.

[45] Dazzo's Third MPO is attached as **Exhibit 25**.

[46] Judge Walsh's order denying Dazzo's Third MPO is attached as **Exhibit 26**.

[47] Dazzo's Discovery Objections are attached as **Exhibit 27**.

on the term "DCG" and, of that 1%, the documents are inconsistent with and do not satisfy AG3's subpoena.[48] As such, AG3 remains in the dark as to the status of the DCGs' collection rights and interests, including but not limited to their interest in the $33 million Tail and claims arising from the disposition of the same. Thus, AG3 moved to hold Dazzo in contempt ("**Dazzo Contempt Motion**").[49]

35. On October 11, 2023, on the eve of Dazzo's deposition, he filed an "emergency" motion for reconsideration of Judge Walsh's order denying Dazzo's Third MPO seeking to prevent his deposition ("**Dazzo's Motion for Reconsideration**").[50] On October 12, 2023, Judge Walsh chastised Dazzo and his counsel for identifying Dazzo's Motion to Reconsider as an "emergency", indicated the motion would receive no such treatment, and held that Dazzo's deposition should proceed as scheduled.[51]

36. On October 24, 2023, AG3 finally deposed Dazzo, during which he made various admissions and representations cited herein.[52]

**B. CLR, Meeler, and Silverman's Delay Tactics**

37. On April 25, 2023, AG3 issued a subpoena for CLR. AG3 had significant difficulty serving CLR. When AG3 attempted to serve CLR at its Nevada address, it discovered that it was an abandoned rural property in the middle of the Nevada desert.[53] As previously noted, though

---

[48] *See* **Exhibit 28**, at 8.

[49] Ex. 28.

[50] The Motion for Reconsideration is attached as **Exhibit 29**.

[51] Judge Walsh's order denying Dazzo's Motion for Reconsideration is attached as **Exhibit 30**.

[52] Dazzo Depo.

[53] Exs. 4 & 5.

CLR has operated exclusively in Florida since at least 2016, its registered agent and business address are a UPS store mailbox.[54]

38. On May 26, 2023, two days after Birkholz's deposition, AG3 issued subpoenas for Meeler and Silverman.[55] Meeler and Silverman failed to respond to AG3's subpoena. On June 20, 2023, AG3 moved to hold Meeler and Silverman in contempt ("**Meeler and Silverman Contempt Motion**").[56] The following day, Meeler and Silverman filed meritless motions for protective order ("**Meeler and Silverman MPOs**").[57]

39. AG3 opposed the Meeler and Silverman MPOs.[58]

40. Judge Walsh heard the Meeler and Silverman MPOs on October 18, 2023.[59] At the hearing, Meeler and Silverman's counsel sought to minimize CLR's relationship to the DCGs, claiming that CLR was a ***minority*** member of the DCGs unrelated to AG3's case.[60] When Meeler and Silverman's counsel could not explain what happened to the Tail, Judge Walsh denied Meeler and Silverman MPOs and ordered them to produce documents and sit for depositions.[61] By filing these bankruptcies, Meeler and Silverman avoided producing documents and sitting for their depositions.[62]

---

[54] Ex 4.

[55] The Silverman and Meeler notices of deposition are attached as **Composite Exhibit 31**.

[56] The Meeler and Silverman Contempt Motion is attached as **Exhibit 32**.

[57] The Meeler and Silverman MPOs are attached as **Composite Exhibit 33**.

[58] AG3's opposition to the Meeler and Silverman MPOs are attached as **Composite Exhibit 34**.

[59] The October 18, 2023, hearing transcript is attached as **Exhibit 35**.

[60] Ex. 35, 11:19-12:12, 13:1-15:5, 29:11-19.

[61] Ex. 35, 15:6-20:7, 25:21-17, 28:19-11. The order denying Meeler and Silverman's MPOs is attached as **Exhibit 36**.

[62] Meeler and/or Silverman are the listed authorized representatives on each of the DCGs' bankruptcy petitions.

41. On October 27, 2023, less than ten days after Meeler and Silverman represented to Judge Walsh that CLR was a minority member of the DCGs and unrelated to the State Court Action, CLR (through the same counsel that appeared for Meeler and Silverman) moved to intervene in the State Court Action ("**Motion to Intervene**").[63] The Motion to Intervene contradicts Meeler and Silverman's prior representations to Judge Wash, and alleged that CLR is the ***majority*** member of each of the DCGs and that it should be permitted to intervene as a plaintiff in the action against the DCGs. The Motion to Intervene was a transparent effort to hijack the State Court Action.[64]

42. Judge Walsh heard CLR's Motion to Intervene on January 4, 2024.[65] CLR sought to intervene, arguing that AG3 "suddenly" discovered the Tail and CLR was also entitled to a share of the funds.[66] Judge Walsh determined that CLR's Motion to Intervene would force the State Court Action to "to go back to [the] start" and "initiate from the beginning."[67] Judge Walsh—yet again—recognized the fraudulent tactics that have become commonplace amongst the Conspirators. In denying the Motion to Intervene, Judge Wash specifically held that CLR had no direct interest in the State Court Action and acknowledged that CLR sought to intervene to "create potentially hostile or adverse positions in this case, that would complicate the litigation, [and] that

[63] CLR's Motion to Intervene is attached as **Exhibit 37**.

[64] AG3's opposition to the Motion to Intervene is attached as **Exhibit 38**.

[65] The January 4, 2024, hearing transcript is attached as **Exhibit 39**. Dazzo's counsel appeared yet again at the hearing, but Judge Walsh—having become familiar with the tactics of those opposing AG3—refused to allow him to interject. Ex. 39, 10:7-10.

[66] Ex. 39, 6:20-7:6.

[67] Ex. 39, 5:21-23.

could undo litigation[.]"[68] CLR appealed Judge Walsh's order denying the Motion to Intervene.[69] The appeal is stayed pursuant to the DCGs' bankruptcy.

43. On November 3, 2023, AG3 noticed its intent to subpoena CLR's bank records from Bank of America.[70] CLR objected.[71] AG3 moved to overrule the objection.[72] The motion was scheduled for hearing in February 2024, but did not occur due to the DCGs' bankruptcy filings.

**C. DRM and Weiner's Delay Tactics**

44. On April 25, 2023 and May 26, 2023, AG3 issued separate notices of deposition for DRM and Weiner, respectively. DRM was required to produce documents by May 15, 2023, and sit for a deposition on May 31, 2023.[73] DRM failed to respond or attend its deposition. Accordingly, AG3 moved to hold DRM in contempt ("**DRM First Contempt Motion**").[74] In response, DRM and Weiner agreed to an order compelling them to produce responsive documents and sit for depositions ("**DRM/Weiner Agreed Order**").[75]

45. On June 29, 2023, DRM and Weiner produced a single eleven-page PDF spreadsheet file identifying millions of dollars in transfers between DRM and the various DCGs between August 2020 and May 2022, but provided no information other than the mere

---

[68] Ex. 39, 17:2-18:15. Judge Walsh's order denying CLR's Motion to Intervene is attached as **Exhibit 40**.

[69] CLR's notice of appeal is attached as **Exhibit 41**.

[70] AG3's notice of intent to subpoena CLR's bank records from Bank of America is attached as **Exhibit 42**.

[71] CLR's objection to AG3's intention to subpoena its bank records is attached as **Exhibit 43**.

[72] AG3's motion to overrule CLR's objection is attached as **Exhibit 44**.

[73] AG3's notices of deposition to DRM and Weiner are attached as **Composite Exhibit 45**.

[74] AG3's DRM First Contempt Motion is attached as **Exhibit 46**.

[75] The DRM/Weiner Agreed Order is attached as **Exhibit 47**.

identification of the transfers ("**DRM PDF**").[76] The DRM PDF further fails to provide any insight into what happened to the Tail.

46. On September 22, 2023, AG3 filed another contempt motion against DRM and Weiner for their failure to comply with the DRM/Weiner Agreed Order ("**DRM Second Contempt Motion**").[77] Several days later—consistent with the same flawed strategy Meeler and Silverman attempted—DRM and Weiner moved for a protective order to prevent them from having to produce documents or sit for depositions ("**DRM and Weiner MPO**").[78]

47. Judge Walsh heard the DRM and Weiner MPO and the DRM Second Contempt Motion on November 6, 2023.[79] AG3 established that DRM and Weiner's production was insufficient and failed to provide an accurate, contemporaneous picture of the flow of funds and what the DCGs were entitled to receive.[80] Upon Judge Walsh's questioning, DRM's counsel could not answer whether AG3 had properly articulated the operations of DRM, the Debt Settlement Business, and the flow of funds, which Judge Walsh found odd given the millions of dollars transferred between the DCGs and DRM, and the lack of documentation provided by DRM to support and explain the DRM PDF.[81] Judge Walsh noted it was "difficult to believe" that there would be no communications concerning the flow of funds between the DCGs and DRM, none of

[76] The DRM PDF is attached as **Exhibit 48**.

[77] The DRM Second Contempt Motion is attached as **Exhibit 49**.

[78] The DRM and Weiner MPO is attached as **Exhibit 50**.

[79] The November 6, 2023, hearing transcript is attached as **Exhibit 51**. Dazzo, CLR, Meeler, and Silverman all attempted to appear and intervene in the hearing.

[80] Ex. 51, 8:11-14.

[81] Ex. 51, 20:21-23:21.

which had been produced.[82] Judge Walsh denied the DRM and Weiner MPO and mandated that they produce additional documents and sit for depositions.[83]

48. DRM and Weiner responded by producing redacted bank records that provide no further insight than the DRM PDF. In essence, the bank statements mirrored the DRM PDF. Indeed, just as before, DRM redacted all transactions except for payments to or from the DCGs until June 2022. Moreover, no documents were produced relating to any transactions after June 2022.

49. The bankruptcy filings permitted DRM and Weiner to avoid producing documents and sitting for their depositions.

## V. DCG Bankruptcy Cases

50. The DCGs filed voluntary Chapter 7 bankruptcy petitions ("**Petitions**") on January 23, 2024 ("**Petition Date**").

51. As of the Petition Date, the following depositions were scheduled:

a. Silverman: January 30, 2024

b. Brenner: February 2, 2024

c. Meeler: February 16, 2024

d. DRM: February 19, 2024

e. Weiner: February 19, 2024

[82] Ex. 51, 23:22-24:2.

[83] Judge Walsh's order denying the DRM and Weiner MPO is attached as **Exhibit 52**.

52. AG3 had also issued subpoenas for CLR, Helbing Law,[84] and ASC Advisors, LLC ("**ASC**").[85]

**A. Petitions and Schedules**

53. Meeler and Silverman filed the Petitions for the DCGs.[86] Each of the Petitions lists a new principal place of business for the DCGs: 225 NE Mizner Blvd., Boca Raton, FL 33432.

54. Even though Meeler and Silverman previously alleged CLR is a majority member of each of the DCGs, none of the corporate ownership statements identify CLR.[87] Additionally, AG3 owns more than 10% of DCG Boca and DCG SI and should have been included in the corporate ownership statement for those entities, but was not.

55. On February 6, 2024, the DCGs each filed amended petitions ("**Amended Petitions**")[88] and schedules ("**Schedules**").[89] Despite claiming he had resigned as manager and his proclamation that Cardinale was effectively suing himself, Dazzo—not Meeler and Silverman—

[84] Judge Walsh specifically permitted AG3 to seek depositions from Helbing Law and Helbing. *See* **Exhibit 53**.

[85] **Composite Exhibit 54**. ASC is the DCGs and the Debt Settlement Business's new accounting firm as of at least September 2023, when ASC prepared Schedule K-1's for every member of the DCGs except for AG3. Dazzo Depo., 200:16-203:12. The DCGs replaced Wolfson after Birkholz provided AG3 information. Birkholz 7:8-23. In September 2023, AG3 learned that DCG retained ASC to issue tax documents, including Schedule K-1s. All members of the DCGs received Schedule K-1s from ASC except for AG3. It is unclear how the DCGs retained ASC as they have had no manager since Dazzo allegedly resigned and Dazzo has maintained in the State Court Action that Cardinale controls the DCGs.

[86] Meeler filed the Chapter 7 petitions for DCG Boca, DCG FL, DCG NY, DCG SI, and DCG TX. Silverman filed the Chapter 7 petition for DCG NJ.

[87] ECF No. 3; DCG FL Bankr. No. 3; DCG NJ Bankr. No. 3; DCG NY Bankr. No. 3; DCG SI Bankr. No. 3; DCG TX Bankr. No. 3.

[88] ECF No. 9; DCG FL Bankr. No. 9; DCG NJ Bankr. No. 9; DCG NY Bankr. No. 7; DCG SI Bankr. No. 9; DCG TX Bankr. No. 9.

[89] ECF No. 10; DCG FL Bankr. No. 10; DCG NJ Bankr. No. 10; DCG NY Bankr. No. 8; DCG SI Bankr. No. 10; DCG TX Bankr. No. 10.

signed the Amended Petitions and Schedules as the DCGs' authorized representative. In relevant part, each of the Schedules identifies:

a. Empire Bank checking accounts with a minimal balances for each of the DCGs' respective lone asset;

b. two unsecured creditors, AG3 and CLR, both of which hold unliquidated claims of unknown value;

c. that CLR funded the attorneys' fees to DCGs' counsel to file the Petitions;

d. identifies CLR as the only "firm[ ] or individual[ ] … in possession of the [DCGs'] books of account and records" on the Petition Date; and

e. identifies no "accountants or bookkeepers who maintained the [DCGs'] books and records within two years before" the Petition Date.

56. The DCGs' Schedules do not identify the DCGs as having any interest in the Debt Settlement Business or any other entity as an asset. The DCGs further do not identify any potential interest in the Tail as an asset.

57. On April 12, 2024, the DCGs amended their Schedules once again. This time, the DCGs amended their Statements of Financial Affairs to indicate that two accountants, Wolfson and ASC, maintained their books and records within two years of the Petition Date.[90] To AG3's knowledge, neither Wolfson nor ASC turned over the DCGs' books and records to the Trustee.

58. DCG NJ also amended its corporate ownership statement to identify AG3 and CLR as entities holding more than 10% ownership interests.[91] Though AG3 is still not listed as having an equity stake in DCG NJ's Amended Schedules, Dazzo confirmed at the § 341 meeting that AG3 owns a 6.5% equity interest in DCG NJ.

### B. Dazzo's 341 Testimony

---

[90] ECF No. 30; DCG FL Bankr. No. 22; DCG NJ Bankr. No. 25; DCG NY Bankr. No. 23; DCG SI Bankr. No. 21; DCG TX Bankr. No. 21.

[91] DCG NJ Bankr. No. 26. Another entity, MAC 1534, LLC, also is included in the corporate ownership statement.

59. Dazzo testified at the DCGs' § 341 meeting ("**341 Meeting**").[92] At the 341 Meeting, Dazzo testified that:

a. Dazzo was selected as the authorized representative because of his knowledge of the DCGs, not based on any formal role with the DCGs;[93]

b. Silverman is the other person most familiar with the DCGs and has access to the DCGs' Quickbooks;[94]

c. the DCGs' schedules were created using the "last known financials" from the summer of 2022;[95]

d. Notwithstanding the DCGs' corporate filings on Sunbiz, Dazzo was ***never*** the DCGs' manager ***but*** resigned as the DCGs' manager;[96]

e. the DCGs filed for bankruptcy upon the agreement of Dazzo, Meeler, Silverman and Brenner because of AG3's Partial Final Judgment;[97]

f. the DCGs' listed address is a "desk in an accountant's office" in Mizner Park that they rent for $4,500 per month since 2019;[98]

g. the DCGs have no assets other than their Empire Bank accounts;[99]

h. even though the DCGs allegedly only invested in "marketing in the debt settlement industry," CLR purportedly has a claim for "administrative services" against the DCGs' estate because CLR "handled all the negotiations and non-legal work for attorneys that were settling debt, maintaining the office, [and] managing the employees" of the Debt Settlement Business;[100]

---

[92] Ex. 2.

[93] 341 Meeting, 8:2-6, 28:22-29:10.

[94] 341 Meeting, 8:24-10:3, 16:7-15.

[95] 341 Meeting, 9:22-10:3, 16:7-15.

[96] 341 Meeting, 12:5-20, 25:10-25, 34:5-16.

[97] 341 Meeting, 13:2-7, 30:12-15.

[98] 341 Meeting, 13:16-14:17, 31:4-34:4.

[99] 341 Meeting, 15:18-20, 17:22-18:9.

[100] 341 Meeting, 6:1-2, 19:23-20:2.

i. CLR continues to provide services to the Debt Settlement Business's existing customers;[101]

j. If there are contracts between the DCGs and CLR, Meeler and Silverman would have them;[102]

k. CLR's members created the DCGs' financial documents;[103]

l. CLR has no documents evidencing its ownership interest in the DCGs and did not invest any funds into the DCGs, but rather obtained its interest based on the "sweat equity" it put into the Debt Settlement Business by "manag[ing] the admin services for the clients that came into the debt settlement program";[104]

m. though millions were exchanged between the DCGs and DRM, Dazzo is not aware of any document governing their relationship;[105]

n. Dazzo does not know whether Helbing Law did any business with DRM and that any such questions should be directed to Silverman and Meeler;[106]

o. DRM is a "continuing business" that acts as a "separate marketing company" with multiple clients;[107]

p. Dazzo refused to provide the name of the new debt settlement business operated by Silverman, Meeler, and Brenner, which would be "save[d] … for the 2004 exam[;]"[108] and

q. Dazzo will "sit for a 2004."[109]

## C. AG3's Rule 2004 Subpoenas

[101] 341 Meeting, 20:3-21:1.

[102] 341 Meeting, 21:21-22:7.

[103] 341 Meeting, 22:9-23:24.

[104] 341 Meeting, 29:11-30:1, 34:17-35:22, 41:10-42:4.

[105] 341 Meeting, 43:13-44:1.

[106] 341 Meeting, 44:19-21.

[107] 341 Meeting, 44:22-45:1.

[108] 341 Meeting, 46:3-47:14.

[109] 341 Meeting, 43:12. Notwithstanding his commitment to sit for a 2004 examination, Dazzo is one of the Movants.

60. On April 25, 2024, AG3 issued notices of Rule 2004 Examinations for the DCGs and the individuals and entities associated with the Debt Settlement Business ("**Rule 2004 Subpoenas**"). Depositions have been noticed for: (i) CLR, (ii) Meeler, (iii) Silverman, (iv) Brenner, (v) Dazzo, (vi) DRM, (vii) Weiner, (viii) Helbing Law, (ix) Helbing, (x) ASC, (xi) Alvarez, (xii) Wolfson, and (xiii) Birkholz.[110] The Rule 2004 Subpoenas seek information related to the DCGs' assets, liabilities, rights, and interests, including their interests and recovery rights in the Debt Settlement Business.

**D. CLR's Notices Rule 2004 Examinations of Cardinale and AG3**

61. On May 8, 2024, CLR issued Rule 2004 Subpoenas for AG3 and Cardinale.[111]

62. While refusing to respond to any discovery here or in the State Court Action, CLR seeks its own discovery by noticing depositions and document requests for AG3 and non-parties Cardinale and Robert Giardina.

63. CLR's request to AG3 asks for documents supporting its proof of claim and its assertions related to the Tail and its belief that individuals and entities associated with the Debt Settlement Business—namely and specifically CLR, Dazzo, Meeler, Silverman, and Brenner—defrauded the DCGs and AG3. Incredibly, CLR refuses to provide discovery on the very same issue for which it seeks discovery from AG3.[112]

---

[110] ECF Nos. 35-53.

[111] ECF No. 69 & 70.

[112] CLR's subpoena to Cardinale seeks 29 categories of documents, most of which appear more related to a derivative lawsuit brought by Meeler on behalf of CLR against Cardinale and other matters unrelated to this bankruptcy case. *See Meeler v. Giardina et al.*, No. 2023-017255-CA-01 (Fla. 11th Cir. Ct.) ("**CLR Derivative Suit**"). The complaint in the CLR Derivative Suit is attached as **Exhibit 55**. In the CLR Derivative Suit, Meeler alleges that Cardinale is preventing the DCGs from issuing the same Schedule K-1 attached to CLR's Claim No. 2-2. CLR also asks for broad information unrelated to the above, including any communication between Cardinale and Robert or Lawrence Giardina.

**E. The DCGs' Bank Subpoenas**

64. On May 15, 2024, the DCGs issued subpoenas to Bank of America and Empire Bank.[113]

65. To date, the DCGs have only ever identified banking information for Empire Bank.[114] They have never identified any accounts with Bank of America. CLR, however, does bank at Bank of America.

66. To the extent the DCGs have assets with Bank of America, such accounts and assets have been shielded from view and improperly excluded from the Schedules.

## MEMORANDUM OF LAW

"On motion of any party in interest, the court may order the examination of any entity." Fed. R. Bankr. P. 2004(a). A Rule 2004 examination may relate "to the acts, conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the debtor's estate[.]" Fed. R. Bankr. P. 2004(b). "***The purpose of a Rule 2004 examination is to assist a party in interest in determining the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred***."[115] *In re Recoton Corp.*, 307 B.R. 751, 755 (Bankr. S.D.N.Y. 2004) (emphasis added). "Potential examinees include 'third parties that possess knowledge of the debtor's acts, conduct, liabilities or financial condition which relate to the administration of the bankruptcy

[113] ECF No. 77 & 78.

[114] ECF No. 10; 341 Meeting, 15:18-20, 17:22-18:9.

[115] *See also In re Marathe*, 459 B.R. 850, 856 (Bankr. M.D. Fla. 2011) ("The scope of an examination under Rule 2004 is broad, and the Rule is properly used to 'determine the condition, extent, and location of the debtor's estate in order to maximize distribution to unsecured creditors.'").

estate." *In re Dewitt*, 608 B.R. 794, 797 (Bankr. W.D. Pa. 2019) (quoting *In re Millenium Lab Holdings II, LLC*, 562 B.R. 614, 625-27 (Bankr. D. Del. 2016)).

"[A] Rule 2004 examination can be legitimately in the nature of a 'fishing expedition'" so long as they are not used for "harassment" or "stray into matters which are not relevant to the basic inquiry." *In re Pan Am. Hosp. Corp.*, No. 04-11819-BKC-AJC, 2005 Bankr. LEXIS 734, at *6 (Bankr. S.D. Fla. Feb. 25, 2005). "[A]s long as the questions posed … at the Rule 2004 Examinations do not exceed the boundaries enunciated by the rule," a party in interest in entitled to its examination. *Id.* at *6-7.

## I. <u>AG3 is a Party in Interest Seeking Appropriate Information Under Rule 2004.</u>

AG3 is undeniably a party in interest by virtue of its proof of claim and recognition as a creditor in the DCGs' schedules.[116] Further, each of AG3's Rule 2004 Subpoenas seek documents and information vital to understanding "the acts, conduct, or property or to the liabilities and financial condition" of the DCGs as well as other matters that may affect the administration of their estate.

### A. CLR, Meeler, Silverman, and Brenner Subpoenas

The CLR, Meeler, Silverman, and Brenner Rule 2004 Subpoenas (collectively, "**CLR Subpoenas**") are identical in all relevant respects.[117]

<u>DCGs' Financial and Corporate Documents</u>:[118] CLR is listed in the Schedules as the entity presently in possession of the DCGs' books and records. These documents are facially within the

[116] Because Chapter 7 does not define "party in interest" standing, bankruptcy courts generally refer to Chapter 11 for guidance. *See, e.g.*, *In re Summit Corp.*, 891 F.2d 1, 5 (1st Cir. 1989). The term "party in interest" includes "the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee," or any other party with "a sufficient stake in the outcome … to require representation." *In re No Rust Rebar, Inc.*, 641 B.R. 412, 420 (Bankr. S.D. Fla. 2022).

[117] ECF Nos. 43, 47, 48, & 50.

[118] *See* CLR Subpoenas, ¶¶ 1-5, 16-17.

definition of Rule 2004 and should be produced. Notably, AG3 is informed such books and records have not been turned over to the Trustee.

Management, Control, and Operations of the DCGs:[119] The management and affairs of the DCGs is mired in confusion. Dazzo testified he was never the manager of the DCGs. Dazzo's testimony, however, is belied by the DCGs' own Sunbiz filings identifying him as their manager and by his own testimony and representations in the State Court Action that he was the DCGs' manager, but resigned shortly after AG3 served him. Indeed, Dazzo is identified in the DCGs' Amended Petitions, Schedules, and all subsequent documents filed by the DCGs as their "representative." On the other hand, CLR and its members (including Dazzo) were the ones who orchestrated filing the Petitions and Meeler, as CLR's manager, signed five of the six initial Petitions. Now, however, Dazzo is still identified as the DCGs' representative. At a minimum, it remains unclear who (a) operated the DCGs; (b) signed contracts (such as the $4,500 per month "sublease" of a desk); (c) oversaw the DCGs; and (d) retained professionals for the DCGs (such as accountants and lawyers). It is impossible to understand the status of the DCGs as of the Petition Date without access to information regarding the DCGs' management, control, and operations.

Debt Settlement Business Documents:[120] The Debt Settlement Business, its operations, income, assets, flow of funds, and the entitlements to distributions are all directly relevant to this case. While the Movants seeks to misdirect this Court just as they tried to argue before Judge Walsh in the State Court Action,[121] AG3 has more than established a sufficient predicate for

[119] *See* CLR Subpoenas, ¶¶ 6-10.

[120] *See* CLR Subpoenas, ¶¶ 11-14, 19-28, 30.

[121] The only Movants who have not previously sought to prevent or delay having to produce documents or sit for depositions are Helbing Law and Helbing because they were not served by AG3 as of the Petition Date.

inquiry into the DCGs' interests in the Debt Settlement Business, the value of that interest, and whether any such interest has been improperly misappropriated, misused, or converted for another purpose.[122] AG3 has undeniably established a sufficient predicate to inquire further into the Debt Settlement Business, the Debt Settlement Entities, and/or any of the Debt Settlement Business's assets.

Transition of the Debt Settlement Business and Misappropriation of the Tail:[123] AG3 seeks documents related to the transition of the Debt Settlement Business and the misappropriation of the Tail. These allegations are the lynchpin of AG3's claim in the State Court Action. Documents identifying what happened to the Tail have ***never*** been produced. While AG3 has access to a portion of CLR's General Ledger, the General Ledger is out of date as it is only through May 2022, when AG3 alleges that the Debt Settlement Business began siphoning funds from the Tail and misappropriating them for use in an alternative debt settlement business without providing the DCGs with a return and/or an ownership interest. The documents sought by AG3 are consistent with logic, reason, and the facts as Dazzo admitted at his October 2023 deposition that the Debt Settlement Business continues to operate and still has approximately 5,000 clients. Movants simply continue to seek to avoid disclosing the evidence of their fraud.

---

[122] Dazzo reviewed the Income Fund's PPM identifying AG3's investment in the Debt Settlement Business. Exs. 11 & 12. Further, Dazzo provided AG3 with access to CLR's CRM platform, which contains only the Debt Settlement Business's customer data, claiming the CRM contained the DCGs' books and records. Ex. 19, 9:23-11:4, 15:9-20:11. Such data is only relevant to the DCGs if they funded the Debt Settlement Business. Finally, at the § 341 Meeting, Dazzo testified that CLR's administrative claim and equity interest in the DCGs arose from its "sweat equity" generated through its administrative work for the Debt Settlement Business rather than for work performed for the DCGs. 341 Meeting, 19:23-20:2, 29:11-30:1, 34:17-35:22, 41:10-42:4; *see also* Ex. 7 (identifying DRM and its predecessor as a repository of investment funds into the Debt Settlement Business).

[123] CLR Subpoenas, ¶¶ 15, 29, 31-33.

CLR's Claim:[124] AG3 requests information about (i) CLR's claim filed in this case, (ii) its assertion standing as a creditor by virtue of its purported "ownership" interests in the DCGs, and (iii) CLR's "right to profits from the same."[125] Unlike CLR's request, AG3's request is pertinent to the further disclosure of CLR's fraud in connection with the Debt Settlement Business.

### B. DRM and Weiner Subpoenas

The DRM and Weiner Rule 2004 Subpoenas (collectively, "**DRM Subpoenas**") are identical in all relevant respects.[126]

Relationship Between DRM and the DCGs:[127] DRM was the entity through which the DCGs invested in the Debt Settlement Business and was the entity through which the DCGs received their returns.[128] Anything related to the same is vital and necessary to understanding the DCGs' property, assets, interests, and rights relating to the Debt Settlement Business. Further, the Weiner declaration asserts that the DCGs invested in DRM.[129] If that is true, then information sought by AG3 relating to the relationship between the DCGs and DRM is even more important. What, precisely was that relationship? What interest do the DCGs have in DRM? Were the DCGs entitled to distributions from DRM for the ongoing services DRM provides to other clients? Are the DCGs still entitled to distributions from DRM for the ongoing services it provides to other clients?

---

124 CLR Subpoenas, ¶ 18.

125 Claim 2-2.

126 ECF Nos. 41 & 51.

127 DRM Subpoenas, ¶¶ 1-3, 9-10.

128 *See* Ex. 7.

129 Weiner Dec.

Debt Settlement Business Documents:[130] *See* § I.A., *supra*, corresponding to the same document categories requested in the CLR Subpoenas.

Transition of the Debt Settlement Business and Misappropriation of the Tail:[131] *See* § I.A., *supra*, corresponding to the same document categories requested in the CLR Subpoenas.

### C. Helbing Law and Helbing Subpoenas

The Helbing Law and Helbing Rule 2004 Subpoenas (collectively, "**Helbing Subpoenas**") are identical in all relevant respects.[132]

DCGs' Financial and Corporate Documents:[133] As previously stated with respect to the CLR Subpoenas, these documents are facially within the context of Rule 2004. To the extent Helbing Law and Helbing have no documents or information related to this category, they may represent the same in their response. AG3, however, is permitted to inquire into whether Helbing Law, as a participant in the Debt Settlement Business, and Helbing, as Helbing Law's principal, have such documents and information.

Debt Settlement Business Documents:[134] *See* § I.A., *supra*, corresponding to the same document categories requested in the CLR Subpoenas. According to the Movants, the DCGs funds were used only to fund DRM, which generated clients for Helbing Law.[135] Understanding the nature of the relationship and payment structure of how DRM allegedly made money from these

[130] DRM Subpoenas, ¶¶ 4-8, 11-19.

[131] DRM Subpoenas, ¶¶ 20-22.

[132] ECF Nos. 45 & 46.

[133] Helbing Subpoenas, ¶¶ 1-3, 5-6.

[134] Helbing Subpoenas, ¶¶ 4, 7-12.

[135] ECF No. 75-2, at 1.

referrals and not from distributions from the Debt Settlement Business in total (which appears to be the Movants' allegation) is necessary to establish what the DCGs are entitled to, the value of those interests, and whether any such funds are due and owing to the DCGs' Chapter 7 bankruptcy estates.

Transition of the Debt Settlement Business and Misappropriation of the Tail:[136] *See* § I.A., *supra*, corresponding to the same document categories requested in the CLR Subpoenas.

Helbing and Helbing Law are not innocent, irrelevant third parties. According to the Movants, distributions were made through the Debt Settlement Business as follows:[137]




[136] Helbing Subpoenas, ¶¶ 13-15.

[137] ECF No. 75-2, at 1.

If the Movants theory of the relationships among the Debt Settlement Entities is to be believed, then the Helbing Subpoenas are even more important because then the DCGs should be entitled to probe the basis by which their alleged investment in DRM would yield returns.

Under the Movants' explanation: (1) the DCGs invested in DRM; (2) DRM referred clients to Helbing Law; (3) Helbing Law deposited client receipts into CLR; (4) CLR paid fees to DRM on behalf of Helbing Law; and (5) DRM provided returns to the DCGs. The myriad of topics that must be investigated include, but are not limited to: How did DRM know how much money it was entitled to receive? How did CLR know how much to pay DRM on behalf of Helbing Law? How did the DCGs know they were receiving the appropriate distribution for their investment interest? What contracts, documents, or information exist reflecting those rights? How did those rights affect the DCGs, as an investor funding DRM's marketing effort? What documents identify the number of referrals DRM made to Helbing Law?

The short answer, of course, is that the above flow of funds proffered by Movants is deceiving. The DCGs invested in the Debt Settlement Business.[138] Helbing Law was the law firm at the center of the Debt Settlement Business and part of that business enterprise. AG3 appropriately seeks information about the Debt Settlement Business—with which both Helbing Law and Helbing were both affiliated.

**D. Dazzo Subpoena**

The Dazzo Subpoena addresses documents and information related to both the DCGs and the Debt Settlement Business because he is a purported member of CLR and the DCGs' current representative (and possibly also their manager).[139] Every category of documents requested relates

---

[138] *See* Footnote 21 and the corresponding chart.

[139] ECF No. 44.

to the DCGs and the Debt Settlement Business and are appropriately directed to him. AG3 seeks the following from Dazzo, the appropriateness of which have all previously been detailed above: (1) DCGs' Financial and Corporate Documents;[140] (2) Operations of the DCGs;[141] (3) Debt Settlement Business Documents;[142] and (4) Transition of the Debt Settlement Business and Misappropriation of the Tail.[143] Thus, Dazzo Subpoena is also wholly appropriate.[144]

## II. Movants Did Not Produce Documents Related to the Debt Settlement Business or the Tail.

Notwithstanding Judge Walsh's prior orders, Movants seek another "bite at the apple." Movants misdirect the Court by arguing that AG3's 2004 subpoenas are harassing. Indeed, AG3 was provided with a very limited production of documents in the State Court Action. As detailed above, although Judge Walsh concluded on numerous occasions that AG3 was entitled to pursue and obtain evidence related to the Debt Settlement Business, Movants refused to comply with Judge Walsh's orders. Consequently, AG3 obtained only limited documents about the Debt Settlement Business. ***Notably, however, none of the documents provide any visibility into the operations of the Debt Settlement Business—and specifically what happened to the $33 million Tail—after May 2022***. No individual or entity has ever provided AG3 with any documents adequately detailing, among other things, the flow of funds in the Debt Settlement Business, the nature of the DCGs' investment, what the DCGs were entitled to receive, and/or how payments into the Debt Settlement Business were distributed amongst the Debt Settlement Entities.

---

[140] Dazzo Subpoena, ¶¶ 1-5.

[141] Dazzo Subpoena, ¶¶ 6-10, 17.

[142] Dazzo Subpoena, ¶¶ 11-15.

[143] Dazzo Subpoena, ¶¶ 18-20.

[144] The Dazzo Contempt Motion was pending in the State Court Action as of the Petition Date.

## III. The Movants' Fail to Present a Cognizable Basis to Quash the Rule 2004 Subpoenas or Obtain a Protective Order.

Movants argue that AG3 cannot inquire into matters plainly within the confines of Rule 2004 unless or until the Trustee determines that there are assets in the Estates to distribute.[145] Of course, the only significant assets of the Estates are the potential claims against the Conspirators, as to which the Movants seek to prevent any discovery. Moreover, Movants' cited cases fail to support such a proposition:

- In *Kipp Flores Architects, LLC v. Mid-Continent Cas. Co.*, a creditor's proof of claim in a no-asset bankruptcy case was not entitled to have *res judicata* effect because, in relevant part, proofs of claim are not resolved or adjudicated in no-asset cases. 852 F.3d 405, 415-16 (5th Cir. 2017) ("We hold that KFA did not have a 'deemed allowed' claim that constitutes res judicata against Mid-Continent because in this no asset bankruptcy case … and no bankruptcy purpose would have been served by the bankruptcy court's adjudicating KFA's claim.").
    - Whether proofs of claim have *res judicata* effect in a no-asset bankruptcy case is not relevant to whether AG3 is permitted to apply Rule 2004 exactly as written to inquire into the extent and value of the DCGs' rights and interests in the Debt Settlement Business, particularly since those are the assets in these cases.
- In *Enterprise Bank v. Eltech, Inc. (In re Eltech, Inc.)*, a bankruptcy court *sua sponte* concluded that, after the Chapter 7 trustee determined there were no assets in the estate, it lacked "related to" jurisdiction under 28 U.S.C. § 157(a) to adjudicate an adversary proceeding because such proceeding could not conceivably affect the administration of the estate. 313 B.R. 659, 663 (Bankr. W.D. Pa. 2004).
    - Whether a bankruptcy court has subject matter jurisdiction to adjudicate a "related to" matter is inconsequential to whether a creditor can use Rule 2004 exactly as intended to investigate "the nature and extent of the bankruptcy estate, reveal[ ] assets, examin[e] transactions and assess[ ] whether wrongdoing has occurred." *Recoton*, 307 B.R. at 755.
- In *In re Clarissian LP*, upon conversion of a Chapter 11 case to a Chapter 7 case, the bankruptcy court concluded that a secured creditor's Rule 2004 subpoenas should be stayed pending appointment of a Chapter 7 trustee and

[145] Motion to Quash, at 10–13.

its analysis when the debtor argued that it had no assets and conversion to a Chapter 7 would only benefit the secured creditor. No. 17-10356(KG), 2018 Bankr. LEXIS 2381, at *7–8 (Bankr. D. Del. Aug. 10, 2018).

- The bankruptcy court's determination in this case was related specifically to the debtor's concern that conversion, rather than dismissal, would only benefit the secured creditor seeking to use Rule 2004. *See id.* at *5 (noting that the debtor argued that its case should be dismissed instead of converted because "[a] Chapter 7 case should not be run for the exclusive benefit of a secured creditor … who [is] owed for their secured debt in excess of $40 million."). It was appropriate under those circumstances to permit a neutral Trustee to determine whether the case should remain in bankruptcy or be dismissed before providing the secured creditor with potentially inappropriate access to Rule 2004. None of those concerns are present here.

- In *In re LLC 1 07ch12487*, the bankruptcy court lamented that it should not have permitted a creditor to essentially stand in the shoes of the Chapter 7 trustee and request documents to prepare the debtor's tax documents, which set off a chain of events that led to "scorched-earth litigation, delay and frustration." 608 B.R. 830, 836 (Bankr. N.D. Ill. 2019).

  - This case is unrelated to the issue at bar as AG3 does not seek documents to prepare the DCGs' tax returns. Here, AG3 seeks to use Rule 2004 exactly as written to investigate the extent of the debtors' rights and assets to determine, among other things, "the nature and extent of the bankruptcy estate, revealing assets, examining transactions and assessing whether wrongdoing has occurred." *Recoton*, 307 B.R. at 755.

These cases present no support for Movants' position that a creditor may not take Rule 2004 discovery unless or until the Chapter 7 trustee determines there are assets in the estate. Movants' position directly contradicts Rule 2004, which contains no such limiting language. Moreover, the potential claims against the Movants/Conspirators ***are*** the assets of the Estates, such that the Rule 2004 subpoenas are not only appropriate, but necessary to assist the Estates in further identifying and pursuing the claims.

There is no legal or equitable principle that would justify preventing AG3 from inquiring into matters plainly within the confines of Rule 2004 to the extent that they are related to the "acts,

conduct, or property or to the liabilities and financial condition of the debtor, or to any matter which may affect the administration of the" DCGs' bankruptcy estates. Fed. R. Bankr. P. 2004(a) and (b). AG3's analysis above details precisely why such information is relevant, necessary, and appropriately within the scope of Rule 2004. Its requests fall well within the broad scope of Rule 2004, which permits discovery to any third party related to the debtor so long as it is not designed to abuse or harass. *Recoton*, 307 B.R. at 755; *see also In re Glitnir banki hf*, No. 08-14757 (SMB), 2011 Bankr. LEXIS 3296 (Bankr. S.D.N.Y. Aug. 19, 2011) (permitting relevant Rule 2004 discovery inquiry to determine whether certain individuals engaged in a fraudulent scheme to "loot" a debtor-bank except to the extent that they sought personal financial information not relevant to the bankruptcy).

## IV. Movants' Requested Protective Order is Onerous and Would Functionally Prevent Any Significant Investigation into the Estates' Assets and Movants' Wrongdoing.

Movants request the Court enter a protective order (i) requiring AG3 to demonstrate good cause for conducting Rule 2004 discovery; (ii) limiting the scope of appropriate subjects for Rule 2004 discovery; (iii) requiring any depositions taken by AG3 to occur via video conference; (iv) limiting the scope of information the Trustee may divulge to AG3; (v) sequencing discovery such that AG3, Cardinale, and Giardina must respond before the Movants; and (vi) permit all interested parties to file individual or group motions for a protective order or motions to quash within fourteen days of the issuance of a court order denying CLR's request to stay, or to quash, all discovery requests propounded by AG3. AG3 opposes these improper and unreasonable requests.

Request (i): The above detailed analysis and attached exhibits clearly establish good cause for AG3's inquiry into the nature and extent of the DCGs' estates, their assets, their transactions, and the wrongdoing that occurred with respect to the DCGs' rights and assets. *Recoton*, 307 B.R. at 755. This inquiry includes what interest the DCGs have in the Debt Settlement Business, what

happened to the Tail, whether they are entitled to any portion of the Tail, what portion of the Tail each of the DCGs is entitled to receive, and what action (if any) must be taken to recover the DCGs' interest in the same.

Request (ii): Movants provide no analysis or explanation of which portion(s) of AG3's Rule 2004 Subpoenas they believe exceed the scope of Rule 2004. AG3's Rule 2004 Subpoenas, as detailed above, seek only documents related to the management, operations, and finances of the DCGs and the Debt Settlement Business in which they invested. Such requests are squarely within the confines of Rule 2004(b). AG3's Rule 2004 Subpoenas should not be restricted. To whatever extent the Court does, however, limit the scope of AG3's Rule 2004 Subpoenas, AG3 requests the Court do so without prejudice to AG3 subsequently renewing its request, if necessary, upon receipt of other documents and testimony.

Request (iii): Movants provide no explanation for why AG3 should not be entitled to take in-person depositions. AG3 intends to depose Movants in-person and Movants articulate no reason why requiring remote depositions is necessary under the circumstances.

Request (iv): The purpose of Movants' request is to prevent AG3 from aiding the Trustee in her review and analysis of the Movants' documents and information AG3 has the necessary background, resources, and experience with this matter and the Conspirators conduct over more than a year of litigation to investigate and expose the Movants and their cohorts. Enforcing such a broad and unidentified limitation on the Trustee's ability to confer with AG3—the entity that has been investigating the fraud against the DCGs for over a year—as a resource would render identification and recovery of potential assets difficult, if not effectively impossible. In essence, the "fox" (the Movants) wishes to guard the "hen house" and render the Trustee functionally impotent to avoid liability for their wrongdoing. AG3 is a creditor who holds a judgment against

the DCGs and, as a party in interest, is entitled to seek information about the acts, conduct, or property or to the liabilities and financial condition of the debtors, or to any matter which may affect the administration of the debtors' estates. *See* Fed. R. Bankr. P. 2004(a) & (b).

Request (v): Movants fail to identify a legitimate basis for their sequencing order. Indeed, Movants' true purpose is to glean as much as possible from AG3 and Cardinale's documents and testimony to prepare and tailor their own testimony. The request for a sequencing order is nothing more than Movants' thinly-veiled effort to continue to delay their own production and testimony as much as possible—just as they previously did in the State Court Action despite repeated orders by Judge Walsh. The Court should not enter a protective order that serves no purpose other than to provide Movants with a strategic advantage, especially considering their well-documented *modus operandi* of delay and obfuscation.

Request (vi): AG3 should not be forced to litigate the Motion to Quash only to subsequently be faced with further motions from each of the Movants—and any related "interested parties." Indeed, this is nothing more than a transparent attempt to (1) continue to delay compliance with any court order mandating that they produce documents or sit for a deposition; and (2) obtain a second (if not a third or even fourth)[146] bite at the apple. Due process requires only notice and an opportunity to be heard. *State Farm Fla. Ins. Co. v. Carapella (In re Gaime)*, 17 F.4th 1349,1354 (11th Cir. 2021) ("Due process requires only the 'opportunity to be heard … at a meaningful time and in a meaningful manner.'" (quoting *Armstrong v. Manzo*, 380 U.S. 545,552 (1965))). Movants—by virtue of their Motion to Quash—have had a meaningful opportunity to brief and detail their alleged bases to seek protection from the Rule 2004 Subpoenas. Movants provide no

[146] The "fourth bite" refers to Dazzo, who lost three motions for protective order and, in addition, a motion for reconsideration of the order denying Dazzo's third motion for protective order.

explanation for why AG3 should be forced to address this Motion to Quash and then, if it prevails, be required to defend the Rule 2004 Subpoenas against further unspecified objections by the same Movants and additional unidentified "interested parties."

## CONCLUSION

The DCGs are investment vehicles for the funding of the Debt Settlement Business. Movants are believed to have misappropriated (and continue to misappropriate) millions in funds to which the DCGs are entitled. To prevent exposure, they have engaged in bad faith delay tactics to obfuscate the truth about the DCGs, their investment in and funding of the Debt Settlement Business, and related issues. This Court should not permit Movants and their co-conspirators to continue these improper delay tactics. With the DCGs now in Chapter 7 bankruptcy, there are significant tools provided by the Bankruptcy Code, including Rule 2004, that allow parties in interest—including AG3—to inquire into the nature and extent of the bankruptcy estate, reveal assets, examine transactions, and assess whether wrongdoing has occurred. AG3's requests are consistent with those purposes and wholly within the broad scope provided by Rule 2004.

**WHEREFORE**, AG3 respectfully requests the Court enter an order (i) denying the Motion to Quash; (ii) directing the Movants produce documents responsive to AG3's Rule 2004 subpoenas; (iii) directing the Movants to confer with AG3 and the Trustee to schedule in-person depositions to be conducted no later than sixty days after the Court's order unless otherwise agreed by AG3 and the Trustee or approved by the Court; and (iv) for such other relief as the Court deems just and proper.

Date: May 27, 2024

Respectfully Submitted,

**GREENBERG TRAURIG, P.A.**
401 East Las Olas Boulevard, Suite 2000
Fort Lauderdale, Florida 33301
T. 954.765.0500
F. 954.765.1477

By: */s/ John B. Hutton*
John B. Hutton, Esq.
Fla. Bar No. 902160
huttonj@gtlaw.com
perezan@gtlaw.com
Jon L. Swergold, Esq.
Fla. Bar No. 108510
swergoldj@gtlaw.com
rita.curran@gtlaw.com
Zachary R. Needell, Esq.
Fla. Bar No. 1011742
zachary.needell@gtlaw.com
jennifer.shiner@gtlaw.com
flservice@gtlaw.com

*Counsel for Creditor Alternative Global Three, LLC*

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that a true and correct copy of the foregoing *Motion to Transfer Case* was served simultaneously upon docketing of all counsel of record or pro se parties attached on the attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF or by first class U.S. mail on those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing in bankruptcy cases on May 27, 2024.

*/s/ John B. Hutton*
John B. Hutton, Esq.